IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

The Estate of Ryan LeRoux
Paul LeRoux, *as Personal Representative*    \*
c/o Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500    \*
Baltimore, Maryland 21202
(County of Residence: Baltimore)    \*

and    \*

Rhonda LeRoux    \*
c/o Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500    \*
Baltimore, Maryland 21202
(County of Residence: Baltimore)    \*

and    \*

Paul LeRoux    \*    Civil Action No. 1: 22-cv-856
c/o Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500    \*
Baltimore, Maryland 21202
(County of Residence: Baltimore)    \*

    Plaintiffs,    \*

    v.    \*

Montgomery County, Maryland    \*
101 Monroe Street
Rockville, Maryland 20850,    \*

    Served on:    \*
        Marc Elrich, County Executive
        101 Monroe Street    \*
        Rockville, Maryland 20850,
    \*
and    \*

John Austin Cerny    \*
c/o Montgomery County, Maryland
101 Monroe Street    \*
Rockville, Maryland 20850,

and                                          *

Brooks Michael Inman                          *
c/o Montgomery County, Maryland
101 Monroe Street                             *
Rockville, Maryland 20850,
                                             *
and
                                             *
Romand Schmuck
c/o Montgomery County, Maryland               *
101 Monroe Street
Rockville, Maryland 20850,                    *

and

Sara Vaughan
c/o Montgomery County, Maryland
101 Monroe Street
Rockville, Maryland 20850,

          Defendants.


**<u>FIRST AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL</u>**

# INTRODUCTION



**Ex. 1 Ryan LeRoux at his high school graduation in 2017**

1.      Today Ryan Nicholas LeRoux should be alive.

2.      He is dead because instead of helping a young African-American male in the midst of a mental health crisis, four Montgomery County Police Department ("MCPD") officers shot 23 bullets at him.

3.      On the night of July 16, 2021, MCPD knew that Ryan needed help—not bullets. Two McDonald's workers called MCPD's 911 line at 9:12 p.m. because they witnessed Ryan's strange behavior. He was holding up the drive-thru lane by sitting in his car. The McDonald's employees informed the 911 dispatcher that no one was "in danger." They reported that no weapons were involved. They described Ryan as "acting crazy" because he would not move out of the drive-thru lane, had on headphones, and had not paid for his food.

4.      MCPD took over an hour to respond to the McDonald's.

5.      Instead of sending someone trained to respond to a person in the midst of a mental health crisis, the MCPD dispatcher sent Defendant Officer Brooks Inman.

6.      When Officer Inman arrived at 10:28 p.m., he saw Ryan reclined in the driver's seat and on his phone. He was wearing large over-the-ear headphones.



**Ex. 2 Ryan LeRoux with cell phone in hand—not a gun—and seat reclined, when Defendant Inman approached.**

7.      Within 18 seconds of his arrival, Defendant Inman saw a gun on the passenger's seat—not in Ryan's hand. Defendant Inman escalated the crisis by pulling out his gun and aiming it directly at Ryan.

8.      Defendant Inman further escalated the crisis by yelling at Ryan, "Put your hands up!"

9.      Confronted with this hostile escalation, Ryan did not respond in kind. Rather, he simply looked back at Defendant Inman, remained reclined in his seat, and stayed on his phone. Ryan did not pick up a gun.

10.     Defendant Inman continued to escalate the crisis by hollering at Ryan, "Keep your fucking hands up!" In response to Officer Inman's hostility, Ryan remained reclined in his seat and stayed on his phone. He did not pick up a gun.

11.     For approximately three minutes, Defendant Inman intermittently barked orders at Ryan, updated other MCPD officers over his radio, and took cover away from Ryan's car.

12.     During this time, Ryan remained reclined in his seat, stayed on his phone, and did not pick up a gun.

13.     Seeing Ryan's behavior, including his lack of response in the face of Defendant Inman's barked orders, Defendant Inman never requested assistance for Ryan's mental health crisis.

14.     By 10:34 p.m., Defendant Officer Sara Vaughan arrived at McDonald's, took cover behind a sport utility vehicle ("SUV") and immediately escalated the crisis by drawing her gun.

15.     Around 10:36 p.m., Defendant Officer John Cerny arrived at McDonald's. He escalated the crisis by grabbing his rifle from his trunk and aiming it at Ryan.



**Ex. 3 Defendant Cerny with rifle and Defendant Vaughan with pistol**

16.     At 10:38 p.m., Defendant Officer Romand "Brian" Schmuck arrived. He escalated the crisis by deploying a shield and standing behind Ryan's SUV with his gun drawn.



**Ex. 4 Defendant Schmuck with his shield**

17.     At 10:49 p.m.—21 minutes after Defendant Inman's initial contact with a "crazy" Ryan—Capt. Brian Dillman finally radioed to MCPD dispatch, "can you see if you have any crisis negotiators working and to have one or two respond here to the McDonald's please?"

18.     At 10:53 p.m., MCPD radio replied that a crisis negotiator was inbound to McDonald's.

19.     From 10:28 p.m. to 11:02 p.m., MCPD sent no less than 17 officers to McDonald's. None of the officers were crisis negotiators or part of a crisis intervention team.[1]

20.     MCPD also failed to timely call Montgomery County's mobile crisis team, which is available 24 hours a day and could have evaluated Ryan, stabilized the mental health crisis, and arranged mental health treatment services.

21.     MCPD also failed to alert Emergency Medical Services ("EMS"), so that EMS could stage a proper response for someone in a mental health crisis.

