## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | | |
|---|---|---|
| THE ESTATE OF RYAN LEROUX, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 8:22-cv-00856-AAQ |
| MONTGOMERY COUNTY, MD, *et al.* | * | |
| Defendants. | * | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 1

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................... 6

I.      Defendants were not excused by exigent circumstances from their duty to
        accommodate Ryan. .......................................................................................... 6

        A.      Defendants misstate the law on when safety concerns may excuse the
                provision of reasonable accommodations. ............................................. 6

        B.      Neither exigent circumstances nor a direct threat excuse Defendants' failure
                to accommodate Ryan. ......................................................................... 7

II.     The Amended Complaint adequately alleges that Ryan was a qualified individual
        with a disability and that Defendants had the requisite knowledge ................................ 12

III.    The Defendants failed to provide Ryan with equally effective communication or
        reasonable modifications and discriminated against him because of his mental
        disability .......................................................................................................... 17

IV.     Montgomery County is liable for its failure to train the responding officers. ................. 18

        A.      Failure to train claims are actionable under the ADA. ......................................... 18

        B.      Plaintiffs have adequately alleged a failure to train claim against
                Montgomery County. ........................................................................... 20

V.      Plaintiffs have pleaded that the County's conduct was the proximate cause of
        Ryan's death ..................................................................................................... 23

VI.     The Officer Defendants cannot rely on public official immunity to avoid charges of
        gross negligence and wrongful death. ...................................................................... 24

VII.    Montgomery County cannot escape liability for gross negligence and wrongful death
        by claiming governmental immunity. ........................................................................ 25

CONCLUSION ............................................................................................................... 26

i

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
   367 F.3d 212 (4th Cir. 2004) ................................................................... 5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................ 4

*Baltimore Police Dep't v. Cherkes*,
   140 Md. App. 282, 780 A.2d 410 (2001) ................................................ 26

*Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*,
   929 F.3d 135 (4ᵗʰ Cir. 2019) ................................................................. 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................ 4

*Bryan County v. Brown*,
   520 U.S. 397 (1997) ........................................................................... 23

*CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   566 F.3d 150 (4th Cir. 2009) ................................................................. 5

*Chevron U.S.A. Inc. v. Echazabal*,
   536 U.S. 73 (2002) ............................................................................. 8

*City of Canton, Ohio v. Harris*,
   489 U.S. 378 (1989) ................................................................ 20, 21, 22

*Connick v. Thompson*,
   563 U.S. 51 (2011) ............................................................................ 21

*Coster v. Maryland*,
   No. CV GLR-21-65, 2021 WL 5605027 (D. Md. Nov. 30, 2021) ................. 7

*DiPino v. Davis*,
   354 Md. 18, 729 A.2d 354 (1999) ......................................................... 26

*Drewry v. Stevenson*,
   No. WDQ–09–2340, 2010 WL 93268 (D. Md. Jan.6, 2010) ....................... 21

*Est. of Saylor v. Regal Cinemas, Inc.*,
   54 F. Supp. 3d 409 (D. Md. 2014) .................................................... 18, 20

*Exxon Mobil Corp. v. Albright*,
   433 Md. 303, 71 A.3d 30 (2013) .......................................................... 25

ii

*Fayetteville Inv'rs v. Commercial Builders, Inc.*,
  936 F.2d 1462 (4th Cir. 1991) ................................................................. 5

*Felix v. City of New York*,
  344 F. Supp. 3d 644 (2018) .................................................................... 22

*Goodman v. Praxair, Inc.*,
  494 F.3d 458 (4th Cir. 2007) ................................................................... 7

*Green v. Brooks*,
  125 Md. App. 349 (1999) ....................................................................... 24

*Hall v. DIRECTV, LLC*,
  846 F.3d 757 (4th Cir. 2017) ................................................. 4, 10, 15, 24

*J.K.J. v. Polk Cnty.*,
  960 F.3d 367 (7th Cir. 2020) ................................................................. 22

*Jackson v. Inhabitants of Town of Sanford*,
  1994 WL 589617 (D. Me. Sept. 23, 1994) ............................................. 19

*Johnson v. Balt. Police Dep't*,
  452 F. Supp. 3d 283 (D. Md. 2020) ........................................................ 4

*Kentucky v. King*,
  563 U.S. 452 (2011) ................................................................................ 9

*Lee v. Cline*,
  384 Md. 245 (2004) ............................................................................... 24

*Lewis v. Simms*,
  No. AW–11–CV–2172, 2012 WL 254024 (D. Md. Jan.26, 2012) .......... 21

*Montgomery v. District of Columbia*,
  No. CV 18-1928 (JDB), 2019 WL 3557369 (D.D.C. Aug. 5, 2019) ...... 18

*Pittway Corp. v. Collins*,
  409 Md. 218, 973 A.2d 771 (2009) ....................................................... 24

*Poole v. Downey*,
  747 F. App'x 171 (4th Cir. 2019) ............................................................ 7

*Poole v. Gaston Cnty.*,
  No. 3:15-CV-309-DCK, 2017 WL 4479219 (W.D.N.C. Oct. 6, 2017) ..... 7

*Presley v. City of Charlottesville*,
  464 F.3d 480 (4th Cir. 2006) ............................................................. 4, 21

*Schorr v. Borough of Lemoyne*,
    243 F. Supp. 2d 232 (M.D. Pa. 2003) ............................................................. 19

*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*,
    673 F.3d 333 (4th Cir. 2012)......................................................... 6, 7, 13

*Shoemaker v. Smith*,
    353 Md. 143 (1999)......................................................................... 24, 25

*Smith v. City of Greensboro*,
    No. 1:19CV386, 2020 WL 1452114 (M.D.N.C. Mar. 25, 2020)......................... 14

*Thomas v. The Salvation Army S. Territory*,
    841 F.3d 632 (4th Cir. 2016).......................................................... 7—8

*Thompson v. Badgujar*,
    No. 20-CV-1272-PWG, 2021 WL 3472130 (D. Md. Aug. 6, 2021) ............................... *passim*

*Waller ex rel. Est. of Hunt v. Danville, VA*,
    556 F.3d 171 (4th Cir. 2009)......................................................... 6, 19, 20

*Williamson v. Prince George's Cnty.*,
    Md., No. CIV.A. DKC 10-1100, 2011 WL 280961 (D. Md. Jan. 26, 2011) ........................... 24

*Wisconsin v. J.K.J.*,
    208 L. Ed. 2d 563, 141 S. Ct. 1125 (2021) .................................................. 22

