UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

THE ESTATE OF RYAN LEROUX, *et al.* \*

  *Plaintiffs* \*

    v. \*  Case No. 8:22-cv-00856-AAQ

MONTGOMERY COUNTY, \*
MARYLAND, *et al.*
    \*
  *Defendants*
    \*

**MEMORANDUM OPINION**

This case concerns the death of Ryan Nicholas LeRoux after he was shot twenty-three times by Montgomery County Police Department ("MCPD") officials. Plaintiffs, his surviving family members, allege violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794(a), as well as state common law torts alleging negligence, gross negligence, and wrongful death. Before the Court is a Motion to Dismiss filed by Defendants Montgomery County, Maryland (the "County"), Police Officers John Austin Cerny, Brooks Michael Inman, Sarah Vaughn, and Cpl. Romand Schmuck (collectively "Officer Defendants"). ECF No. 33. Although Defendants raise several points, Defendants' arguments are largely premised on: 1) recasting the facts in the light most favorable to the Defendants, *contra* to the applicable standard; 2) characterizing an event that allegedly unfolded over the course of approximately two hours as an immediate occurrence; and 3) ignoring several allegations regarding Mr. LeRoux's apparent mental disabilities. Accordingly, for the reasons discussed below, Defendants' Motion to Dismiss will be granted, in part, and denied, in part.

**BACKGROUND**

1

I.        **Mr. LeRoux's Mental Health History Prior to the Shooting.**

Ryan Nicholas LeRoux had a long history of mental illness and psychiatric treatment.[1]  He was diagnosed with depression and Attention Deficit Hyperactivity Disorder ("ADHD") at the age of 8.  ECF No. 25, at ¶ 37.  He had undergone inpatient psychiatric treatment multiple times, including being involuntarily committed to Northwest Hospital after state police found him walking by the side of the road, wearing no clothes and claiming that individuals were chasing him.  *Id.* at ¶¶ 37, 39.  During his inpatient treatment, he continued to exhibit psychosis and paranoid behaviors, including suspicions regarding his healthcare providers, fears that his mother and father were imposters and not his real parents, and reports that someone was following and placing tracking devices on him.  *Id.* at ¶ 40.  While committed, Mr. LeRoux was prescribed antipsychotic medication, *id.* at ¶ 41, which he continued to utilize even after his release.  At the time of his death, Mr. LeRoux had a prescription for Risperidone, an antipsychotic medication – a bottle of which was found when officers inventoried the contents of his car.  *Id.* at ¶¶ 26, 38.

Just four days before Mr. LeRoux was killed, he had an encounter with the Montgomery County Police Department.  Staff from a Holiday Inn called MCPD and requested that they remove Mr. LeRoux from a hotel room which he refused to leave after the time set for check-out.  *Id.* at ¶ 43.  Four MCPD officers found him lying in bed underneath the sheets and, when he did not respond to orders to leave, threatened him with trespassing.  *Id.* at ¶ 44.  Mr. LeRoux remained unresponsive during the encounter, but did not resist when the four officers grabbed him and handcuffed his arms behind his back.  *Id.* at ¶ 45.  He merely asked that they loosen the cuffs on his wrists.  *Id.*

---

[1] Because the case is currently before the Court on Defendants' Motion to Dismiss, I accept all well-pled allegations as true for the purpose of deciding this Motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.     Montgomery County's Available Policies and Resources for Mental Health Crises in the Field.

Unfortunately, Mr. LeRoux's situation was not unique.  According to the National Institute of Mental Health, nearly one in five Americans live with a mental illness, affecting almost 53 million Americans altogether.  National Institute of Mental Health, *Mental Illness* (Jan. 2022), https://www.nimh.nih.gov/health/statistics/mental-illness.   A number of state and local governments have responded by creating services for and policies related to the treatment of individuals suffering from mental illness.  *See e.g.* Maryland Department of Health, *Behavioral Health* (May 18, 2022), https://msa.maryland.gov/msa/mdmanual/16dhmh/mha/html/mhaf.html.

 MCPD has a number of policies and resources available to support individuals suffering from mental health crises.  MCPD's Field Services Bureau operates the MCPD Crisis Intervention Team ("CIT"), which coordinates CIT training for officers and responds to mental health situations in the field.  ECF No. 25, at ¶ 50.  CIT training involves a forty-hour course that covers topics including trauma-informed policing, de-escalation strategies, psychiatric disorders, and intellectual and developmental disabilities.  *Id.* at ¶ 48.  Although CIT training is mandatory for new MCPD recruits, only 66% of officers have completed it and, for those who have completed it once, there is no requirement that they repeat or refresh their training.  *Id.* at ¶¶ 48-49.  The CIT is made up of two officers and one clinician from the Montgomery County Department of Health and Human Services ("DHHS").  *Id.* at ¶ 50.

Additionally, DHHS operates the Montgomery County Crisis Center, which provides crisis services both in-person and by phone twenty-four hours a day, seven days a week.  *Id.* at ¶ 51.  The Montgomery County Crisis Center manages the Mobile Crisis Team ("MCT"), which responds to psychiatric emergencies when they occur, facilitates hospital psychiatric evaluations, and provides crisis evaluation, crisis stabilization, and recommendations for treatment and resources.  *Id.* at ¶¶

52-53.  The MCT is a two-person team composed of a licensed mental health professional and a second Crisis Center staff member.  *Id.* at ¶ 52.

When an individual calls "911" in Montgomery County, the first point of contact is the Emergency Communications Center ("ECC"), which MCPD operates.  *Id.* at ¶ 55.  While ECC dispatchers have participated in the CIT training program in the past, they currently do not receive such training.  *Id.* at ¶¶ 56, 101.  ECC dispatchers have a variety of resources with which to respond to a 911 call, including patrol officers, officers with CIT training, the MCPD Crisis Intervention Team, or the DHHS MCT accompanied by MCPD officers; officers may also request specialized services while on the scene.  *Id.* at ¶¶ 57-58, 98.

According to Plaintiffs, the services are in great demand.  Approximately one in five calls to MCPD are for mental health distress.  *Id.* at ¶ 108.  However, the ECC does not have a policy for handling calls that may require mental health care.  *Id.* at ¶ 100.

Compounding matters, Plaintiffs allege that MCPD regularly uses excessive and deadly force when encountering individuals experiencing mental health and emotional crises.  *Id.* at ¶ 89.  In 2018, an MCPD officer shot and killed Robert White, who suffered from ADHD, allegedly because he reached into his pocket while walking down the street.  *Id.* at ¶ 91.  On May 7, 2020, MCPD responded to a 911 call stating that a man had thrown a rock through his neighbor's window; an officer arrived, saw the individual acting erratically, and allegedly shot him two minutes after arriving.  *Id.* at ¶ 90.

According to Plaintiffs, these situations were not aberrations.  In 2019, 30% of MCPD encounters that involved force involved individuals suspected of having mental illness.  *Id.* at ¶ 94.  In 2021, 48% of those subject to use of force by MCPD were suffering from a mental illness at the time of the encounter.  *Id.* at ¶ 94.  A 2021 review of MCPD by the Montgomery County

Council's Office of Legislative Oversight suggested that suspected mental illness was a key risk factor for triggering use of force from officers. *Id.* at ¶ 92. Another review of MCPD conducted by Effective Law Enforcement for All[2] in 2021 found "MCPD's policies and practices regarding responding to calls involving mental and behavioral health crises are outdated and insufficient to address the need." *Id.* at ¶ 93.

### III.     The Shooting: July 16, 2021

At 9:12 p.m. on July 16, 2021, two workers at a McDonald's in Montgomery County called MCPD to report a young man parked in the drive-thru lane of the restaurant. *Id.* at ¶ 3. The McDonald's employees described him as "acting like crazy" because he would not move out of the drive-thru lane, had on headphones, and had not paid for his food. *Id.* at ¶ 3. The employees, however, were clear that no one was "in danger." *Id.* Rather than calling for a MCT or a MCPD CIT member, the dispatcher routed the call to an armed patrol officer without any crisis intervention training. *Id.* at ¶¶ 62-63.

At 10:28 p.m., more than an hour after the 911 call, MCPD Officer Brooks Inman arrived at the McDonald's, where he saw Mr. LeRoux reclined in the driver's seat of his car and on his phone. *Id.* at ¶ 6. Officer Inman also saw a gun laying on the passenger's seat. *Id.* at ¶ 7. Officer Inman drew his own weapon, aiming it at Mr. LeRoux and told Mr. LeRoux to put his hands up. *Id.* Mr. LeRoux responded by looking at Officer Inman and then returning his gaze to his phone. *Id.* at ¶¶ 8-9. He did not pick up the firearm. *Id.* at ¶ 10. Officer Inman then yelled at Mr. LeRoux for approximately three minutes, telling him to "keep [his] fucking hands up!" *Id.* While Officer

---

[2] Effective Law Enforcement for All is a Maryland-based non-profit organization that was "formed to help police, civic, and community leaders partner to reinvent law enforcement in their communities to achieve policing that is effective, respectful, restrained and, above all, safe for the public and the police." Effective Law Enforcement for All, *About Us*, https://ele4a.org/about-us/.

Inman updated other MCPD officers thereafter, he did not request any assistance from a crisis negotiator or a mental health professional.  *Id.* at ¶¶ 11, 13.

By 10:38 p.m., almost ninety minutes after the initial 911 call, three additional MCPD officers had arrived: Officer Sara Vaughan, Officer John Cerny, and Officer Romand "Brian" Schmuck.  *Id.* at ¶¶ 14-16.  All three drew their weapons and aimed them at Mr. LeRoux's car, which they had surrounded.  *Id.*  At 10:49 p.m., more than twenty minutes after MCPD arrived and more than ninety minutes after the initial phone call to ECC, Captain Brian Dillman radioed to MCPD Dispatch and requested that they have one or two crisis negotiators respond to the McDonald's; at 10:53 p.m., Dispatch replied that a crisis negotiator was on the way.  *Id.* at ¶¶ 17-18.  MCPD did not alert Montgomery County's MCT or Emergency Medical Services.  *Id.* at ¶¶ 20-21.

By 11:02 p.m., seventeen officers had arrived at the scene, though none were crisis negotiators or part of a CIT.  *Id.* at ¶ 19.  The officers surrounded Mr. LeRoux's car and placed "stop sticks" under his tires, which involved walking in front of and behind the vehicle.  *Id.* at ¶¶ 22, 71, 75.  At some point, the officers ran the license plates on Mr. LeRoux's car to obtain his identity and cell phone number.  *Id.* at ¶ 76.  They also began to formulate a plan to remove Mr. LeRoux from the car, which involved breaking the front passenger window, removing the gun from the passenger seat, and pulling him through the open, broken window.  *Id.* at ¶ 80.  While the officers were surrounding the car, they speculated as to Mr. LeRoux's mental state.   MCPD Officer Anna Owen "chuckled" that the situation was "a suicide by cop kind of thing" and noted that he was "not aggressive at all" towards the McDonald's employees.  *Id.* at ¶ 73.  MCPD Officer Chad Eastman commented that Mr. LeRoux was "gonna end up offing himself."  *Id.* at ¶ 23.

