**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | | |
|---|---|---|
| THE ESTATE OF RYAN LEROUX, *et al.,* | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 8:22-cv-00856-AAQ |
| MONTGOMERY COUNTY, MD, *et al.,* | * | |
| Defendants. | * | |

**<u>OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 1

I.      Ryan LeRoux Had a Mental Health Disability—Likely Schizophrenia. ........................... 8

        A.      "Disability" is Defined Broadly and Does Not Require Extensive Analysis. ......... 8

        B.      A Reasonable Jury Could Conclude Ryan Had a Mental Impairment Based on His Diagnoses, Prescription, Treatment History, and Behavior. ........................... 9

                1.      Mental Health History. ....................................................... 10

                2.      October 2020 Hospitalization and Diagnosis. ........................... 11

                3.      Anti-Psychotic Prescription. ............................................... 13

                4.      November 2020 Crisis Center Visit. ...................................... 13

                5.      December 2020 Crisis Center Visit. ...................................... 14

                6.      July 12, 2021 Arrest at the Holiday Inn Express. ...................... 14

                7.      July 16, 2021 Incident at the McDonald's. .............................. 15

        C.      Whether Ryan Had a Disability is an Issue for the Jury to Decide. ................ 17

II.     Ryan's Mental Impairment, and the Need to Summon Specialists to Communicate with Him, Were Sufficiently Apparent. ....................................................... 18

        A.      A Reasonable Jury Could Conclude Montgomery County Failed to Ensure Equally Effective Communication. ........................................................ 19

        B.      A Reasonable Jury Could Conclude Ryan's Disability was Sufficiently Apparent. ................................................................................. 19

                1.      Montgomery County Was Already Familiar with Ryan's Mental Health Crises and Treatment. .............................................. 22

                2.      911 Phone Call Describing Ryan's Behavior and Stating Ryan is Acting "Crazy." ........................................................... 23

                3.      Police Observations of Ryan's Behavior—And Captain Dillman's Call for Crisis Negotiators. ................................................. 24

C.     Defendants' Argument—That No Jury Could Conclude Ryan's Disability Was Sufficiently Apparent—Fails. ........................................................ 27

D.     A Reasonable Jury Could Conclude that Montgomery County Knew Which Accommodations to Provide................................................................... 28

III.    Defendants' Exigent Circumstances Argument Ignores the Breadth of Plaintiffs' Arguments and Fails on Its Own Terms........................................................... 34

A.     The Emergency Call Center Should Have Investigated Facts Concerning Ryan's Mental Health Crisis and Relayed Them to Police Officers. .................... 35

B.     After Officer Inman Arrived on Scene, Officers Should Have Followed Their Own Policies and Implemented Reasonable Accommodations........................... 41

1.     Defendants Omit that, to the Extent Any Exigent Circumstances Existed, Police Officers Themselves Caused Them. ................................ 41

2.     The Sheer Number of Officers Present On-Scene Belies Defendants' Exigent Circumstances Argument................................................ 44

3.     Defendants Failed to Implement Reasonable Accommodations, Including by Failing to Follow Their Own Policies and Training. ........... 46

4.     This Court Should Reject Defendants' Misguided "Direct Threat" Arguments...................................................................................... 50

IV.    A Reasonable Jury Could Conclude Montgomery County Acted with Deliberate Indifference, Entitling Plaintiffs to Monetary Compensation............................ 52

A.     Defendants Were Deliberately Indifferent Because They Knew They Had to Ensure Effective Communication With Ryan LeRoux—Yet Did Nothing........... 53

B.     Defendants Were Deliberately Indifferent Because They Knew Their Policies Were Deficient and Failed to Fix Them............................................... 55

C.     Defendants Were Deliberately Indifferent Because They Failed to Adequately Train Their Officers and ECC Personnel to Comply With Federal Law. ............. 58

D.     Defendants Were Deliberately Indifferent Because They Failed to Support the Specialized Mental Health Resources Available on Paper.................................. 64

E.     Defendants Were Deliberately Indifferent Because Montgomery County Had Been Failing to Comply with the ADA and Section 504 for Years....................... 66

F.     Montgomery County's "Adequate Official" Argument Ignores the Evidence. .... 67

V.    Genuine and Material Disputes of Fact Exist as to Plaintiffs' State-Law Claims. ........... 70

CONCLUSION..................................................................................................................... 73

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate*,
469 U.S. 287 (1985)..................................................................................................... 52

*Anderson v. Diamondback Inv. Grp., LLC*,
117 F.4th 165 (4th Cir. 2024) ....................................................................................... 8

*Anderson v. Kingsley*,
877 F.3d 539 (4th Cir. 2017)................................................................................... 52–53

*Barbre v. Pope*,
402 Md. 157 (Md. 2007).............................................................................................. 70

*Basta v. Novant Health Inc.*,
56 F.4th 307 (4th Cir. 2022).......................................................................... 53, 54, 67

*Biondo v. Kaledia Health*,
935 F.3d 68 (2d Cir. 2019) ..................................................................................... 56, 58

*Board of County Commissioners of Bryan Cty. v. Brown*,
520 U.S. 397 (1997)..................................................................................................... 52

*Brinkley v. Harbour Recreation Club*,
180 F.3d 598 (4th Cir. 1999)....................................................................................... 51

*Brizuela v. City of Sparks*,
2022 WL 3229389 (D. Nev. Aug. 10, 2022)....................................................... passim

*Brown v. Dep't of Pub. Safety & Corr. Servs.*,
383 F. Supp. 3d 519 (D. Md. 2019) ............................................................................ 34

*City & Cnty. of San Francisco, Calif. v. Sheehan*,
575 U.S. 600 (2015)................................................................................................ 48–49

*Crane v. Lifemark Hosps., Inc.*,
898 F.3d 1130 (11th Cir. 2018) ................................................................................... 54

*Desert Palace v. Costa*,
539 U.S. 90 (2003)....................................................................................................... 51

*Durr v. Slator*,
2023 WL 8277960 (N.D.N.Y. Nov. 30, 2023) ................................................ 21–22, 26, 27, 29

*Duvall v. County of Kitsap*,
260 F.3d 1124 (9th Cir. 2001)..................................................................................... 68

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ................................................................................... 52

*J.D. by Doherty v. Colonial Williamsburg Found.,*
   925 F.3d 663 (4th Cir. 2019) ........................................................................ 8

*Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.,*
   2013 WL 1010357 (D. Md. Mar. 13, 2013) ............................................... 19

*Kartman v. Markle,*
   582 F. App'x 151 (4th Cir. 2014) ............................................................... 62

*Koon v. North Carolina,*
   50 F.4th 398 (4th Cir. 2022) ...................................................... 52, 54, 68, 69

*Loeffler v. Staten Island Univ. Hosp.,*
   582 F.3d 268 (2d Cir. 2009) ................................................................. 57, 63

*Makdessi v. Fields,*
   789 F.3d 126 (4th Cir. 2015) ...................................................................... 62

*McGowan v. Prince George's County,*
   401 F. Supp. 3d 564 (D. Md. 2019) ........................................................... 70

*Montgomery v. District of Columbia,*
   2019 WL 3557369 (D.D.C. Aug. 5, 2019) ................................................. 54

*Montgomery v. District of Columbia,*
   2022 WL 1618741 (D.D.C. May 23, 2022) .......................................... 51, 58

*Munday v. Lees-McRae Coll.,*
   2022 WL 17252598 (W.D.N.C. Nov. 28, 2022) ......................................... 17

*Okwa v. Harper,*
   757 A.2d 119 (Md. 2000) ............................................................................ 70

*Paulone v. City of Frederick,*
   787 F. Supp. 2d 360 (D. Md. 2011) .................................... 19, 63, 67, 68

*Pierce v. District of Columbia,*
   128 F. Supp. 3d 250 (D.D.C. 2015) ..................................................... 20, 52

*Proctor v. Prince George's Hosp. Ctr.,*
   32 F. Supp. 2d 820 (D. Md. 1998) ............................................................. 52

*Rosen v. Montgomery County,*
   121 F.3d 154 (4th Cir. 1997) ................................................................ 67, 68

*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*,
  673 F.3d 333 (4th Cir. 2012)..................................................................... 19, 34

*Sheehan v. City & Cnty. of San Francisco*,
  743 F.3d 1211 (9th Cir. 2014) ......................................................................... 48

*Shields v. Prince George's Cnty., Maryland*,
  2019 WL 3536800 (D. Md. Aug. 2, 2019)..................................................... 18, 21, 25

*Short v. City of Rochester*,
  2022 WL 17990106 (W.D.N.Y. Dec. 29, 2022)................................................ 22, 26

*Solis v. Prince George's County*,
  153 F. Supp. 2d 793 (D. Md. 2001) .................................................................. 70

*Stutzman v. Krenik*,
  350 F. Supp. 3d 366 (D. Md. 2018) .................................................................. 70

*Summers v. Altarum Inst., Corp.*,
  740 F.3d 325 (4th Cir. 2014)............................................................................. 8

*T.O. v. Fort Bend Indep. Sch. Dist.*,
  2 F.4th 407 (5th Cir. 2021)............................................................................... 68

*Tarashuk v. Doroski*,
  2023 WL 6567883 (4th Cir. Oct. 10, 2023) ..................................................... 20

*Tarashuk v. Orangeburg County*,
  2022 WL 969752 (D.S.C. Mar. 30, 2022)............................................. 20, 21, 27, 29

*Taylor v. Wexford Health Sources, Inc.*,
  737 F. Supp. 3d 357 (S.D.W. Va. 2024) ........................................................... 68

*Thompson v. Wakefern Food Cor.*,
  No. RDB-15-1240, 2015 WL 9311972 (D. Md. Dec. 23, 2015) ........................ 9

*United States v. Collins*,
  415 F.3d 304 (4th Cir. 2005)............................................................................ 68

*Wood v. Md. Dep't of Transp.*,
  732 F. App'x 177 (4th Cir. 2018)................................................................. 50, 51

*Younger v. Crowder*,
  79 F.4th 373 (4th Cir. 2023)............................................................................ 67

**Statutes**

122 Stat. 3553-54 (2008) ................................................................................... 8

42 U.S.C. § 12102...................................................................................................... 8, 9

**Rules**

Pub. L. No. 110-325 § 2................................................................................................ 8

**Regulations**

28 C.F.R. § 108 ......................................................................................................... 17

28 C.F.R. § 35.101 ....................................................................................................... 8

28 C.F.R. § 35.108 ...................................................................................... 8, 9, 17, 18

28 C.F.R. § 35.139 ..................................................................................................... 51

28 C.F.R. § 35.160 ................................................................................................ 19, 53

29 C.F.R. § 1630.2 ..................................................................................................... 18

**INTRODUCTION**

Instead of helping Ryan LeRoux, a young Black man struggling with a mental health disability, Montgomery County police officers gave him a choice: comply with police commands, or die. But Ryan, who was experiencing the symptoms of his disability when police shot and killed him, was unable to comply in the manner the officers demanded because of his disability. The result was predictably tragic. What happened on July 16, 2021 is an altogether too familiar story in this Nation's history where police violence needlessly kills Black people and people with disabilities. Defendants, Montgomery County and police officers, ask this Court to ignore the myriad material disputed facts and insulate them from liability. This Court should reject Defendants' motion for summary judgment and allow a jury to decide this case.

**BACKGROUND**

Ryan LeRoux had a history of increasing mental health struggles as a young man. His disability-based behavior repeatedly brought him to the attention of the police. In October 2020, State police officers found him wandering naked on the highway, paranoid, and in the midst of an acute mental breakdown. Ex. 1, Crisis Center Records at MC 32511; Ex. 2, Northwest Hospital Records at NORTHWEST HOSPITAL 000012, 000025, 000141. As recorded in reports available through police databases, police transported Ryan to Northwest Hospital, where medical personnel involuntarily admitted him for over a week. Ex. 2 at NORTHWEST HOSPITAL 000012-13, 000065; Ex. 1 at MC 32511-12. For days, Ryan was paranoid and withdrawn. Ex. 2 at NORTHWEST HOSPITAL 000140, 144, 146-47, 150-54, 165-67. Doctors diagnosed him with a mental illness REDACTED Ex. 2 at NORTHWEST HOSPITAL 000015, and prescribed him an anti-psychotic to help him cope with his persistent paranoia and other symptoms of his condition. Ex. 2 at NORTHWEST HOSPITAL 000012–15, 000065.

1

After discharge, in November-December 2020, Ryan continued to receive mental health treatment and anti-psychotic medication through Montgomery County's Crisis Center. Ryan told Crisis Center clinicians about his continued paranoia and mental health struggles. Ex. 1 at MC 32511-15, 32526-28. On July 12, 2021—four days before Montgomery County officers killed him—Ryan had another mental breakdown, and Montgomery County police officers again detained him. This time, Ryan had barricaded himself in a Holiday Inn Express room and refused to leave. After officers forced entry, they found Ryan lying in bed, smiling, immobile, and unresponsive to officer commands. The incident was again recorded in readily available police reports. Ex. 3, MCPD Incident Report at MC 01396.

On July 16, 2021—the night the police killed him—Ryan had another mental health crisis, this time in the drive-thru lane of a McDonald's in Gaithersburg. After disputing whether he had paid for his food, Ryan reclined in the driver's seat, put on headphones, and became unresponsive to McDonald's employees' entreaties to leave the drive-thru lane. Defs.' Summ. J. Mem. Ex. 1, 911 Call Recording (HCSAO 000003). Faced with Ryan's conduct, a McDonald's employee called 911, described Ryan's behavior, partially identified the license plate on Ryan's car, and requested help removing Ryan from the property. The McDonald's worker told the 911 call-taker that Ryan was acting "crazy." *Id.* Although Montgomery County training materials establish that trespassing calls often involve individuals with mental health disabilities, *e.g.*, Ex. 4, BJA Pilot Project Scenarios (August 2016) at MC 11508, the 911 call-taker did not ask follow-up questions to determine if this call concerned a mental health emergency, Defs.' Summ. J. Mem. Ex. 1, and did not note in the call-taking computer system or otherwise tell officers that it did.

2

Because the call was coded a low-priority trespassing call—there was no threat of violence or other reason to prioritize it—the call remained "pending" for about 75 minutes, meaning no police responded to the scene. Ex. 5, Timeline, MC 00532-53; Ex. 6, Worden Dep. Excerpts at 62:2-64:19. During that 75 minutes, the 911 call-taker did not run Ryan's license plate to determine his identity; did not search computer databases to see if Ryan had prior interactions with the police or the Crisis Center; and did not dispatch mental health professionals that Montgomery County makes available for this kind of call. The same is true of the Montgomery County police officers who were aware of the pending call. Officer Ana Owen twice drove by the McDonalds, saw that Ryan's car remained blocking the drive-thru lane, and called the McDonald's employee who had called 911 for updates. Ex. 7, Owen Dep. Excerpts at 55:8-57:16, 59:11-60:20, 85:10-90:16. But she took no action based on the apparent mental health nature of the call.

When the first officer (Brooks Inman) responded to the scene at 10:28 pm, Ex. 5; Defs.' Summ. J. Mem. Ex. 8, there was still no evidence that Ryan was threatening. Upon approaching Ryan's vehicle and observing a handgun on the front passenger seat, Officer Inman drew his weapon, held Ryan at gunpoint, and yelled expletives. Ex. 8, Inman Dep. Excerpts at 155:10-156:4, 222:12-223:19. Ryan did not speak, did not move, and did not respond in any meaningful way to being held at gunpoint by a screaming police officer, which Officer Inman would repeatedly recount as strange to his fellow officers throughout the response. *E.g.*, Defs.' Summ. J. Mem. Ex. 8 at 10:35:00-10:35:15, 10:36:10-10:37:55. Officer Inman radioed for backup; within minutes, more officers arrived, surrounded Ryan's car at a distance of about 10 yards, drew their handguns (or, in one case, an assault rifle) and commanded that Ryan put his hands up even though there was no indication Ryan had touched his gun or was a threat. Ex. 9, Cerny Dep.

3

Excerpts at 105:6-13, 113:19-114:13, 121:6-11; Ex. 10, Vaughan Dep. Excerpts at 111:14-113:12; Ex. 7 at 66:15-67:15; Ex. 6 at 74:12-16. Even after the McDonald's was evacuated and the scene "secured"—which occurred within minutes of Officer Inman's arrival, Ex. 11, Schmuck Dep. Excerpts at 84:20-87:14; Ex. 12, Dillman Dep. Excerpts at 68:7-72:18; Ex. 6 at 69:1-16, 78:8-80:1, 109:8-110:11, 117:1-3—the officers continued to escalate the encounter.

In the throes of another mental health episode, Ryan could not comply as the officers expected. So the 17 officers on scene escalated tensions further. They blinded Ryan with spotlights; barked commands over a loudspeaker (without using Ryan's name); boxed Ryan's car in with police cruisers immediately in front of and behind Ryan's car; placed spiked strips in front of and behind Ryan's car to further immobilize it; and pinned Ryan against the McDonald's. Ryan knew the officers were there; he would periodically sit up and stare at the officers but then lay back down in the reclined driver's seat of his car, looking at his cell phone with headphones on. *E.g.*, Ex.7 at 68:11-70:9, 79:6-80:20, 82:11-20, 85:10-89:9; Ex. 6 at 70:22-74:16, 116:4-117:3, 121:18–124:19, 133:12-135:22; 148:6-149:1; Ex. 8 at 166:2-21, 172:13-15, 174:3-175:1, 183:17-184:3, 191:7–192:5, 205:15-208:18, 217:9-218:19, 222:12-223:19; Ex. 9 at 143:12-144:16, 151:12–20, 178:13-185:2; Ex. 12 at 75:3-17, 99:11-102:1, 203:2-20; Ex. 11 at 95:7-98:22, 139:18-140:19, 142:19-143:8; Defs.' Summ. J. Mem. Exs. 8, 12, 14, 16, 19, 20 (Officers Inman, Vaughan, Cerny, Schmuck, Worden, and Dillman body-worn camera footage). By the time police killed Ryan, they knew who Ryan was and had access to information about his prior mental health crises and interactions with County police. But they ignored that information.