22.     During this 34-minute time period, these 17 officers had Ryan completely trapped on all sides by police cars, armed officers, and "stop sticks."

23.     As Ryan sat in his car, Officer Anna Owen chuckled that the situation was "a suicide by cop kind of thing." Officer Chad Eastman commented that Ryan was "gonna end up offing himself."

---

[1] None of the officers were African American.


**Ex. 5 Defendant Inman at the trunk of the car with gun drawn and Ryan surrounded**

24.     At 11:02, Defendants Cerny and Vaughan radioed that they saw Ryan raise out of his seat with a gun in his hand. The four Officer Defendants shot at Ryan 23 times and killed him.

25.     When MCPD searched Ryan's car, they found several items, including a gun.

26.     They also found a prescription for Risperidone, which is an anti-psychotic medication and consistent with Ryan being in the midst of a mental health crisis on July 16, 2021.



**Ex. 6 Risperidone prescription bottle found in Ryan's car**

27.     Seconds before the Officer Defendants killed Ryan, MCPD's crisis negotiator radioed that he was "about two minutes out."

28.     Today Ryan Nicholas LeRoux should be alive. One of the McDonald's employees said it best when she found out that the police had shot Ryan: "They should have let him go."

<b>JURISDICTION AND VENUE</b>

29.     This Court has jurisdiction over the claims brought under the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Section 504") pursuant to 28 U.S.C. § 1331. It has jurisdiction over the remaining State law claims pursuant to 28 U.S.C. § 1367.

30.     Plaintiffs have complied with the Local Government Tort Claims Act, Md. Code Ann. Cts. & Jud. Proc. §§ 5-301, et seq. by giving notice of their claims within one year of the occurrence of Ryan's death and timely filing this lawsuit.

31.     Venue is appropriate under 28 U.S.C. § 1391 in that the events giving rise to this lawsuit occurred in Maryland and all Defendants are located in Maryland.

## PARTIES

32.     The Estate of Ryan LeRoux was opened in Anne Arundel County, Maryland on August 20, 2021. Paul LeRoux is the personal representative of the Estate.

33.     Paul LeRoux is a resident of Huntingwood, Maryland. He is the father of Ryan Nicholas LeRoux and sues individually and as the representative of the Estate of Ryan LeRoux.

34.     Rhonda LeRoux is a resident of Hanover, Maryland. She is the mother of Ryan Nicholas LeRoux. She sues individually.

35.     Brooks Inman, Sara Vaughan, John Cerny, and Romand Schmuck (the "Officer Defendants") are MCPD police officers. At all times relevant to this action, the officers were acting under color of law and within the scope of their employment as agents for Montgomery County, Maryland.

36.     Montgomery County is a county in the state of Maryland.

## FACTUAL ALLEGATIONS

### Ryan's Mental Health

37.     Ryan struggled with mental illness much of his life. He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and depression at age 8. As an adolescent, he spent time undergoing inpatient treatment at Sheppard Pratt Psychiatric Hospital.

38.     At the time of his death, Ryan had a prescription for Risperidone, which is an anti-psychotic medication.

39.     He was involuntarily committed to an inpatient treatment center at Northwest Hospital in October 2020 after state police found him walking nude by the side of the road during a psychotic episode. He claimed that people were chasing him.

40.     During his stay at the treatment center, Ryan continued to exhibit psychosis with bizarre behaviors. He was suspicious of healthcare providers and thought they were trying to kill him. When Ryan's parents contacted him, he was convinced that his mother and father were imposters and not his real parents. He told his attending physician that someone was following him and that he removed his clothes to get rid of a tracking device. Throughout his stay, he continued to insist that people were chasing him the night he was picked up.

41.     Ryan was prescribed anti-psychotic medication before he was discharged.

42.     The night Ryan was killed was not even the first time that month he had encountered MCPD officers while he was in the midst of a mental health crisis.

43.     On the morning of July 12—four days before MCPD killed him— MCPD officers responded to a request from Holiday Inn staff to remove Ryan from a hotel room when he refused to leave after check-out time.

44.     Four MCPD officers entered Ryan's hotel room and found him lying in bed underneath the sheets. The officers ordered Ryan to leave, and then when he did not respond, threatened him with arrest for trespassing.

45.     Throughout the encounter, Ryan was nearly completely non-responsive. When Ryan did not get up from the hotel bed, the four officers grabbed him and forcibly handcuffed him behind his back. He never displayed any aggression towards the officers. His only communication with them was to ask them to loosen the cuffs.

46.     Because he was distraught from the death of his grandmother and the combined loss of his job, girlfriend, and home, Ryan's depression and mental instability were exacerbated on the night of July 16, 2021. He was living in his car at the time.

### Montgomery County has Resources for People Experiencing Mental Health Crises Besides Patrol Officers

47.     Montgomery County's mental health resources are not limited to armed patrol officers without specialized mental health training.

48.     The most basic level of specialized mental health training is the MCPD 40-hour Crisis Intervention Team ("CIT") training program. CIT training is a 40-hour program that covers topics including "trauma-informed policing, de-escalation, psychiatric disorders, and intellectual and developmental disabilities."[2]

49.     Although CIT training is mandatory for new MCPD recruits, only 66% of MCPD officers have completed it. There is also no requirement for repeating or refreshing CIT training.