*Wood v. Maryland Dep't of Transp.*,
    732 F.App'x 177 (4th Cir. 2018)......................................................... 7

*Wynkoop v. Hagerstown*,
    159 Md. 194, 150 A. 447 (1930)......................................................... 25

**Rules**

Fed. R. Civ. P. 12 ............................................................................. 4, 6, 8

Fed. R. Civ. P. 8 ............................................................................. 4

Md. Code Ann., Cts. & Jud. Proc. § 5-507 ............................................. 24

**Regulations**

28 C.F.R. § 35.108 ............................................................................. 12, 13, 17

28 C.F.R. § 35.130 ............................................................................. 17

28 C.F.R. § 35.160 ............................................................................. 17

45 C.F.R. § 84.4 ............................................................................................................ 17

**Legislative History**

H.R. Rep. No. 101-485, pt. III (1990) ............................................................................ 19

## INTRODUCTION

In an all too familiar story, local police encountered a young Black man who was experiencing a mental health crisis. Instead of rendering aid and service, the police shot and killed him. In this particular familiar story, the young Black man is Ryan LeRoux. The police are the Montgomery County Police Department ("MCPD"). True to character, MCPD now asks this Court to reward its misconduct by asking no questions and moving on. MCPD asks this Court to end this story like too many others—with no accountability. But, the LeRoux family urges this Court to follow the law and the facts, which necessarily lead to accountability for MCPD.

## STATEMENT OF FACTS

On the night of his death, July 16, 2021, Ryan LeRoux was distraught from the death of his grandmother and the combined loss of his job, girlfriend, and home. Am. Compl. ¶ 46. He had resorted to living in his car and had filled a prescription for Risperidone, an anti-psychotic medication. Am. Compl. ¶¶ 26, 46. Ryan drove his car to McDonald's, ordered food from the drive-thru lane, and abruptly refused to pay for his meal or leave the drive-thru lane. Am. Compl. ¶ 3.

In response to Ryan's strange behavior, two McDonald's workers called the 911 line at 9:12 p.m. Am. Compl. ¶ 3. They described Ryan as "acting, like, crazy" because he said he had already paid for his food and would not move out of the drive-thru lane. Am. Compl. ¶ 3. The McDonald's employees informed the 911 dispatcher that no one was "in danger" and that no weapons were involved. Am. Compl. ¶ 3.

The Montgomery County Emergency Communications Center ("ECC") dispatcher who took the call did nothing to follow up with the callers about what services were needed. Am. Compl. ¶ 62. The dispatcher merely continued her checklist of questions, ignoring what she was

told. She advised them to "keep your doors and windows locked" and went so far as to tell them to call back if he returned, even though they had told her he had not left the drive-thru lane. Although the callers gave her the license plate number of Ryan's vehicle, the dispatcher either did not run it, in which case she would have discovered that Ryan had experienced a mental health crisis involving the police just four days earlier, or else she did run his plates and did not care. Am. Compl. ¶¶ 42–45.

As a result of the dispatcher's failure to respond appropriately to the information she was given, instead of sending one of Montgomery County's several resources for de-escalating encounters with mentally ill individuals, the dispatcher sent an armed white MCPD officer with no specialized crisis intervention training ("CIT")—and not until nearly an hour later. Am. Compl. ¶¶ 47–54, 63. When he arrived, although dispatch already had Ryan's license plate number and had presumably communicated it to him, Officer Brooks Inman, too, made no accommodation to the fact that all available evidence indicated a mental health crisis in progress.

Officer Inman saw that Ryan's car was still in the drive-thru lane, and that Ryan was reclined in the driver's seat and on his phone wearing large over-the-ear headphones. Am. Compl. ¶ 65. He then saw a gun resting on the passenger seat and drew his own weapon, even though Ryan made no threatening gestures or comments. Am. Compl. ¶¶ 7, 66.

Because he either did not care that this was likely a mental health crisis or simply had no idea how to respond to such an event because of his lack of mental health training, Officer Inman immediately began shouting commands at Ryan to "keep [his] fucking hands up," while holding him at gunpoint. Am. Compl. ¶ 68. In the face of Officer Inman's shouting and gun-pointing, Ryan remained reclined in his seat, continued using his phone, and did not acknowledge the officer. Am. Compl. ¶¶ 9–10, 69. At no point did Ryan move towards the gun—it remained lying

on the passenger seat. Am. Compl. ¶ 12. Yet, instead of responding to Ryan's silence and stillness by attempting to communicate with him, de-escalating the escalation he, himself, had created, or calling on any of the resources the County provides for such interactions, Officer Inman called for more armed officers. Am. Compl. ¶ 10.

Over the next 34 minutes, nearly 20 MCPD officers arrived at the scene. Am. Compl. ¶ 70. None of them were Black. Am. Compl. ¶ 19. None were crisis negotiators or part of an MCPD crisis intervention team. Am. Compl. ¶ 19. As each officer arrived, they added their weapons to the array of guns pointing at Ryan in his car. The officers evacuated the McDonald's and barricaded Ryan's car with police cars and "stop sticks" to prevent him from going anywhere. Am. Compl. ¶ 71. One officer noted that Ryan was "not aggressive at all" towards the McDonalds employees and speculated that this was "a suicide by cop kind of thing." Am. Compl. ¶ 73. Another officer predicted that Ryan was "gonna end up offing himself." Am. Compl. ¶ 74. They even speculated that he could not hear them because of his headphones. Am. Compl. ¶ 72. Throughout this time, Ryan did not pick up the gun or sit up in his seat.

Approximately 20 minutes after Officer Inman's arrival and more than two hours after the original 911 call, the supervising officer on scene, Captain Brian Dillman, called for a crisis negotiator. Am. Compl. ¶ 77. Four minutes later, dispatch confirmed that one was on the way. Am. Compl. ¶ 77. A few minutes later, a crisis negotiator radioed that he was two minutes away. Am. Compl. ¶ 27. Seconds later, Ryan sat up in the front seat of his car. Am. Compl. ¶ 81. Without waiting to see if Ryan reached for the gun, and without waiting for the crisis negotiator, MCPD officers fired 23 shots at Ryan, killing him. Am. Compl. ¶ 82.

Defendants argue, based on "evidence" not included in the Amended Complaint, that the Amended Complaint fails to state a claim upon which relief may be granted.

**LEGAL STANDARD**

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2), which requires only that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 295 (D. Md. 2020) (quoting Fed. R. Civ. P. 8(a)(2)).