At 11:02 p.m., Mr. LeRoux sat up from the reclining position in the driver's seat. *Id.* at ¶ 81. Officers Cerny and Vaughan radioed that they saw Mr. LeRoux raise out of his seat with a gun in his hand. *Id.* at ¶ 24. At that point, four of the seventeen officers present shot Mr. LeRoux twenty-three times, killing him. *Id.* It is unclear whether Mr. LeRoux was actually holding the gun when the Officer Defendants shot him. *Id.* at ¶ 82. According to Plaintiffs, while bodycam footage of the incident "possibly depicts him raising his right arm," Mr. LeRoux was left-handed. *Id.* at ¶ 83.

Within two weeks of the shooting, the Montgomery County Executive announced a partnership with Effective Law Enforcement for All to help respond to incidents of force involving MCPD. *Id.* at ¶ 106. The organization produced a report sharing preliminary recommendations for improving policies related to use of force, *id.* at ¶ 93, and is currently reviewing the shooting of Mr. LeRoux and other similar incidents to "provide additional recommendations for . . . trainings needed to avoid similar situations." *Id* at ¶ 106.

## IV.   Procedural Background

Paul and Rhonda LeRoux, Mr. LeRoux's parents, as well as the estate of Mr. LeRoux, filed their initial Complaint on April 8, 2022. ECF No. 1. Defendants filed their first Motion to Dismiss on May 27, 2022. ECF No. 19. Before the Court could rule on that Motion, Plaintiffs filed an Amended Complaint on July 8, 2022. ECF No. 25. The Amended Complaint included eleven counts, alleging that: 1) Montgomery County's failure to dispatch mental health services violated Title II of the ADA, *id.* at ¶¶ 110-24; 2) Montgomery County's failure to implement de-escalation or crisis intervention techniques violated Title II of the ADA, *id.* at ¶¶ 125-38; 3) Montgomery County's differential treatment of Mr. LeRoux based on his disability violated Title II of the ADA, *id.* at ¶¶ 139-50; 4) Montgomery County's failure to provide Mr. LeRoux effective communication

violated Title II of the ADA, *id.* at ¶¶ 151-61; 5) Montgomery County's failure to dispatch mental health services to respond to Mr. LeRoux violated Section 504 of the Rehabilitation Act, *id.* at ¶¶ 162-75; 6) Montgomery County's failure to implement de-escalation or crisis intervention techniques violated Section 504 of the Rehabilitation Act, *id.* at ¶¶ 176-88; 7) Montgomery County's differential treatment of Mr. LeRoux based on his disability violated Section 504 of the Rehabilitation Act, *id.* at ¶¶ 189-98; 8) Montgomery County's failure to provide Mr. LeRoux effective communication violated Section 504 of the Rehabilitation Act, *id.* at ¶¶ 199-208; 9) Montgomery County's and the Officers' negligence caused the death of Mr. LeRoux, *id.* at ¶¶ 209-15; 10) Montgomery County's and the Officers' gross negligence caused the death of Mr. LeRoux, *id.* at ¶¶ 216-221; and 11) Montgomery County and the Officers caused the wrongful death of Mr. LeRoux, *id.* at ¶¶ 222-26.

Defendants filed a Motion to Dismiss the Amended Complaint on August 19, 2022. ECF No. 33. On the same day, Defendants also filed a Motion for Leave to File Physical Exhibits, ECF No. 34, which the Court granted without ruling on whether consideration of such materials was proper at the motion to dismiss stage. ECF No. 35. Plaintiffs filed a Response in Opposition to the Motion to Dismiss the Amended Complaint on September 30, 2022. ECF No. 38. Defendants filed a Reply on November 4, 2022. ECF No. 47. Additionally, the United States filed a Statement of Interest in support of the Plaintiffs' Opposition on October 4, 2022. ECF No. 43, 44.

## LEGAL STANDARD

Fed. R. Civ. P. 12(b)(6) provides that a party may move to dismiss where there is "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56

(2007).  For the purposes of a motion to dismiss, the Court should accept as true the well-pled allegations of the complaint.  *Byrd v. Gate Petroleum Co.*, 845 F.2d 86, 87 (4th Cir. 1988).  The plaintiff need not plead facts that are probable, but must present facts showcasing more than a "sheer possibility" that the conduct perpetuated by a defendant is unlawful.  *Ashcroft*, 556 U.S. at 678.

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court may not consider extrinsic evidence unless the motion to dismiss is converted into one for summary judgment. Fed. R. Civ. P. 12(d).  The court should not make such a conversion where the parties are not given notice and are not afforded the opportunity to conduct reasonable discovery.  *Carter v. Baltimore Cty., Maryland*, 39 Fed.Appx. 930, 932-33 (4th Cir. 2002).  However, extrinsic evidence may be considered where the documents attached to a motion to dismiss are integral to the complaint.  *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

## DISCUSSION

Defendants have challenged each of the eleven counts on multiple grounds, arguing that Plaintiffs have failed to plausibly state a cause of action due to numerous alleged deficiencies in their Amended Complaint.  These challenges can be grouped into two main categories: those addressing claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act and those relating to the state law tort claims.

First, Defendants claim that Plaintiffs failed to meet the criteria for a claim under the ADA or Rehabilitation Act because allegedly: (1) they failed to plead that Mr. LeRoux was a qualified individual with a disability and related limitations, ECF No. 33-1, at 10; (2) they failed to plead that the County was aware of a known disability evincing a clear need for accommodation, *id.* at 12-13; (3) they failed to identify a reasonable accommodation that Mr. LeRoux was entitled to and

then denied, *id.* at 24; (4) the ADA does not support a failure-to-train claim and, even if it does, Plaintiffs failed to plead deliberate indifference as required, *id.* at 35; and (5) they failed to establish that discrimination was the proximate cause of Mr. LeRoux's death, *id.* at 39.

Second, Defendants argue that Plaintiffs' state law tort claims fail because the Officer Defendants are protected by public official immunity and the County is protected by governmental immunity. *Id.* at 40-44. In the alternative, Defendants claim that Plaintiffs have failed to sufficiently plead their negligence, gross negligence, and wrongful death claims. *Id.* at 44-45. Finally, Defendants briefly argue that Plaintiffs' claims for punitive damages should be dismissed because they fail establish actual malice. *Id.* at 45.

## I.    Consideration of Extrinsic Materials

Defendants argue that the Court should consider the 911 call, ECC radio traffic and body worn camera footage from the night of Mr. LeRoux's death when ruling on their Motion to Dismiss because the materials are "integral to and relied upon by Plaintiffs' Amended Complaint." ECF 33-1, at 10 (citing *Thompson v. Badgujar*, No. 20-cv-1272-PWG, 2021 WL 3472130, at *7, *10 (D. Md. Aug. 6, 2021)). Specifically, Defendants have filed seven electronic files along with their Motion to Dismiss. ECF Nos. 33-3-9. The recordings purport to depict the incidents described in the Complaint. *Id.* In particular, Defendants seek to challenge Plaintiffs' assertion that the body-worn camera ("BWC") footage is inconclusive as to whether Mr. LeRoux pointed a gun at police when they shot him. *See* ECF No. 33-1, at 6.

When reviewing a motion to dismiss, "[t]he court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Thompson*, 2021 WL 3472130, at *4. Here, the video depicting the shooting is incorporated into the Complaint. ECF No. 25, at ex. 2-5. Plaintiffs

admit that they relied on the materials Defendants present in drafting their Complaint, but note that they also considered other information, as well.  ECF No. 38, at 4-5.

Defendants rely on *Thompson* to support the proposition that disputes between the complaint and extrinsic evidence at the motion to dismiss stage should be resolved in favor of the latter.  ECF No. 33-1, at 10.  In *Thompson*, this Court dismissed without prejudice a number of claims linked to a deadly shooting involving a man with multiple mental illnesses.  2021 WL 3472130, at *1.  Defendants in that case filed a motion to dismiss and relied in part on footage of the incident taken from the defendant officer's body camera.  *Id*. at *3.  The Court in *Thompson* emphasized contradictions between the plaintiff's complaint and the video.  *Id*.  Notably, the complaint alleged that "at no point during the encounter did [the deceased] provoke the officer or pose a risk of serious injury to anyone" while the video revealed that "[the deceased took] an athletic or fighting stance . . . and [began] charging toward Officer Badgujar, his hands chest-high and elbows bent, yelling 'Do it!' repeatedly."  *Id*. at *2-*3.  In reviewing these materials, this Court determined that where what is plain from the video "flatly contradicts" assertions in the complaint, disputes are resolved in favor of the video.  *Id*. at *3.

This case is unlike *Thompson* in that there is no similarly obvious contradiction between Plaintiffs' assertions in the Amended Complaint and the external materials as to whether Mr. LeRoux raised a weapon.  The external materials, like Plaintiffs' Complaint, are inconclusive on the matter.  Likewise, the materials submitted by Defendants do not contradict any other elements of the Complaint material to the present decision.[3]  Further, the video confirms that at no point

---

[3] Defendants emphasize two additional differences between the Amended Complaint and the electronic materials, namely that Mr. LeRoux failed to raise his hands in response to the officers' commands, and that the requesting officer did not ask for the crisis negotiator explicitly because of Mr. LeRoux's mental state.  ECF No. 33-1, at 5; ECF No. 47, at 4 n. 2.  For the purposes of this

before 11:02 p.m. did Mr. LeRoux take any action other than passively reclining in his car and staring at his phone.  Since there is no direct contradiction as to whether Mr. LeRoux posed an immediate threat to the officers present, unlike *Thompson*, there is no need to resolve a dispute in favor of the external materials.  For the purpose of this Motion, this Court will accept the facts as asserted in Plaintiffs' Amended Complaint.  *See Smith v. City of Greensboro*, No. 19CV386, 2020 WL 1452114, at *4 (M.D.N.C. Mar. 25, 2020) (exercising its power to "simply ignore the material at this time" where defendants "seek to employ the video to challenge Plaintiffs' characterization of the facts and demonstrate that the Officers' behavior was reasonable") (internal citations omitted).

The role of the motion to dismiss is to test the sufficiency of the complaint: it is not to assess the merits of the case or its evidence.  Defendants' exhibits have been considered and do not meet the level of clarity needed to rebut the facts, as alleged by Plaintiffs, that are material to the present decision.

## II.    Claims under the ADA and Rehabilitation Act

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132.  Title II applies to police activities and investigations.  *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 337-39 (4th Cir. 2012) (holding that officers and other employees of law enforcement agencies "must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis

---

Motion, the Court will accept that Mr. LeRoux neither raised his hands; nor did the requesting officer make any such motivation explicit.

of disability. . .") (quoting 28 C.F.R. § 35.130(b)(7)).   Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).  The ADA applies to police departments and their investigation of criminal conduct.  *Seremeth*, 673 F.3d at 338-39.  "Title II of the ADA and § 504 of the Rehabilitation Act are closely related, and to 'the extent possible, [courts] construe similar provisions in the two statutes consistently.'" *Paulone v. City of Frederick*, 787 F.Supp.2d 360, 369 (D. Md. 2011) (quoting *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002)).

### A. Plaintiffs Have Adequately Pled that Mr. LeRoux Was a Qualified Individual with a Disability Who Had Limitations Related to that Disability.