These aggressive, "force first" actions flew in the face of Montgomery County Police Department ("MCPD") policies and training. As is true across the country, Montgomery County

4

police officers interact with individuals with mental illness nearly every day—it is a core part of their job. *See, e.g.*, Ex. 13, Mental Illness In-Service 2018 Online Module 1, MC 2361-2413 ("There is rarely a workday that goes by without officers encountering someone with a mental illness"). Pursuant to their training, officers are supposed to recognize signs of mental illness like those Ryan was displaying. §§ II.D, III.B.3, IV.A, C, *infra* (mental health training modules and officer testimony regarding their training). That Ryan was experiencing symptoms of a mental health crisis was so obvious that multiple officers on scene thought he may have a mental health disability and/or concluded aloud that Ryan was likely suicidal and potentially engaging in "suicide by cop" behavior. § I.B.7, *infra.* When faced with these circumstances, Montgomery County officers are trained to understand that the individual in crisis cannot comply and to alter their tactics accordingly—not continue doing the same thing. *E.g.*, Ex. 8 at 59:10-62:20. Officers are supposed to de-escalate the scene by giving the person time and space to emerge from the acute crisis. They are supposed to gather information about the individual—including past interactions with the police or medical information—to inform the police response. Also, they are supposed to summon to the scene specialized mental health resources the County makes available precisely for situations like this—experts who can build bridges and communicate with individuals experiencing a mental health crisis and ensure a peaceful outcome. Such resources include crisis negotiators, the Crisis Center, the Mobile Crisis Outreach Team ("MCOT"), and Crisis Intervention Team ("CIT") trained officers.

Rather than summon these specialized mental-health resources, officers, with guns drawn, contemplated ever more aggressive tactics, such as smashing Ryan's car window and "pepper spraying his ass." Ex. 8 at 222:12-223:19; Defs.' Summ. J. Mem. Ex. 8 at 10:32:50-10:33:05, 11:01:20-11:01:55. Sergeant Worden, who assumed command of the scene after

5

arriving at 10:35 pm, largely gave no direction, leading multiple officers to call out asking what the plan was or to comment on the lack of one. Defs.' Summ. J. Mem. Ex. 8 at 10:45:15, Ex. 14 at 22:14:15-20. One officer walked away to urinate in a nearby bush and talked with passersby about Ryan's behavior. Ex. 14, Chad Eastman BWC at 22:40:27-22:46:00. Even though Ryan's disability would have been apparent to a reasonable officer—with some officers on scene in fact commenting on it—no officer took any action to modify the force-first police response or call specialized resources.

Around 10:47 pm, a new ranking officer—Captain Brian Dillman—arrived on scene. The need for specialized mental health resources was so obvious to Captain Dillman that, about two minutes after arriving, he summoned crisis negotiators—police officers who are specially trained to communicate with individuals in crisis. But it was too late. At 11:02 pm, officers saw Ryan raise his arm, so they shot him—with a crisis negotiator moments away from arrival. There is no evidence that Ryan ever fired his gun.

This lawsuit focuses on the hours leading up to 11:02 pm, when the actions and inactions of police officers and MCPD's Emergency Communications Center ("ECC") personnel made tragedy all but inevitable. The across-the-board failures to recognize Ryan's disability, ensure effective communication with him, and implement reasonable accommodations violated the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").

Further, a reasonable jury could find that Montgomery County was deliberately indifferent to Ryan's ADA and Section 504 rights. First, the County never sent available mental health resources to help Ryan, despite his apparent need. Second, the County was well aware of the need to accommodate mental health disabilities and the longstanding deficiencies in the

6

County's response to such calls for service but did not fix known problems. Indeed, prior to Ryan's killing, Montgomery County completed a third-party audit that found the same deficiencies at issue in this case: inadequate mental health screening and notation by ECC personnel, inadequate polices and training for police officers, and insufficient availability of accommodations. Ex. 15, ELEFA June 2020 Report, MC 17353-17426. Other reports issued before Ryan's death made similar findings. Ex. 16, Office of Legislative Oversight Report 2021-4, Public Safety Responses to Mental Health Situations (March 2021), MC 17427-17502; Ex. 17, 2021 Reimagining Public Safety Task Force Recommendations Report at MC 17514.[1] A reasonable jury could find that Montgomery County and the officer-defendants were deliberately indifferent to Ryan's ADA and Section 504 rights, and, for state-law claims, that actions and inactions of defendants also constitute gross negligence and malice. Moreover, the County knew (yet did not address) that its specialized mental-health resources were ineffective. For instance, MCPD's principal policy on interacting with individuals with mental illness states that CIT-trained officers should take command of a scene involving an individual with a mental impairment and decide which mental-health resources to summon. In practice, that never happens, in part because (contrary to its policy) MCPD never implemented a live-tracking tool for CIT-certified officers in the dispatch system. Moreover, CIT training itself is inadequate—as highlighted by reports issued before Ryan's death criticizing the CIT program.

---

[1] The County agrees with the ELEFA or the Office of Legislative Oversight findings. Ex. 18, Tabachnick 30(b)(6) Dep. Excerpts at 55:14-20, 63:13-64:11.

## I.     Ryan LeRoux Had a Mental Health Disability—Likely Schizophrenia.

Defendants first argue that Ryan did not have a "disability" under the ADA and Section 504 and thus is not eligible for those statutes' protections. The Court should reject that argument outright. At a minimum, a genuine factual dispute exists.

### A.     "Disability" is Defined Broadly and Does Not Require Extensive Analysis.

Plaintiffs alleging ADA and Section 504 claims face only a "minimal burden" to establish a "disability" under those statutes. *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 177 n.6 (4th Cir. 2024). This "is not meant to be a demanding standard." *J.D. by Doherty v. Colonial Williamsburg Found.,* 925 F.3d 663, 670 (4th Cir. 2019). "[T]he definition of disability 'shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted.'" *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (quoting 42 U.S.C. § 12102(4)(A)); *accord* 28 C.F.R. § 35.108(a)(2)(i). Congress passed the ADA Amendments Act of 2008 to "reinstat[e] a broad scope of protection . . . under the ADA." Pub. L. No. 110-325 § 2(b)(1), 122 Stat. 3553-54 (2008); *see* 28 C.F.R. § 35.101(b) ("The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA."); ECF 51 at 13–16 (outlining relevant legal standard).

The ADA definition of "disability" includes a "mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities include, *inter alia*, "communicating," "interacting with others," "concentrating," and "thinking." 28 C.F.R. § 35.108(c)(1)(i). As this Court has noted, a mental impairment "does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." ECF 51 at 13–14 (quoting 28 C.F.R. § 35.108(d)(1)(v)). That is because the term "substantially limits" "shall be construed broadly in favor of expansive coverage" and, again, "is not meant to be a demanding standard"—indeed, whether an individual

8

has a "disability" "should not demand extensive analysis." 28 C.F.R. § 35.108(d)(1)(i)-(ii).

Mental impairments such as schizophrenia and depression "will 'virtually always' be found to

impose a substantial limitation on [a] major life activity" because they "each substantially limit[]

brain function." 28 C.F.R. § 35.108(d)(2)(ii)–(iii). The same is true for psychotic disorders writ

large. *See* ECF 51 at 14 (quoting *Thompson v. Wakefern Food Cor.*, No. RDB-15-1240, 2015 WL

9311972, at *6 (D. Md. Dec. 23, 2015) for the proposition that a "psychotic disorder" could

"substantially limit" major life activities and qualify as an ADA disability).[2]

### B.      A Reasonable Jury Could Conclude Ryan Had a Mental Impairment Based on His Diagnoses, Prescription, Treatment History, and Behavior.

Especially in light of the lenient applicable standard, a reasonable jury could conclude

Ryan had a mental health disability. Carleigh Sailon, an expert clinician who routinely diagnoses

individuals with mental health disabilities, examined all the evidence and concluded that Ryan

"suffered from some form of psychotic mental health disorder, likely schizophrenia." Ex. 19,

Sailon Report at 8. Jesse Trevino, a former police officer and expert instructor on how police

should recognize and respond to symptoms of mental illness, similarly concluded that Ryan's

behavior suggested "psychosis and/or suicidality." Ex. 20, Trevino Report at 12.

That conclusion—that Ryan had a "mental impairment"—is amply supported by the

record, including (1) Ryan's prior involuntary hospitalization in October 2020 after he tore off

---

[2] Contrary to Defendants' assertion (Summ. J. Mem. at 35), an individual also may have a "disability" even if it is episodic; there is no requirement that a disability's "actual or expected duration" exceed "six months." 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). The "six month" provision Defendants cite applies on where an individual is "regarded as" having a disability—not, as here, where the person has a disability. *See* 28 C.F.R. § 35.108(a)(1) (setting out three ways a person may be protected—an actual disability, a record of a disability, or being regarded as having a disability) & 28 C.F.R. § 35.108(d)(2)(ix) (the six-month limitation does not apply to individuals that have an "actual disability").

his clothes, threw away his money, and wandered around naked on a highway; (2) his diagnoses, including an October 2020  diagnosis of "unspecified psychosis" and a personal and family history of struggles with mental health issues; (3) his paranoia and nightmares during the ten months leading up to his death; (4) his prescription for an anti-psychotic medication that he believed he could not live without (as well as evidence that he was still taking that medication the night he was killed, ten months after it was prescribed); (5) his prior arrest record while trespassing and his arrest by Montgomery County police days before he was killed; and (6) his behavior during his final two hours on the night he was killed—behavior that the witness who called 911 described as "crazy" and that three different police officers thought was so abnormal that it indicated Ryan was suicidal.

### 1.    Mental Health History.

More than two years before he was killed, Montgomery County became aware of Ryan's mental health issues. In April 2019, when he was 19 years old, the Clinical Assessment and Transition Services (CATS) office within Montgomery County's Department of Health and Human Services examined Ryan, noted he had been diagnosed with ADHD and prescribed Adderall as a child, and concluded that Ryan presented as **REDACTED** and was not communicative. Ex. 21, Ryan LeRoux CATS Records, MC 32507-10. Because Ryan's family also had a history of mental illness, Ryan was at "higher risk" for mental impairments as he grew up; his older brother, Daniel LeRoux, had been diagnosed with unspecified psychosis, major depressive disorder, and unspecified schizophrenia as far back as 2014. Ex. 22, Sailon Rebuttal Report Ex. A, Daniel Leroux Medical History; *Id*. at 8 n.4 (Ryan's family history "further supports that Ryan had a mental health disability").

10

##### 2.    October 2020 Hospitalization and Diagnosis.

Ryan's mental health troubles reached an initial crisis point 18 months later. On October 20, 2020, believing that REDACTED and REDACTED and that REDACTED were REDACTED Ryan threw away his cell phone and money, tore off his clothes, and ran naked REDACTED REDACTED Ex. 1 at MC 32511; Ex. 2 at NORTHWEST HOSPITAL 000012, 000141. Ryan was picked up by Montgomery County police and transported to Northwest Hospital; at the time, he was suffering from REDACTED *Id*. at NORTHWEST Dr. Donovan Parkes examined and diagnosed him with a REDACTED with symptoms including REDACTED and REDACTED REDACTED *Id*. at NORTHWEST HOSPITAL 000038–42, Ryan was involuntarily admitted for a REDACTED and prescribed risperidone (also known by the brand name Risperdal) an anti-psychotic medication, *id*. at NORTHWEST HOSPITAL 000012–13, 000065.

Ryan remained hospitalized for eleven days. Ex. 1 at MC 32511–12. At first, he REDACTED REDACTED and REDACTED Ex. 2 at NORTHWEST HOSPITAL 000140. His serious symptoms persisted. On October 22, two days after admission, Ryan was still experiencing REDACTED *Id*. at NORTHWEST HOSPITAL 000144. On October 23, staff noted he REDACTED REDACTED his mother is who she says she is. *Id*. at NORTHWEST HOSPITAL 000146-47, 000165. Four days after police picked him up, Ryan remained REDACTED refused to participate in group activities, and REDACTED REDACTED *Id*. at NORTHWEST HOSPITAL 000146-47. By October 26—nearly a week after his admission—Ryan was still REDACTED and REDACTED

11

REDACTED because, in his view, REDACTED

; accordingly, staff continued with their goal of REDACTED

with Ryan. *Id*. at NORTHWEST HOSPITAL 000150–54. By October 27, Ryan was still

REDACTED than before. *Id*. at NORTHWEST HOSPITAL 000166–7.

At the time of his discharge on October 29, Northwest Hospital clinicians diagnosed

Ryan with Psychosis (F29), which is REDACTED

REDACTED *Id*. at NORTHWEST HOSPITAL 000015; Ex. 22 at 7.

According to the DSM-5, "unspecified psychosis" is

> a category that applies to presentations in which symptoms characteristic of a schizophrenia spectrum and other psychotic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the schizophrenia spectrum and other psychotic disorders diagnostic class.

Ex. 22, Sailon Rebuttal Report at 6–7. That diagnosis meant Ryan "may in fact have

schizophrenia or another psychotic disorder." *Id.* at 7. According to Northwest Hospital

clinicians, Ryan's REDACTED also was a REDACTED Ex. 2 at NORTHWEST

HOSPITAL 000065.

Although Ryan was diagnosed with "unspecified psychosis," such a diagnosis is not

necessary to show a plaintiff has a "disability," because "nothing in Title II of the ADA requires

that a person be formally diagnosed with a mental health disorder before finding the person has a

mental impairment." *Brizuela v. City of Sparks*, 2022 WL 3229389, at *10, 32 (D. Nev. Aug. 10,

2022), *aff'd in part, rev'd in part, dismissed in part,* 2023 WL 5348815 (9th Cir. Aug. 21, 2023)

(concluding a decedent had a "disability" because police had taken him to the hospital for a

psychiatric evaluation and hospital records showed he "ha[d] a record of psychosis").

12

### 3.    Anti-Psychotic Prescription.

Further underscoring his mental impairment, Ryan was prescribed Risperdal (also known as Risperidone) upon his discharge from Northwest Hospital. Ex. 2 at NORTHWEST HOSPITAL 000012. Because Risperdal, an anti-psychotic, "is commonly used to treat schizophrenia and psychosis," this prescription further evidences his mental health disability. Ex. 22, Sailon Rebuttal Report at 8. Ryan continued to use and benefit from Risperdal in the months after his release from Northwest Hospital. He sought to refill this prescription, Ex. 1 at MC 32511, and MCPD found a bottle of Risperidone in Ryan's car the night they killed him, Ex. 23, Montgomery County RFA Responses, No. 16. The fact that Ryan used and benefited from Risperdal/Risperidone over an extended period "suggests Ryan was responding well to this antipsychotic medication and saw value in continuing medication management—which suggests his symptoms were caused by a mental health disorder." Ex. 22, Sailon Rebuttal Report at 8.[3]

### 4.    November 2020 Crisis Center Visit.

In the months following his discharge, Ryan continued to seek help for his mental illness at Montgomery County's Crisis Center.[4] On November 21, 2020, Ryan told a Crisis Center employee that he was still suffering from mental illness. His brain, he explained, was REDACTED and had not REDACTED; according to Ryan, even when he took anti-psychotic

---

[3] Ryan later claimed his October 2020 crisis and stay at Northwest Hospital was caused by inadvertently smoking marijuana laced with synthetic cannabinoids. That conclusion contradicts the diagnosis he received at Northwest Hospital, where clinicians coded Ryan's REDACTED Ex. 2 at NORTHWEST HOSPITAL 15, a code that clinicians only use when the psychosis in question "is not caused by a substance" such as synthetic cannabinoids," Ex. 22, Sailon Rebuttal Report at 7-8 (explaining why Ryan's symptoms reflected his mental impairment, not "laced" marijuana consumption). There is no evidence that Ryan ever tested positive for synthetic cannabinoids, in October 2020 or at any other time. Ex. 23 Nos. 4–5.

[4] Department of Health and Human Services , Montgomery County 24 Hour Crisis Center, https://www.montgomerycountymd.gov/HHS-Program/Program.aspx?id=BHCS/BHCS24hrcrisiscenter-p204.html.

13

medication, he still had REDACTED and REDACTED

REDACTED Ex. 1 at MC 32511–15.

Ryan also made clear the anti-psychotic medication was essential for him. The medication



REDACTED without it, he REDACTED

REDACTED

REDACTED and fears he may REDACTED

REDACTED *Id.* A Crisis Center clinician concluded he was REDACTED had

REDACTED suffered from REDACTED and had

an REDACTED *Id.*

### 5.    December 2020 Crisis Center Visit.

On December 7, 2020, Ryan again visited Montgomery County's Crisis Center. His

paranoia remained REDACTED he still had REDACTED and reported that he REDACTED

REDACTED and still REDACTED although his

REDACTED due to his use of the anti-psychotic medication he had been

prescribed. Ex. 1 at MC 32526–28. Ryan reported at one point during this visit that he had not

used marijuana since his admission at Northwest Hospital. *Id.* at MC 32514. Ryan's "persistent

paranoia" in November-December 2020 "further supports the conclusion that Ryan had a mental

health disability." Ex. 22 at 8–9.

### 6.    July 12, 2021 Arrest at the Holiday Inn Express.

On July 12, 2021—four days before his death—Ryan exhibited the non-responsive,

catatonic, trespassing behavior that characterized his mental illness in another encounter with

MCPD.

On this day, Ryan had stayed at a Holiday Inn Express, then barricaded himself in the

hotel room and refused to leave. Montgomery County Fire and Rescue responded to the scene

14

but "cleared" it; the hotel then called for a police response because Ryan "was refusing to speak to anyone and refusing to leave." Ex. 3 at MC 01396. The responding police officers entered Ryan's hotel room and found Ryan lying in bed and "smiling at [the] officers." *Id.* Ryan was non-communicative and non-responsive; he remained silent and did not respond to the officers' commands. When officers pulled the bedsheets off him, he "grabbed [them] and pulled [them] over himself" again. *Id.* After officers helped him up, he "laid back down refusing to speak, shook his head no and smiled." After officers informed Ryan he was trespassing and if he did not comply with their orders, he would be arrested, Ryan "shook his head no and refused to get up." *Id.* "This behavior is strikingly similar to the behavior Ryan exhibited [] days later in the McDonald's drive-through and adds to the data and documentation that Ryan was dealing with mental health issues." Ex. 22 at 9. At the hotel, Ryan also displayed symptoms of catatonia (another indicator of mental illness), when he refused to move and communicate and "tensed up" once officers laid hands on him. Ex. 3 at MC 01396; Ex. 19 at 9 ("[P]eople living with schizophrenia who are in crisis often exhibit symptoms of catatonia," which include "not moving," "not talking," and "staring").