50.     The MCPD's Field Services Bureau operates the MCPD Crisis Intervention Team, which coordinates the CIT training program and is available to respond to mental health situations. Three staff members make up the Crisis Intervention Team: two officers and one clinician from the Montgomery County Department of Health and Human Services ("DHHS").

51.     Separate from MCPD, DHHS operates the Montgomery County Crisis Center. This facility provides crisis services in person and by phone 24 hours a day and seven days a week.

---

[2] Natalia Carrizosa, Montgomery Cnty. MD Office of Leg. Oversight, *Public Safety Responses to Mental Health Situations* 34 (Mar. 9, 2021), https://www.montgomerycountymd.gov/OLO/Resources/Files/2021_Reports/OLOReport2021-4.pdf.

52.     The Montgomery County Crisis Center also manages the Mobile Crisis Team ("MCT").[3] The MCT responds to psychiatric emergencies where the emergency is occurring. The MCT is a two-person team composed of a licensed mental health professional and a second Crisis Center staff member.

53.     MCT provides crisis evaluation, crisis stabilization, recommendations for treatment and resources, and facilitates hospital psychiatric evaluations.

54.     Although DHHS (not MCPD) operates the MCT, MCT co-responds with police.

55.     In Montgomery County, the first point of contact when somebody calls 911 is the Emergency Communications Center ("ECC"). MCPD operates the ECC. ECC is staffed by dispatchers.

56.     ECC dispatchers previously participated in the CIT training program. However, they currently do not receive CIT training.

57.     Based on a caller's description of events, a variety of options are available to ECC and MCPD to respond to a call, such as dispatching patrol officers, officers who have undergone CIT training, the MCPD Crisis Intervention Team, or the DHHS MCT accompanied by MCPD officers.

58.     Even after responding to a call, patrol officers may still request these specialized resources (i.e., the Crisis Intervention Team or the DHHS MCT) through the ECC once they are on the scene.

59.     Montgomery County gave Ryan LeRoux the benefit of none of these services the night of his death.

---

[3] As of July 2021, Montgomery County operated only one MCT. In August 2021, the county added two more part-time MCTs.

**Montgomery County Failed to Accommodate Ryan's Mental Health at Several Critical Junctures**

60.     At 9:15 p.m., the Montgomery County ECC received a non-urgent call from McDonald's employees about a customer who would not leave the drive-thru lane. At this time, Ryan was sitting peacefully in his car.

61.     The McDonald's employees mentioned that Ryan was acting "crazy" but confirmed that he was not dangerous. In fact, one of the employees recognized Ryan from a few days earlier.

62.     The ECC did not call for a MCT from the local Department of Health and Human Services, as would be appropriate for an encounter with a person who was "acting crazy" but not dangerous. Nor did they dispatch a MCPD CIT.

63.     Instead, the dispatcher routed the call to an armed MCPD officer without any crisis intervention training.

64.     Ryan continued to sit peacefully in his car for the next hour, until MCPD officers arrived at the McDonald's.

65.     When MCPD officers eventually responded they found Ryan reclined in the driver's seat of his SUV, wearing large over-the-ear headphones, and holding his cell phone in his right hand.

66.     At around 10:28 p.m., Defendant Inman approached the SUV and noticed a gun in the front passenger seat. Defendant Inman retreated and called for backup.

67.     According to his father, Ryan recently had legally purchased the handgun for personal protection.

68.     Defendant Inman noted that Ryan was reclined in his seat and had both his hands on his phone, nowhere near the gun in the front passenger seat. Defendant Inman disrespectfully ordered Ryan to "keep [his] fucking hands up." Moments later, after trying to open the front passenger door, Defendant Inman contradicted his initial order and told Ryan to unlock the passenger door with his left hand.

69.     Ryan did not respond to Defendant Inman's commands, but continued to hold his phone with both hands. It is unclear if Ryan was able to even hear Defendant Inman's commands—it appears that he was listening to music through his over-the-ear headphones

70.     At least 17 other police officers rapidly arrived, surrounding Ryan. Police cars and SUVs pulled up to the drive-thru and boxed in Ryan's small SUV. MCPD officers secured the area and evacuated the McDonald's.

71.     Officers also deployed "stop sticks" in front of and behind Ryan's car to prevent him from driving off. The officers had contained the situation—Ryan was not going anywhere.

72.     Officers surrounded Ryan's car and pointed their guns at him from behind the cover of their vehicles. Defendant Cerny wielded a military-style assault rifle. Using megaphones, the officers repeatedly told Ryan to put his hands where they could see them. It is unclear if Ryan could hear them through his headphones and mental health crisis.

73.     The officers on scene perceived Ryan's abnormal mental state. Officer Anna Owen speculated that this was "a suicide by cop kind of thing" in the same breath that she noted Ryan was "not aggressive at all" towards the McDonalds employees.

74.     Officer Chad Eastman predicted that Ryan was "gonna end up offing himself."

75.     Despite these observations and the presence of a gun, the officers' actions belied any assertion that they were dealing with a dangerous emergency. Officer Dominick Raysick

casually walked in front of Ryan's car to deploy one set of stop sticks. When Officer Owen questioned this decision, he told her to "calm down."

76.     Within minutes of arrival, the officers had run the license plates on Ryan's car to obtain Ryan's identity and cell phone number. Had any officer on scene done the bare minimum of further investigation, they would have learned about Ryan's mental health incident just days earlier.

77.     By 10:49 p.m., realizing that they were dealing with a fragile mental health situation, Officer Capt. Brian Dillman, who was the senior officer on scene, finally requested a crisis negotiator and confirmed that one was on the way.