"The purpose of Rule 12(b)(6) is 'to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Chestnut v. Kincaid*, 2021 WL 1662469, at *6 (D. Md. Apr. 28, 2021) (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

At the motion to dismiss stage, the Court must limit its consideration to the facts alleged in the Complaint. The goal of a motion to dismiss is not to test the strength of the evidence, but to ensure sufficient facts are alleged to state a claim. Defendants submit purported evidence, Defendants' Exhibits 1, 2, 3, 4a, 4b, 5, and 6, that is not included in the Amended Complaint. Defendants assert that these exhibits are an excerpt of the 911 call made by the McDonalds employees to ECC and "BWC footage" that they claim is "integral, relied upon, and quoted in the Amended Complaint." Plaintiffs did, indeed, consider some of these pieces of evidence in drafting their Amended Complaint. However, these are certainly not the only pieces of evidence

upon which Plaintiffs base the allegations in the Amended Complaint. More importantly, Defendants' excerpts are incomplete. They fail, for example, to include the complete 911 call, where a McDonalds employee conveyed Ryan's license plate to the ECC dispatcher. *See* Exhibit 1 at 04:19.

Further, Defendants misstate the relevant case law governing the consideration of extrinsic evidence. Defendants mislead the Court on *Thompson's* actual holding just as the *Thompson* plaintiffs misled their court on the key facts of their case. *See Thompson v. Badgujar*, No. 20-CV-1272-PWG, 2021 WL 3472130, at *3 (D. Md. Aug. 6, 2021). The *Thompson* Court did not hold that courts may look outside the four corners of the complaint to any material referenced in the complaint. Such a holding would undo decades of precedent. *See*, *e.g. CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (explaining "four corners" rule); 12(b)(6); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (allowing consideration of extrinsic evidence only where it is "integral to and explicitly relied on in the complaint." (quotation omitted)). Instead, the *Thompson* Court more narrowly explained that when a "document or video is referenced as integral to the complaint, disputes between the allegations of the complaint and what is plain from the video are resolved in favor of the video." *Thompson*, 2021 WL 3472130, at *3; *see also Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails.").

Importantly, in this case, on no point does the extraneous evidence Defendants cite contradict the allegations in the Amended Complaint. Indeed, the extrinsic evidence actually buttresses Plaintiffs' case. *See* Argument II (discussing how ECC operator should have discovered Ryan's history of mental health encounters with MCPD from the identifying

information provided by the McDonald's worker). Thus, Defendants' references to outside evidence are inappropriate and the Court should not allow it. These concerns are precisely the reasons the Federal Rules of Civil Procedure call for a Rule 12(b)(6) motion that relies on matters outside the pleadings to be converted to a Rule 56 motion for summary judgment. "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Defendants' extraneous evidence should be stricken and disregarded by this Court.

**ARGUMENT**

I.  **Defendants were not excused by exigent circumstances from their duty to accommodate Ryan.**

   A. **Defendants misstate the law on when safety concerns may excuse the provision of reasonable accommodations.**

Contrary to Defendants' argument, there is no bright-line rule in the Fourth Circuit that the Americans with Disabilities Act ("ADA ") does not require reasonable modifications in exigent circumstances. The Fourth Circuit has made clear that "there is no separate exigent-circumstances inquiry [rather,] the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation" and that "nothing in the text of the ADA suggests that a separate exigent-circumstances inquiry is appropriate." *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012). This approach encourages "the provision of accommodations during exigent circumstances." *Id.*

Defendants rely on *Waller ex rel. Est. of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009), and a Fifth Circuit case for the proposition that "exigent circumstances" can absolve public entities of their duty to provide any reasonable accommodation." Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem.") 30, ECF No. 33-1. To the contrary, in *Seremeth*, the Fourth Circuit made clear that *Waller* did not decide that issue, *Seremeth*, 673 F.3d at 339. *Seremeth* made clear

that the mere existence of "exigent circumstances" does not excuse officers from providing

accommodations that are "reasonable." *See also Poole v. Gaston Cnty.*, No. 3:15-CV-309-DCK,

2017 WL 4479219, at *9 (W.D.N.C. Oct. 6, 2017), *aff'd sub nom. Poole v. Downey*, 747 F.

App'x 171 (4th Cir. 2019) (noting that the Fourth Circuit, unlike other courts, has not "found

situations of exigent circumstances beyond the scope of the ADA's requirement of reasonable

accommodation). "[W]hat is reasonable under the circumstances of a police interaction or

investigation "is a question of fact and will vary according to the circumstances." *Seremeth*, 673

F.3d at 340.

**B. Neither exigent circumstances nor a direct threat excuse Defendants' failure to accommodate Ryan.**

Defendants' main argument relies on their unsupported factual defense that at the

moment he was shot, Ryan posed "a threat of extreme violence." Def.'s Mem. 32. Defendants try

to argue that "Plaintiffs do not allege, nor could they, that the officers did not see Mr. LeRoux

pointing the gun at them at the moment that they fired their weapons or that it would not have

been objectively reasonable for the officers to believe that the object Mr. LeRoux pointed at

them was a gun." Def.'s Mem. 6. Defendants would require Plaintiffs to disprove affirmative

defenses Defendants have not even made yet. That an individual poses a "direct threat" is an

affirmative defense to a charge of discrimination under the ADA. *See Wood v. Maryland Dep't of

Transp.*, 732 F.App'x 177, 181 (4th Cir. 2018). Defendants have the burden of pleading and

proving that Ryan was wielding a gun and posed a direct threat to the officers. *See Goodman v.

Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (explaining that "the burden of establishing the

affirmative defense rests on the defendant."); *Coster v. Maryland*, No. CV GLR-21-65, 2021 WL

5605027, at *14 (D. Md. Nov. 30, 2021) (declining to dismiss ADA claim on basis of "direct

threat" affirmative defense at the motion to dismiss stage). *See also Thomas v. The Salvation*

*Army S. Territory*, 841 F.3d 632, 640 (4th Cir. 2016) ("[I]t is a defense to claims under the Rehabilitation Act that [a plaintiff] may pose a 'direct threat' to the welfare of others." (quoting *McGeshick v. Principi*, 357 F.3d 1146, 1151 (10th Cir. 2004) ) ); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (characterizing the ADA's direct threat provision as an affirmative defense)".