Defendants challenge Counts I-VIII by arguing both that Plaintiffs have failed to plead that Mr. LeRoux was a qualified individual with a disability and that Mr. LeRoux had limitations resulting from that disability.  ECF No. 33-1, at 10, 22.

Under Title II, a "qualified individual with a disability" is defined as one "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  Both the ADA and the Rehabilitation Act "share the same definitions of disability."  *Rogers v. Dept. of Health & Environmental Control*, 174 F.3d 431, 433 (4th Cir. 1999).  The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  "Major life activities include, but are not limited to . . . communicating [and] interacting with others."  28 C.F.R. § 35.108(c)(1)(i).  "An impairment does not need to

prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 28 C.F.R. § 35.108(d)(1)(v). Major depressive disorder and schizophrenia are impairments that "substantially limit[] brain function," 28 C.F.R. § 35.108(d)(2)(iii)(K), and will "virtually always" be found to impose a substantial limitation on major life activity. *Id.*, § 35.108(d)(2)(ii); *see also Shields v. Prince George's Cnty., Md.*, No. GJH-15-1736, 2019 WL 3536800, at *12 (D. Md. Aug. 2, 2019) ("Mr. Shields suffered from schizophrenia, which qualifies as a disability."); *Thompson v. Wakefern Food Corp.*, No. RDB-15-1240, 2015 WL 9311972, at *6 (D. Md. Dec. 23, 2015) ("Plaintiff clearly alleges that he suffers from several mental conditions – schizophrenia, bipolar disorder, and a 'psychotic disorder' – each of which could 'substantially limit' major life activities."). The ADA "requires police departments to make reasonable accommodations for disabled suspects." *Felix v. City of New York*, No. 16-cv-5845 (AJN), 2020 WL 6048153, at *4 (S.D.N.Y. Oct. 13, 2020).

When assessing claims filed under the ADA, the "definition of 'disability' shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(a)(2)(i); *see also J.D. by Doherty v. Colonial Williamsburg Found.,* 925 F.3d 663, 670 (4th Cir. 2019) (holding that the ADA's disability definition must be read "'broadly in favor of expansive coverage,' keeping in mind that the language 'is not meant to be a demanding standard.'") (internal citations omitted). This approach is "consistent with the purpose of the ADA Amendments Act of 2008 . . . which was passed to 'reinstat[e] a broad scope of protection to be available under the ADA.'" *J.D. by Doherty*, 925 F.3d at 670 (internal citations omitted). "The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA." 28 C.F.R. § 35.101(b).

In order to allege that Mr. LeRoux had a disability, Plaintiffs must plead that he had a physical or mental impairment that substantially limited at least one major life activity. Here, Plaintiffs have pled that Mr. LeRoux suffered from schizophrenia, ECF No. 25 at ¶ 111, and had been diagnosed with depression and ADHD at the age of eight. *Id*. at ¶ 37. The ADA implementing regulations speak clearly on this subject, writing that schizophrenia and depression are both impairments that cause a substantial limitation in brain function. 28 C.F.R. § 35.108 (d)(2)(iii)(K). Generally, courts have found that plaintiffs who suffer from schizophrenia have a disability for the purpose of the ADA because of the cognitive limitations that result from the condition. *See Shields*, 2019 WL 3536800, at *12 ("Mr. Shields suffered from schizophrenia, which qualifies as a disability."); *Thompson v. Wakefern Food Corp.*, No. RDB-15-1240, 2015 WL 9311972, at *6 (D. Md. Dec. 23, 2015) ("Plaintiff clearly alleges that he suffers from several mental conditions—schizophrenia, bipolar disorder, and a 'psychotic disorder'—each of which could 'substantially limit' major life activities."); *see also Harvard v. Inch*, 411 F.Supp.3d 1220, 1241 (N.D. Fla. 2019) (finding that multiple plaintiffs demonstrated limitations in brain function by pleading diagnoses of disorders including paranoid schizophrenia, major depressive disorder, bipolar disorder); *Gough v. McCain*, No. 1:190CV091183, 2022 WL 669866, at *16 (W.D. La. Feb. 3, 2022) (finding that, since the implementing regulations declared that schizophrenia is a disability under the ADA due to its limitation of brain function, Gough's ADA claims were timely); *Snider v. Alvarez*, No. 18-801, 2020 WL 6395499, at *27 (M.D. Penn. Nov. 2, 2020) (accepting as true allegations that Snider was disabled on the basis of his schizophrenia and bipolar disorder diagnoses); *Felix*, 2020 WL 6048153, at *4 (finding that the ADA and the Rehabilitation Act apply to individuals with disabilities like schizophrenia because the "ADA's implementing regulations explicitly acknowledge schizophrenia as a disability covered by the ADA").

15

Additionally, Plaintiffs have pled that Mr. LeRoux was hospitalized multiple times for psychiatric and inpatient treatment, exhibited bizarre behaviors including suspicions that his parents were imposters and that his clothes contained tracking devices, and had been found non-responsive during a prior encounter with MCPD.  ECF No. 25, at 10-11.

Plaintiffs have also pled that, on the night in question, Mr. LeRoux exhibited behavior consistent with someone mentally impaired, which in turn impaired his ability to communicate with the officers: he remained parked in the drive-through of a McDonald's without paying for his food, didn't respond to orders from the Officer Defendants, kept his headphones on and looked at his phone while officers yelled at him through megaphones, placed stop sticks around his car, and surrounded him with guns drawn.  *Id.* at 3-7; *see also id.* at ¶ 158 ("Ryan did not have an opportunity to communicate effectively with the responding officers.").  For the purpose of a motion to dismiss, Plaintiffs have sufficiently alleged that Mr. LeRoux was substantially limited in his ability to communicate and interact with others on the night of his death as a result of a disability.

The cases Defendants cite emphasize that the mere assertion of a learning disability may not be enough to demonstrate a substantial limitation on a major life activity.  *See Johnson v. Sedgwick Cnty. Sheriff's Dep't*, 461 Fed.Appx. 756, 758 (10th Cir. 2012); *Lipscomb v. Techs., Serv., & Info.*, No. DKC-09-3344, 2011 WL 691605, at *13 (D. Md. Feb. 18, 2011).  While Mr. LeRoux was diagnosed with learning disabilities, he was also diagnosed with depression and schizophrenia.  As discussed above, schizophrenia or depression alone are both sufficient to establish the presence of a disability under the implementing guidelines.  Further, as noted above, Plaintiffs have not rested on these diagnoses alone, but have alleged facts speaking to the impact of these conditions on his ability to communicate on the night of his death.

### B.  Plaintiffs Have Sufficiently Pled that Mr. LeRoux's Disability Was Obvious or Apparent.

Defendants also claim that Plaintiffs have failed to plead adequately that the County had knowledge of Mr. LeRoux's disability.  ECF No. 33-1, at 13.  Under Title II of the ADA, a public entity must make reasonable modifications when the entity has knowledge of a person's disability and related limitations.  *Seremeth*, 673 F.3d at 336.  A plaintiff can establish that a defendant had such knowledge by showing that the individual with a disability or a third party explicitly asked for modification, though a specific request is not required.  *See Estate of Robert Ethan Saylor v. Regal Cinemas, Inc.*, No. WMN-13-3089, 2016 WL 4721254, at *16 (D. Md. Sept. 9, 2016).  A plaintiff can also demonstrate knowledge by showing that a need for a reasonable modification was obvious or apparent.  *See Jarboe v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. ELH-12-572, 2013 WL 1010357, at *19 (D. Md. Mar. 13, 2013); s*ee also Smith v. City of Greensboro*, 2020 WL 1452114, at *13.   A conclusion that a disability was obvious or apparent can be established where officers observed behaviors suggesting an individual was suffering from a mental illness or received information from third parties suggesting the presence of a mental illness.  *See Brizuela v. City of Sparks*, No. 3:19-cv-00692-MMD-VPC, 2022 WL 3229389, at *33 (D. Nev. Aug. 10, 2022).

In *Shields v. Prince George's County*, this Court denied a defendant's motion for summary judgment, in part, because the plaintiff "introduced some evidence that county employees knew Mr. Shields suffered from a mental illness."  2019 WL 3536800, at *12-13.  The Court specifically noted "his inability to answer basic questions or follow commands" and his exhibition of other behaviors that "made it apparent that he was suffering from a mental illness."  *Id*. at *13.  The defendants, who were correctional officers, were quoted saying that Mr. Shields was "talking just real loud, yelling and stuff" and that he "kept singing," rather than answering questions about his

medical history.  *Id*.  Based on this, defendants said they "'knew something was wrong' with Mr. Shields mentally or emotionally, but 'didn't know what it was.'"  *Id*. (internal citations omitted). Nonetheless, the Court found this was sufficient for plaintiff's ADA claim to advance to trial.  *Id.*; *see also Smith*, 2020 WL 1452114, at *13 (finding that it was "at least plausible that the Officers recognized Smith as . . . disabled, even if the precise nature of his disability was uncertain" because of his strange behavior, including pacing back and forth, running in circles, and banging his head against the windows of a squad car).

Prior encounters with the police "predicated on the same individual's suspected mental illness" can also be enough to imply knowledge, even if they involved separate officers in the same department.  *Brizuela*, 2022 WL 3229389, at *32.  In *Brizuela*, defendant officers shot and killed Rolando Brizuela in the enclosed patio of his home.  *Id.* at *1.  Eight months prior to the fatal encounter, the police department responded to a report that Mr. Brizuela, while armed, was seeing monsters.  *Id.* at *32.  On the day of the shooting, an officer observed that Mr. Brizuela was behaving erratically, *id.* at 33, and spoke to neighbors who suggested that Mr. Brizuela had been "'having some problems,' including . . . talking about 'killing people,' . . . 'talking to himself,' and . . . hearing voices.'"  *Id.* at *4 (internal citations omitted).  The officers returned to Mr. Brizuela's home where Mr. Brizuela raised a gun towards them and, in response, the officers opened fire, shooting Mr. Brizuela eleven times.  *Id.* at *7-8.  His widow sued on multiple grounds, including discrimination on the basis of disability under the ADA.  *Id*. at *10.  The court found that she had shown enough for a rational factfinder to conclude that the defendants had knowledge of Mr. Brizuela's mental health challenges, emphasizing the department's prior encounter with the decedent.  *Id.* at *32-33.  As the Court stated, "liability under Title II of the ADA would be nearly impossible if a police department does not have the requisite knowledge that an individual has a

18

mental illness even after that same department responded to an incident expressly predicated on the same individual's suspected mental illness." *Id.* at \*32.