### 7.    July 16, 2021 Incident at the McDonald's.

Ryan's abnormal behavior the night he was killed further underscores his mental health disability. In fact, multiple officers responding to the McDonald's on July 16, 2021 concluded, based on Ryan's behavior alone, that he may have a mental impairment and/or be suicidal (which itself suggests a mental impairment). Ex. 7 at 79:6–14, 80:21–81:13, 97:20-98:7, 110:20-112:19; Ex. 12 at 169:3-172:5; Ex. 6 at 86:17-87:8, 160:18–161:18. After parking his car in the McDonald's drive-thru lane, Ryan became non-communicative and refused to move. McDonald's employees called 911 at 9:12 p.m. Defs.' Summ. J. Mem. Ex 1, HCSAO 000003. The caller reported Ryan's odd behavior, stating he had parked at the drive-thru lane window,

15

refused to move (such that a "big line" of cars backed up behind him), made claims at odds with reality (i.e., that he had paid for his food when he had not), and then put on headphones and became silent while blocking the restaurant's drive-thru traffic. The McDonald's caller concluded Ryan was "acting like, crazy out there." *Id.* Such behavior at the McDonald's drive-thru reflected and underscored Ryan's mental health disability. Ex. 19 at 8–9.

Ryan's behavior once police responded underscored his disability. Ryan was awake but "unresponsive" and had a "calm demeanor" even after officers (1) responded to the scene with flashing lights and sirens, (2) boxed in Ryan's car by placing one police car immediately in front and another immediately behind, (3) placed other police cars immediately around Ryan's car with flashing lights, (4) got out, surrounded Ryan's vehicle at a distance of no more than 10-15 yards, and "four or five officers" held Ryan at gunpoint, (5) yelled commands at Ryan, including over a loudspeaker, and (6) shone spotlights in his face (partly to blind him). Ryan knew the officers were there; he would periodically sit up and stare at the officers but then lay back down in the reclined driver's seat of his car, looking at his cell phone with headphones on. *E.g.*, Ex. 7 at 79:6-80:20, 82:11-20, 85:10-89:9; Ex. 6 at 72:8-74:16, 121:18–124:19, 133:12-135:22; 148:6-149:1; Ex. 8 at 166:2-21, 172:13-15, 174:3-175:1, 183:17-184:3, 191:7–192:5; Ex. 9 at 151:12–20, 173:11-174:20, 178:13-185:2; Ex. 11 at 95:7-98:22, 139:18-140:19; Ex. 12 at 75:3-17, 99:11-102:1. *See generally* Ex. 14; Defs.' Summ. J. Mem. Exs. 8, 12, 14, 16, 19, 20.

Phone calls from Montgomery County personnel to Ryan's cell phone further evidenced behavior arising from a mental health disability. At 10:55 pm, Montgomery County's Emergency Communications Center—which takes incoming 911 calls and dispatches officers to respond—called Ryan on his cell phone and spoke with him for about four minutes. On that call, Ryan struggled to communicate and (again) expressed beliefs at odds with reality by stating that that

16

he had his hands up (even though officers on scene could clearly see they were not), and then stating that he had put his hands out through his car's window as the 911 dispatcher requested (even though Ryan also had not done that). Defs.' Summ. J. Mem. Ex. 22; Ex. 9 at 155:8–13, 173:11-174:20; Ex. 10 at 172:20-173:14, 179:4-11. When Sergeant Worden later called Ryan on the phone, Ryan said "hello" and then promptly hung up. Ex. 6 at 152:11-22.

In light of Ryan's history of mental illness, his past diagnoses (including for unspecified psychosis), paranoia, anti-psychotic drug prescription and use, pattern of behavior at least from October 2020 to July 2021, and the expert opinions of Carleigh Sailon and Jesse Trevino, a reasonable jury could easily conclude Ryan had schizophrenia, psychosis, or another mental impairment. This Court should be especially skeptical of Defendants' argument because the one person who could testify definitively as to Ryan's mental limitations—Ryan himself—is no longer alive due to Defendants' actions. *See Brizuela*, 2022 WL 3229389 at \*32 (courts must subject defendants' summary-judgment arguments that a disability did not exist to "exacting scrutiny" if "the witness able to testify to material facts has been killed by the defendants").

**C.      Whether Ryan Had a Disability is an Issue for the Jury to Decide.**

Defendants argue that expert diagnosis and testimony is necessary to support the allegation that Ryan had a disability. Relying on an unpublished case from the Western District of North Carolina, Defendants suggest that Ryan's schizophrenia or psychosis "would be unfamiliar to a lay jury" and that a jury could not "fathom" his disability without expert guidance. Defs.' Summ. J. Mem. at 36 (quoting *Munday v. Lees-McRae Coll.*, 2022 WL 17252598, at \*9 (W.D.N.C. Nov. 28, 2022)). That argument contradicts the ADA regulation specifying that whether an individual has a "disability" does not demand "extensive analysis," 28 C.F.R. § 35.108(d)(1)(i)-(ii), and that this element "usually will not require scientific, medical or statistical evidence." 28 C.F.R. § 108(d)(vii). It is already well-established that the mental health

17

condition at issue here is a "disability" and that a jury can make that determination. 28 C.F.R. § 35.108(d)(2)(ii)-(iii) (mental impairments such as schizophrenia "will 'virtually always' be found to impose a substantial limitation on [a] major life activity" because they "each substantially limit[] brain function"); *Shields v. Prince George's Cnty., Maryland*, 2019 WL 3536800, at *12 (D. Md. Aug. 2, 2019) ("Mr. Shields suffered from schizophrenia, which qualifies as a disability."); ECF 51 ("Generally, courts have found that plaintiffs who suffer from schizophrenia have a disability for the purpose of the ADA because of the cognitive limitations that result from the condition.").

Moreover, a jury could easily understand how Ryan's symptoms, including hearing voices, persistent paranoia, and catatonic-like behavior, impaired his ability to "think" and "communicate." There also is ample evidence that Ryan's disability did, in fact, impair his cognition and ability to communicate, including with Northwest Hospital staff in October 2020 (where Ryan was withdrawn and non-communicative) and with police on multiple occasions in July 2021. Even if expert testimony were required, plaintiffs' experts concluded Ryan had a mental impairment that limited his ability to, among other things, communicate with officers. *E.g.*, Ex. 22 at 4–10; Ex. 20 at 11–12. That exceeds the "particularly simple and straightforward inquiry" the law requires to establish a mental health "disability." 29 C.F.R. § 1630.2(j)(3)(ii).

## II. Ryan's Mental Impairment, and the Need to Summon Specialists to Communicate with Him, Were Sufficiently Apparent.

Defendants next argue that even if Ryan had a disability, no jury could find that Defendants knew about it or knew which "modifications" he needed. Defs.' Summ. J. Mem. at 39-49. In essence, Defendants argue they cannot be liable under the ADA or Section 504 because responding officers "were never told" that Ryan had a mental health disability or required an accommodation. *Id.* at 44-45. These arguments misrepresent what the law requires and fail

18

because the facts here establish sufficient knowledge (or at least create a jury question on that issue).

> **A.      A Reasonable Jury Could Conclude Montgomery County Failed to Ensure Equally Effective Communication.**

Under the ADA and Section 504, Montgomery County is required to "ensure that communications with [individuals with disabilities] are as effective as communications with others." 28 C.F.R. § 35.160(a)(1); *see Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 337 (4th Cir. 2012). "When an individual is experiencing a behavioral health issue and officers do not use well-known methods for properly communicating with that individual . . . the law enforcement agency may not have taken appropriate steps to ensure that communications with individuals with disabilities 'are as effective as communications with others.'" U.S. Department of Justice, Investigation of the City of Phoenix and the Phoenix Police Department (June 13, 2024) at 97 (quoting 28 C.F.R. § 35.160(a)(1)). Here, there is ample evidence that Montgomery County did not ensure equally effective communication with Ryan—indeed, it is undisputed that communication with Ryan (both by responding officers and ECC personnel) was never successful. Ex. 6 at 98:12-16. A jury must decide "the ultimate factual question" of whether officers, by yelling instructions at Ryan, not following their training or policies on mental health, and not calling for mental health resources that were available, "ensured effective communication." *See Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 398 (D. Md. 2011).

> **B.      A Reasonable Jury Could Conclude Ryan's Disability was Sufficiently Apparent.**

Montgomery County also must provide an accommodation to Ryan LeRoux if the need for one is sufficiently obvious or apparent. *See Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*, 2013 WL 1010357, at *19 (D. Md. Mar. 13, 2013). A disability is sufficiently apparent if police officers "observed behaviors suggesting an individual was suffering from a mental illness or

19

received information from third parties suggesting the presence of a mental illness." ECF 51 at 17 (*citing Brizuela v. City of Sparks*, 2022 WL 3229389, at *33 (D. Nev. Aug. 10, 2022)). The specific disability in question need not be "obvious"—only the fact that the individual has a disability in the first place. *See Tarashuk v. Orangeburg County*, 2022 WL 969752, at *13 (D.S.C. Mar. 30, 2022), *aff'd sub nom. Tarashuk v. Doroski*, 2023 WL 6567883 (4th Cir. Oct. 10, 2023) (rejecting "Defendants' attempt to narrow the knowledge requirement to their knowledge of [the decedent's] specific mental health diagnosis of schizoaffective disorder"). Whether a disability was sufficiently apparent examines all relevant facts, including prior interactions between the individual and the public entity in question. ECF 51 at 18 (quoting *Brizuela*, 2022 WL 3229389 at *32 for the proposition that "[p]rior encounters with the police 'predicated on the same individual's suspected mental illness' can also be enough to imply knowledge, even if they involved separate officers in the same department").

Defendants' contrary interpretation of the legal standard—that they are not liable because responding officers were never told Ryan had a disability—is unmoored from the case law, which explains that "Section 504 and Title II [of the ADA] include an *affirmative obligation* to make benefits, services, and programs accessible to disabled people." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266 (D.D.C. 2015); *see Tarashuk*, 2022 WL 969752, at *13 ("[W]here the circumstances indicate that an individual has an obvious need for accommodations, the ADA shifts the burden of compliance on public bodies and their employees"). Defendants' argument sets the bar for recovery impossibly high, because "[i]ndividuals suffering from acute mental crises as a result of documented disabilities may not be able to communicate their diagnoses or request accommodations." *Tarashuk*, 2022 WL

20

969752, at *13. It would insulate police from ADA obligations, and, perversely, shift the onus to individuals with mental impairments to assert their rights.

Here, a reasonable juror could readily conclude that "the facts, viewed together," show that "the County knew or should have known of Mr. LeRoux's disability." ECF 51 at 19 n.4. Courts routinely deny defendants' summary judgment motions where, as here, at least some evidence indicates a mental illness was apparent. In *Shields v. Prince George's County*, for example, summary judgment was denied because the plaintiff "introduced some evidence that county employees knew [the decedent] suffered from a mental illness." 2019 WL 3536800, at *12 (D. Md. Aug. 2, 2019). In particular, the decedent "appear[ed] mentally ill," his behavior was "not normal," he was unable to "follow commands" and appeared "withdrawn," and one officer "knew something was wrong" but "didn't know what it was." 2019 WL 3536800, *2, 4, 12-13. Similarly, in *Brizuela v. City of Sparks*, summary judgment was denied because the officer "had reason to believe that [the decedent] may have a mental illness and may require accommodation." 2022 WL 3229389, *33 (D. Nev. Aug. 10, 2022). In particular, the decedent's behavior was "weird," a third party had told the officer the decedent had been "hearing voices," and the police department had taken the decedent in for a psychological evaluation "eight months prior" based on indications of paranoia and mental illness. *Id.* at *32-33. Similarly, in *Tarashuk v. Orangeburg County*, summary judgment was denied because police found the decedent "naked on top of the tractor trailer," "dazed," acting in a "bizarre" fashion, and "silent in response to attempts to communicate"; he "appeared to have shut down completely," and, instead of answering police questions, he would "give a blank stare." 2022 WL 969752, at *1-2, 13. Evidence of suicidality further underscores that a disability is "obvious." In *Durr v. Slator*, summary judgment was denied because the plaintiff "exhibit[ed] signs of an emotionally

21

disturbed person," including by "obstructing traffic," and had informed a 911 call-taker that "he was going to lay down" on the street "in the dark of night." 2023 WL 8277960, *11 (N.D.N.Y. Nov. 30, 2023); *see also Short v. City of Rochester*, 2022 WL 17990106, at *5 (W.D.N.Y. Dec. 29, 2022) (concluding, at the motion-to-dismiss stage, that a disability may be "obvious" if an individual is in "visible mental distress," engaged in "suicide by cop" and came from a location "known" to the police "to serve individuals with mental illness").

Viewing the facts together here, a reasonable juror could conclude Montgomery County "knew or should have known" Ryan had a mental impairment requiring an accommodation.

### 1. Montgomery County Was Already Familiar with Ryan's Mental Health Crises and Treatment.

The County already was familiar with Ryan through interactions with him during past crises. The County's own records—which officers and ECC call-takers and dispatchers have access to—make his mental illness plain. *See* ECF 51 at 18 (prior police encounters evidencing a suspected mental illness "can also be enough to imply knowledge," even if such prior encounters involve separate officers).

"[A]ny report that is generated by [the] Montgomery County Police Department" is available to ECC personnel, officers, and staff through the County's E-Justice database. Ex. 12 at 56:4-9, 187:10-16. Officers may search this database by typing in a person's name or vehicle information, and responsive police reports can be accessed within "minutes" of doing so. Ex. 12 at 56:4-9, 187:10-188:5; Ex. 10 at 92:5-94:15.[5] The County thus knew that, days before his death, its own police force had responded to a call at the Holiday Inn Express in which Ryan exhibited the same behavior indicating mental illness that he displayed at the McDonald's drive-

---

[5] Officers may retrieve information on e-Justice via laptop computers in their cruisers. Ex. 10 at 89:1-10.

thru. *See* Ex. 22 at 9 (Ryan's behavior at the Holiday Inn Express indicated "Ryan was dealing with mental health issues"). County officers and ECC personnel also have access to other databases, like the Linx and NCIC databases, which would have covered the police reports detailing Ryan's acute psychotic episode and involuntary commitment. Ex. 41, Onley Dep. Excerpts at 89:13-21; Ex. 55, Linx Database Excerpt, MC 001429-32. The County also knew that that its Crisis Center had treated Ryan in late 2020, where Ryan described his experience at Northwest Hospital, stated his brain was still REDACTED long after his Northwest Hospital treatment and had not REDACTED and that he REDACTED despite taking the anti-psychotic medication, and that Crisis Center clinicians renewed his prescription and concluded he his paranoia was REDACTED and that he suffered from REDACTED Ex. 1 at MC 32511–15.

### 2. 911 Phone Call Describing Ryan's Behavior and Stating Ryan is Acting "Crazy."

Ryan's disability also was sufficiently apparent from the start of the incident on July 16, 2021. The McDonald's employee calling Montgomery County's ECC described Ryan's bizarre behavior (e.g. making statements at odds with reality, becoming non-communicative, refusing to move from the drive-thru) and concluded that Ryan was acting "crazy." According to Ms. Sailon, Ryan's behavior as described on the 911 call was clearly "abnormal," and it was or should have been "apparent" to the ECC call-taker that this abnormal behavior indicated he had a mental impairment. Ex. 19 at 8–9. The testimony of Erika Lakey, Defendant's own emergency-communications expert, underscores the point. Early on, Montgomery County ECC call-takers must "code" the "chief complaint" of each incoming 911 call; that coding then determines the subsequent questions the ECC call-taker asks and how the call is handled. *See* Section III.A, *infra*. Although the Montgomery County call-taker here coded the 911 call as

23

"trespassing/unwanted," Ms. Lakey opined that, in light of the McDonald's employee's statements, the call-taker could have coded the call as a "mental disorder" call, that doing so would not have been "incorrect" (and that doing so would have prompted the call-taker to ask mental-health related follow-up questions). Ex. 24, Lakey Dep. Excerpts at 358:21-363:3; *see* Ex. 25, IAED Protocols at Def 17674 (options for call-takers using IAED protocols for coding a call's "chief complaint").

Further, even with the call coded as "trespassing/unwanted," trespassing calls are frequently associated with mental illness. As MCPD's training materials explain, a customer trespassing on the premises of a store and refusing to leave indicates the person has a mental illness and that officers should call in specialized resources, including the Crisis Center. Ex. 4 at MC 11508. The association between trespassing calls and mental illness is so strong that, according to the Department of Justice, "a non-police response," such as a response by mental health clinicians rather than police, "would generally be considered appropriate" for such calls. *See* Ex. 49 at 91–92; Ex. 22 at 2 ("purported 'trespass' calls often concern an individual with a mental health disability," and "some jurisdictions have expressly flagged incidents involving a 'trespass' as being appropriate for co-response or alternative response").

### 3. Police Observations of Ryan's Behavior—And Captain Dillman's Call for Crisis Negotiators.

Ryan's disability also was sufficiently apparent to Montgomery County because responding officers "observed behaviors suggesting [Ryan] was suffering from a mental illness." *See* ECF 51 at 17. Multiple officers concluded Ryan may have a mental impairment and/or be suicidal (which itself suggests a mental impairment). Ex. 7 at 79:6–14, 80:21–81:13, 97:20-98:7, 110:20-112:19; Ex. 12 at 169:3-172:5; Ex. 6 at 86:17-87:8, 160:18–161:18.