78.     During the 30-plus-minute interaction with Ryan, the officers communicated with him directly two times. At 10:51 p.m. a dispatcher from ECC spoke with Ryan for five minutes. She asked him to put his hands up and put them out the window. Ryan responded that he had already done so.

79.     Another officer on the scene spoke with Ryan for about one minute at 10:58 p.m. He called Ryan's cell phone and asked him what was going on before they were disconnected.

80.     Even though they knew that a crisis negotiator was on the way, the Officer Defendants did not wait. Instead, they began to formulate their own plan to pull Ryan out of the car. The bodycam footage reveals them discussing a plan to break the front passenger window, grab the gun, and then pull him through the open window.

81.     At 11:02 p.m., before the Officer Defendants could execute this poorly conceived plan, Ryan sat up from his reclining position in the driver's seat. Defendant Vaughan exclaimed "he's up." Defendant Cerny relayed he is "eyeing the gun."

82.     Within seconds of Ryan sitting up in the front seat, the Officer Defendants opened fire on him. The evidence is inconclusive as to whether Ryan pointed a gun at the police when they shot him. There is conclusive evidence that only four out of the 17 officers present shot at Ryan.

83.     It is unclear if Ryan was even holding the gun when the Officer Defendants shot him. The bodycam footage possibly depicts Ryan raising his right arm. Notably, Ryan was left-handed, so it makes little sense that he would wield a gun with his right hand. The Officer Defendants never saw Ryan pick up the gun or put down his cell phone.

84.     The Officer Defendants fired 23 shots at Ryan.

85.     The Officer Defendants unnecessarily killed Ryan LeRoux the night of July 16, 2021. His actions were indicative of a mental health crisis.

86.     Defendant Montgomery County violated Ryan's right to reasonable modifications to their usual policies, practices and procedures at a time when MCPD knew or should have known Ryan was suffering from a mental health crisis. The substance of the McDonald's employee's call, the amount of time it took for the officers to arrive on the scene, the officers' comments among themselves, their other actions while on the scene, and Ryan's prior crisis just a few days earlier are several reasons why MCPD knew or should have known that Ryan was undergoing a mental health crisis.

87.     Even if the Defendants did not know the specifics of Ryan's mental health situation, they knew that he had been sitting, non-responsive, in the drive-thru lane of a McDonald's for more than 90 minutes when the police shot him to death in what MCPD described as a "show of force."

88.     Moreover, had the Defendants and ECC called a person trained to deal with a person in a "mental health crisis"—instead of the Defendant Officers—when the call came in from McDonald's indicating that Ryan was "crazy," then Ryan would have been accommodated and alive today.

### MCPD has a Pattern and Practice of Using Deadly Force in Encounters with People with Mental Health Disabilities and in Mental Health Crises.

89.     MCPD officers routinely use excessive and deadly force in encounters with individuals experiencing mental health and emotional crises.

90.     On the afternoon of May 7, 2020, an MCPD officer responded to a 911 call about a man's neighbor throwing a rock through his window. Finan Berhe was acting erratically and appeared to be suffering a mental health crisis. Less than two minutes after the MCPD officer arrived, he had shot Mr. Berhe dead.

91.     In 2018, an MCPD officer shot and killed a man named Robert White, who had ADHD, because he reached into his pocket. In that case, the MCPD officer was not responding to a call—he merely encountered Mr. White walking down the street.

92.     More generally, a 2021 review by the Montgomery City Council's Office of Legislative Oversight revealed that suspected mental illness was a key risk factor for uses of force by MCPD officers.

93.     Another review of MCPD in 2021 by an outside organization found "MCPD's policies and practices regarding responding to calls involving mental and behavioral health crises are outdated and insufficient to address the need."[4]

---

[4] Effective Law Enforcement for All, *Review of the Montgomery County, Maryland Police Department (MCPD)* 5 (June 30, 2021), https://www.montgomerycountymd.gov/rps/Resources/Files/reports/ELEFA-MCPD-Preliminary-Report.pdf.

94.     In 2019, 30% of uses of force by MCPD officers involved suspected mental illness. The same review found that "police encounters with persons with mental illness too often end in tragedy."[5] The situation has not improved since then—in 2021, 48% of victims subject to use of force by the MCPD were suffering from mental illness at the time of the encounter. This was also on top of a 66% increase from 2020 in the raw number of use of force encounters involving mental illness.[6]

95.     The Officer Defendants' actions were performed pursuant to this de facto custom within MCPD of using excessive force against people with mental health disabilities and people in mental and emotional crisis.

**Montgomery County Failed to Implement Policies, Practices and Procedures for its ECC Call-Takers and MCPD Officers to Appropriately Identify and Respond to Calls Involving Mental Health Crises by Dispatching Mobile Crisis or Crisis Intervention Teams**

96.     Interaction with the police on the fateful night of July 16 could have been completely avoided if anyone in the ECC or among the dispatched officers had acted appropriately on their knowledge that Ryan was having a mental health crisis and called mental health professionals instead of solely armed police officers.

97.     This was not a situation where officers had to make a split-second decision about what resources to send to the incident. The McDonald's caller was clear that there was no danger. Over an hour passed between the 911 call and the arrival of the first officer on the scene.

---

[5] Natalia Carrizosa, Montgomery Cnty. MD Office of Leg. Oversight, *Public Safety Responses to Mental Health Situations* 7 (Mar. 9, 2021), https://www.montgomerycountymd.gov/OLO/Resources/Files/2021_Reports/OLOReport2021-4.pdf.