Affirmative defenses are rarely a basis for dismissal under Fed. R. Civ. P. 12(b)(6) and Plaintiffs are not ordinarily required to plead allegations relevant to potential affirmative defenses. *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 152 (4th Cir. 2019).

The facts alleged in the Amended Complaint do not support such a defense. To the contrary, as an initial matter, the behavior of MCPD officers before they arrived at the scene does not imply that they were dealing with an exigency. The McDonald's worker called 911 to report a trespass at 9:12 PM, and the first officer did not arrive at the scene until 10:28 PM. Am. Compl. ¶¶ 3–4, 6. Four days before he was killed, Ryan had been arrested for trespassing at a hotel. By all appearances, MCPD officers were treating this call as another simple trespass by Ryan.

The Amended Complaint shows that for over two hours, Ryan was not a threat. Am. Compl. ¶¶ 3–6. He was a young black man sitting in the McDonald's drive-thru. He did not even react to Defendants' attempts to escalate the situation. Ryan had been sitting in the drive-thru for some time before the McDonald's worker even called 911. Am. Compl. ¶ 3. MCPD officers took over an hour to arrive at the McDonald's and took no action for some 30 minutes after they arrived. Am. Compl. ¶ 4. All of this is inconsistent with their claim of exigent circumstances. Defendants' conduct also contradicts their claim of exigent circumstances. During the 30

minutes before they shot him, the MCPD officers had Ryan barricaded by police cars and stop

sticks. Even after Officer Inman saw Ryan's gun and called for backup, the actions of the

officers on scene belied any assertion they were dealing with a dangerous emergency. One

officer casually walked in front of Ryan's car to deploy one set of stop sticks. When another

officer questioned this decision, he told her to "calm down." Am. Compl. ¶ 75. Such actions do

not equal exigency.

Throughout that time, the Defendants failed to accommodate Ryan by calling for mental

health services. The Defendants cannot escape their accommodation duty for two hours by

arguing that, in the last seconds of the encounter, an exigent circumstance arose. Nor can they

create an *ex post* justification for their misconduct by claiming Ryan escalated the situation when

they escalated the situation. *See Kentucky v. King*, 563 U.S. 452, 471 (2011) (noting that police

officers cannot impermissibly create exigencies to justify Fourth Amendment violations).

Finally, any exigencies that did exist arose because of the behavior of MCPD officers, not Ryan

himself. Throughout the encounter, Ryan sat peacefully and non-responsively in his car. The

MCPD officers continuously escalated the encounter by shouting at Ryan, cursing at him, and

pointing nearly 20 guns (including a military-style assault rifle) at him. Am. Compl. ¶¶ 7–10,

14–16. MCPD cannot rely on an emergency of their own creation to justify shooting Ryan. *See*

*Kentucky v. King*, 563 U.S. 452, 471 (2011) (noting that police officers cannot impermissibly

create exigencies to justify Fourth Amendment violations).

Most significantly, Defendants ask this Court to forget that Ryan owned his gun legally

and to take Defendants' word, without evidence, and certainly without an allegation in the

Amended Complaint, that Ryan raised his gun at the officers. The Amended Complaint does not

"concede that the BWC video possibly shows Mr. LeRoux's right arm was raised at the officers."

Def.'s Mem. 6. The Amended Complaint merely states that "[t]he bodycam footage possibly depicts Ryan raising his right arm." Am. Compl. ¶ 83. The Amended Complaint certainly does not concede that he raised his arm "*at the officers*." Nor does the Amended Complaint allege or even imply that Ryan had anything, let alone a gun, in his right hand and because the Court must "draw all reasonable inferences in favor of the plaintiff," *Hall*, 846 F.3d at 765, this Court must not read unalleged facts into the Amended Complaint. Indeed, the Amended Complaint alleges facts that indicate Ryan was not wielding a gun in his right hand or pointing anything at officers with that hand. Am. Compl. ¶ 83. Importantly, the Amended Complaint states that Ryan was left-handed, making it less probable that he would pick up a gun with his right hand to shoot at Defendants. *Id.*

Notably, even the extraneous evidence Defendants have tried to put into the record themselves provides no indication that there was an "object Mr. LeRoux pointed at them." Def.'s Mem. 6. This further distinguishes Ryan's situation from *Thompson*, in which video footage indisputably contradicted the complaint and showed the decedent "aggressively charg[ing]" at the officer, struggling with him on the ground, and lunging at him again after the officer fired the first shot. *Thompson*, 2021 WL 3472130, at *8. This is also notable because Defendants have greater access to the Body Worn Camera ("BWC"), evidence than Plaintiffs do and they felt free to introduce BWC evidence as exhibits to their brief. So, if there were evidence that Ryan was pointing "an object" "at the officers" in his right arm, they would have it. Defendants ask this Court to imagine evidence that Defendants hope they might bring to light during the discovery process to support defenses they have not yet made, all while denying Plaintiffs even the opportunity to know what defenses they will allege or to engage in the discovery process. But

neither they nor the Plaintiffs have such evidence now and there is certainly no such allegation in the Amended Complaint.

Defendants would also put the burden on Plaintiffs, before any opportunity to depose the officers, to disprove what the officers might claim to have seen when they killed Ryan.[1] No Defendant has testified under oath to what they did or did not see when they unnecessarily shot Ryan 23 times. *If* the Defendants present evidence that they saw Ryan point his right arm at them, *and* that they saw a gun, *and* that it was in his right hand, *and* that there was no reasonable opportunity to await the arrival of mental health services, *then* Plaintiffs will have the opportunity to challenge the credibility of that evidence. Defendants ask this Court to skip the answer, discovery, testimony, trial, and deliberation processes based on their attorneys' word about what the evidence will show. The attorneys' word is not the legal standard for analyzing the Amended Complaint.

Nor was the moment they shot Ryan the only opportunity Defendants had to provide the necessary accommodation. As the Amended Complaint alleges, ECC and MCPD had opportunities over the course of two hours to seek qualified assistance in the form of a crisis negotiator. *See* ¶¶ Am. Compl. 4–6, 10–16, 19, 60–76. They did not. This is not the three-minute pursuit where Judge Paul W. Grimm found an exigency. *Thompson*, 2021 WL 3472130, at \*2. This was a multi-hour police-citizen interaction that became exigent because of the Defendants' misconduct—not Ryan's actions. Sadly, even minutes before Defendants shot Ryan, they failed to wait another two minutes (after two hours) for the arrival of mental health services.

---

[1] In lieu of discovery and an opportunity to depose the officers, Defendants would bring in more extraneous "evidence" in the form of a report of an investigation by the Howard County State's Attorney's Office. Def.'s Mem. 39.