Using *Shields* and *Brizuela* as models, Plaintiffs have alleged enough at this stage to support the conclusion that Mr. LeRoux's disabilities were apparent to the County.  Mr. LeRoux exhibited highly unusual behaviors over the course of his encounter with MCPD, such as parking in the drive-thru of the McDonald's for almost two hours and not responding in any way to repeated instructions from law enforcement for over thirty minutes as they pointed guns at him and placed stop sticks around his car.  ECF No. 25, at ¶¶ 68-72.  Additionally, the County received third-party notice from a worker at the restaurant that Mr. LeRoux was "acting crazy." *Id.* at ¶ 3. At the time of Mr. LeRoux's shooting, officers present made comments suggesting they knew that they may be interacting with an individual with a mental health disorder, speculating that this was a "suicide by cop kind of thing" and that he was "gonna end up offing himself." *Id.* at ¶¶ 73-74. Another officer, in response to Mr. LeRoux's conduct called a crisis negotiator, further suggesting that Mr. LeRoux's need for specialized assistance was apparent. *Id.* at ¶ 17.  Finally, Plaintiffs also assert that once the officers ran Mr. LeRoux's license plate to confirm his identity, the County should have known about Mr. LeRoux's mental health challenges based on a prior encounter just four days before the shooting in which MCPD officers found him lying in bed in a similarly unresponsive condition as they found him in his car. *Id.* at ¶¶ 43-45.  Together,[4] these facts are sufficient to allege that the Mr. LeRoux's disabilities were apparent to the County.

---

[4] Defendants' argument is also based on viewing each of these facts in isolation and then challenging the import of the facts individually. *See e.g.* ECF No. 33-1, at 19-21.  Defendants' attempt to parse Plaintiffs' Amended Complaint, as such, ignores the relevant question, which asks whether the facts, viewed together, sufficiently allege that the County knew or should have known of Mr. LeRoux's disability. *See Shields*, 2019 WL 3536800, at \*12-13 (viewing together the impact of the plaintiff's actions and words in determining whether defendants had knowledge of his disability).

Much of Defendants' argument is based on re-casting each of Plaintiffs' claims in the narrowest light possible – contrary to the applicable standard at this stage of the case.  Namely, Defendants attempt to separate the knowledge of the dispatcher from the knowledge of the officers on site even though all of Plaintiffs' ADA and Rehabilitation Act claims are against the County, as a whole.  For example, in Counts I and V, Plaintiffs allege that the County failed to dispatch mental health services to respond to the situation.  Plaintiffs incorporate by reference their previous allegations in the 109 paragraphs of factual allegations that preceded it.  *Id.* at ¶ 110.  Defendants characterize the claim as being limited to the actions of the ECC upon receiving the initial call from the McDonald's.  ECF No. 33-1, at 16.  However, as Plaintiffs allege, the failure to dispatch extended to the County's failure to call for such services once the Officer Defendants arrived and gathered additional information regarding Mr. LeRoux's condition.  ECF No. 25, at ¶ 96 ("Interaction with the police on the fateful night of July 16 could have been completely avoided if anyone in the ECC or among the dispatched officers had acted appropriately on their knowledge that Ryan was having a mental health crisis and called mental health professionals instead of solely armed police officers."); *id.* at ¶ 119 ("*At the very least*, the dispatcher should have ensured a response by CIT-trained officers.) (emphasis added); ECF No. 38, at 14 ("In addition to the information the ECC dispatcher had and had access to, the responding officers had a second opportunity to run Ryan's license plate number, from which they received his name and telephone number, among other information.").  Likewise, in Counts IV and VIII, Plaintiffs argue that the County failed to provide Mr. LeRoux effective communication.  In response, Defendants argue that the Court should only consider the knowledge of the officers when assessing the County's knowledge.  ECF No. 33-1, at 18-21.  However, drawing all inferences in favor of Plaintiffs, Plaintiffs' claims under these counts extend beyond just the actions taken by the officers, but

extend to the County's actions in failing to dispatch mental health services with, or in lieu of, police officials in response to the initial call.

Defendants rely on three cases to support their contention that Plaintiffs have failed to plead actual or constructive knowledge: ECF No. 33-1, at 13-16 (citing *Thompson*, 2021 WL 3472130; *Smith*, 2020 WL 1452114; *Talley v. City of Charlotte*, No. 3:14-cv-00683-MOC-DCK, 2016 WL 8679235 (W.D.N.C. Jul. 22, 2016)).  These three cases are distinguishable.

In *Smith*, the plaintiffs' claim did not fail because they failed to sufficiently allege that defendants had knowledge of the decedent's disability.  Rather, the court found that even though, in the Complaint "there [we]re no allegations that the Officers were made aware of this specific medical history, either before or during their interactions with Smith" it was enough that the complaint stated, without factual support, that "it was clear to the Officers that Smith was in the throes of a mental health crisis and that they were aware of [Smith's] mental state and vulnerability." 2020 WL 1452114, at *13 (internal quotation marks omitted).  Plaintiffs' pleadings here, as noted above, exceed this standard.[5]

---

[5] The claim in *Smith* failed because the court found that the complaint did not allege specific modifications that would have been required beyond the treatment generally afforded to "any agitated, intoxicated, or distressed person requiring medical attention."  *Smith*, 2020 WL 1452114, at *13; *see also Smith* Complaint, at ¶ 25 (alleging "Defendants believed that Marcus was under the influence of drugs.").  Further, in *Smith*, the court noted that the factual material in the complaint did not allow for the inference that accommodations were obviously needed because it was not until their brief in opposition to the defendants' motion to dismiss that plaintiffs identified any accommodations that should have been provided.  *Smith*, 2020 WL 1452114, at *13.  Unlike in *Smith*, Plaintiffs, in their Complaint, allege that there were numerous possible accommodations that were available and known to the County, including the MCPD's CIT team, the DHHS-operated Montgomery County Crisis Center hotline and Mobile Crisis Team, and CIT training for officers.  Plaintiffs allege that employing such measures would have accommodated Mr. LeRoux's disability by allowing the County to better respond to his lack of communication and, thus, prevented his death.  ECF No. 25, at ¶ 88.

Defendants also rely on *Talley* and *Thompson* to rebut the claim that comments made during the incident suggest awareness of a disability.  As noted, officers present made comments suggesting they knew that they may be interacting with an individual with a mental health disorder. ECF No. 25, at ¶¶ 73-74.  While *Thompson* and *Talley* support the proposition that passing comments alone may not be sufficient to prove a defendant's knowledge of a disability, *Thompson*, 2021 WL 3472130, at *11; *Talley*, 2016 WL 8679235, at *11, they do not dictate the result in this case.  As noted above, Plaintiffs suggest several other facts indicative of the fact that Mr. LeRoux's disabilities were apparent.  Viewed together, these allegations are enough to distinguish *Talley* and *Thompson* and to plausibly support a conclusion that the County had knowledge of Mr. LeRoux's need for an accommodation.

### C.  Plaintiffs Have Sufficiently Pled Claims Under the ADA.

Defendants advance multiple overlapping arguments that Plaintiffs have failed to state a claim under the ADA or the Rehabilitation Act.  First, Defendants argue that Counts III and VII must be dismissed because Plaintiffs have not identified any specific action the County took against Mr. LeRoux because of his disabilities.  ECF 33-1, at 34.  Second, Defendants argue that Plaintiffs have failed to identify a reasonable accommodation that Mr. LeRoux was entitled to and subsequently denied.  *Id.* at 24.  Finally, as part of the second argument, Defendants assert that there was no duty to accommodate Mr. LeRoux under the exigent circumstances he allegedly created.  *Id.* at 30.

"The intent of the [ADA] is to promote equal access and participation in government services unless the provision causes an 'undue burden.'"  *Seremeth*, 673 F.3d at 340.  The Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodation.  *A Helping*

*Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 362 (4th Cir. 2008).  "A public entity must 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'"  *Seremeth*, 673 F.3d at 339 (internal citations omitted).  "A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily in the run of cases' and will not cause 'undue hardship.'"  *National Federation of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (internal citations omitted).   "What constitutes reasonable accommodations during a police investigation . . . is a question of fact and will vary according to the circumstances."  *Seremeth*, 673 F.3d at 340; *see also Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994) (holding that the reasonableness of a particular accommodation is a question of fact); *see also Brown v. Dept. of Public Safety and Correctional Services*, 383 F.Supp.3d 519, 558-59 (D. Md. 2019) (finding that the jury must resolve questions related to whether plaintiffs received the assistance needed "to communicate 'as effectively' as other [incarcerated persons].").   Exigent circumstances are considered as part of the reasonableness of the accommodation, rather than as a separate inquiry.  *Seremeth*, 673 F.3d at 339.  The mere existence of exigent circumstances does not excuse officers from providing reasonable accommodations.  *Id.*

### 1. Plaintiffs Have Sufficiently Pled Multiple Reasonable Accommodations and a Claim for Disability-Based Discrimination.

Plaintiffs have alleged that there were a number of reasonable accommodations that could have been implemented in the hours that led to the shooting that would have allowed Mr. LeRoux to effectively communicate and, in turn, survive the encounter.  For example, in Counts I and V, Plaintiffs claim that Mr. LeRoux would still be alive if reasonable accommodations – such as dispatching the Mobile Crisis Team, the Crisis Intervention Team, or an officer trained in CIT –

had been provided.  ECF No. 25, at ¶¶ 118, 170.  Likewise, in Counts II and VI, Plaintiffs claim

that reasonable de-escalation techniques – including calling mobile crisis services, using crisis

intervention techniques, or waiting for the crisis negotiator before engaging Mr. LeRoux by

surrounding his vehicle, swearing at him, and directing their weapons at him – were similarly

reasonable accommodations.  *Id*. at ¶¶ 133, 183.  Accordingly, Plaintiffs have alleged a number of

possible accommodations that allegedly were available to Defendants.  Further, Plaintiffs allege

that had these modifications been provided, individuals with specialized training "could have

evaluated [Mr. LeRoux], stabilized the mental health crisis, and arranged mental health services."

*Id.* at ¶ 20.

      As a result of the failure to employ these accommodations, Plaintiffs claim that the County

discriminated against Mr. LeRoux by denying him the opportunity to communicate equally and

effectively with police officials, *id.* at ¶¶ 158, 205; *see also* ECF No. 38, at 17-18, and by shooting

and killing him because of his disability, which denied him the benefit of surviving a police

encounter, ECF 25, at ¶¶ 139-50, 189-98.

      Defendants' arguments, in response, seek to impermissibly heighten the pleading standard

at the motion to dismiss stage.  For example, Defendants argue that even if Plaintiffs have

identified accommodations that the County should have provided, Plaintiffs have failed to

specifically explain how the accommodations would have allowed the County to effectively

communicate with Mr. LeRoux.[6]  *See* ECF No. 33-1, at 26 ("The Amended Complaint, however,

---

[6] This theme runs through several of Defendants' arguments.  Later on in Defendants' Motion,
they argue that it is not enough for a plaintiff to allege as part of a failure to train claim that training
is no longer provided, but they must specifically identify when the training ceased, among other
details.  ECF No. 33-1, at 37.  The argument asks for well beyond the "short and plain statement
of the claim showing that the pleader is entitled to relief" the complaint is intended to provide.
*Twombly*, 550 U.S. at 555.

does not cite to any actual modifications that such an individual would or could have made to the police's normal practices . . . ).  Defendants' argument is contrary to the precedent applicable at the motion to dismiss stage.  "Plaintiffs' prima facie burden [to identify a reasonable accommodation] is not a heavy one." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (internal quotations and citations omitted).  "[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits, and that [o]nce the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of non-persuasion falls on the defendant." *Id.* (internal quotations and citations omitted).