Those officers also testified that they knew Ryan was behaving abnormally—a sign of mental illness. Ex. 26, Chindblom Dep. Excerpts at 96:16-97:3. Sergeant Worden knew "there was something wrong here"; Ryan's behavior was "abnormal" and "needed to be addressed." Ex. 6 at 72:8–73:5, 121:18–123:2. Officer Inman also recognized that Ryan's presentation was atypical; when held at gunpoint, Ryan was "just looking at me I'm fucking stupid!" Ex. 8 at 191:7-192:5. Officer Owen concluded Ryan's behavior was "unusual" and "not normal"—Ryan "seemed liked drugged" and was conscious but "unresponsive" to being held at gunpoint for an extended period of time, which she thought could reflect mental illness. Ex. 7 at 60:8–20, 81:14–82:20, 94:2-98:12. Further, while on scene, a McDonald's employee told Officer Owen that, in her view, Ryan seemed "drugged" and was behaving "like something [is] going on in his mind." Ex. 20 at 6; Ex. 7 at 90:2-16. Sergeant Worden also thought Ryan's behavior was odd; Ryan was acting "slow," indicating that "something [was] going on with" him. Ex. 6 at 139:3–140:9. Captain Brian Dillman and Officer Cerny agreed Ryan's behavior was abnormal. Ex. 12 at 91:15-94:11, 99:11–102:1; Ex. 9 at 152:17-154:20. In sum, as was the case in *Shields*, officers at the McDonald's knew Ryan's behavior was "not normal"—they "knew something was wrong" even if they did not know precisely "what it was." *See Shields*, 2019 WL 3536800, at *2, 4, 12-13. As Mr. Trevino put it, "[a]t every stage of the Incident, Ryan presented as mentally disorganized, with flat affect, and engaged in abnormal behavior." Ex. 20 at 11. That more than suffices. Montgomery County's contrary argument would excuse officers of their obligations under federal law—even when the role of disabilities in a police encounter is clear and all parties agree that officers routinely interact with individuals with mental impairments.

Evidence of suicidality also makes the presence of a mental health disability apparent, *see* Ex. 12 at 112:10-21; Ex. 27, Suicide By Cop (or Law Enforcement Assisted Suicide) Training,

25

MC 23825 (individuals engaged in suicide-by-cop often have schizophrenia or bipolar disorder and are "acting on delusions and/or hallucinations"). Ryan's behavior the night he was killed was so abnormal that several officers expressly concluded Ryan was engaged in "suicide by cop"— further underscoring that Ryan's mental impairment was sufficiently apparent. *See Durr*, 2023 WL 8277960, at *11; *Short*, 2022 WL 17990106, at *5. Officer Owen remarked on scene to a fellow officer, "It's like a suicide-by-cop type of thing." Ex. 7 at 79:6-14. Then, after police killed Ryan, she told that same officer, "I guess I was right." *Id.* at 110:20-112:11; *see also id.* at 80:21-81:13, 112:12-19 (concluding that suicide-by-cop was "probable" given Ryan's behavior). Officer Chad Eastman similarly remarked on scene that he believed Ryan was suicidal and predicted that the standoff would end in Ryan's death. Ex. 12 at 169:3-172:5. Sergeant Worden, one of the commanding officers on the scene, agreed that suicide-by-cop was a "possibility" in light of Ryan's behavior. Ex. 6 at 160:18–161:18. Ryan's apparent suicidality, and these officers' acknowledgments that they did in fact recognize it while on scene, strengthens the conclusion that his need for an accommodation was sufficiently apparent. *See* Ex. 20 at 12 ("A reasonable police officer would have recognized Ryan's presentation and behavior arose from a psychotic and/or suicidal mental health crisis"); *see generally* Ex. 19.[6]

A reasonable jury also could conclude Ryan's disability was sufficiently apparent because, at the time Captain Dillman arrived on scene around 10:47 pm, the need for specialized resources in order to communicate with Ryan was so clear that, two minutes after arriving (at 10:49 p.m.), he called for crisis negotiators. Ex. 28 at MC 00671; Ex. 29 at MC 00197; *see* Ex. 12 at 102:22-103:16 (Dillman testifying he knew "within minutes" of arriving on scene that

---

[6] Defendants' argument that Ryan "did not make any statements" or perform "actions" suggesting suicidal ideation, Defs.' Summ J. Mem. at 45, is contradicted by these officers' conclusions.

crisis negotiators were needed). When Dillman arrived, there was "no conversation ongoing" with Ryan, and it was critical to "hav[e] someone there that at least could have the ability and the training and experience to communicate." *Id*. at 78:10-80:10.

### C. Defendants' Argument—That No Jury Could Conclude Ryan's Disability Was Sufficiently Apparent—Fails.

Defendants' arguments to the contrary readily fail. Relying on Fifth Circuit case law, Defendants first argue that Ryan's disability could not be sufficiently apparent if Ryan's behavior at the McDonald's "could have been" caused by substance use rather than his mental impairment. Defs.' Summ. J. Mem. at 43. But even if Ryan were intoxicated—and there is no medical evidence that he was, Ex. 23 No. 5—summary judgment still would be inappropriate because the evidence also supports the conclusion he had a mental impairment. *See Durr*, 2023 WL 8277960, at *8 (rejecting "the implied allegation that drunkenness would override or negate Plaintiff's bipolar disorder," because "whether Plaintiff was drunk at the time of the incident is immaterial to whether Plaintiff's bipolar disorder was also a qualifying disability."). At best, Defendants' (unsupported) suggestion that Ryan may have been intoxicated the night he was killed creates a dispute of fact that only a jury can decide. *See Tarashuk*, 2022 WL 969752, at *12–13 (whether a decedent's actions reflected intoxication or a mental impairment "effectively amounts to a factual dispute between the parties," because it was "possible that [the decedent's] symptoms were caused by an ADA-qualifying disability" when viewing the record in the plaintiff's favor). Further, intoxication and mental impairment are not mutually exclusive: the County's own training materials teach its officers that substance-use disorders are often "co-occurring" with mental illness and suicidality, such that substance use is itself another indicator of a mental health disability. Ex. 30, Training Module on Co-Occurring Disorders, MC 10717-

27

10742; Ex. 26 at 113:12-114:2 (CIT training for Montgomery County officers covers co-occurring disorders).

Montgomery County also suggests that, because Ryan spoke on his cell phone with ECC personnel for four minutes the night he was killed, his mental impairment could not have been sufficiently apparent. *See* Defs.' Summ. J. Mem. at 43. But that phone call supports Plaintiffs' argument (that Ryan was obviously unable to communicate and in the middle of a mental health crisis), not Defendants'. When the ECC called Ryan around 10:54 p.m., Ex. 29 at MC 00198; Ex. 31 at MC 27074–27075, Ryan made statements divorced from reality—just as he had when he told the McDonald's employee he had paid for his meal when in fact he had not. Ryan stated that his hands were "up" even though they were not. Ryan then stated he had put his hands "out the window" even though he had not. Ex. 31; Ex. 11 at 148:11-150:17. He then told the ECC caller that officers on scene "didn't tell me shit" even though officers were indisputably commanding Ryan to put his hands up, as Ryan later acknowledged on the phone call. Ex. 31. Defendants also omit that Sergeant Worden later called Ryan on the phone; Ryan answered, but then promptly hung up, underscoring his non-communicativeness and unusual behavior. Ex. 6 at 152:11-22. In any event, even if Defendants are right that multiple interpretations of Ryan's behavior were possible, that argument only emphasizes that a jury must decide the question.

### D. A Reasonable Jury Could Conclude that Montgomery County Knew Which Accommodations to Provide.

Defendants next argue they had no way of knowing which accommodation "might have been reasonable under the circumstances" and would have had to "guess" how to respond to Ryan's apparent disability. Defs.' Summ. J. Mem. at 46–48. That argument also fails to persuade.

Ryan's mental health disability impaired his ability to think and communicate. That is why he was non-responsive to police commands at the Holiday Inn Express and the McDonald's,

and why he was non-communicative during his stay at Northwest Hospital. How officers should have responded to Ryan's apparent disability is not guesswork, because "MCPD has specialized resources and procedures for encounters with people with mental illness and for mental health crises, and it has specialized procedures and resources for life-threatening standoff situations." Ex. 20 at 12. These specialized resources—which include de-escalatory tactics, the Mobile Crisis Outreach Team, the Crisis Center, a dedicated team of CIT-trained officers, and an Emergency Response Team (ERT)—are specifically provided to respond to individuals with mental impairments who are non-communicative—just like Ryan. *See* Section II.D, *supra* (outlining available resources for responding to mental health crises). Because Montgomery County only had to follow its own policies and employ resources it had already established for such circumstances, but failed to do so, a jury could conclude Defendants had sufficient knowledge of appropriate accommodations. *See Tarshuk*, 2022 WL 969752, at *13 (summary judgment is inappropriate if the accommodation is for officers to "follow" their own "protocols"); *see Durr*, 2023 WL 8277960, *11 (rejecting summary judgment motion where a reasonable juror could find police should have employed alternative procedures that were available at the time).

Moreover, it is clear (or at least genuinely disputed) that Montgomery County did not implement any of the accommodations available to it. Responding officers did not de-escalate the standoff with Ryan—they escalated it. Ex. 20 at 12 (noting that the County's response to Ryan "became more and more escalatory as it went on"). Officers did not summon the Mobile Crisis Outreach Team to the scene nor did they call the Crisis Center for advice. Although some officers on scene were CIT-trained, they did not use that training. Ex. 20 at 20-21. No one called for crisis negotiators or activated an ERT until Captain Dillman called for crisis negotiators minutes before Ryan was shot and killed—far too late.

29

**De-escalation:** All MCPD officers are trained in de-escalation tactics. *E.g.*, Ex. 9 at 58:14-63:11; Ex. 7 at 9:20-10:12, 14:17-15:21; Ex. 8 at 78:2-79:20); Ex. 32, Inman Employee Profile at MC 00041-42. CIT-trained officers receive additional instruction on de-escalation techniques. Ex. 7 at 27:10-28:2; Ex. 12 at 25:3-8; Ex. 26 at 103:15-112:18; Ex. 33, CIT Training Agenda at MC 7472. De-escalation is central to MCPD's interactions with the public— it is "how officers interact with their community," and there is an "expectation" that officers will use de-escalation tactics "in any communication" with "anybody." Ex. 34, Picerno 30(b)(6) Dep. Excerpts at 113:1-114:4. As a matter of MCPD policy, de-escalation techniques *must* be implemented before the use of force is authorized. Ex. 35, FC 131: Response to Resistance and Use of Force (May 17, 2021), MC 00602-14 § II.B & III.D; Ex. 34 at 48:1-7, 116:15-117:14. MCPD trains its officers that de-escalation techniques are the primary, most essential response to people in crisis, including mental health crises and suicidality. *See* Ex. 36, Intervening with People with Mental Illness Training (In-Service 2021), MC 27372 at 39-40 (when someone is in an apparent mental health crisis, police must "attempt to de-escalate" the "highly charged situation"); Ex. 37, Mental Health First Aid USA Training at MC 12095 (instructing officers how to "Try to De-escalate the Situation"); *see also* Ex. 38, Tactical De Escalation Training, MC 26400; Ex. 13, Mental Illness In-Service 2018 Online Module 1, MC 2361-2413 (explaining how officers should respond to individuals with mental illness); Ex. 39, Mental Illness Civilian In-Service 2020 Online Module at Def 18294-5 (similar).

**Crisis Intervention Team:** MCPD has a "Crisis Intervention Team" (CIT) program consisting of two parts. First, "MCPD's Crisis Intervention Team is the dedicated mental health response team staffed by two officers and a [Montgomery County Department of Health and Human Services] clinician," and it is tasked with "Responding to complicated mental health

30

situations as a co-responder team and providing telephonic assistance for individuals in crisis that have been in contact with police." Ex. 16 at MC 17430; Ex. 26 at 22:22-26:14.

Second, in July 2021, officers could become CIT-certified by volunteering for a 40-hour training program, which trained them on responding to people with mental illness. Ex. 26 at 47:13-50:16; Ex. 15 at MC 17372-73; Ex. 40, FC 921, Emergency Evaluation of Mentally Disordered Individuals (June 10, 2005) at MC 00636-37.

MCPD's policies provide for the use of CIT-certified officers and a CIT approach in responding to mental health crises like this one. Ex. 40 at MC 00636-37. Officers also are trained to call for CIT-trained officers when facing mental health crises. Ex. 13 at MC 2410; Ex. 39 at Def 18304; Ex. 36 at 41.

**Mobile Crisis Outreach Team:** MCPD has procedures for deploying specialized practitioners with expertise and experience in mental health to respond to scenes like this one. The Mobile Crisis Outreach Team (MCOT), based in the County's Crisis Center, is an "alternative response" program that makes mental health practitioners available to assist police in communicating with people in mental health crisis, including by "co-responding" with police to a scene. Ex. 18 at 27:7-35:3, 37:20-39:4, 42:21-44:11, 80:11-22, 99:10-101:7, 107:22-109:17, 112:21-113:5, 124:14-130:9. Officers know that MCOT's role is to "go and assist officers on the road [] when . . . it's not a black and white [] that [a] person is demonstrating mental illness" but the officers "feel something is not right"). Ex. 7 at 22:3-23:19, 24:1-9; Ex. 26 at 98:3-21 (officers should call MCOT if they are not sure if a subject has a mental illness). Even if a scene were too dangerous for the MCOT to be on the frontlines, the resource is still available to provide "technical assistance" to frontline officers responding to a call with a mental health component. Ex. 18 at 99:10-101:7, 105:13-107:20. Officers call the Crisis Center for MCOT assistance, *id.* at

72:4-22, and are instructed to do so when they encounter mental health crises, Ex. 42, Dealing with PTSD in the Community Training, MC 24044 at 27-28; Ex. 36 at 41; Ex. 43, Mental Illness Awareness Update, MCPD In-Service (2012), MC 02426-2467, at MC 02443; Ex. 7 at 26:2-27:9.

**Crisis Center Remote Support:** Independent of its MCOT resource, MCPD trains its officers that the Crisis Center is available as a 24/7 resource for assisting with mental health calls. Officers are trained that they can consult with the Crisis Center for technical assistance, either by phone or even by a special line on their radio system. Ex. 4 at MC 11500, 11508; Ex. 39 at Def 18305; Ex. 13 at MC 2410; Ex. 42 at 27-28 (officers should consider consulting with the Crisis Center when there is "Evidence of Psychosis" or a "Threat of violence and/or suicide"); Ex. 36 at 41; Ex. 44, Shift Meetings June 2019, MC 26858 at 5-8; Ex. 43 at MC 02443 (instructing officers to call for a CIT Team or the Crisis Center for over-the-phone help or Mobile Crisis Outreach).

**Crisis Negotiators:** MCPD maintains a unit of specially trained crisis negotiators, whose training and expertise extends to mental health calls, especially when a mental health disability creates barriers to communication. Ex. 45, O'Brien 30(b)(6) Dep. Excerpts at 19:10-17, 26:13-28:17, 29:18-31:7, 33:6-35:16, 64:9-71:21. Crisis negotiators have specialized skills to communicate effectively with individuals with mental illness (including non-responsive and suicidal individuals) and to de-escalate and gather information about a subject in crisis. Ex. 45 at 26:13-27:10, 29:18-31:7, 39:5-46:12, 47:6-53:20, 56:22-64:8, 71:22-74:12, 115:14-119:1; Ex. 12 at 27:14-28:16, 30:13-32:3, 78:10-80:10, 113:10-114:10, 177:1-178:3. Calling crisis negotiators is warranted where, as here, "initial efforts of communication from the responding officers to an individual in an agitated state or in a moment of crisis have proven to be unsuccessful," such as

32

when "an individual refus[es] to communicate." Ex. 45 at 27:14–28:17, 64:9–65:17. Per MCPD procedure, the first responding officer or the commanding officer on a scene is empowered to call for crisis negotiators once it becomes apparent that there is a crisis and communication barriers with the subject—no amount of time must elapse first. Ex. 45 at 55:4-56:20, 65:12-66:8, 71:4-15, 83:19-84:20. Officers are instructed that crisis negotiators are available to help with individuals in mental health crises and how to call them. *Id.* at 88:14-89:4; Ex. 34 at 120:6-122:11. "Crisis negotiators have specialized training and experience in communicating with subjects in crisis scenarios," and are trained to use a calm tone of voice, to show respect, to use names, and not to use obscenities, all in service of de-escalation. Ex. 45 at 26:13-27:10, 39:5–43:13, 44:12–46:12, 79:19–81:8. Crisis negotiators also are trained that de-escalation techniques include turning down police cruiser lights, turning off sirens and any other controllable sounds, and backing away from a subject. *Id.* at 33:6-34:19, 115:22–116:6, 116:8–117:1, 117:20–118:16.

**Barricade Situations (ERT Activation):** MCPD's Use of Force policy anticipates response modifications when dealing with "barricade situations"[7] situations, which is what MCPD officers testified the situation with Ryan became. Ex. 45 at 51:17-52:4, 99:17-100:7; Ex. 12 at 102:22-103:13, 109:17-110:2, 122:8-123:4; Ex. 11 at 99:17-102:1. The policy provides for activation of an "Emergency Response Team," which brings resources to a scene (including, in every instance, crisis negotiators) and imposes special procedures to organize the command structure and prevent chaos in the response. Ex. 46, FC 950, Emergency Response Team/Other High Risk Incidents (July 15, 2016), MC 00643-47, at 00644-5; Ex. 45 at 37:2-12, 99:17-100:7; Ex. 34 at 81:19-84:10. The senior ranking officer may initiate an ERT response. *Id*. at 85:2-3,

---

[7] A barricade situation refers to when an individual positions themselves inside of a structure and refuses to come out. Ex. 12 at 109:17-110:2.

92:3-13. *But see* Ex. 9 at 34:2-7, 65:18-22 (unaware of an MCPD policy covering barricade situations and unaware of the Emergency Response Team).

In sum, a reasonable jury could conclude that, because Montgomery County had specific policies to follow and resources to employ when officers encounter non-communicative individuals in apparent mental health crises like Ryan's, the required accommodation was sufficiently apparent.