[6] Montgomery Cnty Dept. of Police, *Annual Use of Force Report 2021* 22, https://www.montgomerycountymd.gov/pol/Resources/Files/Annual-Reports/UseOfForce/2021%20MCPD%20Use%20of%20Force%20Report.pdf.

Yet no one made any effort to reach out to the available mental health resources that could have responded and avoided the tragedy to come.

98.     Montgomery County has mobile crisis teams available to dispatch to non-emergency situations involving mental health crises. That is exactly what the McDonald's employees who called 911 here reported to ECC.

99.     Mobile crisis teams are composed of mental health professionals who can respond to mental health crises alongside police. Mobile crisis teams evaluate mental health crisis situations, deescalate and stabilize the situation and connect individuals experiencing mental health crises to treatment resources. They provide an important alternative to an armed response or incarceration.

100.    The Montgomery County ECC does not have a policy for handling calls that appear to be related to mental health crises. By comparison, the Baltimore City Police Department has a Behavioral Health Crisis Dispatch Policy.

101.    ECC dispatchers do not receive training in CIT, in identifying mental health-related calls, or in the resources available to respond to mental health crises.

102.    ECC responded to the McDonald's employee's call by dispatching armed officers without reaching out to the available mobile crisis units and without requesting officers with crisis intervention training.

103.    MCPD recognized that Ryan's situation was not an emergency, as they did not arrive for over an hour. The responding officer recognized or should have recognized that Ryan was experiencing a mental health crisis due to his non-responsive and irrational behavior. Yet none of the responding officers called someone trained in how to address a person in a mental health crisis.

**MCPD Failed to Train Its Officers to Respond Appropriately and Non-Violently to Individuals with Mental Illness or in Mental or Emotional Crisis.**

104.    Fatal shootings such as these have occurred notwithstanding the putative availability of crisis intervention training on how to respond to individuals suffering from mental health disabilities or experiencing mental health and emotional crises.

105.    MCPD's policies regarding interacting with people in crisis are inadequate, giving officers few tools for managing such situations. For example, the policy tells officers to request a crisis intervention team officer or Mobile Crisis Team but provides no guidance on how to de-escalate, either generally or by example.[7] Practically the only advice to the responding officer is to call a crisis intervention team officer and sit tight. In this case, the responding officers' failure to follow even MCPD's minimal instructions suggests that they did not receive adequate training on those policies that do exist.

106.    Montgomery County leadership itself has recognized this training gap. Less than two weeks after MCPD officers killed Ryan, County Executive Marc Elrich announced a partnership with Effective Law Enforcement for All ("ELEFA") in response to the incident. ELEFA is in the process of conducting reviews of Ryan's shooting and similar incidents to, in Mr. Elrich's words, "provide additional recommendations for . . . trainings needed to avoid similar situations."[8]

107.    Police officers are expected to show restraint when faced with a person experiencing a mental health crisis because that person may misinterpret instructions and, when

---

[7] Montgomery Cnty. Dep't of Police, *Emergency Evaluation of Mentally Disordered Individuals* (June 15, 2005), Dep't Policy 900 Emergency Procedures, Function Code 921.

[8] Marc Elrich, Montgomery Cnty. Exec., *Statement from Montgomery County Executive Marc Elrich on the Video from the Officer-Involved Shooting in Gaithersburg* (July 27, 2021), https://www2.montgomerycountymd.gov/mcgportalapps/Statement_Detail.aspx?id=1522.

confronted with demands, may believe themselves to be under attack and that they need to defend themselves.

108.     Montgomery County's enactment of these policies and provision of CIT training to some officers demonstrates that the County knows MCPD officers need instruction to safely and successfully respond to encounters with people in crisis. Indeed, one in five calls to MCPD are for mental health distress. Nevertheless, many MCPD officers do not receive crisis intervention training.

109.     Despite the fact that MCPD officers frequently encounter individuals experiencing mental or emotional illness, they do not receive adequate training on how to respond to these individuals. MCPD's failure to train these officers caused Ryan's death.

## CAUSES OF ACTION

### COUNT I
**Title II of the Americans with Disabilities Act – Survival Action – Failure to Modify – Failure to Dispatch Mental Health Services**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

110.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

111.     Ryan LeRoux was a qualified individual with a disability protected by the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. §§ 12102, 12131(2). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of the ADA.

112.     Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

113. Montgomery County is a local government and, therefore, a public entity subject to Title II of the ADA.

114. Montgomery County operates the ECC (i.e., dispatch services). Under the ADA, public entities are responsible for the discriminatory actions of their employees.

115. Emergency services and dispatch is a program, service and/or activity within the meaning of Title II.

116. Discrimination under Title II of the ADA includes the failure to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

117. ECC is obligated to modify its policies, practices, and procedures when necessary to avoid discrimination on the basis of disability in violation of the ADA.

118. Defendant Montgomery County failed to reasonably modify its approach to the dispatch of emergency services to Ryan at a time when it knew or should have known that he was suffering from a mental health disability.

119. Reasonable modifications under the circumstances would have included dispatching someone trained in handling a person in a mental health crisis, such as the Mobile Crisis Team or the Crisis Intervention Team. At the very least, the dispatcher should have ensured a response by CIT-trained officers. Defendant Montgomery County's failure to provide Ryan with reasonable modifications violated Title II of the ADA.