**II.     The Amended Complaint adequately alleges that Ryan was a qualified individual with a disability and that Defendants had the requisite knowledge**

Despite the Amended Complaint's specific allegations that Ryan was diagnosed with ADHD, depression, and schizophrenia, had undergone inpatient treatment several times, including in October 2020, exhibited psychosis and paranoia, and was prescribed anti-psychotic medication, ECF 25 ¶¶ 37-41, 111, Defendants argue that Plaintiffs have not sufficiently alleged that Ryan's impairments substantially limited a major life activity. *See* Def.'s Mem. 12. This level of specificity is not required when Plaintiffs have pleaded the relevant facts under the relevant legal standard. Am. Compl. ¶¶ 111, 126, 140, 152, 163, 177, 190, 200 ("Ryan was a qualified individual with a disability protected by [the ADA or Section 504] . . . Ryan suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of [the ADA or Section 504]." Plaintiffs have pleaded the elements of the claim. It is not necessary that they plead every element of every definition contained in every element of each claim.

While not every impairment is a disability, Ryan's were. The ADA's implementing regulations note that depression and schizophrenia are the type of impairments that "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity," 28 C.F.R. § 35.108(d)(2)(ii), because they "each substantially limit[] brain function," 28 C.F.R. § 35.108(d)(2)(iii). The cases Defendants cite, such as *Thompson*, address only when ADHD and learning disorders may be considered disabilities, but say nothing about depression and schizophrenia. Def.'s Mem. 12. *Thompson* is readily distinguishable as, there, the plaintiff only alleged the suspect had ADHD, without any information regarding how ADHD substantially limited a major life activity or even how ADHD would have explained his dangerous behavior or could have been accommodated.

12

Further, concentrating, thinking, communicating, and interacting with others are all examples of major life activities. *See* 28 C.F.R. § 35.108(c)(1). Plaintiffs provide numerous examples of how Ryan's conditions substantially limited his ability to think, communicate and interact with others, including the responding officers. *See*, *e.g.*, Am. Compl. ¶ 39 (Ryan's disability led him to involuntary commitment to an inpatient treatment center; Ryan's disability made him walk nude by the side of the road; Ryan had a "psychotic episode" and "claimed that people were chasing him"); Am. Compl. ¶ 40 (Ryan exhibited "psychosis with bizarre behaviors. He . . . thought [healthcare providers] were trying to kill him. . . he was convinced that his mother and father were imposters and not his real parents. He told his attending physician that someone was following him and that he removed his clothes to get rid of a tracking device. . . .he continued to insist that people were chasing him"); Am. Compl. ¶ 42–46 (describing Ryan's earlier interaction with police throughout which he also remained non-responsive); Am. Compl. ¶ 78 (describing how Ryan insisted that his hands were outside the car window when observers confirmed that he was still holding his phone). These facts clearly demonstrate some of the ways Ryan's disabilities substantially limited his major life activities of to thinking, communicating, and interacting with others.

The Amended Complaint also adequately alleges that Defendants knew (or should have known) that Ryan was suffering from a mental health disability. In order for liability to attach, the Defendants must have had constructive knowledge that Ryan was suffering from a mental health disability. That is, the Defendants must have either known that Ryan was suffering from a mental health disability or had reason to know that was the case. *See Seremeth*, 673 F.3d at 336. At the motion to dismiss stage, Plaintiffs' Amended Complaint needs to evince that it was "at least plausible that the dispatcher and officers recognized [Ryan] as mentally disabled, even if

the precise nature of his disability was uncertain." *Smith v. City of Greensboro*, No. 1:19CV386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020), *reconsideration denied*, No. 1:19CV386, 2021 WL 5771544 (M.D.N.C. Dec. 6, 2021). Plaintiffs meet that burden, and also plead that the dispatcher and officers "should have perceived a need for special accommodation aside from the usual, lawful treatment afforded to any agitated, intoxicated, or distressed person." *Thompson v. Badgujar*, at *10 (quoting *Smith*, 2020 WL 1452114, at *13).

The first things the ECC operator heard about Ryan from the McDonald's employees who called 911 were that he was "acting crazy," that he was not dangerous, but that he was saying he had already paid for his food when he had not. The McDonald's employees were not trained psychologists, but they were capable of this common-sense observation. The ECC dispatcher did not follow up or ask any further questions about what services might be needed. But the ECC dispatcher also had Ryan's license plate number. Running that plate would have given her Ryan's identity, address, and telephone number, just as it did the officers on the scene. It would have also given her access to information about Ryan's interaction with MCPD officers just four days earlier, just as it would have for the officers on the scene. Am. Compl. ¶ 76.

In addition to the information the ECC dispatcher had and had access to, the responding officers had a second opportunity to run Ryan's license plate number, from which they received his name and telephone number, among other information. They also either knew, or could easily have discovered, the details of his recent interaction with police, which clearly indicated a mental illness.

When they arrived, the MCPD officers knew that Ryan had been sitting non-responsive in the drive-thru lane for nearly an hour already, doing nothing. By the time he was dead, Ryan had been sitting in the drive-thru lane for more than two hours. These are behaviors consistent

with someone who is mentally unwell, and the officers either realized that and did nothing or should have realized that and rendered aid. In addition to the information that Ryan was "acting crazy," the officers also had the opportunity to observe Ryan's behavior for over 30 minutes. The officers on scene saw that Ryan was non-responsive despite their many shouted commands, and the officers knew that Ryan insisted that his hands were up and outside the car window even when they visibly were not. Am. Compl. ¶ 78. Several officers on the scene commented on Ryan's abnormal mental state. One officer speculated that this was a "suicide by cop kind of thing." Am. Compl. ¶ 73. Another officer predicted that Ryan was "gonna end up offing himself." Am. Compl. ¶ 74. These callous comments reflect the officers' awareness of Ryan's ongoing mental health crisis. While police officers may not be required to be psychologists and diagnose people's disabilities, neither can they close their eyes to the obvious indications of mental health crisis and pretend they had no options.