Defendants' argument is further undercut by the fact that at the same time, they call on the Court, without support, to accept that the measures the County did apply – the use of a megaphone, the development of a plan to remove Mr. LeRoux through the windshield of his vehicle, and calling Mr. LeRoux on his telephone – were, in fact, reasonable accommodations.  ECF No. 33-1, at 26-27.  The argument is contradictory, as it calls on the Court to at once reject the measures that Plaintiffs allege should have been applied, while accepting that Defendants' proposed accommodations would have allowed an individual with Mr. LeRoux's disabilities to effectively communicate with MCPD.  Ultimately, whether the accommodations Plaintiffs propose would have allowed the County to effectively communicate with Mr. LeRoux, or whether the measures the County employed were sufficient are questions of fact that cannot be resolved upon a motion to dismiss.  At this stage, it is sufficient that Plaintiffs have plausibly alleged measures that on their face would have allowed Mr. LeRoux to effectively communicate with the County.  *Nat'l Fed'n of the Blind, Inc. v. Lamone*, 438 F. Supp. 3d 510, 529-30 (D. Md. 2020) (declining to grant motion to dismiss where proposed modifications sought to "enact a significant change" and came at a

"significant cost" but were still plausible at pleading stage "where all inferences must be drawn in Plaintiffs' favor."). Plaintiffs' allegation that the County could have employed various modifications that would have resulted in individuals who had specialized training in working with individuals suffering from mental disabilities, as opposed to officers who had no such training, interacting with Mr. LeRoux meets this standard.

> ### 2. Plaintiffs Have Sufficiently Pled the Accommodations Could Have Been Provided Under the Alleged Circumstances.

Defendants' argument, regarding the alleged "exigent circumstances", is similarly unavailing at this stage of the case. First, Defendants repeatedly emphasize the danger that Mr. LeRoux posed to the officers by allegedly raising his gun towards them. *See* ECF No. 33-1, at 27 ("Plaintiffs have taken the position that the police should have 'accommodated' Mr. LeRoux by not taking action for their own protection at the moment they reported seeing Mr. LeRoux raise his gun at them"). The argument misconstrues Plaintiffs' Amended Complaint, as well as the relevant query when considering a motion to dismiss. Plaintiffs' Complaint does not concede that Mr. LeRoux raised his weapon, but rather alleges that the evidence is inconclusive on this point. To conclude that Mr. LeRoux did raise his weapon would require the Court to not only disregard the facts alleged in the Complaint, but draw inferences against the non-moving party, contra to the applicable standard. Second, Defendants repeatedly emphasize the exigent circumstances in which the Defendants' encounter with Mr. LeRoux unfolded, emphasizing the split-second decision officers had to make once Mr. LeRoux sat up in his vehicle. *See id.* at 28 ("Plaintiff cannot credibly assert that the officers should have accommodated Mr. LeRoux by standing there waiting for the negotiator while Mr. Leroux pointed his gun at them."). Defendants' argument again misconstrues the facts, as alleged in the Complaint. As Plaintiffs' allege, the County's failure to accommodate was not limited to the instant in which Mr. LeRoux sat up, but began more than two hours before

when the County failed to contact either of the teams available to serve individuals in the County experiencing mental health crises.  According to Plaintiffs, these failures continued over the course of the next two hours, as officers failed to promptly seek the assistance of mental health teams,[7] failed to employ proper techniques on which they allegedly were not trained, and instead employed other measures which allegedly escalated the situation.  According to the Complaint, by the time Mr. LeRoux sat up in his seat, thus allegedly creating the exigent circumstances which Defendants emphasize, he had already been denied several accommodations.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (reversing summary judgment, in part, where officers shot a man who was running around a convenience store and ignored two commands to drop the scissors because the officers "had the time and the opportunity to assess the situation and potentially employ . . . accommodations . . . including de-escalation, communication, or specialized help.").

Each of the cases Defendants cite for the proposition that these modifications were unreasonable because of exigent circumstances are distinguishable.  As a preliminary matter, *Seremeth*, *Waller*, *Hainze*, and *Poole*, on which Defendants rely, ECF No. 33-1, at 30; ECF No. 47, at 8, were all decided at the summary judgment stage, when the Court may not accept a plaintiff's allegations but must examine whether the allegations can withstand evidence the defendant presents in response.  *See Seremeth*, 673 F.3d at 336; *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 174 (4th Cir. 2009); *Hainze v. Richards*, 207 F.3d 795, 798 (5th Cir. 2000); *Poole v. Gaston Cnty.*, No. 3:15-cv-309-DCK, 2017 WL 4479219, at *4 (W.D.N.C. Oct. 6,

---

[7] Defendants also argue that the County, in fact, did eventually call a crisis negotiator and thus did provide one of the modifications requested.  ECF No. 33-1, at 25.  However, as Plaintiffs' allege, the County failed to call for the negotiator promptly, ECF No. 25, at ¶ 5, thus preventing them from arriving before the situation resulted in Mr. LeRoux's death.

2017).  While *Thompson* was decided upon a motion to dismiss, as noted above, in that case, the court was presented with clear video evidence rebutting the plaintiffs' complaint that the decedent did not pose an immediate threat.  2021 WL 3472130, at *11.  Accordingly, in each of these cases, the court was presented with and required to consider a more robust record when assessing the reasonableness of the intervention.  *See Seremeth*, No. 1:09-cv-00058, 2010 WL 2025551 (D. Md. filed May 18, 2010), ECF Nos. 47-2, 3, 4, 5, 6, 7, 8 (Defendants' motion for summary judgment citing to deposition of plaintiff, interrogatories answered by plaintiff, deposition of defendant officer, affidavit of defendant officer, incident report from the arrest, interrogatories answered by defendant Sherriff, policies relating to treatment of individuals with disabilities, attendance records for trainings, and affidavit of Frederick County Attorney); *Waller*, 556 F.3d at 174 (discussing the initial reversal and remand of the first grant of summary judgment because "the parties had not fully briefed the merits of the claim, and that appellant had not been able to conduct discovery on the claim" and reconsideration of the issues after "extensive discovery" had been conducted); *Hainze*, Brief for Plaintiff-Appellant, Kim Michael, Hainze, 1999 WL 33619189, at *6 (5th Cir. May 12, 1999) (citing to depositions of plaintiff and defendants, as well as affidavits of defendants and defendants' expert); *Poole*, 2017 WL 4479219, at *2 (citing to depositions of defendant officers as well as the official description of the 911 call).  In contrast, there is no developed factual record here, as discussed *supra*.  Even if such a record did exist, considering it at this stage would be inappropriate, since the success of a motion to dismiss, almost always, turns on the plaintiff's complaint.

Second, the cases that Defendants cite involved situations in which the individual harmed posed a clear and immediate threats to police officials.  *See Seremeth*, 673 F.3d at 340 ("The deputies were responding to a domestic disturbance call, which Deputy Rohrer characterized as

'some of the most dangerous calls that we ever go on.'  The deputies were obligated to assure themselves that no threat existed against them, Seremeth's children, or anyone else."); *Waller*, 556 F.3d at 173 ("When [the responding officer] spoke to [decedent] through the back door, [decedent] yelled, 'I'm going to blow your goddamned head off.' . . . After [decedent] came toward the officers twice, swinging what appeared to be a scythe and brandishing what looked like a knife, three officers shot and killed him."); *Hainze*, 207 F.3d at 797 ("Deputy Allison exited his vehicle, drew his weapon, and ordered Hainze away from the truck.  Hainze responded with profanities and began to walk towards Allison [with a knife in his hand] . . . Allison twice ordered Hainze to stop but Hainze ignored him. When Hainze was within four to six feet, Allison fired two shots in rapid succession into Hainze's chest."); *Thompson*, 2021 WL 3472130, at *11 ("Mr. White certainly posed an unpredictable threat to the officer.  This is particularly so, considering Mr. White charged at Officer Badgujar after the officer's request that he stop . . . as well as his repeated physical altercations with the officer and unwillingness to follow demands. The need to address these exigent circumstances left Officer Badgujar with no time to have gathered more information about Mr. White and relay it to dispatch."); *Poole*, 2017 WL 4479219, at *3 ("Poole then pulled out a pistol, pointed it up into the air, and immediately began lowering the pistol in a motion consistent with gaining target acquisition upon Defendant Officers.").

In contrast, Plaintiffs' allegations, and the available evidence that the Court may consider, do not establish that Mr. LeRoux posed a similar threat to the officers.  Mr. LeRoux did not pick up the firearm at any point in his initial exchange with Officer Inman.  ECF No. 25, at ¶ 10.  He did not verbally or physically threaten the officers when they surrounded Mr. LeRoux's car and placed "stop sticks" under his tires, which involved walking in front of and behind the vehicle.  *Id.* at ¶¶ 22, 71, 75.  The lack of an immediate threat is further supported by the timing of the shooting

in relation to the other events of the night: if an exigent circumstance existed from the moment Officer Inman arrived, then the County – ninety minutes after the initial 911 call – would not have been able to attempt to implement the single modification it allegedly did.

### 3. Plaintiffs Need Not Establish at this Stage that the Alleged Discrimination and Failure to Accommodate Were the Proximate Causes of Mr. LeRoux's Death.

Defendants also allege that Counts I through VIII must be dismissed because Plaintiffs have failed to set forth allegations sufficient to "establish" that any purported discrimination or failure to accommodate was the proximate cause of Mr. LeRoux's death. ECF No. 33-1, at 39.

To ultimately succeed, "the plaintiff is obligated to show . . . that the defendant's violation of the ADA proximately caused her actual injury before she can recover." *Montgomery v. District of Columbia*, No. 18-1928 (JDB), 2022 WL 1618741, at *23 (D.D.C. May 23, 2022) (citing *DeLeon v. City of Alvin Police Dep't*, Civ. A. No. H-09-1022, 2010 WL 4942648, at *3 (S.D. Tex. Nov. 30, 2010); *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998)). "Whether one event can be described as the cause of another is an intensely fact-sensitive question and 'ordinarily is one for the jury.'" *Montgomery*, 2022 WL 1618741, at *28 (citing *Colonial Parking, Inc. v. Morley*, 391 F.2d 989, 990 (D.C. Cir. 1968)).