## III.   Defendants' Exigent Circumstances Argument Ignores the Breadth of Plaintiffs' Arguments and Fails on Its Own Terms.

Defendants' exigent circumstances argument fares no better. Defendants argue that, because Ryan allegedly pointed a gun at officers from inside his car, it was unreasonable to offer him any accommodations. That argument is premised on a dispute of fact (that Ryan pointed a gun at officers in the first place) and, critically, also ignores all the moments leading up to the fatal encounter where Defendants should have, but did not, offer an accommodation while creating a tense standoff through Defendants' own force-first tactics.

In the Fourth Circuit, "there is no separate exigent-circumstances inquiry"—"the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation." *Seremeth*, 673 F.3d at 339. Even in the presence of exigent circumstances, accommodations may be required, depending on the facts of the case. *See id.* (concluding there is no separate exigent-circumstances inquiry partly because doing so "encourage[s] the provision of accommodations during exigent circumstances"). Because "[w]hat constitutes reasonable accommodations" "is a question of fact and will vary according to the circumstances," *id.* at 340, it is rarely decided at summary judgment, *see Seremeth*, 673 F.3d at 340; *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 557–58 (D. Md. 2019).

Here, there was ample time to implement accommodations in the extended period before Ryan allegedly raised his gun. Starting with the ECC call-taker—who should have (but did not) ask additional mental-health questions upon learning of Ryan's behavior and hearing that Ryan was acting "crazy"—and continuing through officers' on-scene deficient response, Defendants consistently declined to implement commonsense accommodations.

### A.    The Emergency Call Center Should Have Investigated Facts Concerning Ryan's Mental Health Crisis and Relayed Them to Police Officers.

When McDonald's employees called Montgomery County's ECC at 9:12 p.m., Ryan was neither violent nor threatening. Accordingly, the Emergency Call Center (ECC) call-taker coded the call as a low-priority trespassing/unwanted incident with no indication that it involved a mental health crisis, and it was left pending (meaning no police responded to it) for over an hour. Ex. 29 at MC 00188–89. During that time, the ECC failed to implement three crucial accommodations. These failures came long before any potential exigent circumstances arose on scene.

First, the ECC failed to ask the caller mental-health-related questions in order to understand the nature of Ryan's crisis and provide an appropriate response. As a matter of policy, Montgomery County's ECC "does not have any screening process" for asking mental health questions "to determine when the County's specialized resources should be used." Ex. 19 at 8-9; Ex. 41 at 130:6-10 (stating, as ECC Director, that ECC call-takers do not "ask any questions to identify whether mental or behavioral health issues are a component of [a] 911 call"). Worse, even once the symptoms of Ryan's mental impairment were "apparent" and "the need for a

modified response was readily identifiable," ECC failed to ask appropriate follow-up questions concerning the nature of his mental health crisis. Ex. 19 at 9; Ex. 22 at 2.[8]

"Asking such additional, mental-health-related questions is standard practice in communication center triage" where, as in Montgomery County, specialized mental-health resources are available. Ex. 19 at 9; Ex. 22 at 1. For instance, a 2021 APCO International publication—which, according to Defendants' emergency-communications expert, Erika Lakey, constitutes an industry standard, Ex. 24 at 205:7-213:14—states that call-takers "should be able to recognize signs and symptoms" of a mental health crisis and "shall ask questions regarding pertinent medical history and behavioral health history" in order to "better classify the call and send appropriate units" in response. Ex. 47, APCO Int'l, 1.120.1-2021 Crisis Intervention Techniques & Call Handling Procedures for PST at 17, 23[9]; *see* Ex. 48, Council of State Gov'ts, et al., *Community Responder Programs: Understanding the Call Triage Process* (2021) at 3 (discussing the importance of mental health screening questions)[10]. Conversely, failure to ask such questions violates the ADA and Section 504, as the Department of Justice (the entity tasked with interpreting the ADA) has concluded. Ex. 49, U.S. Department of Justice, Investigation of the City of Phoenix and the Phoenix Police Department (June 13, 2024) at 87-95[11].

---

[8] At her deposition, Ms. Lakey (Defendants' expert) explained that signs that a 911 call involve an individual with a mental health disability include if the caller "is describing someone who's out of control," if the caller describes abnormal behavior, and if the caller describes someone who is conscious but not responsive. Ex. 24 at 249:14-254:10. All three of those indicators were present here. ECC's Director, by contrast, denied it was possible to screen 911 callers for a potential mental health component, because "if you are alive and functioning, you have a mental health component." Ex. 41 at 148:20-149:22.

[9] Available at https://www.apcointl.org/~documents/standard/11201-2021-cit-and-call-handling?layout=file.

[10] Available at https://csgjusticecenter.org/wp-content/uploads/2021/12/CRP_Understanding-the-Call-Triage-Process_FINAL.pdf.

[11] Available at https://www.justice.gov/crt/media/1355866/dl?inline.

36

Here, the ECC call-taker did not meaningfully follow up once the nature of Ryan's mental health crisis was "clear" to fully determine the nature of the call and which mental-health resources were needed in response. There is no dispute that, once the McDonald's employee described Ryan's bizarre and disruptive behavior and concluded Ryan was "acting like crazy," the call-taker was required to follow-up, because it is critical for call-takers to gather facts and fully understand what the caller is trying to convey. Indeed, as Defendants' expert testified, "one possible interpretation" of the call-taker's comment that Ryan was "acting like crazy" (let alone the accompanying description of his behavior) "is that [Ryan] is in the middle of a mental health crisis." Ex. 24 at 342:19-343:10. Defendants' expert also agrees that, when the call-taker followed up, she received no new information—meaning the ambiguity remained, as did the possibility that Ryan was in the midst of a mental health crisis. *Id.* at 334:12-337:18, 341:2-346:8. In these circumstances, a reasonable jury could conclude—as Ms. Sailon did—that the call-taker should have asked additional questions to fully understand Ryan's crisis.

Second, the ECC call-taker failed to ensure appropriate personnel responded to Ryan's mental health crisis. Despite having specialized resources available for mental health calls—including officers with specialized training (crisis negotiators, CIT-trained officers), and a Mobile Crisis Outreach Team comprised of mental health clinicians—Montgomery County policy and practice constrain ECC's power to actually activate these resources absent a request from an officer. Ex. 12 at 188:16-189:2; Ex. 41 at 135:7-137:4, 141:6–142:19, 145:1-2, 146:17-22, 150:4-11; Ex. 50, Graves Depo. Excerpts at 64:4–65:3, 69:14–71:22, 80:12–19. By contrast, if a 911 call involves a suspected crime and physical injury, Montgomery County dispatchers are empowered to send appropriate resources (*e.g.*, an ambulance and Emergency Medical Technicians) to the scene. Ex. 19 at 6-7. ECC's "unreasonably constrained ability to dispatch

37

appropriate resources to calls with a mental health component" is out of sync with industry standards. Ex. 19 at 8, 10; Ex. 47 at 26-27 (stating that ECC call-takers "shall dispatch the appropriate resources," including specialized mental health resources such as "CIT," a "Department embedded clinician/support team," or a "Mobile crisis unit," where appropriate, to respond to mental health calls).[12] Worse, even if an officer instructs ECC to dispatch CIT-trained officers, ECC is unable to do so because it does not have a reasonable way to look up on-duty CIT-trained officials—meaning a dispatcher could at best issue a call over the radio for available CIT officers to respond.[13] Section IV.B, *infra*.

Third, Montgomery County's ECC failed to notify responding police officers that the call involved a mental health component and failed to inquire whether officers needed ECC to dispatch mental health resources to the scene. Ex. 22 at 2 (the ECC call-taker "should have [] flagged" the call "as involving a mental health component"); Ex. 24 at 285:13-286:18 (agreeing with the APCO standard stating that ECC call-takers "shall use the information they receive from the call to guide a response to the caller and to relay relevant information to responding units");

---

[12] The result in this case was predictably tragic. Emergency calls often involve rapidly evolving scenarios, and "[v]aluable time is lost when an officer must first arrive on scene, assess the need, request dispatch, and wait on scene for the specialized response." Ex. 19 at 8. By contrast, "ECC is best situated to assess all the information provided by the 911 caller" and decide whether to dispatch specialized resources as a result—"just as ECC does when deciding whether to dispatch a police response or a medical response." *Id.*

[13] Any contention that ECC direct dispatch authority is not reasonable because it would empower ECC to send civilians to potentially unstable scenes ignores the facts. First, it is undisputed that many of the specialized resources available—including CIT-trained officers, the CIT Team, and crisis negotiators—are comprised of sworn police officers. Second, specialized civilian resources, such as the Crisis Center or MCOT, can guide police officer response either remotely (Crisis Center) or from a secure position away from the "front lines" if necessary (MCOT).

Ex. 50 at 57:22-58:6 (in July 2021 ECC had no way to "flag" a call as having a mental health component).[14]

That Montgomery County's ECC follows IAED protocols further underscores the reasonableness of these accommodations. IAED protocols are one system that an emergency call center may use to guide call-taker response; the protocols guide call-takers to ask initial questions, identify a "chief complaint" for the call (based on the call-taker's initial questions), and then prompts call-takers to ask additional, specific questions based on the "chief complaint" the call-taker has identified.[15] Here, for instance, the Montgomery County ECC identified a "chief complaint" of "trespassing/unwanted" rather than "mental disorder" (both of which are options in IAED protocols). Had the call-taker chosen "mental disorder" instead, that would have prompted the call-taker to ask additional questions concerning Ryan's mental health and the nature of his crisis. Ex. 50 at 18:14-21:1, 25:18-32:3; Ex. 18 at 31:11-41:4, 43:12-45:2, 57:9-58:8.

---

[14] Strikingly, Defendants' own expert testified that, in her jurisdiction, ECC personnel proactively contact officers to suggest deploying specialized resources when they believe, based on the 911 call, that such resources may be needed—further underscoring that this was a reasonable accommodation here. Ex. 24 at 153:14-19, 157:17-159:17, 161:8-163:20. Being proactive is critical; because emergency situations are "dynamic" and can change "minute by minute" or even "second by second," getting the correct resources to the scene as soon as possible is incredibly important. *Id.* at 166:9-169:7, 170:11-20; 176:4-19.

[15] Defendants' suggestion that they cannot be held liable so long as they complied with IAED protocols is a red herring. IAED protocols are merely one system an emergency communication center may use to help guide call-center response. There is no "national standard as far as you have to use this one protocol"—rather, "agencies are able to see what's out there and decide what's best for them." Ex. 24 at 45:14-46:20. Some 911 call centers follow computer software-based "protocols" like the IAED protocol or a different protocol developed by APCO; others follow policies or procedures or guidelines, *id.* 31:2-32:9, while still other call centers create their own "homegrown" protocols rather than using the IAED or APCO versions, *id.* 46:21-47:12. These are all legitimate options. *Id.* 47:13-48:48:19.

Irrespective of which "chief complaint" a call-taker selects, IAED protocols also have built-in flexibilities that enable the very accommodations Montgomery County should have implemented. For example, ECCs using IAED protocols can add or adapt questions to suit local needs. Ex. 24 at 195:13-20, 198:22-199:22. Moreover, "even call-takers using IAED protocols can and should ask follow-up questions when it is apparent a call involves a mental health component." Ex. 22 at 1. Call-takers following IAED protocols "have two opportunities to ask follow-up questions concerning mental health: immediately after the issue arises (such as when the call-taker here was told Ryan was 'acting like crazy') and at the end of a call." Ex. 22 at 1-2. Irrespective of which "chief complaint" the ECC call-taker selects, IAED protocols also permit call-takers to "flag" a call as involving a mental health crisis, including by typing notes into the IAED software that are then automatically passed on to officers. According to Defendants' expert, ECC call-takers must document any "relevant" information—anything "they need to document" that is "outside of the structured protocol questions," including whether the person appears to be in a mental health crisis. Ex. 24 at 72:17-73:16, 75:12-79:21, 80:1-82:10, 83:13-84:18, 84:20-85:13, 291:19-293:3, 294:5-297:7. Finally, the chief complaint the ECC call-taker selects does not determine which resources are dispatched to a scene; for instance, "a dispatcher using IAED protocols may code an incident as involving a 'trespass' but then opt to send mental health professionals if the 9-1-1- call indicated the need for such professionals." Ex. 22 at 2-3; Ex. 24 at 378:21-379:14, 384:9-385:1 (IAED protocols do not govern whether or how mental-health resources are dispatched). Ms. Lakey cannot opine on which (if any) non-police resources should have been dispatched here, because she is not an expert in co-responses or non-police responses. Ex. 24 at 51:18-20, 53:3-5, 54:20-22, 60:18-21.

40

In sum, Montgomery County ECC failed to implement reasonable modifications needed to ensure the correct mental-health resources were deployed to the McDonald's. Such failures occurred long before any possible "exigent circumstances" arose. Montgomery County's policies and practices of limiting ECC call taker's discretion to deploy the County's specialized resources, failing to properly implement its CIT program, and failing to screen mental health calls led to the failure to implement accommodations for Ryan on July 16, 2021.

**B.    After Officer Inman Arrived on Scene, Officers Should Have Followed Their Own Policies and Implemented Reasonable Accommodations.**

Although Defendants suggest it was unreasonable to accommodate Ryan's mental health crisis after Officer Inman arrived on scene at 10:28 pm and observed a gun lying in the front passenger seat of Ryan's car, a reasonable jury could conclude otherwise. Reasonable accommodations included: (1) following Montgomery County's own policies and summoning mental health resources, (2) following Montgomery County's own training with respect to de-escalating (rather than escalating) the stand-off, and (3) gathering additional information about Ryan LeRoux to further inform the police response.

**1.    Defendants Omit that, to the Extent Any Exigent Circumstances Existed, Police Officers Themselves Caused Them.**

Defendants' argument starts from a mistaken premise—that Ryan's behavior forced police into a confrontational standoff. Really, it was the other way around. It is undisputed that, although there was a handgun on the front passenger seat of the car, responding officers understood that Ryan had been sitting calmly in the drive-thru for hours, not threatening anyone, reclined in the driver's seat, with headphones on, and looking at his cell phone; with respect to officers that surrounded his car, yelled at him, and held him at gunpoint, Ryan did little more than give a blank stare. *See, e.g.*, Ex. 7 at 64:7-68:9, 79:6-82:20, 88:8-89:9 (testifying that, when she arrived on scene, she understood Ryan was "calm" and the only crime being investigated was

41

"theft of service" because Ryan had "ordered a sandwich and didn't pay for it")[16]. "[B]ased on [Ryan's] behavior, the environment, and the context of the situation," the gun "did not pose an immediate imminent threat" for the "vast majority of the call." Ex. 51, Trevino Rebuttal Report at 3. Further, any potential threat to civilians was quickly addressed; by 10:39 pm, police had evacuated the McDonald's, all "innocents" were away, and the scene was secure. Ex. 11 at 84:20-87:14; Ex. 12 at 68:7-72:18; Ex. 6 at 69:1-16, 78:8-80:1, 109:8-110:11, 117:1-3. Officers were chatting and milling about with no sense of urgency and little coordination. Ex. 14 at 22:40:27-22:46:00 (officers outside McDonald's chatting and joking, predicting Ryan is "gonna end up offing himself," and Officer Eastman chatting with passersby and urinating in the bushes). When officers entered the McDonald's, they milled around and joked about the food. *Id.* at 22:52:25-22:52:50. Officers felt so secure on scene that when Sergeant Worden was notified that a civilian "ride along" guest was present in an officer's police cruiser, he said, "she's fine," approving the civilian's continued presence on the scene. Ex. 6 at 121:3-16; Ex. 20 at 6.

Defendants' argument also assumes that Ryan picked up and pointed the gun at officers around 10:47 pm when, construing all inferences in Plaintiffs' favor, that is disputed. Officers testified that "they s[aw] Ryan raise his gun" with his <u>right</u> hand at 10:47 pm and point it at officers and then, a "moment" later, he dropped it, such that the gun was in his hand for mere "seconds"—it was "very quick." Ex. 20 at 7; Ex. 10 at 185:13-187:7; Ex. 8 at 224:22-225:11; Defs.' Summ. J. Mem. Ex. 8 at 10:45:54-10:45:57. But Ryan was <u>left</u>-handed and did not use his right hand—the hand he purportedly used to point the gun at officers—for sports or activities of daily living. Ex. 52, Hears Dep. Excerpts at 90:25-91:8; Ex. 53, Daniel LeRoux Dep. Excerpts at

---

[16] It is not illegal to possess a handgun in Maryland, and it is not a felony to have a handgun on the passenger seat. Ex. 11 at 76:16-78:5.

54:1-55:3. Even Officer Inman testified that if Ryan were left-handed, it would be "unusual" for Ryan to pick up the gun and point it at officers with his right hand. Ex. 8 at 229:9-21. Further casting doubt on the police officers' version of the story, the police investigated but could not determine that Ryan ever fired the gun. Ex. 10 at 189:10-17. In any event, there was ample time for accommodations before Ryan ever purportedly touched the gun. And, after the alleged gun raise, officers continued to act the same they had before, providing clear evidence that the alleged gun raise did not create new, exigent circumstances on scene. *See* Ex. 20 at 7.

Rather than implementing accommodations, responding officers ignored MCPD policy and their training and unnecessarily escalated the standoff. "With the McDonald's evacuated and the scene closed off, the officers themselves were the only people at risk from any potential threat from Ryan, and they remained unnecessarily close to his vehicle." Ex. 20 at 18. The officers were about 10 yards away. Ex. 9 at 121:6-11, 124:3-6 (estimating he was pointing his rifle at Ryan from 10 yards away, and that Officer Vaughan was the same distance from Ryan's car); Ex. 6 at 82:13-16 (officers parked police cruisers 10-15 yards from Ryan's car); Ex. 12 at 126:14-127:3 (Officers Cerny, Kim, and Inman were about 15 yards from Ryan's car). The officers did not need to be so close to see Ryan and deploy lethal force if needed; officers with handguns could be 25 yards away and still see Ryan and shoot him if necessary, Ex. 12 at 131:6-132:1, while Officer Cerny was trained with his rifle from 150 yards away, Ex. 9 at 190:16-192:3. As Mr. Trevino noted, "[r]easonable officers would have called for the County's mental health resources and backed further and further away," thereby "reducing the need for force and extending the period available for communication and de-escalation." Ex. 20 at 18. Instead, officers "escalated the situation and limited the possibilities for a peaceful outcome." *Id.* Defendants cannot use exigent circumstances they created as a shield from liability.