120. Because Defendant Montgomery County had ample reason to believe that Ryan was in a mental health crisis, failing to provide someone trained in handling a person in a mental health crisis, such as the Mobile Crisis Team or the Crisis Intervention Team, violated Title II of the ADA.

121. To ensure compliance with the ADA, public entities, including emergency dispatch services, must provide training adequate to ensure that individuals with disabilities are provided services in a manner that complies with the ADA. Defendant Montgomery County failed to provide adequate training to its ECC call takers concerning how to identify and dispatch appropriate services to individuals suffering from mental health disabilities and experiencing mental health or emotional crises. Defendant Montgomery County failed to train its ECC call-takers to appropriately identify calls regarding mental health crises and dispatch mobile crisis and/or crisis intervention teams, even though its call takers are all likely to encounter situations where such skills are essential.

122. Defendant Montgomery County's violations of Title II of the ADA were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

123. Defendant Montgomery County's violations of Title II of the ADA proximately caused the death of Ryan LeRoux.

124. Defendant Montgomery County's violations of the ADA caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

**COUNT II**
**Title II of the Americans with Disabilities Act – Survival Action – Failure to Modify – Failure to Implement De-Escalation or Crisis Intervention Techniques**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

125. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

126. Ryan was a qualified individual with a disability protected by the ADA, *see* 42 U.S.C. §§ 12102, 12131(2). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of the ADA.

127.    Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

128.    Montgomery County is a local government and, therefore, a public entity subject to Title II of the ADA.

129.    Montgomery County operates MCPD. Under the ADA, public entities are responsible for the discriminatory actions of their employees.

130.    Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Title II.

131.    Discrimination under Title II of the ADA includes the failure to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

132.    Defendant Montgomery County failed to reasonably modify its approach to the investigation and seizure of Ryan at a time when it knew or should have known that he was suffering from a mental health disability.

133.    Reasonable modifications under the circumstances would have included de-escalating the situation by using Crisis Intervention Techniques, calling for mobile crisis services, or waiting for the crisis negotiator who had already been requested instead of hastily engaging a man in crisis and escalating the crisis into a catastrophe. Defendant Montgomery County's failure to provide Ryan with reasonable modifications violated Title II of the ADA.

134.    Because Defendant Montgomery County had ample reason to know that Ryan was in a mental health crisis, holding him at gunpoint for over 30 minutes without attempting de-escalation techniques and then using lethal force violated Title II of the ADA.

135.     To ensure compliance with the ADA, public entities, including police departments, must provide training adequate to ensure that individuals with disabilities are provided services in a manner that complies with the ADA. The MCPD fails to provide adequate training to its officers on its written policies, manuals, and orders concerning how to interact with and respond to individuals suffering from mental health disabilities and experiencing mental health or emotional crises. The MCPD also fails to provide crisis intervention training to all of its officers, even though its officers are all likely to encounter situations where such skills are essential.

136.     Defendant Montgomery County's violations of Title II of the ADA were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

137.     Montgomery County's violation of Title II of the ADA proximately caused the death of Ryan LeRoux.

138.     Montgomery County's violations of the ADA caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

**COUNT III**
**Title II of the Americans with Disabilities Act – Survival Action – Discrimination on the Basis of Disability**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

139.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

140.     Ryan LeRoux was a qualified individual with a disability protected by the ADA, *see* 42 U.S.C. §§ 12102, 12131(2). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of the ADA.

141.    Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

142.    Montgomery County is a local government and, therefore, a public entity subject to Title II of the ADA.

143.    Montgomery County operates MCPD. Under the ADA, public entities are responsible for the discriminatory actions of their employees.

144.    Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Title II.

145.    Under Title II, a public entity may not, on the basis of disability, "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i).

146.    A public entity also may not, "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others" or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(ii)–(iii).

147.    As a result of Ryan' disability, MCPD officers shot and killed him. In doing so, they denied him the benefit of a police encounter not ending in death. Because of his mental health disability, Ryan was not afforded the same opportunity to emerge alive from his encounter with MCPD.

148.     Defendant Montgomery County's violations of Title II of the ADA were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

149.     Montgomery County's violation of Title II of the ADA proximately caused the death of Ryan LeRoux.

150.     Montgomery County's violations of the ADA caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

**COUNT IV**
**Title II of the Americans with Disabilities Act – Survival Action – Failure to Provide Effective Communication**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

151.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

152.     Ryan LeRoux was a qualified individual with a disability protected by the ADA, *see* 42 U.S.C. §§ 12102, 12131(2). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of the ADA.

153.     Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

154.     Montgomery County is a local government and, therefore, a public entity subject to Title II of the ADA.

155.     Montgomery County operates MCPD. Under the ADA, public entities are responsible for the discriminatory actions of their employees.

156.     Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Title II.

157.     Under Title II, a public entity must "take appropriate steps to ensure that communications with . . . members of the public. . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

158.     MCPD did not take appropriate steps to ensure communication with Ryan was equally effective as communication with an individual without a disability during their interactions. Instead of communicating in a way that could be understood by a person in a mental health crisis, the responding officers repeatedly shouted at Ryan and pointed their guns at him. As a result, Ryan did not have an opportunity to communicate effectively with the responding officers.