The facts, as alleged in the Amended Complaint, support an inference that Defendants did, in fact, know Ryan had a mental illness and needed an accommodation. Not only did officers comment on the "suicide by cop situation," but Captain Brian Dillman eventually did call for a crisis negotiator, indicating awareness that Ryan was in the midst of a mental health crisis. Am. Compl. ¶¶ 17, 77. Tragically, the officers on scene did not wait for the negotiator's arrival. Defendants argue that it is merely Plaintiffs' "speculation" that the request for a negotiator was based on Ryan's ongoing mental health crisis. Def.'s Mem. 20. While Captain Dillman did not explain to the dispatcher why he was asking for a crisis negotiator, drawing the reasonable inference in Plaintiffs' favor, this is evidence of knowledge that Plaintiffs will be able to support with the benefit of discovery. It is a "reasonable inference[]" for the Court to draw at this stage. *Hall*, 846 F.3d at 765.

This case is clearly distinguishable from *Thompson v. Badgujar*, an unreported opinion on which Defendants rely heavily. First, unlike in *Thompson*, Defendants' evidence does nothing to undermine Plaintiffs' allegations in the Amended Complaint. In *Thompson*, defendants' Body Worn Camera footage "contradict[ed] allegations in the complaint, as well as the characterization of the events by Plaintiffs." *Thompson*, 2021 WL 3472130 at *3. Here, unlike in *Thompson*, Defendants' extrinsic evidence, , is incomplete and potentially misleading, such as Defendants' incomplete excerpt of the ECC call, which omits that McDonald's worker provided Ryan's license plate. Def.'s Mem. 16[2]

Also the evidence in this case, even including Defendants' extraneous evidence, supports Plaintiffs' allegations that there was no exigency and that Defendants had knowledge, and time to gain more knowledge, about Ryan's disability, as well as time to implement an accommodation. That is in sharp contrast to *Thompson*. In *Thompson*, as was clear from the BWC video, the responding officer was immediately, and repeatedly, attacked by the suspect. When the officer attempted to back away, the suspect pursued him and tried to grab or hit him. *Id.* Nothing like that occurred in Ryan's case.

Moreover, in *Thompson*, the officers knew nothing about the suspect and had no ability to know anything about the suspect prior to being attacked. The suspect was not in a vehicle and had not been the subject of an ECC call, so no license plates had been run, and no witnesses could describe prior behavior. The only behavior on which the officers had to act was the suspect's physical attacks. In Ryan's case, unlike in *Thompson,* the officers already had access to information about Ryan, including his identity, his behavior in the drive-thru line as reported by the McDonalds employees, his behavior during the 30 minutes the officers observed him, his

---

[2] See complete recording of ECC call at Exhibit 1, beginning at 04:19 (demonstrating that McDonald's worker provided ECC employee with Ryan's license plate number)..

responses to the police officer's call to his cell phone, and all the information available from

running his license plates, including the mental health incident with MCPD just four days before.

Am. Compl. ¶ 42–45. This is more than enough "to support a reasonable inference that the

County should have perceived [Ryan] had a disability necessitating an accommodation."

*Thompson*, 2021 WL 3472130 at *11.

### III.    The Defendants failed to provide Ryan with equally effective communication or reasonable modifications and discriminated against him because of his mental disability.

The ADA's, and Section 504's, implementing regulations prohibit covered entities from

discriminating on the basis of disability in any program, service, or activity. *See* 28 C.F.R. §

35.130(b)(1)(ii)–(iii) (ADA); 45 C.F.R. § 84.4(b)(1)(ii)–(iii) (Section 504). Discrimination

includes, among other things, , denying a person with a disability the opportunity to benefit from

a program or service, providing an unequal benefit, or providing a less effective benefit. 28

C.F.R. § 35.130(b)(1)(i)-(iii). The regulations also require that public entities affirmatively "take

appropriate steps to ensure that communications with . . . members of the public. . . with

disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). In

addition, the regulations require "reasonable modifications in policies, practices or procedures

when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7).

Plaintiffs have met their pleading burden on these elements.

As discussed above, Ryan suffered from schizophrenia and depression, two conditions

that "each substantially limit[] brain function." 28 C.F.R. § 35.108(d)(2)(iii). Plaintiffs have

alleged that Defendants discriminated against Ryan by shooting and killing him because of his

disability. They thus denied him the benefit of surviving a police encounter. Am. Compl. ¶¶ 139–

150; 189–198. When nondisabled individuals are able to survive a police encounter over a minor

incident such as not leaving a fast-food restaurant drive-thru, but a person with a mental

disability is killed in the same circumstance, the person with a disability has experienced discrimination.

Plaintiffs have alleged that Ryan's mental illness limited his ability to communicate with MCPD officers. Therefore, Defendants were required to provide auxiliary aids and services, such as "communicating in a way that could be understood by a person in a mental health crisis." Am. Compl. ¶¶ 158; 199–208. By failing to do so, Defendants violated the effective communication obligation. *See Montgomery v. District of Columbia*, No. CV 18-1928 (JDB), 2019 WL 3557369, at *2 (D.D.C. Aug. 5, 2019) (noting allegations that suspect's mental illness "limited his ability to understand information and communicate information.").

Finally, Plaintiffs have alleged that Ryan's mental illness necessitated modifications such as dispatching mental health services or CIT-trained officers, employing de-escalation techniques, or providing mobile crisis services or a crisis negotiator. But instead, Defendants "hastily engag[ed] with a man in crisis and escalat[ed] the crisis into a catastrophe." Am. Compl. ¶¶ 110–124; 125–138; 162–175; 176–188.

## IV. Montgomery County is liable for its failure to train the responding officers.

### A. Failure to train claims are actionable under the ADA.

A claim for failure to train law enforcement officers is actionable under the ADA. *See Est. of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 424 (D. Md. 2014). The legislative history of Title II also confirms that the duty to train law enforcement officers is implicit in the regulatory obligation to modify policies and procedures.

> In order to comply with the non-discrimination mandate, *it is often necessary to provide training to public employees about disability*. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid for seizures. Often, after being arrested, they are deprived

of medications while in jail, resulting in further seizures. Such discriminatory
treatment based on disability can be avoided by proper training.

H.R. Rep. No. 101-485, pt. III (1990) (emphasis added).  Accordingly, Title II of the ADA

clearly gives rise to a cognizable claim against public entities for failure to train law enforcement

officers to recognize an individual with a disability, as in this case, and to prevent unnecessary

injury to a person with a disability.