Although Defendants describe their argument as one related to proximate cause, it is largely repetitive of their previously addressed argument that Plaintiffs' claims must be dismissed because they failed to specify the exact measures that properly trained officials would have employed. ECF No. 33-1, at 40 ("[Plaintiffs] claim that someone trained in crisis intervention should have arrived on scene to provide some unidentified accommodation for unidentified limitations resulting from an unspecified disability; that the officers should have implemented some additional, unidentified de-escalation techniques; and that the officers should have

implemented some other, unidentified communication method.").  As discussed above, at this stage of the proceedings, it is sufficient that Plaintiffs have alleged an accommodation that plausibly would have allowed Mr. LeRoux to effectively communicate with the officers present and survive the encounter.[8]

### 4. Plaintiffs Have Met the Pleading Requirements for Failure to Train Claims Under the ADA.

Defendants also argue that Plaintiffs' ADA failure-to-train claims under Counts I, II, V, and VI should be dismissed for failure to state a claim.  *Id.* at 35.  Since each of the counts alleges more than a failure-to-train, the failure to state such a claim would not unilaterally defeat each count.  Still, for the purpose of assessing the subcomponents of each count, a discussion of Defendants' arguments seeking dismissal of Plaintiffs' failure-to-train claims under the ADA follows.[9]

### a. The ADA Supports a Cause of Action for Failure to Train.

---

[8] Defendants provide little additional support for their argument that Plaintiffs have failed to properly plead proximate cause.  In their Reply, Defendants argue that it is "wholly speculative" that Mr. LeRoux would not have died had the officers, acting on behalf of the County, waited for a crisis negotiator, ECF No. 47, at 25, but fail to address the fact that Plaintiffs have pled the existence of discrimination beyond only failing to wait.  *See* ECF No. 25, at ¶¶ 118-21, 132-35, 147, 158, 169-70, 182-83, 195, 204-05.  Likewise, Defendants' argument that the officers were in immediate danger relies on facts contrary to the pleadings.  As noted above, Plaintiffs allege that for approximately two hours, Mr. LeRoux sat silently in the driver's seat of his vehicle.  While the presence of a weapon created some danger, the Court cannot conclude at this stage of the case, that the weapon alone created a risk of danger that made Plaintiffs' proposed accommodations unreasonable.  The result of such a ruling, upon a motion to dismiss, would be that anytime a weapon is present, regardless of the other circumstances, an accommodation is *per se* unreasonable.  Such a holding would be inconsistent with the ADA and the Fourth Circuit's exigent circumstances precedents.

[9] As discussed above, Plaintiffs have presented enough in their Complaint to support underlying ADA and Rehabilitation Act violations; accordingly, their failure-to-train claim cannot be dismissed on that ground alone.  *Contra* ECF No. 33-1, at 35; *Thompson*, 2021 WL 3472130, at *11 ("But because there is no underlying ADA violation, the failure to train claim, to the extent one is asserted, must fail.") (citing *Waller*, 556 F.3d at 177 n. 3)).

Defendants argue that, because the U.S. Court of Appeals for the Fourth Circuit has failed to recognize a failure-to-train claim, such a claim cannot lie.  However, when the court has addressed the issue, it has declined to consider such a cause of action because the plaintiff's claim failed for other reasons.  *Waller*, 556 F.3d at 177 n.3 (declining to reach the question of whether a failure-to-train claim existed because the officers had met the duty of reasonable accommodation).  There is no indication in *Waller*, or in any other Fourth Circuit decision, however, that would indicate that the Fourth Circuit would not recognize an ADA Title II failure to train claim under the appropriate circumstances."  *Estate of Saylor v. Regal Cinemas. Inc.,* 54 F.Supp.3d 409, 424 (D. Md. 2014).  Accordingly, as this Court has stated, "such a claim is viable".  *Id*.

Other district courts in and out of the Fourth Circuit have likewise found such a claim to be viable after *Waller*.  *See Poole v. County*, No. 3:15-cv-00309-FDW-DCK, 2016 WL 4267792, at *6 (W.D.N.C. Aug. 11, 2016) (rejecting the county's contention that *Waller* precluded a failure-to-train claim under the ADA); *Hogan v. City of Easton*, Civ. No. 04-759, 2004 WL 1836992, at *7 (E.D. Pa. Aug. 17, 2004) (finding that "the Complaint states a valid claim under the ADA based on the failure of the [defendants] to properly train its police officers for encounters with disabled persons."); *see also Lewis v. Truitt*, 960 F.Supp. 175, 178 (S.D. Ind. 1997) ("In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability.") (quoting H.R. Rep. No. 101-485, pt. III (1990)).  Given that both this District and other districts have found that these claims may lie, the fact that the Fourth Circuit has yet "to reach the issue is no indication that it would not follow other courts and recognize such a claim." *Saylor*, 54 F.Supp.3d at 426.

### b.  Plaintiffs Have Sufficiently Alleged Deliberate Indifference.

As to the question of deliberate indifference, Defendants fail to identify any cases that require a plaintiff to plead specific facts supporting a finding of deliberate indifference at the motion to dismiss stage of an ADA failure-to-train claim.  ECF No. 33-1, at 35-38; *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) (applying the deliberate indifference standard to Plaintiff's claims under 42 U.S.C. § 1983); *Chaunnault v. Mitchell*, 923 F.Supp.2d 765, 787 (E.D. Va. 2013) (same); *Hill v. Robeson County, N.C.*, 733 F.Supp.2d 676, 686-87 (E.D.N.C. 2010) (same); *Peters v. City of Mount Rainer*, No. GJH-14-00955, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014) (same); *Brown v. City of Charleston*, No. 2:12-cv-01865-DCN, 2013 WL 6850145, at *3 (D.S.C. Dec. 30, 2013) (same); *Hall v. Fabrizio*, No. JKB-12-754, 2012 WL 2905293, at *2 (D. Md. Jul. 13, 2012) (same).

Further, the sole published case from this Court assessing an ADA failure-to-train claim in the context of a motion to dismiss did not require Plaintiffs to plead deliberate indifference.[10]  *See Saylor*, 54 F.Supp.3d at 424-28.  Relying on the "implicit duty to train officers as to how to interact with individuals with disabilities in the course of an investigation or arrest," this Court, upon a motion to dismiss, asked only whether there was an underlying violation of Title II, *id.* at 425, and whether Plaintiffs had sufficiently alleged that deputies were not trained to make modifications when interacting with individuals with developmental disabilities.  *Id*. at 427.

As in *Saylor*, Plaintiffs here have alleged both an underlying failure to accommodate and that the officers were not trained on how to accommodate individuals with disability-based mental health crises.  Plaintiffs have alleged that the "Montgomery County ECC does not have a policy

---

[10] However, the Court, subsequently, in an unpublished decision, did require a showing of deliberate indifference at the summary judgment stage.  *Saylor*, 2016 WL 4721254, at *16. Accordingly, the Court analyzes Plaintiffs' claim under this standard, as well, out of an abundance of caution.

for handling calls that appear to be related to mental health crisis" and that "ECC dispatchers do not receive training in CIT, in identifying mental health-related calls, or in the resources available to respond to mental health crises.  ECF No. 25, at ¶¶ 100-01.  Plaintiffs also allege that only 66% of MCPD officers have received any CIT training and that there is no requirement for repeating or refreshing such training.  *Id.* at ¶ 49.  Applying the test in *Saylor*, this is sufficient to state a claim for failure to train.

Even if the standard applicable to failure to train claims under § 1983 was appropriate to assess a plaintiff's pleading of an ADA failure-to-train claim, Plaintiffs have met that burden.  To hold a municipality liable for failure to train or failure to implement a policy in the § 1983 context, a plaintiff must allege three elements: (1) that the defendant instituted inadequate policies or inadequately trained its officers, (2) that the policies or training were so deficient that they demonstrated deliberate or conscious choice by the municipality, and (3) that the training or policy deficiency caused the officer's conduct.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989); *see also Lewis v. Simms*, No. AW-11-cv-2172, 2012 WL 254024, at *2-3 (D. Md. Jan. 26, 2012).  Although a plaintiff need not prove their claim in response to a motion to dismiss, it must allege "some facts" relevant to each element.  *Hall,* 2012 WL 2905293, at *2.

As discussed above, Plaintiffs have alleged multiple deficiencies in the County's training of its officers, satisfying prong one.  *Contra McDougald v. Spinnato*, No. ELH-17-2898, 2019 WL 1226344, at *15 (D. Md. Mar. 15, 2019) (dismissing a §1983 claim in part because plaintiff "failed to identify a particular [police] training practice or any specific defect or omission in the [police] training program."); *Hall*, 2012 WL 2905293, at *2 (dismissing a failure to train claim because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker.").

Specifically, Plaintiffs alleged that although CIT training is mandatory for new MCPD recruits, only 66% of officers have completed it.  ECF No. 25, at ¶¶ 48-49.  Plaintiffs also detail resources available to officers responding to individuals with mental health needs; nonetheless, Plaintiffs have also alleged that although calls from individuals suffering from mental health issues are frequent, *id.* at ¶ 108, the ECC does not have a policy for handling calls that may require mental health care.  *Id.* at ¶ 100.   Two external reviews – including one requested by Montgomery County's executive – found that the MCPD's policies and practices were inadequate to serve members of the community with mental health disorders.  *Id*. at ¶¶ 92-93.

Also, as discussed above, Plaintiffs have alleged facts from which the Court could infer that individuals with training in interacting with individuals suffering from mental illness would have responded to the situation differently than the officers who upon their arrival allegedly surrounded the vehicle, began swearing at Mr. LeRoux, and drew their weapons, despite the alleged lack of an immediate threat over the course of a prolonged period of time.  Further, neither the ECC dispatcher nor the responding officers attempted to utilize available services until more than ninety minutes had passed from the initial 911 call, thus allegedly resulting in a situation in which they were not available in a timely manner and, ultimately, Mr. LeRoux's death.  *Id.* at ¶¶ 3, 18.

This leaves prong two: deliberate indifference.  "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference' to the rights of persons with whom the [untrained employees] come into contact."  *Connick*, 563 U.S. at 61 (internal citations omitted).   "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Board of County Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).  "Thus, when

city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61-62. In *Connick*, the Supreme Court considered whether a "district attorney's office [could be] held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. Although the Court held that a single *Brady* violation would be insufficient, *id.*, it noted that the Court in *Canton* "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64.

Plaintiffs have sufficiently alleged, for the purposes of a motion to dismiss, that the County was deliberately indifferent in failing to train its officers. According to the Amended Complaint, in 2021, "48% of victims subject to use of force by the MCPD were suffering from mental illness at the time of the encounter." *Id.* at ¶ 92, 94. According to the Montgomery County Council's Office of Legislative Oversight, MCPD "encounters with persons with mental illness too often end in tragedy." *Id.* at ¶ 93-94. On at least two prior occasions, before the incident that is the subject of this suit, these uses of force resulted in death.[11] *Id.* at ¶¶ 89, 91. Although Defendants attempt to distinguish these instances on the grounds that they did not result in a finding of liability or misconduct, "there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise or failure to train."[12] *Felix v. City of*

---

[11] Consistent with many of their other arguments, Defendants ask the Court, at the motion to dismiss stage, to conduct its own analysis of the appropriateness of one of these shootings based on an external report beyond the Complaint. *See* ECF No. 33-1, at 39 n. 28.

[12] However, once Plaintiffs' claim advances beyond the motion to dismiss stage, they may have difficulty relying on the incident at issue in *Thompson* for, as discussed above, this Court has previously reviewed the body camera footage at issue in that case and found that the decedent's

*New York*, 344 F.Supp.3d 644, 662 (S.D.N.Y. 2018).  This is particularly so at the motion to

dismiss stage.  *See id.* ("[T]he question at this stage is whether Plaintiffs have plausibly supported

the existence of a training deficiency and the City's awareness of the same.").  Plaintiffs'

allegations are distinguishable from those cases in which this Court has dismissed § 1983 claims

pre-discovery.  *See Peters*, 2014 WL 4855032, at *5 ("Peters has not even attempted to allege any

such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different

ways that the City failed to train and supervise its officers."); *Hall*, 2012 WL 2905293, at *2

(dismissing a failure to train claim against the BPD because the complaint "d[id] not . . . allege a

single instance of these alleged violations other than Plaintiff's own experience").