43

**2.     The Sheer Number of Officers Present On-Scene Belies Defendants'
Exigent Circumstances Argument.**

Further undermining Defendants' exigent-circumstances argument is the sheer number of
police officers present on scene, most of whom were contributing little and, partly for that
reason, were available to implement reasonable accommodations.

The on-scene response was characterized by "tactical chaos, lack of coordination and
planning, wasted time, ineffective communication methodologies, [and] escalating behaviors."
Ex. 20 at 9. Reflecting this "complete utter tactical chaos," a grand total of "17 officers were
ultimately present without clearly assigned roles, any coordinated response plan, or any form of
organization of the scene." *Id.* at 17. Instead, "[g]roups of officers milled about the perimeters of
the scene making small talk or joking around." *Id.* at 18. No one coordinated efforts or made a
plan. *See* Ex. 7 at 72:21-73:4 (does not recall "a particular person taking control"); Ex. 9 at
113:19-118:7, 131:3-132:21, 158:6-159:22 (until Captain Dillman arrived, he was unaware who
was in charge and officers did not make a plan or divvy up roles); Ex. 10 at 133:3-6, 193:19-
194:3 (no commanding officer assigned her a role); *see also* Ex. 12 at 60:1-62:11, 114:14-115:8
(testifying that he did not want ECC to call Ryan directly and was surprised to learn ECC had);
Defs.' Summ. J. Mem. Ex. 8 at 10:34:49, 10:44:15 (repeatedly asking what the plan is); *id.* Ex.
14 at 22:44:15-20 (answering "good question" after Inman asked him what the plan was); Ex. 6
at 151:8-11 (Worden was in charge but did not know which officers were CIT-trained).
Additionally, officers did not discuss Ryan's apparent mental health crisis. Ex. 7 at 97:20-100:1
(she did not discuss Ryan's potential suicidality with her superiors); Ex. 12 at 166:1-167:15,
171:20-173:1 (officers who believed Ryan may be suicidal never told him).

Officer Inman, the first responding officer, should have taken control of the scene but did
not. Ex. 20 at 17. After observing a gun on the front seat of Ryan's car, Inman drew his gun,

44

screamed commands laced with expletives at Ryan, then withdrew to cover and marveled at Ryan's placid demeanor to incoming back-up officers. Defs.' Summ. J. Mem. Ex. 8. Rather than organizing a coordinated response to the apparent mental health crisis, Inman was among the officers to comment aloud on the apparent lack of any plan. *Id.* at 10:34:49. Perhaps the only action Officer Inman proposed was that officers smash Ryan's car window and "pepper-spray his ass." Ex. 8 at 222:12-223:19.

Worden, who replaced Inman as senior ranking officer when he arrived at 10:35 pm, "provided no coordination or organization either." Ex. 20 at 17. Rather, "Sgt. Worden walked around the scene for his ten minutes in command without any sense of urgency and almost never giving any proactive instruction to anyone." *Id.*; *see* Defs.' Summ. J. Mem. Ex. 19. Sergeant Worden never gave any unprompted instructions or commands to officers on scene. *Id.*; Ex. 7 at 118:22-120:3. But Worden did walk away from the frontlines to personally drive a police cruiser directly in front of Ryan's car, in the line of fire of surrounding officers who had their guns drawn (not to mention of the subject the officers purportedly saw as a threat). Defs.' Summ. J. Mem. Ex. 14 at 22:42:40-22:44:10. Sergeant Worden then jumped out of the cruiser and ran back behind the perimeter, commenting to other officers that Ryan's lack of reaction was "crazy," yet once again taking no action based on that observation, while another officer affixed a spotlight to the outside of the cruiser in front of Ryan. Defs.' Summ. J. Mem. Ex. 19 at 22:41:23-22:44:30.

What is reasonable in terms of providing accommodations depends on all relevant circumstances, and is a decision for a jury. Here, a reasonable jury could conclude that the number of officers milling about on scene underscored the reasonableness of available accommodations.

45

### 3. Defendants Failed to Implement Reasonable Accommodations, Including by Failing to Follow Their Own Policies and Training.

A reasonable jury also could conclude that Defendants failed to provide reasonable accommodations because providing accommodations required Defendants to do nothing more than follow their own policies and trainings for interacting with individuals with mental impairments.

**Crisis Negotiators:** A reasonable jury could conclude that responding officers should have summoned crisis negotiators to the scene soon after Officer Inman arrived and discovered (as was immediately apparent) that Ryan was non-communicative.

According to one of the leads of the County's crisis negotiators unit, officers should request crisis negotiators when "the initial levels and initial efforts of communication from the responding officers to an individual . . . in a moment of crisis have proven to be unsuccessful," including because of an "an individual refusing to communicate." Ex. 45 at 27:14–28:10, 64:9–65:17. Further, the 2021-effective version of FC950, Montgomery County's "Emergency Response Team/Other High Risk Incident" policy, provides for a "specialized response" (including crisis negotiators) in all "barricade" situations, Ex. 46 at MC 00643—which responding officers testified this was, *see* Section II.D, *supra*; Ex. 20 at 8-9.[17]

A reasonable jury could conclude that summoning crisis negotiators—as officers were supposed to do pursuant to their training and MCPD policy—was a reasonable accommodation.

---

[17] When, as here, the criteria in FC950 are met, the policy requires that the "senior ranking officer on scene" determine whether an "Emergency Response Team" or a "modified ERT response" is appropriate; the latter may involve either just crisis negotiators or a "smaller contingent of personnel" to respond to, for instance, "a lone barricaded suicidal person." Ex. 46 at MC 00645; Ex. 20 at 9 (citing MC 00645 and Ex. 34 at 73:8-77:20).

46

Indeed, Captain Dillman called for crisis negotiators within minutes of arriving on scene. But by then it was too late, and reasonable jury could conclude the call should have gone out earlier.

**Mental Health Resources:** Apart from crisis negotiators, "MCPD has specialized resources and procedures for encounters with people with mental illness and for mental health crises," Ex. 20 at 12, and reasonable jury could conclude it would have been reasonable for officers to utilize these resources to bridge the communication gap with Ryan. After all, "[t]hese programs, experts, and trained officers exist to help police respond to mental health crisis offering services to people with behavioral health disabilities," Ex. 20 at 12. Moreover, Montgomery County policy requires officers to send CIT-trained officers "trained in handling the mentally ill consumer" to a scene like the one unfolding at the McDonald's and, "[o]nce the CIT officer is on the scene of a mental illness call, the CIT officer becomes the "primary officer" and "will determine" if other mental-health resources (e.g., the Mobile Crisis Outreach Team) are required to assist. Ex. 40 at MC 00636-40. But, contrary to policy, no CIT-trained officer became the "primary officer" and evaluated the need for such resources here. In fact, before Captain Dillman arrived, officers on scene (including CIT-trained officers) never considered calling crisis negotiators, the dedicated CIT team, the Mobile Crisis Outreach Team, or the Crisis Center. *E.g.*, Ex. 7 at 100:10-22; Ex. 9 at 229:13-234:17; Ex. 11 at 179:15-181:15.

Further underscoring the reasonableness of these accommodations, MCPD training instructs officers to call for mental health professionals in situations like this one. In the County's CIT training materials, officers were trained that a trespassing situation exactly like this one warrants mental health modifications to the response. The training provides various hypothetical situations that suggest a mental health condition; one situation features an individual "acting bizarrely" while "refusing to leave" a convenience store. Ex. 4 at MC 11508. The training

identifies this behavior as reflecting a "thought disorder." *Id.* The training instructs officers that the proper response to this scenario includes contacting the Crisis Center for guidance. *Id.*

**De-Escalation:** A reasonable jury also could conclude that responding officers should have implemented their training and de-escalated tensions at the McDonald's rather than ratcheting them up. This too is a straightforward matter of following MCPD policies and training, which "expressly require implementation of de-escalation techniques before any use of force is authorized and in encounters with people with mental health disabilities." Ex. 20 at 19; *see* Ex. 35 § III.D; Ex. 34 at 48:1-7, 116:15-117:14.[18]

Rather than using a calm tone of voice, limiting external stimuli, and building rapport with Ryan, officers boxed him in with police cruisers, blinded him with spotlights, stood 10 yards away with guns (or rifle) drawn, with cruiser lights flashing and loudspeaker blaring, all of which "likely led to Mr. LeRoux being more overwhelmed and added to his mental health crisis and to the barriers to communication." Ex. 20 at 18–19. Moreover, officers continued this force-first approach even after they "believed Ryan raised a gun at them at 2247 hours" and even though some believed he was engaged in "suicide by cop," virtually ensuring that officers would use deadly force "when [they] believed Ryan repeated the same movement 15 minutes later." Ex. 20 at 18.[19]

---

[18] In deposition testimony, MCPD officers properly identified the relationship between "space, time, and distance" and de-escalation but improperly applied those terms to cover escalatory tactics. "Multiple officers present on-scene, and spokespeople for Montgomery County, testified that pointing weapons at a subject was 'de-escalation,' which displays a clear lack of understanding of basic de-escalation principles and the MCPD use of force policy." Ex. 20 at 19. "By their reasoning, **any** tactic can be 'de-escalation,' including even the use of force. That is not what de-escalation training teaches, and it contradicts that County's use of force policy, which requires de-escalation techniques be used *before* the use of force." *Id.*

[19] Courts reject summary judgment motions where, as here, parties dispute if defendants' actions unduly escalated a mental health crisis. *See Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cnty. of San*

48

**Searching Police & Medical Records:** According to Montgomery County, "[g]athering intelligence information is standard practice in a stabilized standoff situation," Ex. 45 at 47:18–50:20. Such information gathering "is always the first step in the process" for a crisis negotiation, *especially* for a non-responsive subject." Ex. 20 at 16. Thus, a reasonable jury also could conclude Defendants failed to implement the reasonable accommodation of investigating Ryan's police and medical history.

"With so many officers present on scene, and the scene stabilized and secure (including confirmation that all civilians were away), with Ryan silent, the officers had time and opportunity to take steps to gather intelligence." Ex. 20 at 17. "The officers on scene acted unreasonably by failing to use the time available to them to gather all available intelligence about Ryan LeRoux during the Incident, which would have shaped the appropriate response and avoided the improper response adopted by MCPD." *Id.* The 911 caller conveyed Ryan's license plate to ECC around 9:15 pm,[20] yet it was not until 10:36 pm that the 911 call center identified the vehicle in the McDonald's drive-thru as belonging to Ryan LeRoux. Moreover, once ECC called to all responding officers (over the radio) that the car belonged to Ryan LeRoux, ECC did not use that name to search police or medical records, nor did any officer request ECC to perform such a search. Finally, responding officers did not bother to search (via the computers in their cruisers) any relevant databases for information about Ryan, *e.g.*, Ex. 9 at 146:6-147:20;

---

*Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) (concluding the plaintiff met her "initial burden of producing evidence of the existence of a reasonable accommodation" at the motion for summary judgment stage by asserting that "the officers should have respected her comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation"); *Brizuela*, 2022 WL 3229389 at *33 (rejecting summary judgment motion because the parties disputed if officers "attempted at any point to de-escalate the situation or in fact contributed to its escalation").

[20] Although, at 9:15, the McDonald's employee could not identify the state from which Ryan's plate had been issued, ECC did not run the plate in obvious potential states (MD, VA, DC).

Ex. 11 at 119:7-22, something that would have taken mere minutes, Ex. 12 at 56:4-9, 187:10-188:5; Ex. 10 at 92:5-94:15. Had officers done so, they would have learned of Ryan's October 2020 hospitalization, his apparent mental health crisis at the Holiday Inn Express four days earlier, his medical records from November-December 2020 at the Crisis Center, and other pertinent information—which should have informed their on-scene response. Ex. 55; Ex. 3 at MC 01396-1400; Ex. 20 at 16. "Considering how critical information about the person in a mental health crisis is to a de-escalation response, the number of officers present on scene, and the extended period in which many officers lack a defined role on scene," a jury could conclude this was yet another missed reasonable accommodation. *See* Ex. 20 at 16.[21] That is especially so because gathering intelligence is crucial for resolving a mental health crisis peacefully. Ex. 45 at 29:18-31:7.

### 4. This Court Should Reject Defendants' Misguided "Direct Threat" Arguments.

This Court should reject Defendant's unsupported "direct threat" arguments. For starters, Defendants inappropriately merge the concepts of "exigent circumstances" and "direct threat" *e.g.*, Defs.' Summ. J. Mem. at 47-60, muddying the analysis. "Exigent circumstances" is subsumed within the inquiry of whether an accommodation was reasonable; "direct threat," by contrast, is an affirmative defense that Defendants must assert in their Answer and then prove in order to prevail at summary judgment. *Wood v. Md. Dep't of Transp.*, 732 F. App'x 177, 181 (4th Cir. 2018) (direct threat is an affirmative defense).

---

[21] While the low-priority trespassing call was "pending," Officer Owen drove by the McDonald's "a couple times" and saw Ryan's car parked in the drive-thru. Ex. 7 at 55:8-56:2. She called the McDonald's and spoke with the person who had called 911 and learned that "nobody was being [] bothered at the time" and there was no "conflict," but that Ryan was "just sitting there and not saying much" which was "unusual." *Id*. at 56:3-57:16, 59:11-60:20. Officer Owen could have searched databases for information on Ryan but did not.

Because Defendants never asserted a direct threat defense in their Answers, see ECF 54-59, Defendants have waived that defense if it causes "unfair surprise or prejudice to the plaintiff." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003). Here, Plaintiffs had no opportunity to take discovery on this purported "direct threat" defense and thus were prejudiced.

Even if this Court disagrees, Defendants come nowhere close to establishing this defense. The "direct threat" defense is a high hurdle because, if established, it excuses public entities from complying with the ADA and Section 504. *Wood*, 732 F. App'x at 181. To determine a person is a "direct threat," the public entity must make an "individualized assessment" that relies on "best available objective evidence" in order to ascertain "the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 35.139. There is no evidence that Defendants did any of that. Even if Defendants could establish that a "direct threat" existed at 11:02 pm, when officers fired on Ryan, summary judgment is inappropriate because the evidence amply supports the conclusion that Ryan was not a "direct threat" during the preceding hours.

Defendants make several other arguments that merit only brief mention. First, they argue that Plaintiffs' claims fail because the ADA and Section 504 violations did not proximately cause Ryan's death. Defs.' Summ. J. Mem. at 60-61. "Whether one event can be described as the cause of another is an intensely fact-sensitive question and 'ordinarily is one for the jury.' " ECF 51 (quoting *Montgomery*, 2022 WL 1618741, at *28 (D.D.C. May 23, 2022)). Here, there is ample evidence that, had MCPD (including ECC) acted differently in the hours leading up to Ryan's death, his death would not have occurred—as both of Plaintiffs' experts concluded. Ex. 19 at 10;

51

Ex. 20 at 9-10. Defendants also argue that Counts III and VII are not viable because Defendants did not discriminate on the basis of disability, which fails because the mere failure to ensure effective communication or provide accommodations constitutes disability discrimination. *Koon v. North Carolina*, 50 F.4th 398, 405-06 (4th Cir. 2022) ("disability discrimination includes the failure to provide reasonable modifications").

**IV.    A Reasonable Jury Could Conclude Montgomery County Acted with Deliberate Indifference, Entitling Plaintiffs to Monetary Compensation.**

A reasonable jury also could conclude Defendants were deliberately indifferent to Ryan's rights under the ADA and Section 504. Deliberate indifference "require[es] proof that a municipal actor disregarded a known or obvious consequence of his action." ECF 51 (quoting *Board of County Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). Deliberate indifference exists if a defendant (1) knew that harm to a federally protected right was substantially likely, but (2) failed to act on that likelihood. *Koon*, 50 F.4th at 405. With respect to the first prong, the "knowledge" requirement "can be shown by circumstantial evidence," as when "a risk was so 'obvious' that an official must have had knowledge." *Id.* at 407; *see also Farmer v. Brennan,* 511 U.S. 825, 842 (1994) (whether a defendant possessed knowledge "is a question of fact" that can be shown through "inference from circumstantial evidence"). With respect to the second prong, a defendant need not harbor discriminatory animus when failing to act; harm to a protected right resulting from "thoughtlessness and indifference" suffices, *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829–30 (D. Md. 1998), because the ADA and Section 504 were meant to address "the evils of benign neglect" and discrimination stemming from "apathetic attitudes rather than affirmative animus." *Pierce*, 128 F. Supp. 3d at 279 (quoting *Alexander v. Choate*, 469 U.S. 287, 296–97 (1985)). The second prong is satisfied if a defendant fails to take "reasonable measures to deal with the risk" of harm that the plaintiff faces. *Anderson*

*v. Kingsley*, 877 F.3d 539, 546 (4th Cir. 2017). Overall, analyzing whether a defendant acted with

deliberate indifference is a "fact-intensive" inquiry that is typically not resolved at summary

judgment. *See Basta v. Novant Health Inc.*, 56 F.4th 307, 319 (4th Cir. 2022).

> **A.      Defendants Were Deliberately Indifferent Because They Knew They Had to Ensure Effective Communication With Ryan LeRoux—Yet Did Nothing.**

Defendants largely ignore that this case concerns the County's failure to ensure effective

communication and also its failure to implement reasonable accommodations. A reasonable jury

could find the County was deliberately indifferent to its obligation to ensure effective

communication.