159.     Defendant Montgomery County's violations of Title II of the ADA were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

160.     Montgomery County's violation of Title II of the ADA proximately caused the death of Ryan LeRoux.

161.     Montgomery County's violations of the ADA caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

**COUNT V**
**Section 504 of the Rehabilitation Act – Survival Action – Failure to Modify – Failure to Dispatch Mental Health Services**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

162.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

163.     Ryan was a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of Section 504.

164.     The Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

165.     Defendant Montgomery County, including its ECC (i.e., dispatch services), receive federal financial assistance as that term is used in Section 504, and is therefore covered by the Rehabilitation Act. Montgomery County and the ECC are responsible under Section 504 for the discriminatory acts of their employees.

166.     Emergency services and dispatch is a program, service and/or activity within the meaning of Section 504.

167.     Discrimination under Section 504 includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others."  45 C.F.R. § 84.4(b)(1)(ii)–(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

168.     Defendant Montgomery County is obligated to modify its policies, practices, and procedures when necessary to avoid discrimination on the basis of disability in violation of Section 504.

169.     Defendant Montgomery County failed to reasonably modify its approach to the dispatch of emergency services to Ryan at a time when it knew or should have known that he was suffering from a mental health disability.

170.     Reasonable modifications under the circumstances would have included dispatching someone trained in handling a person in a mental health crisis, including the Mobile

Crisis Team or the Crisis Intervention Team. At the very least, the dispatcher should have ensured a response by CIT-trained officers. Defendant Montgomery County's failure to provide Ryan with reasonable modifications violated Section 504.

171. Because Defendant Montgomery County had ample reason to believe that Ryan was in a mental health crisis, failing to provide someone trained in handling a person in a mental health crisis, including the Mobile Crisis Team or the Crisis Intervention Team, violated Section 504.

172. To ensure compliance with Section 504, local and state governments must provide adequate training to their employees to ensure that individuals with disabilities are provided services in a manner that complies with Section 504. Defendant Montgomery County failed to provide adequate training to its call takers on its written policies, manuals, and orders concerning how to identify and dispatch appropriate responses to individuals suffering from mental health disabilities and experiencing mental health and emotional crises. Defendant Montgomery County failed to train its call-takers to appropriately identify calls regarding mental health crises and dispatch mobile crisis and/or crisis intervention teams, even though its call takers are all likely to encounter situations where such skills are essential.

173. Defendant Montgomery County's violations of Section 504 were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

174. Defendant Montgomery County's violation of Section 504 proximately caused Ryan's death.

175. Defendant Montgomery County's violations of Section 504 caused Ryan to sustain severe conscious pain and suffering between the time of injury and death.

**COUNT VI**
**Section 504 of the Rehabilitation Act – Survival Action – Failure to Modify – Failure to Implement De-Escalation or Crisis Intervention Techniques**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

176. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

177. Ryan was a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of Section 504.

178. The Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

179. Defendant Montgomery County, including its police department, receive federal financial assistance as that term is used in Section 504, and is therefore covered by the Rehabilitation Act. Montgomery County and the MCPD are responsible under Section 504 for the discriminatory acts of their employees.

180. Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Section 504.

181. Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others." 45 C.F.R. § 84.4(b)(1)(ii)–(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

182.     Defendant Montgomery County failed to reasonably modify its approach to the investigation and seizure of Ryan at a time when it knew or should have known that he was suffering from a mental health disability.

183.     Reasonable modifications under the circumstances would have included de-escalating the situation by using Crisis Intervention Techniques, calling for mobile crisis services, or waiting for the crisis negotiator who had already been requested instead of hastily engaging a man in crisis and escalating the crisis into a catastrophe. Defendant Montgomery County's failure to provide Ryan with reasonable modifications violated Section 504.

184.     Because Defendant Montgomery County had ample reason to believe that Ryan was in a mental health crisis, holding Ryan at gunpoint for over 30 minutes and then using lethal force amounts a violation of Section 504.

185.     To ensure compliance with Section 504, local and state governments must provide adequate training to their employees to ensure that individuals with disabilities are provided services in a manner that complies with Section 504. MCPD fails to provide adequate training to its officers on its written policies, manuals, and orders concerning how to interact with and respond to individuals suffering from mental health disabilities and experiencing mental health and emotional crises. MCPD also fails to provide crisis intervention training to all of its officers, even though its officers are all likely to encounter situations where such skills are essential.

186.     Defendant Montgomery County's violations of Section 504 were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

187.     Defendant Montgomery County's violation of Section 504 proximately caused Ryan's death.

188.     Defendant Montgomery County's violations of Section 504 caused Ryan to sustain severe conscious pain and suffering between the time of injury and death.

## COUNT VII
**Section 504 of the Rehabilitation Act – Survival Action - Discrimination on the Basis of Disability**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

189.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

190.     Ryan was a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. See 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of Section 504.

191.     The Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

192.     Defendant Montgomery County, including its police department, receive federal financial assistance as that term is used in Section 504, and is therefore covered by the Rehabilitation Act. Montgomery County and the MCPD are responsible under Section 504 for the discriminatory acts of their employees.

193.     Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Section 504.

194.     Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that

is not as effective as that provided to others."  45 C.F.R. § 84.4(b)(1)(ii)–(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

195.    As a result of Ryan's disability, MCPD officers shot and killed him. In doing so, they denied him the benefit of a police encounter not ending in death. Because of his mental health disability, Ryan was not afforded the same opportunity to emerge alive from his encounter with MCPD.