Defendants attempt to twist the Fourth Circuit's decision not to decide whether a failure

to train claim existed under the ADA, *see Waller*, 556 F.3d at 177 n.3, into a "precedent" of not

recognizing the existence of such a claim. Def.'s Mem. 35. Other courts have held that such

claims are cognizable and arise out of the duty to modify policies and procedures to prevent

discrimination.  For example, in *Jackson v. Inhabitants of Town of Sanford*, 1994 WL 589617

(D. Me. Sept. 23, 1994), the plaintiff, who had paralysis of his right side and slurred speech, was

arrested on suspicion of operating a vehicle under the influence.  *Id.* at *1.  The plaintiff sued the

defendant municipality under Title II of the ADA, alleging that the municipality "failed to train

its police officers in recognizing symptoms of disabilities and failed to modify police policies,

practices and procedures to prevent discriminatory treatment of the disabled." *Id.* at *6.  Citing

to the implementing regulations and legislative history of the ADA, the court denied summary

judgment to the municipality, holding that "the ADA demonstrates that Congress was concerned

with unjustified arrests of disabled persons such as [the plaintiff] alleges here."  *Id.* at *7.

Likewise, the court in *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232 (M.D. Pa.

2003), held that the broad scope of the ADA's nondiscrimination mandate encompasses a failure

to train claim. There, police officers shot and killed the plaintiffs' son while attempting to

involuntarily commit him.  *Id.* at 233.  Regarding the scope of the ADA's protections, the court
held:

> Plaintiffs allege . . . that the failure of Defendants to properly train the police for
> peaceful encounters with disabled persons caused decedent [] to be discriminated
> against and excluded from these government services.  Nothing in the language of
> the statute suggests that the ADA does not extend to this type of governmental
> activity.

*Id.* at 235.  In denying the police commission's motion to dismiss, the court held that the

alleged noncompliance with the training requirements of the ADA occurred when "[commission]

policy makers failed to institute policies to accommodate disabled individuals such as [the

decedent] by giving the officers the tools and resources to handle the situation peacefully."  *Id.* at

238.  The court held that the plaintiffs stated a cognizable claim against the police commission

for failing to modify police practices to accommodate individuals with disabilities. *Id.*

Finally, the district court in Maryland has allowed a failure to train claim under the ADA

to proceed. *See Est. of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 424 (D. Md. 2014).

The Court there noted that "there is no indication in *Waller*, or in any other Fourth Circuit

decision, however, that would indicate that the Fourth Circuit would not recognize an ADA Title

II failure to train claim under the appropriate circumstances." *Saylor*, 54 F. Supp. 3d at 424. It

ultimately found that such a claim was viable. *Id.*

**B.  Plaintiffs have adequately alleged a failure to train claim against Montgomery
County.**

There are three elements of a claim based on a lack of policies or failure to train. First,

the Court must consider whether MCPD instituted inadequate policies or inadequately trained its

officers. "[T]he focus must be on adequacy of the training program in relation to the tasks the

particular officers must perform." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, (1989).

Second, the policies or training must be so deficient that they rise to the level of a "'deliberate or

conscious' choice by the municipality." *Lewis v. Simms*, No. AW–11–CV–2172, 2012 WL 254024, at *3 (D. Md. Jan.26, 2012) (quoting *Drewry v. Stevenson*, No. WDQ–09–2340, 2010 WL 93268, *4 (D. Md. Jan.6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). Finally, the training or policy deficiency must have caused the officer's illegal conduct. *Id.*

At this stage, Plaintiffs need not prove their claims. *Presley*, 464 F.3d at 483. Rather, Plaintiffs need only allege sufficient facts that give rise to a cognizable claim. *Id.* Plaintiffs have met that burden with regard to the first element of a failure to train claim. Plaintiffs allege that "[t]he Montgomery County ECC does not have a policy for handling calls that appear to be related to mental health crises" and that "ECC dispatchers do not receive training in CIT, in identifying mental health-related calls, or in the resources available to respond to mental health crises." Am. Compl. ¶ 100–101. Plaintiffs also allege that only 66% of MCPD officers have received any CIT training and there is no requirement for repeating or refreshing such training, Am. Compl. ¶ 49, and that the policies for MCPD officers "regarding interacting with people in crisis are inadequate, giving officers few tools for managing such situations." Am. Compl. ¶ 105. MCPD has only one policy governing these situations, and according to their website it has not been updated since 2005. *Id.*

Plaintiffs have also met their pleading burden on the element of deliberate indifference. To hold a municipality liable on a claim of failure to train or failure to implement an adequate policy, a plaintiff must allege that the entity knew or should have known that the training or policy was inadequate and exhibited deliberate indifference to the resulting violations of citizens' constitutional rights. *See Canton*, 489 U.S. at 387, 390 n.10. Sometimes deliberate indifference may be shown through a pattern of similar violations. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011). But not always. Single-incident liability arises when "the need for more or different

training is so obvious, and the inadequacy [in training is] so likely to result in the violation of []

rights, that the policymakers of the [municipality] can reasonably be said to have been

deliberately indifferent." *Canton*, 489 U.S. at 390. Although the standard for finding deliberate

indifference from a single incident is "rigorous," it is not "insurmountable." *J.K.J. v. Polk Cnty.*,

960 F.3d 367, 378 (7th Cir. 2020), *cert. denied sub nom. Polk Cnty., Wisconsin v. J.K.J.*, 208 L.

Ed. 2d 563, 141 S. Ct. 1125 (2021).

Defendants take issue with Plaintiffs' citations to the deaths of Finan Berhe and Robert

White, two other mentally ill individuals killed by MCPD. Def.'s Mem. 38–39. They argue that

these instances are irrelevant because Montgomery County made no finding of misconduct by its

own officers. Defendants misapprehend the purpose of these examples— "there is no

requirement that complaints result in a formal finding of misconduct for such complaints to

support findings of failure to supervise or train." *Felix v. City of New York*, 344 F. Supp. 3d 644,

662 (2018) (citations omitted). Rather, these examples demonstrate that "Plaintiffs have

plausibly supported the existence of a training deficiency and the [County's] awareness of the

same." *Id.*

The 2021 report from the Montgomery City Council's Office of Legislative Oversight

serves the same purpose, and also supports Montgomery County's liability based on the single

incident of Ryan's death. The report states that suspected mental illness was a key risk factor for

uses of force by MCPD officers—in 2021, 48% of victims subject to use of force by the MCPD

were suffering from mental illness at the time of the encounter. Am. Compl. ¶ 92, 94. The report

also notes that "MCPD's policies and practices regarding responding to calls involving mental

and behavioral health crises are outdated and insufficient to address the need" and that "police

encounters with persons with mental illness too often end in tragedy." Am. Compl. ¶ 93–94.