### III.    Claims for Negligence, Gross Negligence, and Wrongful Death

Plaintiffs also claim that Defendants are liable for the death of Mr. LeRoux under common

law theories of negligence, gross negligence, and wrongful death.  Defendants challenge each of

the three counts on three grounds: (1) that the County is protected by governmental immunity; (2)

that the Officer Defendants are protected by public official immunity; and (3) that Plaintiffs have

failed to state a claim for negligence, gross negligence and wrongful death.  ECF No. 33-1, at 40,

44.

### A.  Count IX: Negligence

Plaintiffs' negligence claim against the County will be dismissed because the County is

protected by governmental immunity.  However, since Plaintiffs have alleged actual malice and

---

conduct posed an immediate threat to the officers.  At this stage, the Court is considering this
incident only because it is ancillary to other evidence of deliberate indifference and that there may
have been other relevant circumstances, evidencing a failure to train, that are not readily apparent
from the Court's decision in *Thompson*.

stated a claim for negligence, their negligence claim against the Officer Defendants will not be dismissed.

### 1. Governmental Immunity Protects the County.

Defendants argue that Count IX, as to the County, should be dismissed because the County's operation of its police force is protected by governmental immunity. *Id.* at 44. Compared with the common law sovereign immunity of the State and its agencies, "the common law governmental immunity of local governments, municipalities, and their agencies is limited." *Baltimore Police Dept. v. Cherkes*, 780 A.2d 410, 429 (Md. App. 2001). A local government is only "immune from liability for common law torts when the conduct was committed in a governmental capacity, but can be held liable for common law torts arising from conduct in its private or proprietary capacity." *Moore v. Peitzmeier*, TDC-18-2151, 2019 WL 1370097, at *2 (D. Md. Mar. 26, 2019) (internal citations omitted); *see also Gray-Hopkins v. Prince George's Cty., Md.*, 309 F.3d 224, 234 (4th Cir. 2002); *Crouch v. City of Hyattsville*, No. DKC-09-2544, 2010 WL 3653345, at *4 (D. Md Sept. 15, 2010). "A law enforcement officer 'purporting to enforce the State criminal law' acts in a 'quintessentially governmental' capacity." *Moore*, 2019 WL 1370097, at *2 (internal citations omitted); *see also DiPino v. Davis*, 729 A.2d 354, 370 (Md. 1999) ("In this case, it is clear that DiPino's conduct was not committed in any private or proprietary capacity. In her capacity as a City police officer, she was purporting to enforce the State criminal law. That is quintessentially governmental in nature. There is, therefore, no *common law* liability on the part of the city."). "Thus, a city is immune as to common law tort claims asserted against it based on torts committed by its police officers." *Crouch*, 2010 WL 3653345, at *4.

Here, Plaintiffs pursue three common law tort claims against the County under a theory of vicarious liability.[13]   At the time of the shooting, the officers were responding to a disturbance at a restaurant, which constitutes a governmental function.  *See Moore*, 2019 WL 1370097, at *3 ("[T]he Officer Defendants were responding to and investigating a disturbance" and "thus engaged in the enforcement of criminal laws, a governmental, rather than proprietary function.").  As such, the County is protected under governmental immunity.  While the County may ultimately be responsible for paying a judgment resulting from claims against the Officer Defendants, Plaintiffs cannot maintain a claim for common law negligence against the County.  *See Taylor v. Montgomery County, Maryland*, No. GJH-20-3143, 2021 WL 3857949, at *10 (D. Md. Aug. 30, 2021); *Moore*, 2019 WL 1370097, at *3.  As such, Count IX against the County will be dismissed.

### 2. Plaintiffs Have Sufficiently Pled that the Officer Defendants Are Not Protected by Public Official Immunity.

"An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."  Md. Code. Cts. & Jud. Proc. § 5-507(a)(1); *see also White v. City of Annapolis by and through City Council*, 439 F.Supp.3d 522, 536 (D. Md. 2020).  Law enforcement officers are public officials for the purpose of public official immunity.  *McGowan v. Prince George's Cty., Maryland*, 401 F.Supp.3d 564, 571 (D. Md. 2019) (citing *Cooper v. Rodriguez*, 118 A.3d 829 (Md. App. 2015)).  However, there is no immunity for any alleged intentional torts or any alleged acts committed with actual malice or which were grossly negligent.  *See McGowan*, 401 F.Supp.3d at 571 (citing *Ashton v. Brown*,

---

[13] The third tort claim, for wrongful death, is based only in part on a theory of vicarious liability. As discussed below, portions of the claim arise out of the County's own actions in, for example, failing to train its officers.

660 A.2d 447 (1995)).  Malice means "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will, or fraud;" a plaintiff asserting malice "must point to specific evidence that raises an inference that the defendant's actions were improperly motivated."  *White*, 439 F.Supp.3d at 536 (citing *Koon as next friend of Glay v. Prince George's Cnty.*, No. DKC-17-2799, 2019 WL 1317401, at *7 (D. Md. Mar. 22, 2019)).  Determining whether officers acted with malice is a fact-intensive exercise that looks to the whole record.  *See Williams v. Prince George's County*, 685 A.2d 884, 896-97 (Md. App. 1996) ("[W]e may look to the facts and circumstances set forth in the deposition testimony as well as other matters outside of the pleadings.").

To survive a motion to dismiss, the plaintiff must make "specific factual allegations [that], if proven, could support a finding that [defendants] acted with actual malice."  *Hovatter v. Widdowson*, No. CCB-03-2904, 2004 WL 2075467, at *6 (D. Md. Sept. 15, 2004); *see also  Hall v. Maryland*, No. RDB-19-3005, 2020 WL 5642047, at *6 (D. Md. Sept. 22, 2020) ("To overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious.").  If a plaintiff does so, defendants "are not entitled to statutory immunity as a matter of law, and the claims against them can proceed."  *Hovatter*, 2004 WL 2075467, at *6.

While the word "malice" does not create an easily definable standard, this Court has established contours for proving malice in situations that involve police shootings.  Generally, a finding of malice hinges on the specific facts of the police encounter.  "Unjustified application of malignant force may give rise to a reasonable inference that [an officer] was motivated by ill will toward or an affirmative intent to injure Plaintiff."  *Solis v. Prince George's Cnty.*, 153 F.Supp.2d 793, 805 (D. Md. 2001); *see also Gray-Hopkins v. Prince George's Cty., Maryland*, 309 F.3d 224,

233 (4th Cir. 2002) (finding officer acted with malice and was not entitled to public official immunity because plaintiff's version of the facts justified conclusion that the officer shot and killed decedent while his hands were above his head); *Cooper v. Doyle*, No. DKC-22-0052, 2022 WL 16923857, at *3 (D. Md. Nov. 14, 2022) (finding malice where plaintiff alleged that defendant officers shot decedent several times in the back as he ran away from them without a weapon in his hands).  In *Cooper*, this Court assessed an officer's malice in relationship to potential harm: where an individual "did not pose a risk of harm to the officers or others," "application of lethal force would be unjustified and malicious."  *Cooper*, 2022 WL 16923857, at *3; *see also Sawyer v. Humphries*, 587 A.2d 467, 474 (1991) ("Wrestling another to the ground, pulling his hair, and hitting him on the face, again without cause or provocation, is certainly malicious conduct."); *Solis*, 153 F.Supp.2d at 805 ("Officer Ruffin choked Plaintiff and struck him multiple times for no apparent reason.  Such unjustified application of malignant force may give rise to a reasonable inference that Officer Ruffin was motivated by ill will toward or an affirmative intent to injure Plaintiff."); *Smith v. Mothershed*, No. WMN-12-3215, 2013 WL 4501310, at *4 (D. Md. Aug. 21, 2013) (denying officer's claim to statutory immunity based on plaintiff's allegations that defendants dragged him out of a car through an open window, beat and tasered him, and caused a K-9 to bite a large piece of flesh from his leg); *Johnson v. Prince George's Cty.*, No. DKC 10-0582, 2011 WL 806448, at *7 (D. Md. Mar. 1, 2011) (finding malice where an officer "gratuitous[ly]" beat a plaintiff in response to his "reasonable question"); *Williamson v. Prince George's Cty., Maryland*, No. DKC 10-1100, 2011 WL 280961, at *6 (D. Md. Jan. 26, 2011) (holding that plaintiff had adequately pled malice for the purpose of a motion to dismiss after presenting evidence that defendant severely beat plaintiff after he made a sarcastic comment). Where disputed material facts exist in the record and where "inferences of malicious conduct may

41

be drawn from [plaintiff's] version of the facts," claims of negligence against police officials are not suitable for early disposition. *Okwa v. Harper*, 757 A.2d 118, 129 (Md. 2000).

At the time of the incident, the Officer Defendants were acting as law enforcement officers and were within the category of defendants who can invoke public official immunity. The parties do not dispute that the officers were acting within the scope of their employment nor that they were acting in a discretionary capacity. Instead, the parties dispute whether the Officer Defendants acted with malice. *Compare* ECF No. 33-1, at 41-42 *and* ECF No. 38, at 24-25.

As required to survive a motion to dismiss, Plaintiffs have not "[m]erely assert[ed] that an act was done maliciously" but rather have "allege[d] with some clarity and precision those facts which make the act malicious." *Cooper*, 2022 WL 16923857, at *3. As discussed above, Plaintiffs have pled that the Officer Defendants surrounded Mr. LeRoux's vehicle while he sat therein attending to his phone. Although a weapon was present, Plaintiffs allege that he made no movement towards the weapon or turned away from his phone for over thirty minutes. In the interim, officers allegedly swore at Mr. LeRoux and discussed a plan to drag him across shards of glass through a car window. These allegations go beyond "merely asserting that an act was done maliciously[,]" *Elliot*, 473 A.2d at 969, or providing only "bare legal conclusions." *Hovatter*, 2004 WL 2075467, at *7.

The cases Defendants cite are distinguishable. For example, *Williams v. Prince George's County* involved the review of a lower court's decision to grant the defendant county summary judgment based on a developed factual record which included depositions of the officers involved, who testified as to their motivations and states of mind at the time of the incident in dispute. 685 A.2d at 889-890. While the court in that case reviewed the record and found no instance of malice, *id.* at 897, this case lacks the robust factual record necessary to make a determination as to whether

Plaintiffs' factual allegations regarding malice are supported.  Further, the court's conclusions stand in contrast with Plaintiffs' allegations in this case.  *See id.* at 896 ("Therein is to be found no expressions of hostility of the officers nor any physical harm inflicted, and indeed, the record reflects conciliation, accommodation, and even an apologetic attitude on the part of the arresting officer.").  Likewise, *Parker v. State*, which Defendants also cite, addressed the absolute immunity granted to judicial officers for judicial acts.  653 A.2d 436, 443 (Md.  1995).  Other than mentioning that law enforcement officers receive qualified immunity in some circumstances, it has little bearing on this case.  Finally, in *Davis v. DiPino*, the court assessed whether a law enforcement officer acted with malice when submitting an Application for Statement of Charges.  637 A.2d 475, 480 (Md. App. 1994).  In *DiPino*, the court dismissed the plaintiff's claim because there was no allegation that the officer had included false or misleading information in the application.  *Id.*  Defendants provide no explanation as to why the standard for malice in submitting forms dictates the result in this case involving the alleged unlawful use of force.