With respect to the first prong of the deliberate-indifference test, Defendants knew they

were required to "ensure that communications with [individuals with disabilities] are as effective

as communications with others." 28 C.F.R. § 35.160(a)(1). Montgomery County instructs its

police officers that, under Title II, "Montgomery County must . . . communicate with people who

have a disability as effectively as with someone who does not" and also must "ensure people

with disabilities can participate in, and benefit from, all of its programs and services." Ex. 54,

Americans with Disabilities Act (ADA) Title II: Montgomery County Police Department Online

Training Module at MC 2293, 2306; *see id.* at MC 2323 ("the ADA requires . . . local

governments [to] communicate as effectively with people who have disabilities as it does with

those who do not"); *id.* at MC 2301 (training officers that "major life activities" under the ADA

include "communicating"); Ex. 32 at MC 00042 (showing Officer Inman received ADA training

prior to the Incident). Partly for that reason, officers also are trained that, if they are unable to

communicate with an individual who may have a mental impairment, they should not simply

continue the same failed strategy and instead must call in specialized mental health resources.

*E.g.*, Ex. 4 at MC 11508 (training officers to recognize that an individual who is "acting

bizarrely" and "refusing to leave" a 7-11 convenience store may have a "thought disorder" and police should contact the Crisis Center); Ex. 43 at MC 2410 (instructing officers to call for a CIT Team or the Crisis Center for over-the-phone help or Mobile Crisis Outreach).

Defendants also knew they were likely failing to ensure effective communication because it was apparent that Ryan had a disability (Section II.B, *supra*), many responding officers believed Ryan may, in fact, have a mental health disability (Section I.B.7, *supra*), and Defendants further knew that Ryan was non-communicative and that communication attempts had failed. Ex. 6 at 85:15-22, 98:12-16; Ex. 12 at 78:10-80:10, 202:11-20. Thus, as to the second prong, despite knowing it was "likely" they were failing to ensure equally effective communication, officers did nothing. *See Koon*, 50 F.4th at 405.

In these circumstances, a reasonable jury could find that deliberate indifference exists, because Defendants "knew there was a substantial likelihood that they would be unable to communicate effectively" yet "did *nothing* to remedy this situation despite having ample time to do so," evidencing "a sort of apathy that shows [their] indifference to [Ryan's] rights may have been so pervasive as to amount to a choice." *See Basta*, 56 F.4th at 317-19; *see also Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) (to establish deliberate indifference, a plaintiff "must show ineffective communication done with knowledge that it was substantially likely to occur"). Indeed, until Captain Dillman's too-late call for crisis negotiators, responding officers had no coordinated plan (apart from "force first" escalatory tactics) and did not even *discuss* calling for specialized mental-health resources (as they had been trained to do)—further underscoring Defendants' deliberate indifference. *See Montgomery v. District of Columbia*, 2019 WL 3557369, at *9 (D.D.C. Aug. 5, 2019) (deliberate indifference exists if local government

54

knew the a person had a disability "but nevertheless failed to assess whether accommodations were necessary, or to provide those accommodations").

> **B.    Defendants Were Deliberately Indifferent Because They Knew Their Policies Were Deficient and Failed to Fix Them.**

Even though MCPD officers must routinely interact with and de-escalate individuals with mental impairments,[22] Montgomery County failed to put in place adequate policies and procedures to guide police response to such individuals—even after the County commissioned an audit that sharply criticized its lack of adequate policies. That is, Montgomery County knew its policies for responding to mental health calls were deficient yet failed to fix them.

Well before July 2021, Montgomery County had contracted with a third party, Effective Law Enforcement for All (ELEFA), to examine whether MCPD police policies and practices for responding to mental health calls were adequate. The conclusion was unequivocal. In preliminary findings released June 2021, ELEFA concluded that "MCPD's policies and practices regarding responding to calls involving mental and behavioral health crises are outdated and insufficient to address the need." Ex. 15 at MC 17357; *see id.* at MC 17357 ("The Department's policies for responding to mental health calls are impractical and, consequently, often not relied upon."). With respect to FC 921— MCPD's principal policy concerning police interactions with individuals with mental illness—ELEFA concluded the policy was inadequate and "should be strengthened" because it "devotes only one page to crisis intervention/alternative response" and

---

[22] For officers, responding to individuals with mental health disabilities is a big part of the job. *See* Ex. 6 at 156:15–22, 157:1–4 (he encounters individuals with mental health disabilities "every day"); Ex. 7 at 15:22–17:5 (officers encounter people with mental illness "weekly" and she encounters suicidal people "once a month"); Ex. 12 at 35:5-21 (officers encounter suicidal people "very often"); Ex. 13 at MC 2403 ("There is rarely a workday that goes by without officers encountering someone with a mental illness"); Ex. 36 at 27 ("1 in 5 adults lives with mental illness" and "1 in 25 adults lives with a serious mental illness"); Ex. 7 at 22:3-24:9 ("patrol officers [] know that we deal primarily with subjects that have mental illness").

"uses outdated language and includes processes that no longer exist." For instance, even though the policy "requires prioritizing a CIT officer to respond to calls for service [] involving a mental or behavioral health condition," the County's ECC "does not have a roster of CIT officers to prioritize dispatch." *Id.* at MC 17357, 17370, 17375. FC 921 also does not specify when officers should call for other specialized mental health resources such as the Mobile Crisis Outreach Team. Ex. 26 at 130:5-133:14. Also, no policy explains when calling crisis negotiators is appropriate. Ex. 45 at 88:11-89:1.

The ELEFA audit is paradigmatic deliberate indifference evidence. A reasonable jury could conclude Montgomery County was on notice of the inadequacies of its policies and practices for responding to mental health crises prior to July 2021 yet did nothing and that those same inadequacies led to the flawed response that ended with Ryan's killing. *See Biondo v. Kaledia Health*, 935 F.3d 68, 76 n.4 (2d Cir. 2019) (a defendant acts with deliberate indifference if it "fail[s] to put in place a policy that would reasonably enable a [person with a disability] to obtain the relief guaranteed by [Section 504]").

The inadequacies the ELEFA report highlights is amply supported by the record. Per FC 921, the County's "Crisis Intervention Team" consists of "officers trained in handling the mentally ill consumer"; CIT officers "will be identified in the [Computer-Aided Dispatch] with a code so they can be dispatched when requested to handle complicated mental illness calls for service"; "[o]nce the CIT officer is on the scene of a mental illness call, the CIT officer becomes the primary officer" and "will determine" if "the Mobile Crisis Team needs to respond to assist" or another mental health resource; and the CIT officer will complete special reports documenting their response. Ex. 40 at MC 00636-40; Ex. 26 at 58:15-62:8.

56

The policy "had insufficient guidance for the CIT resource" because it did not provide clear instructions to officers on whether and when to summon CIT officers to a scene. Ex. 20 at 19-20. Worse, "[t]he little guidance it did provide was not actually followed by MCPD." *Id.* As the ELEFA report noted, the text of FC 921 notwithstanding, the County's ECC did not maintain a "roster" of CIT-trained officers for easy dispatch; CIT officers did not become the effective incident commander when they arrived on the scene of an incident involving an individual with a mental impairment; and CIT officers did not complete special reports documenting their response. Ex. 26 at 57:6–58:4, 58:15–72:10, 81:1–19, 87:2–91:5; Ex. 34 at 29:17–32:1, 59:13–60:12; Ex. 50 at 75:17-81:16.

Not surprisingly, given that FC 921 was inadequate and not followed in practice, officers who responded to the McDonald's testified they were either unaware that a team of CIT officers existed or knew it existed but had never used it. Ex. 7 at 33:12-34:2, 47:11-21 (unaware the CIT team existed and has never seen an officer called to a scene because they are CIT-trained); Ex. 6 at 45:12-49:12 (never called for the CIT team and never seen it used); Ex. 11 at 38:12-44:3 (never called the CIT team to a scene); Ex. 9 at 77:13-81:7 (never called the CIT team). That too underscores deliberate indifference. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275–76 (2d Cir. 2009) (deliberate indifference exists if a defendant "had a general policy of providing [accommodations], but [staff] was unaware of any practice of" actually following those procedures).

Not only was MCPD's FC 921 policy not followed with respect to prioritizing a CIT officer to respond to call for service—the policy also failed to explain whether and when other mental health resources should be used, for instance, when crisis negotiators or the Mobile Crisis Outreach Team may be called or the Crisis Center may be contacted. *See* Ex. 20 at 11 ("MCPD

57

has no written policy addressing the crisis negotiator resource and providing officers with guidance on their availability and the standard for when they should be requested."); Ex. 45 at 37:2–13, 82:3–7, 88:11–89:8; Ex. 34 at 119:12–124:14. Despite knowing of these deficiencies, the County failed to revise its policies to ensure officers called these mental-health resources when needed to comply with federal law—underscoring why a reasonable jury could find deliberate indifference. *See Biondo*, 935 F.3d at 76 n.4.

**C.     Defendants Were Deliberately Indifferent Because They Failed to Adequately Train Their Officers and ECC Personnel to Comply With Federal Law.**

Deliberate indifference also exists if a local government like Montgomery County "fail[s] to train its officers to respect [] statutory rights under Title II and Section 504." *See Montgomery v. District of Columbia*, 2022 WL 1618741, at *21 (D.D.C. May 23, 2022). Here, Montgomery County's failure to train its officers to respond to mental health crises at least creates a jury question. *See id.* (collecting cases and concluding, "[I]t is not uncommon for deliberate indifference claims alleging inadequate training of police officers regarding interactions with mentally ill individuals to survive motions . . . for summary judgment.").

As was the case with its deficient policies, Montgomery County knew (before Ryan's death) that its training for responding to mental health crises was inadequate—yet it did nothing, despite knowing that such training was paramount because officers routinely interact with individuals with mental health disabilities. This training deficiency was highlighted by the ELEFA audit (which Montgomery County commissioned) and also by multiple other reports examining Montgomery County's police policies and practices.

The June 2020 ELEFA report is unequivocal— MCPD's "[m]ental health response training is also inadequate." Ex. 15 at MC 17357. With respect to de-escalating encounters with individuals in crisis, "MCPD appears to recognize the need for additional training on de-

58

escalation," the report notes, but MCPD must do more to train officers "to slow down the situation and use de-escalation tactical techniques to increase the probability of using no force or the minimal amount of force necessary." *Id.* at MC 17359-60. Such training should "instruct[] officers not to approach a person in a mental health crisis but to create distance between them, take cover . . . and then use the time you gained getting additional resources, creating a plan, and communicating with the subject." *Id.* at MC 17391.

With respect to CIT-trained officers, the ELEFA report further notes that CIT officers never "refresh" their CIT training (because the CIT certification never expires), so many CIT officers forget their training years after receiving it, and the report concludes that "[i]t is imperative that annual refresher training be added to training requirements for all police officers to refresh skills." *See id.* at MC 17376; Ex. 26 at 52:4–53:3, 93:3-14. As the ELEFA report also makes clear, this "one-and-done" approach to CIT training, *id*. at 53:1-6, is inadequate, Ex. 20 at 21; *see* Ex. 9 at 74:1-76:18 (testifying he received CIT training 20 years ago).

Other reports on MCPD policies and practices released before Ryan's death similarly concluded MCPD's training was deficient. A March 2021 report from the County's Office of Legislative Oversight criticized MCPD for "not hav[ing] a goal or requirement for repeating or refreshing CIT training, beyond the annual 1-2 hours of in-service training." Ex. 16 at MC 17465. Similarly, the Reimagining Public Safety Task Force, convened by County Executive Marc Elrich, concluded in a February 2021 report that all officers should "receive enhanced Crisis Intervention Training" and instructed MCPD "to seek out or develop a police training model that prioritizes problem-solving, crisis intervention, mediation and basic mental health triage as its core competencies." Ex. 17 at MC 17514. *But see* Ex. 41 at 148:20-149:22 (ECC

59

Director denying it is possible to screen mental health calls because "if you are alive and functioning, you have a mental health component").

Further underscoring the deficient mental-health training, officers responding to the McDonald's misconstrued what "de-escalation" means; could not recall even the most basic aspects of their mental health training; and failed to follow even their own (deficient) policies that govern how officers are supposed to respond to mental health crises.

With respect to de-escalation, MCPD policy defines what de-escalation means. Ex. 35 at MC 00604 (explaining that de-escalation tactics and techniques are "proactive actions and approaches used by a law enforcement officer to stabilize the situation so that more time, options, and resources are available to gain a person's voluntary compliance and reduce or eliminate the need to use force" and include "verbal persuasion, warnings, tactical techniques, slowing down the pace of an incident, waiting out a subject, creating distance between the officer and the threat, and requesting additional resources to resolve the incident."). Yet responding officers did not implement "de-escalatory" tactics and instead employed escalatory tactics like holding Ryan at gunpoint for an extended period. Then, when sitting for depositions, the officers argued—in a true through-the-looking-glass moment—that these escalatory tactics were in fact de-escalatory tactics. *E.g.*, Ex. 9 at 137:15-139:7, 167:17-168:2 (testifying that pointing a gun at Ryan and placing spiked stop sticks in front and behind his car were de-escalatory tactics); Ex. 6 at 125:16-127:1, 136:9-17 (boxing Ryan in with police cruisers, holding him at gunpoint, and blinding him with spotlights are de-escalatory tactics). In sum, responding officers "display a clear lack of understanding of basic de-escalation principles and the MCPD use of force policy."

*See* Ex. 20 at 19.[23] See also Ex. 26 at 103:15-112:18 (de-escalation includes "limit[ing] the total number of officers just generally on scene" and introducing yourself, building rapport, slowing things down—not pointing a gun at a subject or boxing a person in with cars, which can make a person anxious); Ex. 45 at 41:8-16, 45:4-47:17, 52:17-53:20, 79:16-81:8, 115:14-119:1 (de-escalation includes not raising your voice, avoiding obscenities, giving space, taking time, turning down lights, and reducing sirens and sounds in order to open lines of communication; by contrast, drawing guns can cause anxiety and be counter-productive to de-escalation). *See generally* Ex. 10 at 220:6-221:14 (unable to recall any de-escalation tactics used by anybody on scene besides positioning "at a distance" from Ryan's car).

More broadly, responding officers could not recall their training on responding to individuals with mental health disabilities. "Officer Defendants who were CIT-certified consistently could not remember the substance of their mental health training." Ex. 20 at 21; *see* Ex. 12 at 23:6-26:21 (does not recall specifics of CIT training); Ex. 8 at 119:7-16 (received CIT training but does not know what, if any, specialized skills a CIT-trained officer has); Ex. 7 at 27:10-28:18 (does not recall CIT training on de-escalation and thought disorders). Officers who received only MCPD's Mental Health First Aid training could not recall that training either. *E.g.*, Ex. 11 at 55:9-56:7, 46:1-48:18 (does not remember specifics of Mental Health First Aid training or other training regarding mental impairments); Ex. 9 at 96:12-16 (same). Officers did not remember the specifics of in-service mental health trainings. Ex. 8 at 39:13-49:4, 73:2-18 (does

---

[23] Officers not only escalated the scene; they also displayed animus towards Ryan, which also evidences deliberate indifference to his rights. Officer Inman, for instance, yelled obscenities at Ryan ("get your fucking hands up") and urged officers to "pepper spray his ass." Ex. 8 at 222:12-223:19. Responding officers also made light of Ryan's situation; they "milled about the perimeters of the scene making small talk or joking around, such as the group of officers who entered the McDonald's and made jokes about being hungry or speculating whether food by the window was prepared for Ryan." Ex. 20 at 18.

not recall in-service training on symptoms of mentally ill individuals or in-service training on "thought disorders" and "mood disorders"); Ex. 12 at 37:17-38:16 (unable to recall in-service training on mood disorders and thought disorders); Ex. 9 at 37:9-13, 40:10-42:21, 82:1-14 (does not recall in-service training on mental illness). CIT-trained officers could not recall the specifics of their de-escalation training. Ex. 12 at 23:6-26:21 (does not remember specifics of CIT training on how to identify mental health symptoms and how to de-escalate); Ex. 7 at 27:10-28:2 (does not remember CIT training on de-escalation); Ex. 9 at 72:16-73:5 (does not recall March 2021 training on de-escalation). They could not recall training on suicidality. Ex. 12 at 35:5-21 (unable to recall training on suicidal people even though officers encounter suicidal people "very often"); Ex. 11 at 25:1-12, 36:18-21, 57:16-59:21 (cannot recall training on response to suicide-by-cop scenarios). Additionally, officers did not remember training on ADA requirements. Ex. 7 at 14:10-16 (does not recall ADA training); Ex. 11 at 46:1-48:18 (does not recall training on "disabilities and disability law" and does not recall training on interacting with people with mental health disabilities besides autism); Ex. 9 at 51:12-52:6 (does not recall training on ADA or accommodations).[24]

Responding officers failed to follow even the inadequate MCPD policies in place at the time. Officers did not activate an ERT or modified ERT response, such as by calling crisis negotiators, even when their own policies called for such actions. They did not follow policies requiring a CIT-trained individual to assume command and determine whether to call specialized resources. Despite being aware of the availability of mental health resources such as crisis

---

[24] That officers could not remember their training does not mean they were not, under the deliberate-indifference analysis, aware of the harm to a federally-protected right, because defendants may not "skirt liability" by "bury[ing] their heads in the sand." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015); *see also Kartman v. Markle*, 582 F. App'x 151, 155 (4th Cir. 2014) (deliberate indifference can be shown by "willful blindness of [a] serious risk").

negotiators, the Mobile Crisis Outreach Team, the Crisis Center, and the CIT Team, responding officers did not take any steps to activate such resources until it was far too late. Having policies or resources, but not following them or using them, makes deliberate indifference a jury question. *See Loeffler*, 582 F.3d at 275–76; *Paulone*, 787 F. Supp. 2d at 388.