196.    Defendant Montgomery County's violations of Section 504 were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

197.    Montgomery County's violation of Section 504 proximately caused the death of Ryan LeRoux.

198.    Montgomery County's violations of Section 504 caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

## COUNT VIII
### Section 504 of the Rehabilitation Act – Survival Action – Failure to Provide Effective Communication
### (Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)

199.    Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

200.    Ryan was a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j). Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of Section 504.

201.    The Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

202.    Defendant Montgomery County, including its police department, receive federal financial assistance as that term is used in Section 504, and is therefore covered by the Rehabilitation Act. Montgomery County and the MCPD are responsible under Section 504 for the discriminatory acts of their employees.

203.    Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Section 504.

204.    Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others." 45 C.F.R. § 84.4(b)(1)(ii)–(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

205.    MCPD did not take appropriate steps to ensure communication with Ryan was equally effective as communication with an individual without a disability during their interactions. Instead of communicating in a way that could be understood by a person in a mental health crisis, the responding officers repeatedly shouted at Ryan and pointed their guns at him. As a result, Ryan did not have an opportunity to communicate effectively with the responding officers.

206.    Defendant Montgomery County's violations of Section 504 were taken with deliberate indifference to the likelihood that pursuit of its actions and inactions would likely result in a violation of federally protected rights.

207.     Montgomery County's violation of Section 504 proximately caused the death of Ryan LeRoux.

208.     Montgomery County's violations of Section 504 caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

## COUNT IX
### Negligence – Survival Action
### (Estate of Ryan LeRoux against all Defendants)

209.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

210.     The Officer Defendants failed to follow MCPD protocols concerning responding to individuals in mental health crises. These protocols instruct MCPD officers to wait for the arrival of a crisis intervention team officer or mobile crisis team.

211.     Rather than acting as a reasonable officer in their circumstances would have and waiting for the crisis intervention team officers who were already on their way, the Officer Defendants breached their duties as police officers and escalated the encounter with Ryan by utilizing deadly force.

212.     The Officer Defendants' malice towards Ryan is shown by the facts that they repeatedly cursed at him, repeatedly trained their guns on him despite him not engaging in any threatening behavior, declined to request any mental health assistance, and developed a cruel plan to break the window and haul him through the broken window.

213.     The Defendants knew, had reason to know, or should have known of the risks of escalating an encounter with someone in mental distress.

214.     The Defendants' negligence proximately caused Ryan's death, and his death was a foreseeable result of such negligence.

215. As a direct and proximate result of the conduct of the Defendants, Ryan endured severe conscious pain and suffering between the time of injury and death.

## COUNT X
### Gross Negligence – Survival Action
### (Estate of Ryan LeRoux Against All Defendants)

216. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

217. The Officer Defendants failed to follow MCPD protocols concerning responding to individuals in mental health crises. These protocols instruct MCPD officers to wait for the arrival of a crisis intervention team officer or mobile crisis team.

218. Rather than acting as a reasonable officer in their circumstances would have and waiting for the crisis intervention team officers who were already on their way, the Officer Defendants breached their duties as police officers and escalated the encounter with Ryan by utilizing deadly force.

219. The Officer Defendants' malice towards Ryan is shown by the facts that they repeatedly cursed at him, repeatedly trained their guns on him despite him not engaging in any threatening behavior, declined to request any mental health assistance, and developed a cruel plan to break the window and haul him through the broken window.

220. Defendants knew, had reason to know, or should have known of the risks of engaging in such conduct with someone in mental distress.

221. The gross negligence of the Defendants proximately caused the death of Ryan. As a direct and proximate result of the conduct of the Defendants, Ryan endured severe conscious pain and suffering between the time of injury and death.

## COUNT XI
### Wrongful Death
### (Paul LeRoux and Rhonda LeRoux against All Defendants)

222.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

223.     Paul and Rhonda LeRoux are the parents of Ryan LeRoux. At the time of his death, decedent was an unmarried resident of Montgomery County with no children. Both individual Plaintiffs are primary beneficiaries in this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-904. No other individuals are entitled by law to recover damages for Ryan's death.

224.     By the wrongful acts set out above, Defendants caused Ryan's death.

225.     The Officer Defendants' malice towards Ryan is shown by the facts that they repeatedly cursed at him, repeatedly trained their guns on him despite him not engaging in any threatening behavior, declined to request any mental health assistance, and developed a cruel plan to break the window and haul him through the broken window.

226.     As a direct and proximate result of Defendants' wrongful acts in causing the death of Ryan, Paul and Rhonda LeRoux sustained mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of comfort.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.     Enter judgment in Plaintiffs' favor and against Defendants;

b.     Award compensatory damages to Plaintiffs jointly and severally against all Defendants;

c.     Award punitive damages to all Plaintiffs against the Officer Defendants;

d.    Award the Estate of Ryan LeRoux attorneys' fees and costs pursuant to 42 U.S.C.

§§ 1988 and 12205; and

e.    Issue any and all other further relief as this Court may deem just and proper.


Dated: July 8, 2022                          Respectfully submitted,


                                             _____
                                             Kobie A. Flowers (Bar No. 16511)
                                             kflowers@browngold.com
                                             Eve L. Hill (Bar No. 19938)
                                             ehill@browngold.com
                                             Brown, Goldstein & Levy, LLP
                                             120 E. Baltimore Street, Suite 2500
                                             Baltimore, Maryland 21202
                                             Tel: (410) 962-1030
                                             Fax: (410) 385-0869

                                             *Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury.

Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com
Eve L. Hill (Bar No. 19938)
ehill@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

*Attorneys for Plaintiffs*