Given the alleged deficiencies in MCPD's training and the frequency with which MCPD officers use force against mentally ill suspects, the death of a mentally ill individual at the hands of MCPD officers was a "highly predictable consequence" of Montgomery County's failure to train its officers on how to interact with mentally ill individuals. *Bryan County v. Brown*, 520 U.S. 397 (1997).

Finally, Plaintiffs have pleaded causation. It is reasonable to infer that ECC dispatchers, who had received sufficient training on the county's available mental health crisis resources and when to deploy them, would have deployed them in response to someone "acting crazy" but not dangerous, who had been involved in a similar interaction with police just days earlier. In addition, MCPD officers who had been given adequate training in de-escalation and crisis intervention would not have escalated the situation as they did or misinterpreted Ryan's conduct as threatening, and would have called on mental health crisis services, and Ryan's death would have been avoided. At this stage, Plaintiffs' allegations make it plausible that MCPD's lack of policies and training on interacting with mentally ill individuals was the "moving force" behind Ryan's death. *Brown*, 520 U.S. at 404.

V.   **Plaintiffs have pleaded that the County's conduct was the proximate cause of Ryan's death.**

Defendants argue that Plaintiffs have not adequately alleged that the County's negligence and gross negligence were the proximate cause of Ryan's death. Def.'s Mem. 39. Plaintiffs have met this burden. As discussed above, they have not alleged an "unidentified disability" causing "unspecified limitations." Def.'s Mem. 40. Plaintiffs have alleged that Ryan suffered from schizophrenia, ADHD, and depression, which compromised his ability to think, communicate, and interact with others. They have not vaguely gestured at "unspecified changes." Def.'s Mem. 40. They have specifically outlined Montgomery County's resources for encounters with people

in crisis. And as discussed above, Defendants cannot rely on the unproven assertion, not included in the Amended Complaint, that Ryan raised his gun to break the causal chain between their failures and Ryan's death. It is a "reasonable inference[], " *Hall*, 846 F.3d at 765, that Ryan's shooting death at the hands of gun-wielding police officers was a "foreseeable result" of their violations of the ADA and Section 504, *Pittway Corp. v. Collins*, 409 Md. 218, 246, 973 A.2d 771, 788 (2009).

## VI.   The Officer Defendants cannot rely on public official immunity to avoid charges of gross negligence and wrongful death.

In Maryland, municipal officials are immune from civil liability for acts committed within the scope of their employment while acting in a discretionary capacity without malice. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-507. The Officers are not immune from liability for the state law torts of gross negligence and wrongful death because Plaintiffs' allegations, viewed in the light most favorable to the Plaintiffs, indicate that the Deputies acted with malice towards Ryan. *See Williamson v. Prince George's Cnty.*, Md., No. CIV.A. DKC 10-1100, 2011 WL 280961, at *6 (D. Md. Jan. 26, 2011) (finding that police officer could not claim public official immunity from claim rooted in negligence because plaintiff's allegations evidenced malice).

The Plaintiffs have alleged that the Officer Defendants acted with malice in killing Ryan. To show malice, the evidence must show "that petitioners' conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure [Ryan]." *Shoemaker v. Smith*, 353 Md. 143, 164 (1999); *see also Lee v. Cline*, 384 Md. 245, 269 (2004).  "Malice may be inferred from the surrounding circumstances". *Green v. Brooks*, 125 Md. App. 349, 377 (1999). The circumstances alleged by Plaintiffs here are sufficient, at this stage, to indicate malice.

The Officer Defendants repeatedly cursed at Ryan, repeatedly trained their guns on him despite him not engaging in any threatening behavior and declined to wait for any mental health assistance. Am. Comp. ¶ 212. They also made callous comments that Ryan was "gonna end up offing himself." The officers on scene even discussed a plan to break the passenger-side window and pull Ryan through the broken window. Am. Compl. ¶ 80. This plan would have resulted in serious injury to Ryan as they dragged him through a jagged glass window. Even though they did not implement this plan (they killed Ryan before they could), the plan to pull Ryan through a shattered glass window demonstrates an "improper motive, *Shoemaker*, 353 Md. 143 at 164, and a certain level of callousness reserved for people suffering from mental illness.

Plaintiffs have alleged that the Officer Defendants acted with malice as relates to their conduct underlying the state tort claims. Plaintiffs' claim for punitive damages against the Officer Defendants survives for the same reasons. *See Exxon Mobil Corp. v. Albright*, 433 Md. 303, 348, 71 A.3d 30, 57, *on reconsideration in part*, 433 Md. 502, 71 A.3d 150 (2013) (noting that punitive damages only awarded if plaintiff establishes malice at trial). The Officer Defendants cannot rely on public official immunity to escape the state law tort claims of gross negligence and wrongful death that Plaintiffs have levied. And, just as Plaintiffs' allegations of malice eliminate public official immunity as a defense, they also open the door for punitive damages.

**VII.    Montgomery County cannot escape liability for gross negligence and wrongful death by claiming governmental immunity.**

Defendants' invocation of "governmental immunity" is puzzling. One of the cases they cite is nearly a century old. Def.'s Mem. 44 (citing *Wynkoop v. Hagerstown*, 159 Md. 194, 201, 150 A. 447 (1930)). The other cited case makes clear that "a police officer, who might otherwise have the benefit of this immunity, does not enjoy it if the officer commits an intentional tort or acts

with malice." *DiPino v. Davis*, 354 Md. 18, 49, 729 A.2d 354, 370 (1999). As discussed above, Plaintiffs have alleged that the MCPD officers committed an intentional civil rights violation and acted maliciously. Thus, governmental immunity does not apply to the negligence, gross negligence, and wrongful death claims against Montgomery County. *See Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 330, 780 A.2d 410, 438 (2001) (to defeat a "motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious.") (quotation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss and allow this case to move to discovery. Defendants should not be able to cut off, at the earliest possible point, Plaintiffs' pursuit of accountability in this unfortunate and all too familiar story.

Dated:  September 30, 2022                              Respectfully submitted,

                                                       Kobie A. Flowers (Bar No. 16511)
                                                       kflowers@browngold.com
                                                       Eve L. Hill (Bar No. 19938)
                                                       ehill@browngold.com
                                                       Brown, Goldstein & Levy, LLP
                                                       120 E. Baltimore Street, Suite 2500
                                                       Baltimore, Maryland 21201
                                                       Tel: (410) 962-1030
                                                       Fax: (410) 385-0869

                                                       *Attorneys for Plaintiffs*

26