The presence of actual malice is generally a fact-specific inquiry not well-suited to resolution upon a motion to dismiss.  Here, Plaintiffs have made sufficient factual allegations that officers acted with actual malice.  As such, these claims will not be dismissed, at this time, due to public official immunity.

### 3.  Plaintiffs' Have Stated a Claim for Negligence.

Even if a plaintiff's claim is not barred by public official immunity, their complaint must adequately state a claim for negligence.  Negligence is "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm."  *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (quoting *Mayor & City Council of Baltimore v. Hart*, 910 A.2d 463, 472 (2006)).  To

successfully state a claim for negligence, a plaintiff must allege that the defendant was under a duty to protect the plaintiff from injury, the defendant breached that duty, and the plaintiff suffered an actual injury or loss that resulted from that breach. *Hart,* 910 A.2d at 472.

Plaintiffs allege that the Officer Defendants had a duty to interact appropriately with an individual suffering from mental disabilities, including waiting for a crisis intervention team before unnecessarily escalating the encounter by repeatedly targeted him with their weapons.  ECF No. 25, at ¶ 211. Additionally, Plaintiffs alleged that officers failed to timely request mental health assistance, and, instead, swore at and threatened violence against Mr. LeRoux.  *Id.*  at ¶ 212. Defendants' response does not contest the sufficiency of the allegations under the applicable legal precedents.  ECF No. 33-1, at 44.  Instead, their rebuttal focuses on the actions the officers took once they saw Mr. LeRoux allegedly raise a weapon.  *Id.*  Putting aside the question as to whether Mr. LeRoux actually raised a weapon, Defendants' argument ignores that Plaintiffs' negligence claim focuses on the actions the Officer Defendants did and did not take before Mr. LeRoux was allegedly seen raising a weapon.  As such, Plaintiffs' negligence claim will not be dismissed at this time.

### B.  Count X: Gross Negligence

For similar reasons, Plaintiffs' gross negligence claim will be dismissed against the County,[14] while Plaintiffs' claim against the Officer Defendants, as pled, is sufficient to surpass Defendants' Motion to Dismiss.

---

[14] As discussed *supra*, the County is protected by governmental immunity in this circumstance; accordingly, Count X will be dismissed as to that Defendant.  *See Moore*, 2019 WL 1370097, at *4 (dismissing all common law tort claims, including a claim of gross negligence, against the county).

Defendants allege that Plaintiffs' allegations against the Officer Defendants do not meet the "stringent standard" for a claim of gross negligence and, as a result, should be dismissed both for failing to defeat public official immunity and for failing to state a viable claim.  ECF No. 33-1, at 44.

As discussed above, Maryland statutory law immunizes "local government employees from tort liability for acts or omissions committed within the scope of their employment and made without actual malice or gross negligence."  *Hovatter*, 2004 WL 2075467, at *6 (citing Md. Code Ann., Cts. & Jud. Proc.§ 5-399.2(b)).  Unlike the actual malice standard, which is a distinct inquiry from whether negligence was committed, the statutory exception for gross negligence corresponds to the underlying need to state a claim: where a plaintiff has stated a claim for gross negligence, they meet the pleading requirements to bypass public official immunity.

"Gross negligence is 'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.'"  *Shields*, 2019 WL 3536800, at *13 (quoting *Cooper*, 118 A.3d at 845).  "The Maryland Court of Appeals has held that the principle of objective reasonableness as articulated in *Graham v. Connor*, 490 U.S. 386, 394 (1989), applies to excessive force claims brought under common law claims of gross negligence."  *Taylor*, 2021 WL 3857949, at *9 (citing *Stutzman v. Krenik*, 350 F. Supp.3d 366, 383 (D. Md. 2018)).  "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence."  *Cooper*, 118 A.3d at 846 (quoting *Taylor v. Harford Cty. Dep't of Soc. Servs.*, 862 A.2d 1026, 1034 (Md. 2004)).

When evaluating a claim of gross negligence upon a motion to dismiss, this Court assesses whether the pleadings include facts speaking to an intentional failure to perform a manifest duty

and a thoughtless disregard for the consequences.  *See Shields*, 2019 WL 3536800, at *13 (denying motion for summary judgment on the grounds that, "[g]iven that [the correctional officers'] goal was to change [Mr. Shields's] clothes so that he could get medical treatment, the decision to ineffectively strike, punch, and kick him, or to tacitly authorize this conduct, 'implies a thoughtless disregard of the consequences' (i.e. Mr. Shields's injuries) 'without the exertion of any effort to avoid them.'") (quoting *Cooper*, 118 A.3d at 854); *Barbre*, 935 A.2d at 718-19 (finding that plaintiff pled enough to demonstrate gross negligence by alleging that "Barbre ordered Pope, who was unarmed, to raise his hands, and that after Pope complied with the request, Barbre approached with his gun drawn and shot him in the neck.").

As discussed above, Plaintiffs have alleged that Mr. LeRoux did not pose a threat to the officers because he did not make any movement towards the firearm in response to Officer Inman, ECF No. 25, at ¶ 10, did not verbally or physically threaten the officers when they surrounded his car and placed "stop sticks" under his tires, which involved walking in front of and behind the vehicle, *id.* at ¶¶ 22, 71, 75, and did not communicate with officers at any point in the exchange despite the fact that he had multiple weapons pointed at him.  *Id.* at ¶¶ 14-16.  Plaintiffs allege that it is unclear whether Mr. LeRoux ever raised a weapon during the encounter.  *Id.* at ¶83.  These facts support a conclusion that Mr. LeRoux for, at a minimum, most of the encounter did not pose a threat to the officers.  Nonetheless, as Plaintiffs allege, the officers "repeatedly trained their guns on him despite him not engaging in any threatening behavior, declined to request any mental health assistance, and developed a cruel plan to break the window and haul him through the broken window."  *Id.* at 219.  Together, these facts are sufficient to plead a claim that the Officer Defendants exhibited gross negligence in reckless disregard of the ultimate impact these actions had on Mr. LeRoux's life.  *See Sulton v. Baltimore County, Maryland*, No. SAG-18-2864, 2021

WL 948820, at *1, *8 (D. Md. Mar. 12, 2021) (denying motion to dismiss because plaintiffs had adequately pled gross negligence against officers who shot and killed a man who was "sufficiently far away from the Defendant officers that he did not pose any threat to their safety and could not reasonably be perceived to pose any threat to their safety").

### C.  Count XI: Wrongful Death

For the reasons stated above, the portions of the wrongful death claim against the County, grounded in negligence and gross negligence, will be dismissed based on governmental immunity. However, because Plaintiffs have pled enough to surpass public official immunity on its other state law claims and have alleged plausible ADA and Rehabilitation Act claims, Count XI will not be dismissed as against the Officer Defendants.  Additionally, for the same reason, the portions of the wrongful death claim arising out of Counts I-VIII will not be dismissed against the County.

In Maryland, a wrongful death action "may be maintained against a person whose wrongful act causes the death of another."  Md. Code Ann., Cts. & Jud. Proc. § 3-902.  A wrongful act is "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued."  *Id.*, § 3-901(e).  "To succeed on a wrongful death claim under Maryland law, a plaintiff who qualifies as a beneficiary under the wrongful death statute 'must show by a preponderance of the evidence that the conduct of [the] defendant was negligent and that such negligence was a proximate cause of the death of the decedent.'"  *Thompson*, 2021 WL 3472130, at *12 (quoting *Weimer v. Hetrick*, 25 A.2d 643, 652 (Md. 1987)).  Defendants assert that since the wrongful death claim is derivative of claims under Counts I through VIII, this claim should fail for the same reasons as they assert earlier in their brief.  ECF No. 33-1, at 45.

Defendants' argument is unavailing for, as discussed above, the referenced claims are legally sufficient for the purpose of a motion to dismiss.  Plaintiffs have pled a number of plausible claims of an "act, neglect, or default," including violations of the ADA and Rehabilitation Act and the commission of negligence and gross negligence under state law.  There is no dispute over whether Defendants were the cause in fact of Mr. LeRoux's death: all parties agree that Mr. LeRoux was shot and killed by the Officer Defendants.  Likewise, as discussed above, Plaintiffs have plausibly alleged that the harm that Mr. LeRoux suffered was the foreseeable result of the Defendants' failure to employ the measures that were proper when interacting with a person suffering from the disabilities alleged, in light of the time period over which the interactions occurred.  Because Mr. LeRoux would have been able to pursue such claims had he survived the encounter with the Officer Defendants, Plaintiffs can pursue them pursuant to § 3-904.  Accordingly, Plaintiffs' wrongful death claim, as alleged, is sufficient to survive a motion to dismiss.

### D.  Punitive Damages

Finally, Defendants ask the Court to dismiss Plaintiffs' demand for punitive damages against the Officer Defendants because Plaintiffs have allegedly failed to set forth facts "establish[ing]" actual malice, evil motive, or intent.  ECF No. 33-1, at 45.

To recover punitive damages in any tort action, facts sufficient to show actual malice must be pled and later proven, and parties must make a specific demand for their recovery before damages are awarded.  *Darcars Motors of Silver Spring, Inc. v. Borzym*, 818 A.2d 1159, 1180 (Md. App. 2003).  Plaintiffs need not establish malice at the motion to dismiss stage in order to preserve a claim for punitive damages at trial.  Rather, Plaintiffs need only establish malice at trial in order to collect punitive damages.  *See Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 57 (Md.

2013) ("Punitive damages may be awarded only if a plaintiff proves *at trial* malice, ill will, or intent to injure.") (emphasis added); *Borzym*, 818 A.2d at 1164-65 (finding punitive damages permissible where evidence supports a jury's finding that dealership's conduct was motivated by actual malice).

Here, Plaintiffs have made a specific demand for the recovery of punitive damages in their Amended Complaint. ECF No. 25, at 39. Plaintiffs also allege that the Officer Defendants showed malice towards Mr. LeRoux, by "repeatedly curs[ing] at him, repeatedly train[ing] their guns on him despite him not engaging in any threatening behavior, declin[ing] to request any mental health assistance, and develop[ing] a cruel plan to break the window and haul him through the broken window." *Id*. at ¶¶ 212, 219, 225. Accordingly, Plaintiffs' claim for punitive damages against the Officer Defendants may proceed. *See Sulton*, 2021 WL 948820, at * 8 ("Assessment of the types of damages that might be available if Plaintiffs eventually prevail on their claims is not well-suited to the relevant question presented in a Rule 12(b)(6) motion – whether Plaintiffs have adequately stated claims affording them some basis for relief.").

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss will be GRANTED in part and DENIED in part. Defendants' Motion to Dismiss Counts I through VIII of Plaintiffs' Amended Complaint shall be DENIED. Defendants' Motion to Dismiss Counts IX through XI of Plaintiffs' Amended Complaint shall be GRANTED, in part, as to the Defendant County, and DENIED as to the Officer Defendants.

So ordered.

Date:   March 20, 2023                                       _____/s/_____

                                                            Ajmel A. Quereshi
                                                            United States Magistrate Judge