Worse, because officers routinely encounter individuals with mental impairments, they are trained to recognize symptoms of mental impairments—including that a person is non-communicative, not obeying police commands, or otherwise acting abnormally. Officers' failure to follow this training further shows they were deliberately indifferent to Ryan's rights. *See, e.g.*, Ex. 6 at 12:10-15:5 (all officers are trained to recognize symptoms of mental impairments, such as "someone who's just not responding verbally, who may be not listening, not following direction or orders" or "not conducting themselves in a normal way"); Ex. 7 at 15:22-16:20 (an individual may have a mental illness if that person "ha[s] no reason to act a certain way, but they still do"). Officers also are trained that mentally-ill individuals may be unable to respond to, or comply with, police commands. Ex. 8 at 54:12-55:19 (in-service training instructs officers that individuals with mental illnesses can lose control of verbal expression); *Id*. at 57:16-59:9, 63:3-64:3, Ex. 13 at MC 02361–2413 (officers are trained that non-compliance may reflect mental illness and not a desire to defy police commands); *see* Ex. 12 at 120:4-122:7 (people with mental impairments such as schizophrenia or who are suicidal may not be able to comply with police commands). Officers also are trained on signs of "suicide by cop," including pointing a gun at police. Ex. 6 at 14:12-15:5, 54:19-56:11. That officers received training on symptoms of mental health crises and on what to do, yet did nothing, evinces deliberate indifference.

The County knew its training was deficient—so much so that it commissioned the ELEFA audit and had its preliminary findings in hand, and also had the other reports in hand,

63

well before Ryan was shot and killed. Yet the County did not fix the problem—even though the stakes could not be higher. According to the ELEFA report, 21 percent of officers' time may be spent responding to individuals in mental health crises. Ex. 15 at MC 17371. As MCPD puts it, "[t]here is rarely a workday that goes by without officers encountering someone with a mental illness in the course of their duties." Ex. 13 at MC 2403. Critically, the County knew individuals with mental health disabilities disproportionately are shot and killed by police. *Id*. at MC 2363 ("Approximately one in four fatal encounters involve an individual with severe mental illness."). The County's inaction further supports finding deliberate indifference.

###### D.       Defendants Were Deliberately Indifferent Because They Failed to Support the Specialized Mental Health Resources Available on Paper.

A jury also could conclude Montgomery County was deliberately indifferent because, despite knowing the likelihood that officers would encounter individuals with mental health disabilities, and despite knowing specialized resources would be needed to assist with such encounters, and despite providing for such resources "on paper," Montgomery County did not do nearly enough to make such mental-health resources available in practice. Those failings include the availability of mental health resources as well as ECC practices for dispatching them.

Here too, the County knew of the problems well before Ryan was killed. The June 2021 ELEFA report that Montgomery County had commissioned concluded that "County resources devoted to mental crisis response are inadequate and poorly coordinated." Ex. 15 at MC 17357. That was partly because the Mobile Crisis Outreach Team was under-resourced. As the Office of Legislative Oversight concluded in its report, "28 percent of requests for the MCOT could not be fulfilled" due to lack of resources. Ex. 16 at MC 17456. In July 2021, the Mobile Crisis Outreach Team "was under-resourced and unable to effectively provide its service." Ex. 20 at 21; *see* Ex. 18 at 40:13–41:15, 42:8–55:20, 62:9–64:11, 65:7–66:13, 85:6–86:18; Ex. 12 at 47:10-50:22. The

Mobile Crisis Team "maintained only a single unit during a night shift, responsible for the entire county" and "was often slow to respond to scenes" even if an officer did request its presence. *Id.*; *see* Ex. 18 at 28:13–19, 33:12–18, 35:4–36:2. "As a result, officers regarded the Mobile Crisis Team as a resource only for non-time-sensitive incidents, or for incidents where a police response was not necessary at all," contrary to the purpose of the MCOT. Ex. 20 at 21-22; Ex. 18 at 43:17–45:7.

Similarly, its own policy notwithstanding, MCPD as of July 2021 did not have a "team" of CIT officers to dispatch on calls with a mental health component. Instead, "[t]he CIT Unit of MCPD is primarily tasked with training and investigatory follow-up; at the time of this Incident, the CIT Unit was not available for dispatch." Ex. 20 at 20; Ex. 26 at 32:14–36:8, 37:20–40:04, 40:17–41:3, 74:9–76:9.

Compounding the problem, the County knew that ECC's policies, practices, and training also were deficient. That is partly because, as the Office of Legislative Oversight report concluded, ECC personnel are not adequately trained. Ex. 16 at MC 17495, 17499 (ECC staff "receive limited training for addressing mental health situations" and "have been unable to participate in recent CIT trainings").

More broadly, the Office of Legislative Oversight and the Reimagining Public Safety Task Force reports criticized the County's failure to shift responses to mental health crises away from police officers (despite resources available on paper), starting with ECC triaging of 911 calls. The County's own report found the County must do more to "seek to minimize law enforcement involvement" in mental-health calls. *See* Ex. 16 at MC 17490. Law enforcement should be involved "only as needed," which means ECC call-takers need additional training "to identify community needs that may be handled by non-law enforcement personnel," and such

65

"improved triage" would include training that "allow[s] dispatchers to more precisely identify a caller's needs, and connect them to the appropriate service(s)." Ex. 17 at MC 17514, 17520, 17527, 17540, 17548. The County had also concluded that ECC personnel must do more to alert officers about mental health calls. As the ELEFA report found, "there has not been a strategy for identifying a way to uniformly track incoming calls that involve a mental health component," and "there should be a designation that triggers an automated set of triage questions at call intake"—for example, "a series of triage questions could pop up on the screen to identify important information for officers responding and would indicate to dispatch that a CIT officer should be prioritized whenever possible." Ex. 15 at MC 17378.

The result is predictable—officers did not use the mental health resources available on paper. Ex. 7 at 24:16-26:1, 31:12-34:2, 47:11-21 (has never called Crisis Center, never seen anyone called to a scene because they are CIT-trained, never called for MCOT and never seen MCOT called to an active scene, unaware of existence of dedicated CIT team); Ex. 9 at 77:13-81:7, 90:2-95:22 (has never called dedicated CIT team, never sought advice from Crisis Center and does not know which radio channel officers use to call it, never seen an officer call for crisis negotiators, never personally called for MCOT and does not know what it does); Ex. 11 at 34:20-36:21, 41:14-42:16, 53:5-6 (has used the Crisis Center "several times" in 26 years but has never called CIT team or crisis negotiators); Ex. 6 at 45:12-49:12 (has never called for MCOT or CIT services and never seen CIT team used on scene); Ex. 26 at 74:9-76:9 (CIT team provided remote support to responding officers a "handful" of times per year).

**E.  Defendants Were Deliberately Indifferent Because Montgomery County Had Been Failing to Comply with the ADA and Section 504 for Years.**

The fact that ECC failed to have appropriate procedures in place to ask mental-health-related questions; that MCPD's policies and training were deficient; and that specialized mental-

66

resources were inadequately supported all suggest Montgomery County had failed for years to ensure effective communication and adequately respond to mental health calls. Such a finding is amply supported by the ELEFA report, the Office of Legislative Oversight report, and the Reimagining Public Safety Task Force Recommendations report. Courts consistently conclude that a history of violations evidences deliberate indifference. *See, e.g.*, *Paulone*, 787 F. Supp. 2d at 399 (a "pattern of failure" to ensure effective communication "evince[s] [] deliberate indifference"). Indeed, a "history of violations is relevant evidence to proving deliberate indifference," and evidence that a defendant "routinely" failed to ensure effective communication "[is] enough of a showing of deliberate indifference to survive summary judgment." *See Basta*, 56 F.4th at 317; *see also Younger v. Crowder*, 79 F.4th 373, 383 (4th Cir. 2023) (actual knowledge of the risk of harm may be inferred if that risk was "longstanding, pervasive, well-documented, or expressly noted" by officials in the past and "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk"). For this reason too, there is a genuine dispute as to whether the County's longstanding failures support a finding of deliberate indifference.

F.      **Montgomery County's "Adequate Official" Argument Ignores the Evidence.**

Finally, Montgomery County argues it cannot be liable because there were no adequate officials empowered to provide accommodations the night Ryan was killed. That argument fails for two reasons. First, the argument starts from a mistaken premise—that *respondeat superior* liability is no longer available in ADA and Section 504 claims. Defendants' brief omits that this theory of liability has long been available in the Fourth Circuit. *Rosen v. Montgomery County*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) ("[W]e reject the . .. argument that there is no *respondeat superior* liability under the ADA . . . . Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent"). Although Defendants rely on

*Koon*, there are good reasons to read that decision more narrowly than Defendants suggest. As an initial matter, the *Koon* Court had no authority to overrule the prior ruling in *Rosen. See United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless overruled by a subsequent *en banc* opinion of this court or a superseding contrary decision of the Supreme Court."). Nor did it; in fact, the *Koon* decision made no mention of either *Rosen* or *respondeat superior* liability— further counseling a narrow reading of its holding. Indeed, at least one court in this Circuit has continued to apply *Rosen* and find *respondeat superior* liability available. *See Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 375 (S.D.W. Va. 2024) (quoting *Rosen*).[25]

Regardless, the Court need not decide that issue because summary-judgment on deliberate indifference would be inappropriate even applying Defendants' standard. At the least, a public entity is directly liable for deliberate indifference "if an official who has authority to address the alleged discrimination and to institute corrective measures" "had knowledge of his federally protected rights and nonetheless failed to help him." *Koon*, 50 F.4th at 407. That is precisely the circumstance here. Start with the 911 call to Montgomery County's ECC. Once the 911 caller informed the ECC of Ryan's bizarre, disruptive behavior and concluded that Ryan was "acting like crazy," the ECC call-taker not only had "authority" to ask follow-up questions to determine if specialized resources were required, but was required to under IAED protocols.

---

[25] Other courts apply respondeat superior liability too. *E.g.*, *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021) ("[A] public entity may be held vicariously liable for the acts of its employees under either" the ADA or Section 504); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (*respondeat superior* applies in Title II claims); *see Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 372 (D. Md. 2011) ("Both Title II of the ADA and § 504 of the Rehabilitation Act contemplate respondeat superior liability.").

Moreover, ECC call-takers are empowered to write notes in the CAD or otherwise communicate with officers about the mental-health component of calls.

For all responding officers, it was sufficiently apparent that Ryan had a mental impairment; that communication efforts with Ryan had failed; and that Ryan needed the specialized resources that Montgomery County had available (at least on paper). Nonetheless, officers failed to take any steps to ensure effective communication or call for such resources. Officer Inman, the first responding officer, was CIT-trained; thus, per MCPD policy, he was "the primary officer" and was authorized to "determine" if specialized resources were needed. Ex. 40 at MC 00636-37. Inman also was the "senior ranking officer" on scene for an extended period, and, for that reason too, was empowered to call for specialized resources, including crisis negotiators. Ex. 7 at 72:5-20; Ex. 34 at 85:2-86:3, 92:3-13. Yet Inman nonetheless "failed to institute corrective measures." *Koon*, 50 F.4th at 407. He ignored his training on de-escalation. He never called for specialized mental health resources. Ex. 8 at 200:19-21, 224:16-19, 83:10-20. He did not search County databases for additional information on Ryan to inform the police response, or instruct anyone to do so. *Id*. at 196:18-197:14.

Once Worden arrived, he became the senior ranking officer, Ex. 7 at 118:22-120:3, meaning he "assume[d] command of the scene" and was the "decision-maker," Ex. 6 at 66:13-68:17. Worden had authority to call for crisis negotiators, the Mobile Crisis Outreach Team, the CIT team, and other specialized resources. Ex. 12 at 44:15-45:4, 141:14-142:1; Ex. 6 at 101:6-103:16; Ex. 26 at 66:21-68:7 (responding officers may call MCOT). Yet he did not do so. More broadly, as acknowledged by the County in 30(b)(6) depositions, multiple officers on scene were authorized by the County's policies and practices to implement appropriate accommodations. *See* Ex. 45 at 55:4-19, 66:10-70:10 (senior ranking officer can request crisis negotiators and

requests are not denied); Ex. 18 at 72:4-22 (police can request MCOT); Ex. 26 at 62:13-63:8 (responding officers can request CIT-trained officers).

**V.    Genuine and Material Disputes of Fact Exist as to Plaintiffs' State-Law Claims.**

Because genuine factual disputes exist as to whether the Officer-Defendants violated state law, these claims too must proceed to a jury.

Negligence and Gross Negligence Claims (against Officer Defendants)Plaintiffs have viable negligence claims against the Officer Defendants that must be decided by a jury because (1) there is a genuine dispute regarding whether the Office Defendants acted with "actual malice" or were "grossly negligent," ECF 51 (citing *McGowan v. Prince George's County*, 401 F. Supp. 3d 564, 571 (D. Md. 2019)), and (2) there is a genuine dispute (at least) as to whether the Officer Defendants acted negligently.

Whether the Officer-Defendants acted with malice is a fact-intensive inquiry, ECF 51 at 43, and "inferences of malicious conduct may be drawn from [plaintiff's] version of the facts." *Okwa v. Harper*, 757 A.2d 119, 129 (Md. 2000). Malice requires finding that Officer-Defendants were "motivated by ill will or an affirmative intent to injure," *see Solis v. Prince George's County*, 153 F. Supp. 2d 793, 805 (D. Md. 2001), or that the Defendant-Officers engaged in "knowing and deliberate wrongdoing," *Barbre v. Pope*, 402 Md. 157 (Md. 2007). Gross negligence, a more lenient standard, also is a fact-intensive inquiry that requires evidence that the Officer Defendants were "so utterly indifferent" to Ryan's rights "that [they] act[ed] as if such rights did not exist." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018).

Taking the facts in the Plaintiffs' favor, Ryan LeRoux posed no threat to police officers over an extended period of inaction by the officers. Although Officer Inman saw a gun on the front seat of Ryan's car, for an extended period there was no indication that Ryan was paying any attention to it; instead, he was reclined in the driver's seat, with headphones on, looking at his

70

cell phone and seemingly ignoring the officers surrounding him. Nonetheless, the officers surrounded him with guns drawn, threatening him with lethal force, for an unprecedented amount of time. *See* Ex. 9 at 205:1-16, 237:3-14 (he had never before trained his rifle on someone for more than a few minutes); Ex. 7 at 97:12-19 (cannot recall another incident where a subject was surrounded and held at gunpoint yet was non-responsive); Ex. 11 at 108:9-13 (same). Rather than following their training and de-escalating the standoff, the Officer-Defendants made a violent confrontation inevitable by refusing to modify their response to effectively communicate with Ryan and make accommodations for his mental health disability. They boxed him in—one police car in front, another in back. They did so although the McDonald's was evacuated and the scene was secured. The driver's side of Ryan's car was pinned against the McDonald's—Ryan could not exit that way. They blinded him with spotlights and yelled at him over a loudspeaker that was deafening. Multiple officers held him at gunpoint from the passenger side. Officers violated MCPD policy, which required de-escalation. They violated their training, which identified the symptoms of mental illness that Ryan was exhibiting and trained the officers that such a person would struggle to understand and comply with commands, such that officers should modify their approach, de-escalate, and call for specialized mental health response. They even violated their own understanding of MCPD procedures, which required them to communicate, coordinate, and formulate a plan of action. They did so even after they knew their force-first approach and yelling was not working. They made no attempt to learn about who was in the car, or what may explain his non-compliance. The officers contemplated "pepper spraying his ass" or smashing his window but ultimately gave Ryan a simple choice—comply with police commands or die.

Officers insisted the only way to reach a peaceful outcome was for Ryan to comply, in the manner they expected him to. According to Captain Dillman, only one thing could have avoided Ryan's death—Ryan needed to comply with police commands. Ex. 12 at 152:21-153:17. Yet, as Captain Dillman also acknowledged, mental health disabilities may make compliance impossible because the person with the disability cannot understand commands. *Id.* at 120:4-122:7; *see* Ex. 9 at 168:8-169:20 (Ryan needed to comply with officer commands but Cerny is "not sure" how Ryan could have done that); Ex. 8 at 155:10-157:8, 239:15-19 (Ryan needed to comply and Ofc. Inman did not think about his training that mental health disabilities may preclude compliance); Ex. 6 at 106:11-16, 155:6-20 (testifying he did consider Ryan might not be able to comply with commands and the situation could only have been defused if Ryan communicated with officers and surrendered); Ex. 8 at 239:15-19 (to end peacefully Ryan had to "listen to our commands"). But as their training specifically addressed, Ryan's disability made it *impossible* for him to do so. Psychosis, thought disorder, mood disorder, and suicidality can all involve disruptions to sensory and language processing. Ryan displayed such symptoms on July 16, 2021, as the officers frequently observed and commented upon. Yet they continued their force-first approach that was premised on Ryan ultimately behaving in a way that his disability made impossible. After the officers killed Ryan, they harbored no regrets—they testified the police made no mistakes. Ex. 9 at 258:3-22; Ex. 11 at 181:16-182:14; Ex. 10 at 242:1-21; Ex. 8 at 257:5-259:6. But a reasonable juror could conclude that the officers were "motivated by ill will" were engaged in "knowing and deliberate wrongdoing" or, at the very least, that they evidenced "an intentional failure to perform a manifest duty"—to protect Ryan's life—"in reckless disregard of the consequences."

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion for Summary Judgment and allow a jury to decide if Defendants are liable for their misconduct on July 16, 2021.

Respectfully submitted,

_____/s/_____

Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com
Eve L. Hill (Bar No. 19938)
ehill@browngold.com
Neel K. Lalchandani (Bar No. 20291)
nlalchandani@browngold.com
James O. Strawbridge (Bar No. 20005)
jstrawbridge@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21201
Tel: (410) 962-1030
Fax: (410) 385-0869
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April 2025, the foregoing was electronically filed with notice to:

Patricia L. Kane (Bar No. 13621)
Patricia.Kane@montgomerycountymd.gov
Patricia V. Haggerty (Bar No. 18472)
Patricia.Haggerty@montgomerycountymd.gov
Aaron Ramirez (Bar No. 30812)
Aaron.Ramirez@montgomerycountymd.gov
101 Monroe Street, Third Floor
Rockville, Maryland 20850
Tel: (240) 777-6700

Kevin Karpinski (Bar No. 11849)
Kevin@bkcklaw.com
120 East Baltimore Street, Suite 1850
Baltimore, Maryland 21202
Tel: 410-727-5000
*Attorneys for Defendants*

                     /s/
Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com

75