**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| THE ESTATE OF RYAN LEROUX, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action No. 8:22-856-AAQ |
| v. | * | |
| | * | |
| MONTGOMERY COUNTY, MARYLAND, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | ****** | |

## MEMORANDUM OPINION

This case concerns the death of Ryan Nicholas LeRoux after Montgomery County Police Department ("MCPD") officers fired twenty-three shots into his vehicle. Plaintiffs, Mr. LeRoux's Estate and surviving family members, allege violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), as well as state common law torts of negligence, gross negligence, and wrongful death. Currently before the Court is a Motion for Summary Judgment filed by Defendants Montgomery County, Maryland (the "County"), and Police Officers John Austin Cerny, Brooks Michael Inman, Sarah Vaughn, and Corporal Romand Schmuck (collectively "Officer Defendants"). ECF Nos. 126, 127, 128. Although the parties vigorously dispute the propriety of the County's and the officers' actions on the night of Mr. LeRoux's death, the question before the Court is a narrower one – whether Plaintiffs have advanced sufficient evidence for the jury to consider the issue. The Court makes no determination as to the legality of the County's

1

and the officers' actions, but concludes only that there is sufficient evidence to support a material dispute of fact.   For these reasons and the reasons discussed below, Defendants' Motion is denied.

## BACKGROUND

### I.    Factual History

On July 16, 2021, Montgomery County police officers shot and killed Mr. LeRoux at a McDonald's restaurant in Gaithersburg, Maryland.   ECF No. 134-29, at 2.   The fatal interaction was not Mr. LeRoux's first encounter with Montgomery County police, nor was it his first time exhibiting behavior consistent with psychosis.

### A.  Mr. LeRoux's History of Mental Health Struggles and Police Involvement

Mr. LeRoux had a history of mental health struggles and subsequent interactions with police.   In October 2020, Maryland police officers found Mr. LeRoux walking by the side of the road, wearing no clothes, and claiming that people were chasing him.   ECF No. 136-2, at 2.   Mr. LeRoux was subsequently involuntarily committed to inpatient treatment for one week.   *Id.* at 3. Doctors diagnosed Mr. LeRoux with "psychosis," and prescribed him antipsychotics.   *Id.* at 2, 16. Though "unspecified psychosis" is a diagnosis given when psychosis is not caused by drug use, Mr. LeRoux later self-reported that he believed his psychosis was the result of smoking laced cannabis.   ECF Nos. 136-2, at 148; 136-1, at 2.

Following his hospitalization, Mr. LeRoux sought care from the Montgomery County Crisis Center in November and December of 2020.   ECF No. 136-1, at 2, 21.   Mr. LeRoux told Crisis Center staff about his ongoing paranoia and asked the Crisis Center to refill his antipsychotic medication.   *Id.* at 2.

On July 12, 2021—four days before the McDonald's interaction that led to Mr. LeRoux's death—Montgomery County police responded to a trespass call at a Holiday Inn Express.   ECF

No. 134-4, at 4.   Upon their arrival, hotel staff informed police that Mr. LeRoux was refusing to leave his room.   *Id.*   Officers found Mr. LeRoux lying in bed and "smiling at officers."   *Id.*   Mr. LeRoux "refused to move" and did not speak.   *Id.*   Mr. LeRoux remained unresponsive to officers throughout the encounter, during which officers eventually rolled Mr. LeRoux over, handcuffed him, and escorted him from the property.   *Id.*

### B.  Events of July 16, 2021

On the evening of July 16, 2021, a McDonald's employee called 911 at 9:12 p.m.   ECF Nos. 126-4; 134-29, at 7.   During the call—which lasted five minutes and was recorded—the McDonald's employee stated that a customer—who would later be identified as Mr. LeRoux— refused to pay, told the employees that he had already paid when he had not, and would not move from the drive-thru lane.   ECF No. 126-4.   The Emergency Communications Center (ECC) call-taker asked the McDonald's employee if any weapons were involved, and the employee responded "no."   *Id.* at 02:29–02:32.   The McDonald's employee went on to state that the customer was "acting crazy out there."   *Id*. at 02:32–02:42.   When the ECC call-taker asked how the man was "acting crazy", the McDonald's employee repeated that he was claiming that he had already paid for his food when he had not and was refusing to move.   *Id.* at 02:42–02:54.   The call-taker asked the McDonald's employee if anyone was in danger, and the employee replied no.   *Id.* at 03:57– 04:02. The call-taker classified the call as "Trespassing/Unwanted."   ECF No. 126-5, at 6.   After the call, no police units were available to dispatch to the McDonald's, and the call was put on a list of pending non-priority calls for service.   ECF Nos. 126-5, at 8; 126-8, at 9–11.

While the call was pending, Officer Ana Owen drove past the McDonald's and saw that Mr. LeRoux's car was still stopped in the drive-thru lane.   ECF No. 134-8, at 21–23.   Officer Owen called the McDonald's to assess if the situation remained stable.   *Id.*   The McDonald's

3

employee informed Officer Owen that Mr. Leroux was still blocking the drive-thru lane but that he was calm, just "sitting there and not saying much."  *Id.* at 23.  Officer Owen did not report to the McDonald's, but told the McDonald's employee to call 911 if the situation evolved.  *Id.* at 25.

At 10:28 p.m., Defendant Officer Brooks Inman arrived at the McDonald's and observed a white SUV parked in the drive-thru lane.  ECF Nos. 126-10, at 5–6; 126-12, at 00:05.[1]  Officer Inman approached the passenger side of the vehicle and saw a man—not yet identified as Mr. LeRoux—fully reclined in the driver's seat, wearing large headphones, and holding his phone. ECF Nos. 126-10, at 6; 126-12, at 00:12.  When Officer Inman tapped on the passenger window, Mr. LeRoux turned and looked directly at him, but did not otherwise respond.  ECF No. 126-12, at 00:13.  Officer Inman then observed a handgun sitting on the passenger seat of the vehicle. ECF No. 126-10, at 6.  At that point, Officer Inman drew his weapon, pointed it at Mr. LeRoux, and repeatedly yelled at Mr. LeRoux to raise his hands.  ECF No. 126-12, at 00:15–00:29. Again, Mr. LeRoux looked at Officer Inman before returning to his phone.  ECF Nos. 126-12, at 00:15; 126-10, at 6.  Officer Inman attempted to open the passenger door, but it was locked.  ECF No. 126-10, at 6.  Officer Inman then repeatedly commanded Mr. LeRoux to unlock the door, to which Mr. LeRoux did not respond.  ECF No 126-12, at 00:35–01:10.  Officer Inman radioed that "He's sitting in the car, the gun is on the passenger's seat.  I'm backing up.  He's unresponsive.  He's awake but he's not listening to my commands."  ECF No. 126-12, at 01:25-01:38.  Officer Inman then retreated behind a cement pole, keeping his firearm drawn.  *Id.* at 02:24-02:33.

---

[1] Officer Inman's body-worn camera (BWC) timestamp is in Coordinated Universal Time.  *See* ECF Nos. 126-12; 126-1, at 9 n.3.  This Opinion has converted all times to Eastern Standard Time for the reader's ease.  Additionally, pincites in this Opinion refer to the time within a given BWC recording rather than the time reflected on a video's timestamp.

Within seconds of approaching the vehicle, Officer Inman requested police backup to the scene. ECF No. 126-10, at 6; ECF No. 126-12, at 00:10–00:28. Additional officers, including Defendant Officers Vaughan, Cerny, and Schmuck, arrived on the scene in the next few minutes, between 10:32 and 10:38 p.m. ECF Nos. 127-6, at 04:38; 127-4, at 08:18; 127-8, at 00:01. By the end of the incident, a total of seventeen officers were present at the McDonald's. *See* ECF Nos. 134-29, at 5; 134-21, at 18. Officers surrounded Mr. LeRoux's car at a distance of about ten yards. ECF No. 134-10, at 47; *see also*, *e.g.*, ECF No. 127-11, at 15:51. Multiple officers drew their handguns, and Officer Cerny trained his assault rifle on Mr. LeRoux. ECF Nos. 134-10, at 45; 127-11, at 14:03, 15:50.

Once other officers arrived, Officer Inman discussed the possibility of breaking the vehicle's window with another officer. ECF No. 126-12, at 04:05–04:23. Officer Inman then asked the other officers, "What do you guys want to do?" *Id.* at 06:07. The other officers' responses are not audible, but no plan was subsequently put into place. *Id.* at 06:10-06:15. An officer asked Officer Inman: "Did you give him commands?" to which Officer Inman replied "Oh yeah. He's just looking at me like I'm fucking stupid." *Id.* at 06:25–06:30. At 10:34 p.m., an officer on the scene radioed in the full license plate number of the vehicle and requested that ECC run the plates. ECF No. 127-10, at 03:05–03:33; *see also* ECF No. 126-12, at 05:42. At 10:36 p.m., an ECC dispatcher radioed that the vehicle was registered to Ryan LeRoux and provided a phone number. ECF No. 126-12, at 08:12. No action was taken in response to the receipt of Mr. LeRoux's name or phone number.

At 10:35 p.m., Sergeant Worden arrived on the scene and became the senior ranking officer. ECF Nos. 127-11, at 04:45; 134-7, at 19. Other officers briefed Sergeant Worden on the situation: "He was looking right at me"; "Yeah he's on his phone with his headphones in I think";

"He's moving"; "The gun's on the passenger seat just in plain view.  He's been here for two hours."   ECF No. 127-11, at 05:25–05:56.  Sergeant Worden did not relay any directives or suggest any plan to the officers.   As officers contemplated the lack of a plan, Officer Inman again opined that officers should break the window and "pepper spray his ass."  *See* ECF No. 126-12, at 10:05.   At 10:39 p.m., Sergeant Worden called Captain Dillman to update him on the situation, noting that "all innocents" were away and that the McDonald's was "pretty much sealed off." ECF No. 127-11, at 08:33–09:40.   At 10:41 p.m., Sergeant Worden instructed an officer to reposition his cruiser behind Mr. LeRoux's car to prevent Mr. LeRoux from leaving.  *Id.* at 10:27– 10:37.   Sergeant Worden then pulled a SUV in front of Mr. LeRoux's car.  *Id.* 11:48–12:12. After doing so, Sergeant Worden remarked: "He looked right at me, too.  I'm not sure what his deal is.  Crazy."  *Id.* at 12:13–12:23.   Officers placed stop sticks in front of Mr. LeRoux's wheels, ECF Nos. 127-8, at 2:56–3:08; 127-6, at 10:05–11:16, shined spotlights into Mr. LeRoux's vehicle, and called out orders through a loudspeaker, ECF No. 134-12, at 30, 41.  *See also* ECF No. 127-11, at 18:44–19:12 (An officer can be heard over the loudspeaker stating, "Vehicle driver, put your hands up.").

At 10:46 p.m., Defendant Officer Vaughn stated that Mr. LeRoux had "raised the gun," and ducked for cover.  ECF No. 127-4, at 21:08–21:10.  Officer Inman stated, "Gun in hand," and, a few seconds later, "now it's not."  ECF No. 126-12, at 18:12–18:17.  No officer responded in any fashion other than taking cover.  *See* ECF Nos. 126-12, at 18:12–18:17; 127-4, at 21:08– 21:10; *see also* ECF No. 127-11, at 16:05–16:15.

At 10:47 p.m., Captain Dillman arrived on scene.  Sergeant Worden briefed Captain Dillman on the situation.  ECF No. 127-11, at 16:20–17:00.  At 10:49 p.m., Captain Dillman summoned crisis negotiators to the scene.  *Id.*, at 18:20–18:25.  MCPD crisis negotiators are

6

armed officers who have received additional training related to communicating with individuals in a moment of crisis.   ECF No 134-46, at 4, 21–22.

At 10:52 p.m., Sergeant Worden attempted to call Mr. LeRoux on the phone number ECC previously provided.   ECF No. 127-11, at 21:50–22:01.   Mr. LeRoux did not answer, and Sergeant Worden left a message.   *Id.*   At 10:53 p.m., ECC advised that they had a call-taker on the line with Mr. LeRoux.   ECF Nos. 127-11, at 22:26; 127-10, at 05:15–05:30.   On that call, Mr. LeRoux confirmed that he was at a McDonald's and could see officers.   ECF No. 134-32, at 4. When the call-taker asked Mr. LeRoux to raise his hands, Mr. LeRoux replied that his hands were already up.   *Id.*   The call-taker then asked Mr. LeRoux to put his hands out the window, and Mr. LeRoux replied that he had done so.   *Id.* at 5.   ECC reached out to officers on the scene to verify whether Mr. LeRoux's hands were up and out the window; officers confirmed that they were not. ECF No. 127-8, at 16:44–17:20.   Captain Dillman asked ECC to transfer the call to Sergeant Worden, but Mr. LeRoux hung up before the transfer connected.   ECF No. 134-7, at 58.   The ECC dispatcher noted that Mr. LeRoux sounded intoxicated.   ECF No. 128-3, at 64.   Sergeant Worden attempted to call Mr. LeRoux again.   ECF No. 134-7, at 58–59.   Mr. LeRoux answered once, but immediately hung up.   ECF Nos. 134-7, at 59; 127-11, at 28:16–28:40.

At 10:59 p.m., an officer inside the McDonald's looked through the drive-thru window to confirm that the gun was on the passenger seat rather than in Mr. LeRoux's hand.   ECF No. 127-4, at 34:00–34:24.   The officer also noted that there was alcohol in the vehicle.   *Id.*

At 11:01 p.m., officers discussed an arrest plan which Captain Dillman outlined.   ECF Nos. 127-4, at 35:38–35:56; 126-12, at 32:07–32:40.   The officers expressed a lack of clarity over the plan: "Does Brian understand we're going to be pulling him through where the gun is?" "I tried to tell him that . . . I think this is if he comes out on his own."   ECF No. 126-12, at 33:06–33:19.

At 11:02 p.m., a crisis negotiator radioed that he was two minutes away. ECF Nos. 127-12, at 25:05; 127-10, at 08:27. A few seconds later, Mr. LeRoux again raised the gun with his right arm. ECF Nos. 126-12, at 33:45–33:55; 134-9, at 53. At that point, Defendant Officers Inman, Vaughan, Cerny, and Schmuck fired a total of twenty-three shots at Mr. LeRoux. ECF Nos. 126-12, at 33:50–33:58; 134-21, at 9. Officer Cerny fired ten shots from his assault rifle; Officer Vaughan fired two shots; Officer Inman fired seven shots; and Corporal Schmuck fired four shots. ECF No. 134-29, at 10–11. Officers then approached the vehicle to attempt to provide medical aid. ECF No. 127-4, at 37:25–38:00. As they approached, officers could see that Mr. LeRoux had been shot but was still alive. *Id.*, at 37:58–38:05. Officers secured the gun, removed Mr. LeRoux from the vehicle, and began attempting aid. ECF Nos. 127-4, at 37:25–38:30; 127-12, at 27:10–27:20. An ambulance transported Mr. LeRoux to Suburban Hospital, where he died at approximately 12:30 a.m. on July 17, 2021. ECF No. 134-29, at 2.

## II.    Procedural History

Paul and Rhonda LeRoux, Mr. LeRoux's parents, and the Estate of Mr. LeRoux filed their initial Complaint on April 8, 2022, ECF No. 1, and an Amended Complaint on July 8, 2022, ECF No. 25. The Amended Complaint included eleven counts, alleging that: (1) Montgomery County's failure to dispatch mental health services violated Title II of the ADA, *id.* at 22; (2) Montgomery County's failure to implement de-escalation or crisis intervention techniques violated Title II of the ADA, *id.* at 24; (3) Montgomery County's differential treatment of Mr. LeRoux based on his disability violated Title II of the ADA, *id.* at 26; (4) Montgomery County's failure to provide Mr. LeRoux effective communication violated Title II of the ADA, *id.* at 28; (5) Montgomery County's failure to dispatch mental health services to respond to Mr. LeRoux violated Section 504 of the Rehabilitation Act, *id.* at 29; (6) Montgomery County's failure to

8

implement de-escalation or crisis intervention techniques violated Section 504 of the Rehabilitation Act, *id.* at 32; (7) Montgomery County's differential treatment of Mr. LeRoux based on his disability violated Section 504 of the Rehabilitation Act, *id.* at 34; (8) Montgomery County's failure to provide Mr. LeRoux effective communication violated Section 504 of the Rehabilitation Act, *id.* at 35; (9) Montgomery County's and the Officers' negligence caused the death of Mr. LeRoux, *id.* 37; (10) Montgomery County's and the Officers' gross negligence caused the death of Mr. LeRoux, *id.* at 38; and (11) Montgomery County and the Officers caused the wrongful death of Mr. LeRoux, *id.* at 39.

Defendants filed a Motion to Dismiss the Amended Complaint on August 19, 2022, ECF No. 33, which was fully briefed by November 4, 2022. ECF Nos. 38, 47. Additionally, the United States filed a Statement of Interest in support of the Plaintiffs' Opposition. ECF Nos. 43, 44. On March 20, 2023, this Court issued a Memorandum Opinion and Order granting, in part, and denying, in part, Defendants' Motion to Dismiss. ECF Nos. 51, 52. The Court denied Defendants' Motion to Dismiss as to all Plaintiffs' ADA and Rehabilitation Act claims against Defendant Montgomery County. ECF No. 52. The Court also denied Defendants' Motion as to Plaintiffs' state law negligence, gross negligence, and wrongful death claims against the Defendant Officers. *Id.* However, the Court granted Defendants' Motion as to Plaintiffs' state law claims against Defendant Montgomery County on the grounds of governmental immunity. ECF No. 51, at 38–39.

Defendants answered Plaintiffs' Amended Complaint on April 21, 2023, ECF Nos. 55–59, and the parties engaged in discovery. On March 10, 2025, Defendants filed the Motion for Summary Judgment now before the Court, ECF No. 126, as well as two supplements to their Motion with additional exhibits, ECF Nos. 127, 128. Plaintiffs filed a Response in Opposition to

Defendants' Motion on April 28, 2025, ECF No. 134, to which Defendants replied on June 16, 2025, ECF No. 148.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment.   *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).   The moving party bears the burden of showing that there is no genuine issue of material fact.   Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "A party who bears the burden of proof on a particular claim must factually support each element of his or her claim."   *Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007).   Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.   *See Anderson*, 477 U.S. at 256–57.   "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function

of the fact-finder to resolve factual disputes, including matters of witness credibility." *Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002)).

## DISCUSSION

Defendants argue that they are entitled to summary judgment on multiple grounds.  To begin, Defendants assert that Plaintiffs have not demonstrated that Montgomery County violated Mr. LeRoux's rights under the ADA or Rehabilitation Act.  ECF No. 126-1, at 35.  Defendants then argue that even if Plaintiffs have established an ADA violation, Plaintiffs have not provided sufficient evidence to show that the County acted with deliberate indifference as required to support a claim for compensatory damages.  *Id.* at 64.  As to the state law claims, Defendants argue that the Defendant Officers are entitled to summary judgment on the grounds of public official immunity.  *Id.* at 71.  Alternatively, Defendants argue that Plaintiffs have failed to produce evidence showing that the Officers acted negligently.  *Id.* at 74.

### I.    Claims Under the ADA and Rehabilitation Act

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[2]

---

[2] The Fourth Circuit has not formally held that the language "or be subjected to discrimination by that entity" is "meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of context[.]'"  *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 338 (4th Cir. 2012) (first quoting 42 U.S.C. § 12132; and then quoting *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1084–85 (11th Cir. 2007)).  However, it has "emphasized the disjunctive 'or'" in the statutory language, *id.* at 338 n.3 (citing *Constantine v. Rectors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)), and stated that "the broad approach," which views the clause as a catch-all phrase, "is appealing," *id.* at 338.

42 U.S.C. § 12132.   Title II applies to police activities and investigations.   *See Seremeth v. Bd.*
*of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 337–39 (4th Cir. 2012) (holding that officers
and other employees of law enforcement agencies must "make reasonable modifications in
policies, practices, or procedures when the modifications are necessary to avoid discrimination on
the basis of disability . . .") (quoting 28 C.F.R. § 35.130(b)(7)).   Under the Rehabilitation Act,
"[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his
disability, be excluded from the participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal financial assistance[.]"   29 U.S.C.
§ 794(a).   "The Fourth Circuit treats claims under the Rehabilitation Act and the ADA as the
same."   *Koon v. North Carolina*, 50 F.4th 398, 403 n.2 (4th Cir. 2022).   Thus, ADA and
Rehabilitation Act claims can be "combined for analytical purposes[.]"   *Id.* (quoting *Seremeth*,
673 F.3d at 336 n.1).

### A. A Reasonable Jury Could Find that Montgomery County Violated Mr. LeRoux's Rights Under Title II of the ADA and Section 504 of the Rehabilitation Act.

To establish a violation of either discrimination statute, a plaintiff must show that he: (1)
"is a qualified individual with a disability," (2) "was discriminated against, excluded from
participation in, or denied the benefits of a public entity's services, programs, or activities;" and
(3) "the discrimination, exclusion, or denial of benefits was because of [his] disability."   *Paulone*
*v. City of Frederick*, 718 F. Supp. 2d 626, 634 (D. Md. 2010), *on reconsideration in part*,
No. WDQ-09-2007, 2010 WL 3000989 (D. Md. July 26, 2010).   "Discrimination includes not
making reasonable accommodations to the known physical or mental limitations of an otherwise
qualified individual with a disability."   *Seremeth*, 673 F.3d at 336.

Defendants first argue that Plaintiffs have failed to put forth sufficient evidence that Mr. LeRoux had a disability as the ADA or Rehabilitation Act defines it.[3]  ECF No. 126-1, at 35. Defendants next assert that even if Mr. LeRoux was a qualified individual with a disability, there is no evidence that the County knew of his disability or need for accommodation.  *Id.* at 39. Lastly, Defendants claim that the County did not have a duty to accommodate Mr. LeRoux given the exigent circumstances at hand—specifically, a handgun within Mr. LeRoux's reach.  *Id.* at 49.

### 1. A Genuine Dispute of Fact Exists as to Whether Mr. LeRoux Had a Disability as the ADA Defines it.

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  An impairment includes "[a]ny physiological disorder or condition . . . affecting one or more body systems," including the "neurological" system, or "[a]ny mental or psychological disorder such as an intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability."  28 C.F.R. § 35.108(b)(1)(i)–(ii).  An "episodic" impairment "is a disability if it would substantially limit a major life activity when active."  28 C.F.R. § 35.108(d)(1)(iv).  "Major life activities include, but are not limited to: . . . speaking, . . . thinking, . . . communicating, [and] interacting with others." 28 C.F.R. § 35.108(c)(1)(i).  Importantly, an impairment need not "prevent, or significantly or

---

[3] Whether an individual has a disability presents a mixed question of law and fact.  As Defendants in their present Motion challenge whether Mr. LeRoux in fact experienced certain conditions and the degree to which Mr. LeRoux, as a factual matter was affected, Defendants' Motion raises questions of fact.  The Fourth Circuit has regularly assessed such issues as questions of fact.  *See J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 671 (4th Cir. 2019) (assessing a dispute as to severity of effects the plaintiff actually experienced as a question of fact); *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569–70 (4th Cir. 2015) (reversing a district court's finding that an individual did not have a disability where it failed to consider conflicting evidence in the record).  However, whether certain facts, either agreed to by the parties or decided by the jury, together meet the standard for a disability presents a question of law.  *See Equal Emp. Opportunity Comm'n v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 104 (D. Md. 2019) (assessing whether defendant's "incompetent cervix" constituted a disability as a question of law).

severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."   28 C.F.R. § 35.108(d)(1)(v).

When assessing claims filed under the ADA, the "definition of 'disability' shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA."   28 C.F.R. § 35.108(a)(2)(i); *see also J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019) (holding that the ADA's disability definition must be read "'broadly in favor of expansive coverage,' keeping in mind that the language 'is not meant to be a demanding standard.'" (citations omitted).   This approach is "consistent with the purpose of the ADA Amendments Act of 2008 . . . which was passed to 'reinstat[e] a broad scope of protection to be available under the ADA.'"   *J.D. by Doherty*, 925 F.3d at 670 (citations omitted).   "The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA."   28 C.F.R. § 35.101(b).   The amendments also clarify that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability."   *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)).

Defendants argue that Plaintiffs have failed to put forth evidence satisfying either prong of the ADA definition of disability.   Specifically, Defendants claim that Plaintiffs have not adequately shown that Mr. LeRoux had a mental impairment—particularly the alleged impairments of depression, schizophrenia, and ADHD—or that such an impairment limited Mr. LeRoux's major life activities.   ECF No. 126-1, at 36.

14

### a. A Reasonable Jury Could Find that Mr. LeRoux Had a "Mental Impairment" as the ADA Defines It.

Plaintiffs have produced sufficient evidence tending to show that Mr. LeRoux suffered from a "mental impairment" as contemplated by the ADA.    In October of 2020, when Mr. LeRoux was brought to the hospital after police found him on the side of the street experiencing paranoid delusions, he was involuntarily committed to inpatient treatment with the diagnosis of "unspecified mental health disorder."  ECF No. 136-2, at 33.    When submitting the paperwork to involuntarily admit Mr. LeRoux, both of Mr. LeRoux's treating physicians at Northwest Hospital Center checked a box that read "I find that: The individual has a mental disorder."  ECF No. 136-2, at 29, 32.    After the conclusion of Mr. LeRoux's inpatient treatment, he was discharged with the diagnosis of "psychosis."  *Id.* at 16.    Doctors also prescribed Mr. LeRoux Risperidone, *id.* at 16, an anti-psychotic medication, ECF No. 134-23, at 9, which Mr. LeRoux sought to keep taking to combat ongoing paranoia after his first prescription expired, ECF No. 136-1, at 2.    After reviewing the record, Plaintiffs' expert Carly Sailon—"a licensed clinical social worker" with "extensive experience working with people living with serious and persistent mental illness"— asserted that, based on her review of the evidence, "Ryan LeRoux suffered from some form of psychotic mental health disorder, likely schizophrenia."  ECF No. 134-20, at 2, 9.    Lastly, Plaintiffs have produced evidence of other behaviors that—drawing all reasonable inferences in Plaintiffs' favor—are indicative of a mental health impairment, including Mr. LeRoux's behavior on July 12, 2021, when police found him smiling and unresponsive while refusing to vacate a Holiday Inn Express hotel room bed, ECF No. 134-4, at 4, and Mr. LeRoux's behavior on the night

of the shooting, when he remained uncommunicative and unresponsive for a period of over two hours while parked in a McDonald's drive-thru.

Defendants unsuccessfully argue that the above evidence is insufficient for Plaintiffs to meet their burden. Defendants take issue with Plaintiffs' failure to set forth expert testimony diagnosing Mr. LeRoux with a specific mental health condition, such as schizophrenia or depression. ECF No. 126-1, at 37. Though Defendants acknowledge that expert testimony is not always required to establish a disability, they insist that, in cases like this one, "[c]ourts have generally required expert testimony when 'a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition.'" *Id.* at 36 (quoting *Munday v. Lees-McRae Coll.*, No. 1:20-CV-00105, 2022 WL 17252598, at *9 (W.D.N.C. Nov. 28, 2022)). However, in considering an identical argument, the Fourth Circuit declined to require that medical evidence is necessary to establish a disability at the summary judgment stage, even where an alleged impairment might be "unfamiliar to a lay jury." *Anderson v. Diamondback Inv. Group, LLC*, 117 F.4th 165, 175–76 (4th Cir. 2024) ("Whether [plaintiff] was required to offer medical evidence to carry her burden on this element [that she was disabled under the ADA], however, is a separate question, and one we don't resolve here.").

Additionally, though Defendants repeatedly highlight Mr. LeRoux's lack of a formal depression or schizophrenia diagnosis, "nothing in Title II of the ADA requires that a person be formally diagnosed with a mental health disorder before finding the person has a mental impairment." *Brizuela v. City of Sparks*, No. 3:19-cv-00692-MMD-VPC, 2022 WL 3229389, at *32 (D. Nev. Aug. 10, 2022), *aff'd in part, rev'd in part on other grounds, dismissed in part on other grounds*, No. 22-16357, 2023 WL 5348815 (9th Cir. Aug. 21, 2023) (citing 28 C.F.R. § 35.108(e)(1)). In fact, the exact nature and extent of an impairment need not be entirely clear to

16

qualify as a disability under the ADA. *J.D. by Doherty*, 925 F.3d at 670 (upholding the district court's finding that plaintiff's impairment "could qualify as a disability under the ADA" where the "record [was] unclear regarding the nature and extent of [plaintiff's] impairment."). Defendants repeatedly note that Plaintiffs' expert—Carly Sailon—declined to definitively diagnose Mr. LeRoux with a specific psychotic disorder based on the record alone. ECF No. 24–25. However, the fact that a non-examining expert declines to formally diagnose an impairment based on the record alone "does not support [a] finding of no disability." *Jacobs*, 780 F.3d at 570. Lastly, Defendants' insistence that Mr. LeRoux's diagnosis of "psyshosis" is not a mental impairment runs counter to federal guidance that "the definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(a)(2)(i).

Defendants' final argument that Mr. LeRoux's behavior was drug-induced and, thus, not an impairment under the ADA is similarly unsuccessful. ECF No. 148, at 6. In October 2020, hospital staff specifically diagnosed Mr. LeRoux with "unspecified psychosis," as noted by the International Classification of Diseases (ICD) code F29. ECF No. 136-2, at 142. "When an F29 ICD code is used, that expressly means that staff have found an individual suffers from unspecified psychosis that is not caused by a substance or known psychological condition." ECF No. 134-23, at 8 (internal quotation marks omitted). Additionally, when Mr. LeRoux was initially admitted for the October 2020 incident, he reported that "he had only smoked one blunt that day" and "did not think it was laced or mixed with any [h]allucinogens." ECF No. 136-2, at 152. While Mr. LeRoux later reported a belief that his October 2020 psychotic episode was caused by "laced" marijuana, ECF No. 136-2, at 148 ("I think it was laced with something."); ECF No. 136-1, at 2 (informing Crisis Center staff that he was hospitalized in October 2020 after smoking marijuana

that had been laced with "something"), these statements contradict his earlier assertions. Further, Plaintiffs have produced an expert opinion indicating that the prolonged paranoia that Mr. LeRoux experienced after October 2020 is more consistent with a mental health disability rather than one-time consumption of laced marijuana. ECF No. 134-23, at 8–9. Lastly, there is no evidence that drug use played a role in either of the other instances Plaintiffs put forth as evidence that Mr. LeRoux had a mental health disorder, including Mr. LeRoux's behavior at the Holiday Inn Express on July 12, 2021, and at the McDonald's on the night he was killed. Thus, there is sufficient evidence tending to show that Mr. LeRoux's behavior stemmed from a mental health disability rather than drug use.

Viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in Plaintiffs' favor, a reasonable jury could find that Mr. LeRoux suffered from a mental impairment as the ADA defines it.

### b. A Reasonable Jury Could Find that Mr. LeRoux's Impairment Substantially Limited His Major Life Activities.

We now turn to the second prong of the ADA disability inquiry: whether Mr. LeRoux's impairment substantially limited his major life activities. Plaintiffs have met their burden at this stage on this factor, as well. "In considering whether an impairment substantially limits an individual in a major life activity, we construe the statutory text 'broadly in favor of expansive coverage,' keeping in mind that the language 'is not meant to be a demanding standard.'" *J.D. by Doherty*, 925 F.3d at 670 (quoting 28 C.F.R. § 36.105(d)(1)(i)). Plaintiffs have put forth evidence that, when Mr. LeRoux was experiencing the effects of his mental health disability—specifically, immediately prior to and during his October 2020 hospitalization; on July 12, 2021, at the Holiday Inn Express; and on July 16, 2021, at the McDonald's—it impacted Mr. LeRoux's ability to think, communicate, interact with others, and speak. ECF No. 136-2, at 2 (describing

18

Mr. LeRoux as paranoid and that he "believed someone was following him and tracking him with a device"); ECF No. 136-1, at 2 (describing how Mr. LeRoux "fears he will become paranoid again if he stops his medication . . . Without the medication [Mr. LeRoux] says he dreams about people trying to kill him."); ECF No. 134-4, at 4 (describing how, during the Holiday Inn incident, Mr. LeRoux "refused to speak," and "continued laying in bed and smiling at officers."); ECF No. 134-8, at 38 (describing Mr. LeRoux's behavior on the night of the shooting: "[I]t's not normal to act, you know, to act unresponsive to the police.").    Each of these is a major life activity.    28 C.F.R. § 35.108(c)(1)(i).    Accordingly, a reasonable jury could find that Mr. LeRoux's mental impairment substantially limited one or more major life activities.    Plaintiffs have thus created a genuine issue of material fact as to whether Mr. LeRoux was disabled under the ADA.

### 2. A Reasonable Jury Could Find that Defendant Montgomery County Knew of Mr. LeRoux's Disability and Need for Accommodation.

Under Title II of the ADA, a public entity must make reasonable modifications when the entity has knowledge of a person's disability-related limitations.    *Seremeth*, 673 F.3d at 336 ("Discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." (citation and quotation marks omitted)).    Moreover, a person's need for accommodation must be "clear."    *Tarashuk v. Orangeburg County*, No. 19-CV-02495, 2022 WL 969752, at *12 (D.S.C. Mar. 30, 2022), *aff'd sub nom. Tarashuk v. Doroski*, No. 22-1470, 2023 WL 6567883 (4th Cir. Oct. 10, 2023) ("[T]he obligation to provide reasonable accommodations applies only where public entities were aware of the individual's 'known physical and mental limitation' and the need for accommodations was clear." (quoting 42 U.S.C. § 12112(b)(5)(A)); *Thompson v. Badgujar*, No. 20-CV-1272, 2021 WL 3472130, at *9 (D. Md. Aug. 6, 2021) ("[W]hen it comes to holding public entities liable under

the ADA, a plaintiff must establish knowledge on that entity's part, meaning the entity is aware of a 'known physical or mental limitation,' evincing a clear need for accommodation.").

A plaintiff may establish that a defendant knew of an individual's need for accommodation by showing that the individual with a disability or a third party explicitly asked for a modification, but a specific request is not required. *See Estate of Robert Ethan Saylor v. Regal Cinemas, Inc.*, No. WMN-13-3089, 2016 WL 4721254, at *16 (D. Md. Sept. 9, 2016). A plaintiff can also demonstrate knowledge by showing that an individual's disability and resulting need for an accommodation were obvious or apparent. *See Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. ELH-12-572, 2013 WL 1010357, at *19 (D. Md. Mar. 13, 2013) ("[S]ometimes a person's need for accommodations will be obvious, and in those circumstances an explicit request for an accommodation is not required in order to establish the obligation to provide reasonable accommodations." (quotation marks, alterations, and citation omitted)); *Smith v. City of Greensboro*, No. 1:19CV386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020) ("Knowledge of the need for an accommodation can . . . arise because the need is obvious." (quotation marks and citation omitted)); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) ("[B]efore a public entity can be required under the ADA to provide an auxiliary aid . . . . the entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability."). Evidence indicating that a person's disability and need for an accommodation were obvious includes, among other things, evidence that officers on the scene (1) observed behaviors suggesting that an individual suffered from a disability, (2) received training on behavior indicators associated with particular disabilities, or (3) received information from third parties suggesting the presence of a disability. *See Brizuela*, 2022 WL 3229389, at *33; *Lawman v. City & County of San*

20

*Francisco*, 159 F. Supp. 3d 1130, 1148–49 (N.D. Cal. 2016); *Shields v. Prince George's County*, No. GJH-15-1736, 2019 WL 3536800, at *12–13 (D. Md. Aug. 2, 2019).

Defendants repeatedly emphasize that Montgomery County officials were never told that Mr. LeRoux had a disability, and that Mr. LeRoux never requested an accommodation. However, neither action is necessary to establish knowledge under the ADA. Rather, to establish that Montgomery County had an obligation to provide reasonable accommodations under the ADA, Plaintiffs must show that Mr. LeRoux's disability-related limitations, and subsequent need for an accommodation were obvious.

A reasonable jury could find that Mr. LeRoux's disability and need for accommodation were sufficiently apparent to establish knowledge on the part of Montgomery County. Plaintiffs have produced evidence that County officials knew of Mr. LeRoux's disability from as early as the initial 9:12 p.m. 911 call. Specifically, Plaintiffs note that the McDonald's employee stated that Mr. LeRoux was "acting crazy." ECF No. 126-4, at 02:32–02:42. The employee elaborated by describing Mr. LeRoux's abnormal behavior—that he refused to exit the drive-thru line, had stopped communicating or responding, and had put his headphones on—and noted that, before Mr. LeRoux became unresponsive, he made statements inconsistent with reality by stating that he had already paid when he had not. *Id.* at 02:42–02:54. Plaintiffs' expert Carleigh Sailon—an emergency response communications expert—opined that, based on the information in the 911 call, the ECC call-taker knew or should have known that the call for service involved a mental health component and required a modified response. ECF No. 134-20, at 10 ("Based on the information provided in the 911 call, a reasonable ECC would have identified the call for service as involving a mental health component requiring a modified response.").

Plaintiffs have produced additional evidence that Mr. LeRoux's disability and need for accommodation was obvious once officers arrived on the scene. Plaintiffs' experts—Mr. Jesse Trevino and Ms. Carleigh Sailon—both reported that symptoms of Mr. LeRoux's mental illness were readily observable. *See*, *e.g.*, *Shields*, 2019 WL 3536800, at *12–13 ("Plaintiff has also introduced some evidence that county employees knew [plaintiff] suffered from a mental illness. Specifically, [plaintiff's expert] testified at his deposition, that symptoms of Mr. Shields's mental illness were readily observable."). Mr. Trevino asserted that "[a]t every stage of the Incident, [Mr. LeRoux] presented as mentally disorganized, with flat affect, and engaged in abnormal behavior." ECF No. 134-21, at 12. Ms. Sailon stated that "[b]y parking in a drive-thru lane for an extended period, . . . insisting that he had already paid when he had not, and eventually putting on headphones and becoming non-communicative, [Mr. LeRoux] exhibited behavior consistent with psychosis[.]" ECF No. 134-20, at 9–10. Such behavior included "symptoms of catatonia," such as "not moving, not talking, staring, or sluggish responses," *id.* at 10, all of which officers at the McDonald's observed. The observable nature of Mr. LeRoux's symptoms not only supports an inference that County officials knew of Mr. LeRoux's disability, but also suggests knowledge of the limitations caused by that disability—such as the inability to effectively communicate with the officers or follow orders—and need for an accommodation to address those limitations.

Third parties also informed officers about Mr. LeRoux's abnormal behavior. Once on the scene, Officer Owen reached back out to the McDonald's employee and asked questions about Mr. LeRoux's behavior. *See* ECF No. 134-8, at 43–44. The employee responded that it seemed like "something going on in his mind." ECF No. 134-21, at 7. Later, when an ECC call-taker was able to contact Mr. LeRoux inside the car, the call-taker informed officers that Mr. LeRoux was

again making statements inconsistent with reality, stating that his hands were up and out the window, when neither statement was true.   ECF No. 134-30, at 5.

Officers' behavior on the scene and testimony regarding the incident further suggest that Mr. LeRoux's disability, limitations, and need for accommodation were obvious.   While at the McDonald's, officers observed Mr. LeRoux's inability to engage, answer questions, or follow basic commands.   Officers noted the abnormality of Mr. LeRoux's behavior, with Officer Owen stating, "I don't know what the heck is going on with this guy," and "It's like a suicide-by-cop type of thing."   ECF No. 134-8, at 35.   Officer Eastman similarly remarked that, based on Mr. LeRoux's abnormal and unresponsive behavior in the presence of police officers, "he's going to end up offing himself."   ECF No. 134-15, at 09:47–10:10.   Officers testified that they knew "something was wrong here," and knew that "this was not a normal situation."   ECF No. 134-7, at 24; *see also* ECF No. 134-8, at 38 ("[I]t's not normal to act, you know, to act unresponsive to the police.").     Additionally, after only two minutes on the scene, Commanding Officer Dillman requested dispatch of crisis negotiators.   ECF No. 134-29, at 9.   Officers' comments and actions on the scene, as well as their testimony regarding the incident, could lead a reasonable jury to find that Mr. LeRoux's disability, related limitations, and need for an accommodation were obvious.

Plaintiffs have also produced evidence that Montgomery County officers are trained on recognizing and interacting with people with mental illness.   ECF No. 134-37, at 25 (MCPD training on how to recognize signs of mental illness and considerations for interacting with people with mental illness).   The training included information on "recognizing potential symptoms of people who are in . . . emotional distress, mental distress," ECF No. 134-7, at 4, and instructed officers that when a person with a mental illness does not comply with orders "it is possible they are not intentionally ignoring your orders or being defiant.   Many individuals with these disorders

experience processing delays and/or may be distracted by hallucinations or other stimuli." ECF No. 134-37, at 37. Relatedly, multiple officers opined that Mr. LeRoux might be engaged in what is known as "suicide-by-cop," ECF Nos. 134-8, at 25; 134-15, at 09:47–10:10—the topic of another MCPD training. ECF Nos. 134-28; 134-7, at 4. That training instructs officers that most individuals engaged in "suicide-by-cop" struggle with mental illness—most often schizophrenia or bipolar disorder. ECF No. 134-28, at 7, 11. Officer training on the specific disability and limitations Mr. LeRoux exhibited could support an inference of officer knowledge. *See Lawman*, 159 F. Supp. 3d at 1148–49.

Lastly, Plaintiffs presented evidence that Montgomery County was familiar with Mr. LeRoux through past interactions. Mr. LeRoux had interacted with MCPD at the Holiday Inn Express just days before his death. While the police report from that incident does not expressly state that Mr. LeRoux had a mental health disability, it describes abnormal behaviors like those Mr. LeRoux displayed at the McDonald's—laying down and refusing to speak or respond to police officers—which are indicative of a mental health disability that limited Mr. LeRoux's ability to communicate and interact with others. ECF No. 134-20, at 9–10. Prior encounters with the police "predicated on the same individual's suspected mental illness" can imply knowledge, even if they involved separate officers in the same department. *Brizuela*, 2022 WL 3229389, at *32.

Defendants unsuccessfully argue that, because Mr. LeRoux's behavior could have suggested substance use rather than mental illness, County officials could not have known that Mr. LeRoux had a disability. ECF No. 126-1, at 42–43 (citing *Woods v. Harris County*, No. 4:18-CV-1152, 2022 WL 18396216, at *2 (S.D. Tex. May 26, 2022), *report and recommendation adopted in part sub nom. Thomas ex rel. Estate of Thomas v. Harris County*, No. CV H-18-1152, 2022 WL 22596773 (S.D. Tex. Aug. 22, 2022), *aff'd sub nom. Woods v. Harris County*, No. 22-

20482, 2024 WL 1174185 (5th Cir. Mar. 19, 2024)).   The fact that a given abnormal behavior could be indicative of either a mental illness or substance use is not enough to absolve an entity of knowledge of a disability under the ADA.   *See*, *e.g.*, *Tarashuk*, 2022 WL 969752, at \*12–13 (finding a dispute of material fact as to officer knowledge where intoxication or a psychotic break could have caused plaintiff's behavior).   Additionally, while the ECC dispatcher noted that Mr. LeRoux sounded intoxicated, ECF No. 128-3, at 64, officers on the scene were not operating under the assumption that Mr. LeRoux's abnormal behavior was due to substance use.   *See*, *e.g*., ECF No. 126-12, at 09:00–09:10 ("He's not like drunk or anything.   Well, I mean he might be.   But he can react.").   Evidence that Mr. LeRoux's behavior could have suggested mental illness or intoxication at most creates a dispute of fact the Court need not decide at summary judgment.   *Tarashuk*, 2022 WL 969752, at \*12 ("But, at the summary judgment stage, the court need not decide what effectively amounts to a factual dispute between the parties.").

Defendants further argue that officers could not have known of Mr. LeRoux's disability because it was not clear that Mr. LeRoux suffered from the specific disabilities of schizophrenia, depression, or ADHD, and officers are not trained to diagnose or identify specific mental health conditions.   ECF No. 126-1, at 48.   However, "Defendants' attempt to narrow the knowledge requirement to their knowledge of [Mr. LeRoux's] specific mental health diagnosis . . . is unavailing."   *Tarashuk*, 2022 WL 969752, at \*13.   An individual must only demonstrate obvious limitations and a clear need for accommodation: "where the circumstances indicate that an individual has an obvious need for accommodations, the ADA shifts the burden of compliance on public bodies and their employees."   *Id.*

Lastly, Defendants' claim that Mr. LeRoux did not exhibit any disability-related limitations similarly falls short.   Defendants note that Mr. LeRoux could speak, as evidenced by his call with

ECC; hear, as evidenced by his call with ECC and reactions to Defendant Officer Inman's initial engagement; and think, as evidenced by his use of his phone.   ECF No. 126-1, at 46–47.   Thus, Defendants argue that officers could not have observed or known of any disability-related limitations evincing a clear need for an accommodation.   *Id.*   In making this argument, Defendants attempt to narrow the definition of "limitation" to include only the basic building blocks of human functioning.   However, Mr. LeRoux's broader limitations identified by Plaintiffs and observed by officers—such as his inability to effectively communicate, understand and follow orders, or engage with officers—constitute disability-related limitations that officers arguably knew.

Construing all facts in the light most favorable to Plaintiffs and drawing all reasonable inferences in Plaintiffs' favor, a genuine dispute of material fact exists as to whether the County knew that Mr. LeRoux had a disability and needed a reasonable modification to address his disability-related limitations.[4]   *See, e.g.*, *Shields*, 2019 WL 3536800, at *12–13 (finding a dispute

---

[4] Defendants, relying on Fifth Circuit precedent, argue that to satisfy the knowledge requirement of the ADA, a plaintiff must demonstrate that the (1) disability, (2) resulting limitation, and (3) necessary reasonable accommodation are open, obvious, and apparent.   ECF No. 126-1, at 40 (citing *Windham v. Harris County*, 875 F.3d 229, 237 (5th Cir. 2017)).   The Fourth Circuit has not adopted this three-part test.   Rather, courts in this Circuit require that, to satisfy the knowledge requirement, a plaintiff must show: (1) the physical or mental disability-related limitation is known, and (2) the need for accommodation is clear.   *See, e.g.*, *Badgujar*, 2021 WL 3472130, at *9 ("[W]hen it comes to holding public entities liable under the ADA, a plaintiff must establish knowledge on that entity's part, meaning the entity is aware of a 'known physical or mental limitation,' evincing a clear need for accommodations." (citation omitted)); *Smith v. City of Greensboro*, 2020 WL 1452114, at *13 ("The duty to provide reasonable accommodation only arises when the public entity is aware of a 'known physical or mental limitation,' and the need for accommodation is or should be clear."); *Tarashuk*, 2022 WL 969752, at *12 ("[T]he obligation to provide reasonable accommodations applies only where public entities are aware of a 'known physical and mental limitation' and that the need for accommodation is clear." (citation omitted)).   Thus, it is the need for accommodation, not the specific necessary accommodation itself, that must be obvious.   Such an interpretation of the law is consistent across most other circuits.   *Robertson*,

of material fact as to whether defendants knew of plaintiff's mental illness where plaintiff's expert testified that symptoms of the illness were readily observable and officers observed abnormal behaviors); *Lawman*, 159 F. Supp. 3d at 1148–49 (finding a dispute of material fact as to whether defendants knew of plaintiff's mental illness where plaintiff presented evidence of officer training on the issue and officers observed that plaintiff's behavior was unusual); *Brizuela*, 2022 WL 3229389, at *32 (finding a dispute of material fact as to whether defendants knew of plaintiff's mental illness where plaintiff had previously interacted with the police department, defendants observed plaintiff behaving erratically, and neighbors made comments suggesting plaintiff might have a mental illness).

### 3. A Reasonable Jury Could Find that Montgomery County Failed to Provide Reasonable Accommodations.

Defendants next argue that the County provided reasonable accommodations and, therefore, fulfilled its obligations under the ADA.

Under the ADA, "[a] public entity must 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Seremeth*, 673 F.3d at 339 (citation omitted). "A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily in the run of cases' and will not cause 'undue hardship.'" *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) (citations omitted). "What constitutes reasonable accommodations during a police investigation . . . is a question of fact and will vary according to

---

500 F.3d at 1197 (collecting cases across circuits indicating that, to trigger an obligation to accommodate under the ADA, an entity must know of an individual's disability-related limitations and need for accommodation).

the circumstances." *Seremeth*, 673 F.3d at 340; *see also Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994) (holding that the reasonableness of a particular accommodation is a question of fact); *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F.Supp.3d 519, 558–59 (D. Md. 2019) (finding that the jury must resolve questions related to whether plaintiffs received the assistance needed "to communicate 'as effectively' as other [incarcerated persons]."). Exigent circumstances are considered as part of the reasonableness of the accommodation, rather than as a separate inquiry. *Seremeth*, 673 F.3d at 339. The existence of exigent circumstances, however, does not excuse officers from providing reasonable accommodations. *Id*.

Plaintiffs suggest several courses of action that would have constituted a reasonable accommodation, including (1) identifying the 911 call as a mental-health crisis and alerting officers accordingly; (2) following Montgomery County's own policies and summoning mental health resources such as the Crisis Intervention Team ("CIT"), CIT-trained officers, the Mobile Crisis Outreach team, Crisis Center remote support, the Emergency Response Team, or crisis negotiators; (3) implementing de-escalation tactics; and (4) gathering additional information about Mr. LeRoux to inform the police response. ECF No. 136, at 38–43, 49. Defendants argue that Plaintiffs cannot show that the County failed to provide a reasonable accommodation, as the County provided Mr. LeRoux with two of the accommodations Plaintiffs identify: CIT-trained officers and a call to crisis negotiators. ECF No. 126-1, at 56–57. Defendants further assert that these accommodations were particularly reasonable in light of the exigent circumstances at play— namely, Mr. LeRoux's possession of a handgun—and the fact that Mr. LeRoux presented a direct threat, absolving the County of its duty to accommodate at all. ECF No. 126-1, at 57–58. Plaintiffs counter that these accommodations fell short, as they were either provided ineffectively—no CIT-trained officer utilized their training—or too late. ECF No. 136, at 37.

Plaintiffs further note that any exigent circumstances arose long after the County's duty to accommodate began.   ECF No. 136, at 49.

A reasonable jury could find that Montgomery County failed to provide reasonable accommodations in light of the circumstances.   When the County first became aware of Mr. LeRoux and his abnormal behavior, the McDonald's employee stated that Mr. LeRoux was not a danger to those around him.   ECF No. 126-4, at 03:57–04:02.   Plaintiffs' expert Ms. Sailon has opined that at this point, Montgomery County knew or should have known that Mr. LeRoux was exhibiting disability-related limitations and required an accommodation, thereby triggering the County's obligation to accommodate under the ADA.   ECF No. 134-20, at 10.   Given the content of the call and Ms. Sailon's expert opinion, a reasonable jury could find that the County had a responsibility to provide a reasonable accommodation at the 911-call stage—specifically, identifying the incident as involving a mental health component and requiring a modified response—but failed to do so.

A reasonable jury could further find that the accommodations Defendants did provide were ineffective or unreasonably delayed and, thus, inadequate under the ADA.   The first accommodation provided—the presence of CIT-trained officers on scene—was not provided until Officer Inman's arrival at 10:28 p.m., nearly seventy-five minutes after the initial 911 call.   *See* ECF Nos. 134-6, at 2; 134-29, at 7.   Once CIT-trained officers were on scene, they did not adhere to their CIT training, thereby providing an accommodation "in name only."   ECF No. 134-21, at 21 ("MCPD's CIT training and resources are inadequate and/or not adhered to, as demonstrated by this incident, in which CIT practices were not applied.").   Nearly all CIT-trained officers who were asked about their CIT training—some of whom received the training nearly two decades ago—could not answer any questions about the content of the training.   *See*, *e.g*., ECF No. 134-

8, at 14 (When asked about her CIT training, Officer Owen replied: "I don't remember much. It was eight years ago, so I don't remember the content of it."); ECF No. 134-9, at 24 (Officer Inman replied "I don't remember" to all questions about the content of his CIT training); ECF No. 134-10, at 25–26 (Officer Cerny stated that he remembers little from his CIT training two decades ago); ECF No. 134-13, at 55 (When asked about his CIT training, Captain Dillman replied: "I think it's hard to remember [with] how long ago it was.").[5]   A reasonable jury could find that the actual accommodation Plaintiffs identify—competently-trained CIT officers who recall and apply their CIT training—was implemented in such an ineffective manner that it was as though Defendants provided no accommodation at all.  *See, e.g.*, *Equal Emp. Opportunity Comm'n v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1113 (9th Cir. 2010) ("[A]n employer cannot satisfy its obligations under the ADA by providing an ineffective modification.").

Plaintiffs further argue that officers requested crisis negotiators too late to constitute an adequate reasonable accommodation under the ADA.   Captain Dillman called for crisis negotiators at 10:49 p.m.—ninety-seven minutes after the 911 call and twenty-one minutes after the first officer arrived on scene.   ECF No. 134-29, at 9.   "In some circumstances, an 'unreasonable delay' may constitute a denial of an accommodation."  *Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021) (citing *Marks v. Wash. Wholesale Liquor Co.*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017)).   Typically, "relatively short" delays do not support such an argument.  *Id.* (noting how, when an employee requests an accommodation from an employer, a delay of days or even months may be "reasonable").   However, the circumstances surrounding a delay remain part of a larger reasonableness inquiry and should be considered within the context of an individual incident.  *See*, *e.g.*, *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) ("Whether a particular

---

[5] Officer Schmuck stated he never received CIT-training.   ECF No. 134-12, at 8.

delay qualifies as unreasonable necessarily turns on the totality of the circumstances."). For instance, a delay is more likely to be reasonable when an entity is actively working towards securing an accommodation, *Smith v. CSRA*, 12 F.4th at 415 (citing *Hannah P. v. Coats*, 916 F.3d 327, 338 (4th Cir. 2019)), or when an entity has no reason to believe harm might follow from a brief delay, *Marks*, 253 F. Supp. 3d at 326. Additionally, "where a genuine factual dispute exists surrounding such a delay, that question is one for the factfinder. *Williams v. Fairfax County*, No. 121CV598, 2022 WL 2346615, at *8 (E.D. Va. June 29, 2022).

Here, there is a genuine dispute of fact as to the reasonableness of Defendants' delay in calling for crisis negotiators. Plaintiffs have produced evidence that Mr. LeRoux was unresponsive and in need of an accommodation for the entirety of the incident, beginning prior to the 911 call at 9:12 p.m., up until Captain Dillman called for crisis negotiators at 10:49 p.m. However, prior to Captain Dillman's eventual request, no officer attempted to secure such an accommodation. ECF No. 134-21, at 18 ("[T]his particular scene was what I describe as complete utter tactical chaos. 17 officers were ultimately present without clearly assigned roles, any coordinated response plan, or any form of organization of the scene."); ECF No. 134-8, at 51 ("Q: Did you consider calling for any of the mental health related resources the Montgomery County Police Department has available? . . . A: I in particular did not."); ECF No. 134-9, at 51–52 (Officer Inman explaining he made no effort to call for mental health resources); ECF No. 134-10, at 82–83 (Officer Cerny stating he did not consider calling for crisis negotiators at any point prior to Captain Dillman's eventual request); ECF No. 134-11, at 18 (Officer Vaughn stating she focused only on "maintain[ing] scene security" and did not consider calling any mental health resources to the scene); ECF No. 134-12, at 47–49 (Corporal Schmuck stating that at no time did he consider calling for mental health resources).

31

Despite their lack of efforts to secure an accommodation, County officials had good reason to believe—and indeed, did believe—that harm might befall Mr. LeRoux if the situation continued. ECF No. 146-15, at 09:47–10:10; ECF No. 134-8, at 35 (officers commenting that they believed Mr. LeRoux was engaged in "suicide-by-cop" or going to "end up offing himself"). Plaintiffs have also produced evidence that the County's failure to call for negotiators and implement mental health accommodations sooner was counter to MCPD's own policies and training. ECF No. 134-21, at 13–15. Additionally, there is a dispute as to the length of the delay, with Plaintiffs alleging that the County's duty to accommodate arose at 9:12 p.m.—resulting in a ninety-seven-minute delay—and Defendants emphasizing that crisis negotiators were called just twenty-one minutes after the first officers arrived on the scene. *See* ECF No. 134-29, at 7, 9. Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have created a genuine issue of material fact as to the reasonableness of the County's delay in calling for crisis negotiators.

### a. Defendants' Argument that They Fulfilled Their Obligations in Light of the Exigent Circumstances Is Unsuccessful.

As to exigent circumstances, a reasonable jury could find that the County fell short of its obligation to accommodate even when considering the exigent circumstances. Defendants assert that, due to the presence of a firearm in Mr. LeRoux's car, "at all times, the threat of extreme violence and exigency existed while the police officers were on the scene." ECF No. 126-1, at 58. However, officer behavior at the scene undercuts Defendants' argument. Indeed, during the thirty-four minutes between when the first officer arrived on the scene and Mr. LeRoux's death, "[g]roups of officers milled about the perimeters of the scene making small talk or joking around." ECF No. 134-21, at 19. Sergeant Worden, who was the commanding officer on the scene for a period, "walked around the scene for his ten minutes in command without any sense of urgency and almost never giving any proactive instruction to anyone." *Id.*, at 18. Throughout that same

period, Mr. LeRoux was calm and "had made no threats or shown any signs of violence or escalation." *Id.* at 19. By 10:39 p.m., Sergeant Worden described the scene as secure, noting that "innocents" were away and the McDonald's was sealed off. ECF No. 127-11, at 08:44–09:23. As to the presence of a firearm, Plaintiffs' expert Jesse Trevino—an expert in police training and crisis intervention—opined that "based on Mr. LeRoux's behavior, the environment, and the context of the situation, the gun did not pose an immediate threat for much of the time." ECF No. 134-52, at 4.

While Defendants point to officer testimony that Mr. LeRoux pointed the gun at officers at 10:46 p.m. as evidence of the volatile and dangerous environment, the event occurred well after officers' obligation to provide a reasonable accommodation arguably arose—over ninety minutes after the 911 call and eighteen minutes after officers arrived on the scene. Mr. LeRoux's actions did not impact the officers' ability to summon mental health resources before he raised the weapon. Seventeen officers were on the scene, most without any clearly assigned roles. ECF No. 134-21, at 18. Any of those officers, including those "mill[ing] about the perimeter[] of the scene," could have been tasked with implementing reasonable accommodations, such as calling crisis negotiators or finding out additional information about Mr. LeRoux. *See id.* at 19. Accordingly, when considering the exigent circumstances as part of the greater reasonableness inquiry, there remains a genuine dispute of material fact as to whether the County met its obligation to reasonably accommodate under the ADA.

Defendants rely on *Waller ex rel. Estate of Hunt v. City of Danville* to argue that the accommodations provided were reasonable when considering the exigent circumstances. ECF No. 126-1, at 51. In *Waller*, the decedent was aggressive and agitated. *Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 175 (4th Cir. 2009). When an officer spoke to the decedent

through the back door, the decedent yelled, "I'm going to blow your goddamned head off." *Id.* at 173.  The decedent was also holding a woman hostage in his home, not allowing her to speak to her family or the police.  *Id.* at 174.  Once officers entered the house, the decedent "came toward the officers twice, swinging what appeared to be a scythe and brandishing what looked like a knife," before "three officers shot and killed him." *Id.* at 173.  In finding that "exigency is not confined to split-second circumstances," the Court noted that while "officers did not face an immediate crisis," during the hours leading up to the eventual confrontation, "the situation was unstable." *Id.* at 175.  The Court characterized the "unstable" nature of the scene by emphasizing that the decedent had a third-party hostage who the officers could not see or hear and whose safety was continually at risk, as well as the fact that the decedent was growing increasingly agitated. *Id.*  The Court further took issue with the list of reasonable accommodations the plaintiffs suggested. *Id.* at 176.

This case is distinguishable from *Waller* as to both the lack of exigency of the circumstances and the reasonable accommodations suggested.  Here, unlike in *Waller*, the scene was "sealed off," and all civilians had been evacuated by at least 10:39 p.m.  ECF No. 127-11, at 08:44–09:23.  Plaintiffs' expert in police training and crisis intervention characterized the scene as "stabilized and secure."  ECF No. 134-21, at 18.  Thus, there was minimal risk of a "dark turn" like the one contemplated by the court in *Waller*—the loss of the hostage's life. *Waller*, 556 F.3d at 175.  Officers had also placed themselves in positions of safety behind vehicles and ballistic shields.  Those who were not actively taking cover "milled about . . . making small talk," demonstrating a general lack or urgency or perceived risk of immediate danger.  ECF No. 134-21, at 19.  The accommodations Plaintiffs suggest are also distinct from the "problematic" accommodations the plaintiff in *Waller* suggested.  556 F.3d at 176.  While the *Waller* plaintiff

suggested vague and general accommodations such as calling mental health professionals, summoning family members or administering medication, the Plaintiffs here ask that the County adhere to its own specific policies and utilize preexisting systems developed for circumstances like this one.

The other cases on which Defendants rely are similarly distinguishable. *See Seremeth*, 673 F.3d at 336; *Hainze v. Richards*, 207 F.3d 795, 798 (5th Cir. 2000); *Poole v. Gaston County*, No. 3:15-cv-309-DCK, 2017 WL 4479219, at *4 (W.D.N.C. Oct. 6, 2017); *Rambert v. City of Greenville*, 107 F.4th 388, 400–01 (4th Cir. 2024).   In each of these cases, the individual harmed posed a clear and immediate threat to police officials.   *See Seremeth*, 673 F.3d at 340 ("The deputies were responding to a domestic disturbance call, which Deputy Rohrer characterized as 'some of the most dangerous calls that we ever go on.'   The deputies were obligated to assure themselves that no threat existed against them, Seremeth's children, or anyone else."); *Hainze*, 207 F.3d at 797 ("Deputy Allison exited his vehicle, drew his weapon, and ordered Hainze away from the truck.   Hainze responded with profanities and began to walk towards Allison [with a knife in his hand]. . . . Allison twice ordered Hainze to stop but Hainze ignored him.   When Hainze was within four to six feet, Allison fired two shots in rapid succession into Hainze's chest."); *Rambert*, 107 F.4th at 400-01 ("[Rambert] charged at Johnson at full speed while yelling and ignoring Johnson's commands to get on the ground, ultimately reaching a proximity where he might have been able to grapple with Johnson and seize his gun."); *Poole*, 2017 WL 4479219, at *3 ("Poole then pulled out a pistol, pointed it up into the air, and immediately began lowering the pistol in a motion consistent with gaining target acquisition upon Defendant Officers.").

Plaintiffs have put forth evidence indicating that Mr. LeRoux did not pose a similar threat to officers during most of the incident, and certainly not before officers had the opportunity to

assess the scene and enact accommodations.    Indeed, the McDonald's workers characterized Mr.

LeRoux as calm and not dangerous both on the initial 911 call and when Officer Owen called for

an update on the situation.    ECF Nos. 126-4, at 03:57–04:02; 134-8, at 23.    Later, when officers

arrived at the scene, Mr. LeRoux did not pick up his firearm during his initial exchange with

Officer Inman and did not verbally or physically threaten the officers when they surrounded Mr.

LeRoux's car, placed "stop sticks' under his tires, contacted him via his cell phone, or shined a

spotlight into his vehicle.    The first alleged threat from Mr. LeRoux did not occur until 10:46 p.m.,

by which point Defendants had had "the time and opportunity to assess the situation" and employ

the accommodations Plaintiffs identify.    *See*, *e.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024,

1037 (9th Cir. 2018) (reversing summary judgment, in part, where officers "had the time and

opportunity to assess the situation and potentially employ . . . accommodations . . . including de-

escalation, communication, or specialized help").

What constitutes a reasonable accommodation is a question of fact.    *Seremeth*, 673 F.3d

at 340.    Here, viewing the evidence in the light most favorable to Plaintiffs, a genuine question of

material fact exists as to whether the County met its obligations under the ADA of providing a

reasonable accommodation in light of the totality of the circumstances.

### 4.  Defendants Have Not Conclusively Established the Direct Threat Affirmative Defense.

Distinct from their exigent circumstances argument, Defendants further argue that the

County was not required to provide any accommodations to Mr. LeRoux because Mr. LeRoux

posed a direct threat.    ECF No. 126-1, at 55 (citing 28 C.F.R. § 35.139).

The ADA allows for certain affirmative defenses.    *Wood v. Md. Dep't of Transp.*, 732 F.

App'x 177, 181 (4th Cir. 2018) (unpublished).    The "direct-threat defense" excuses public

entities from complying with the ADA when an individual with a disability poses a direct threat

to others. *Id.* "Direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services[.]" 28 C.F.R. § 35.104. To determine whether an individual poses a direct threat:

> [A] public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

*Wood*, 732 F. App'x at 181 (quoting 28 C.F.R. § 35.139).

When a "movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012). Thus, to prove their direct threat affirmative defense, Defendants must conclusively show that the County conducted an individualized inquiry based on the best available objective evidence to ascertain, among other things, the nature of the risk, the probability that potential injury will occur, and whether modifications would mitigate the risk. *Wood*, 732 F. App'x at 181 (quoting 28 C.F.R. § 35.139).

Defendants have not conclusively established their defense. Plaintiffs have produced evidence that the County did not utilize resources available—either the County's mental health resources or the resources available to officers via the laptops in their cruisers—to learn more about Mr. LeRoux, his past police involvement, or his mental health history. *See* ECF No. 134-13, at 21, 70 (describing the E-Justice database); ECF No. 134-21, at 17 ("By running Ryan's name through the law enforcement databases that MCPD has access to, which can be attempted easily and quickly, reasonable officers would have obtained information describing Ryan's past

interactions with law enforcement during mental health crises."). Evidence further indicates that the County did not assess whether reasonable modifications to its procedures would mitigate the risk at hand. *See*, *e.g*., ECF No. 134-11, at 18 (Officer Vaughn stating she did not consider calling any mental health resources to the scene); ECF No. 134-12, at 47–49 (Officer Schmuck stating that at no time did he consider calling for mental health resources); ECF No. 134-8, at 51 (Officer Owen testifying that she did not consider calling for any mental health related resources). Lastly, Plaintiffs have put forth evidence that the threat Mr. LeRoux eventually posed could have been eliminated had officers implemented reasonable accommodations in a timely manner. *See*, *e.g*., ECF No. 134-20, at 11 ("By taking reasonable, proper actions—especially during the crucial 74 minutes this call was pending—MCPD ECC would have altered the outcome of this encounter."). Thus, Defendants have not conclusively shown that Mr. LeRoux posed a direct threat that could not be eliminated through reasonable modifications, nor that the County made an individualized assessment based on the best available objective evidence. Accordingly, Defendants' "direct threat" defense does not dispose of Plaintiffs' ADA and Rehabilitation Act claims at summary judgement.

### 5. A Reasonable Jury Could Find that the County's Failure to Reasonably Accommodate Proximately Caused Mr. LeRoux's Death.

Defendants next allege that Plaintiffs have not established an ADA claim because they have failed to show that the County's alleged failure to reasonably accommodate proximately caused Mr. LeRoux's injury. Specifically, Defendants allege that a showing of proximate cause is required for Mr. LeRoux's ADA claim to survive his death under Maryland law. ECF No. 126-1, at 62 ("The three elements of a survival action are: (1) that the defendant's negligence [wrongful conduct] was the direct and proximate cause of the accident; (2) that the deceased lived after the accident; and (3) that between the time of the accident and the time of death [the deceased] suffered

conscious pain.") (citing *Ory v. Libersky*, 389 A.2d 922, 925 (Md. Ct. Spec. App. 1978)).

However, such an argument rests on the incorrect premise that Maryland law governs the survival

of Mr. LeRoux's ADA claim.

Though the Fourth Circuit has not explicitly addressed the question of survival of claims

under the ADA, courts in this circuit and beyond have tended to hold that federal common law,

rather than state law, governs the survival of claims for compensatory damages under the ADA.

*See, e.g.*, *Flaum v. Gloucester Lanes, Inc.*, No. 4:13cv131, 2015 WL 364603, at *2 (E.D. Va. Jan.

27, 2015) ("[B]ecause the ADA is remedial in nature, and not punitive, under federal common law

the plaintiff's cause of action survives."); *Hager v. First Va. Banks, Inc.*, No. 7:01cv53, 2002 WL

57249, at *3 n.2 (W.D. Va. Jan. 10, 2002) (finding that, under federal common law principles, an

ADA claim survives the decedent); *Guenther v. Griffin Constr. Co.*, 846 F.3d 979, 986 (8th Cir.

2017) ("[W]e hold federal common law does not incorporate state law to determine whether an

ADA claim for compensatory damages survives or abates upon the death of the aggrieved party.

We join other courts that have allowed the individual's estate to bring and maintain suit for

compensatory damages under the ADA[.]").  *But see Green ex rel. Estate of Green v. City of*

*Welch*, 467 F. Supp. 2d 656, 667 (S.D.W. Va. 2006) (holding that state law governs the survival

of ADA claims).   Thus, Mr. LeRoux's ADA claim need not satisfy the elements of a survival

action under Maryland law.   Instead, it need only be a remedial rather than a punitive action.

*Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir. 1991) ("The basic federal rule is that an action

for a penalty does not survive, though remedial actions do." (citations omitted)).   An action for

compensatory damages under the ADA is remedial, not punitive, in nature.   *See Flaum*, 2015 WL

364603, at *2.   Thus, Mr. LeRoux's ADA claim survives under federal common law.

Though Defendants misinterpret how a proximate cause requirement applies to Plaintiffs' claims, they are ultimately correct that for Plaintiffs to succeed on their ADA claims, Plaintiffs must "show . . . that the defendant's violation of the ADA proximately caused [plaintiffs'] actual injury before [he] can recover." *Montgomery v. District of Columbia*, No. 18-1928 (JDB), 2022 WL 1618741, at *23 (D.D.C. May 23, 2022) (*Montgomery II*) (citing *DeLeon v. City of Alvin Police Dep't*, Civ. A. No. H-09-1022, 2010 WL 4942648, at *3 (S.D. Tex. Nov. 30, 2010)); *see also CC Recovery, Inc. v. Cecil County*, 26 F. Supp. 3d 487, 495 (D. Md. 2014) (discussing how a plaintiff bringing a claim under Title II of the ADA must demonstrate some proximate cause between the asserted injuries and conduct of the government entities). "Whether one event can be described as the cause of another is an intensely fact-sensitive question and 'ordinarily is one for the jury.'" *Montgomery II*, 2022 WL 1618741, at *28 (citing *Colonial Parking, Inc. v. Morley*, 391 F.2d 989, 990 (D.C. Cir. 1968)).

A reasonable jury could find that Defendants' alleged violations of the ADA proximately caused Mr. LeRoux's death. Plaintiffs have produced evidence demonstrating that had Defendants accommodated Mr. LeRoux in a reasonably timely manner, the incident at McDonald's would not have resulted in Mr. LeRoux's death. ECF No. 134-20, at 11 ("By taking reasonable, proper actions—especially during the crucial 74 minutes this call was pending— MCPD ECC would have altered the outcome of this encounter, even with a handgun present in Ryan's car"); ECF No. 134-21, at 14 ("As a result of his mental health state not being recognized, Ryan was denied the resources and appropriate response that likely would have prevented this tragic outcome.").

Though Defendants counter that Mr. LeRoux's own actions—namely, pointing a gun at Defendant officers—caused his death, ECF No. 126-1, at 62–63, such an argument ignores the

larger context of Plaintiffs' claims.  Plaintiffs allege ADA violations long before Mr. LeRoux pointed his gun at the officers.  Thus, considering the evidence in the light most favorable to Plaintiffs, genuine issues of material fact remain as to whether the County's alleged violations proximately caused Mr. LeRoux's death.

### 6.  A Reasonable Jury Could Find that the County Discriminated Against Mr. LeRoux Based on His Disability.

Defendants next argue that Plaintiffs have failed to establish Counts III and VII—both of which allege discrimination on the basis of disability—because Plaintiffs have produced no evidence that any of the County's actions or omissions were because of Mr. LeRoux's disability. ECF No. 126-1, at 63.  In response, Plaintiffs correctly highlight that under Fourth Circuit precedent the failure to provide accommodations may constitute a form of disability discrimination.  ECF No. 136, at 60; *see also Koon v. North Carolina*, 50 F.4th 398, 405 (4th Cir. 2022) ("Congress has told us that disability discrimination includes not just outright intentional exclusion but also lesser injustices like failure to make modifications to existing facilities and practices." (internal citations and quotation marks omitted)).  Accordingly, Plaintiffs' alleged failure does not require dismissal of these counts.

Alternatively, Defendants—largely relying on the exigent circumstances arguments discussed above—assert that any action or inaction taken by the officers was due to Mr. LeRoux's own misconduct rather than Mr. LeRoux's disability.  As addressed above, there is a genuine dispute of material fact as to whether the County provided Mr. LeRoux with reasonable accommodations under the relevant circumstances.

In making their argument, Defendants cite to a number of cases, none of which rely on a failure to accommodate theory of discrimination—the theory Plaintiffs advance.[6]  ECF No. 126-1, at 63 (citing *Paine v. City of Chicago*, No. 06 C 3173, 2009 WL 10687409, at *3 (N.D. Ill. May 21, 2009) (dismissing plaintiff's wrongful arrest ADA claim while allowing plaintiff's failure to accommodate ADA claim to proceed); *Bates ex rel. Johns v. Chesterfield County*, 216 F.3d 367, 373 (4th Cir. 2000) (dismissing plaintiff's wrongful arrest ADA claim); *Thompson v. Williamson County*, 219 F.3d 555, 558 (6th Cir. 2000) (dismissing ADA claim alleging defendant denied the plaintiff medical care because of his disability).[7]  Failure to accommodate claims differ from disability discrimination claims in that Plaintiffs' failure to accommodate claims do not allege that the victim was treated differently explicitly because of his disability, but rather that defendants failed to respond reasonably to the individual's disability and, as a result, they harmed the victim. See *Seremeth*, 673 F.3d at 336 (quoting 42 U.S.C. § 12112(b)(5)(A)) (explaining that failure to

---

[6] In their Reply, Defendants argue that Plaintiffs have pled their "intentional disability discrimination" and failure to accommodate claims as distinct claims.  ECF No. 148, at 31-32. Defendants' argument overlooks that the relevant counts of Plaintiffs' Amended Complaint incorporate the earlier paragraphs of the Amended Complaint which explicitly state that Defendants' failure to provide accommodations discriminated against Mr. LeRoux.  *See* ECF No. 25, at ¶¶ 139, 151 (incorporating previous paragraphs); *id.* at ¶¶ 116, 131 ("Discrimination under Title II of the ADA includes the failure to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.").  Plaintiffs made clear that they intended to proceed on this theory of discrimination in the Amended Complaint, as well as in their briefing on Defendants' Motion to Dismiss, filed before discovery commenced.  *See* ECF No. 38, at 17 ("The Defendants failed to provide Ryan with equally effective communication or reasonable modifications and discriminated against him because of his mental disability.").

[7] The Sixth Circuit's decision in *Thompson* is additionally distinguishable because in that case, upon the police's arrival, the decedent rushed at the police officials.  219 F.3d at 556 ("[Defendant officer] attempted to peer around the side of the house without being seen. However, the decedent spotted him and began to come toward him with the two machetes.").  As noted, in this case, the decedent sat in his car for several minutes, while the police were able to secure the scene.

accommodate claims are premised on the fact that discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); *see also Koon*, 50 F.4th at 403.   While perhaps subtle, the difference is not inconsequential.   In the context of a failure to accommodate claim, how Mr. LeRoux's own behavior impacts the reasonableness of an accommodation is considered within the greater totality of the circumstances.   *See Seremeth*, 673 F.3d at 340.

Accordingly, summary judgment on Counts III and VII is not warranted on the grounds Defendants allege.   However, the claims may proceed regarding only the argument that the County's failure to provide an effective accommodation constituted a form of disability discrimination.

## B.  A Reasonable Jury Could Find that Montgomery County Acted with Deliberate Indifference.

Having determined that genuine disputes of material fact exist as to whether an ADA violation occurred, the Court now turns to whether a reasonable jury could find that Plaintiffs are entitled to damages.   An ADA plaintiff can only receive compensatory damages for intentional discrimination.   *Koon*, 50 F.4th at 403.   "[A] plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference."   *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *see also Basta v. Novant Health Inc.*, 56 F.4th 307, 316–17 (4th Cir. 2022) ("Most of our sister circuits have also found that intentional discrimination can be proven via deliberate indifference . . . Because there is a substantial interest in preserving a uniform approach to this question, we too will proceed under that standard." (citations omitted)).   Thus, for a plaintiff to establish intentional discrimination, the Fourth Circuit has held that he must show: (1) "an ongoing or likely violation of a federally protected right," (2) "knowledge of a substantial risk of a deprivation of those rights," and (3) "a failure to act to resolve that risk."   *Koon*, 50 F.4th

at 405.   The first element has been addressed above; Plaintiffs have produced sufficient evidence that a reasonable jury could find that the County violated Mr. LeRoux's right to a reasonable accommodation on the night he was killed.   The Court now turns to the latter two elements, which make up the deliberate indifference standard.

"Deliberate indifference is, at bottom, an actual-notice standard."   *Id.* at 406.   To show deliberate indifference, "[i]t is not enough simply to point to what could or should have been done . . . Deliberate indifference requires a 'deliberate or conscious choice' to ignore something."   *Id.* (citation omitted).   Put succinctly: "An official must know of the dangers to federal rights and nonetheless disregard them.   The official must know of the facts from which a federal-rights violation could be inferred and then actually draw the damning inference."   *Id.* at 407.

Plaintiffs advance multiple theories of the County's deliberate indifference.   Plaintiffs argue that Defendant Montgomery County was deliberately indifferent because: (1) Montgomery County officials knew they needed to accommodate Mr. LeRoux but did nothing; (2) Montgomery County failed to adequately train officers and other personnel to comply with federal law; (3) Montgomery County knew its policies were deficient but failed to fix them; (4) Montgomery County failed to support the mental health resources allegedly available; and (5) Montgomery County had a history of ADA violations.   ECF No. 136 at 61–75.

### 1.  A Reasonable Jury Could Find that a Montgomery County Official Knew of the Need to Accommodate Mr. LeRoux and Failed to Act.

Knowledge under the deliberate indifference standard "can be shown by circumstantial evidence."   *Koon*, 50 F.4th at 407.   "When a risk was so 'obvious' that an official must have had knowledge, that can get a deliberate-indifference question to a jury."   *Id.*   The Court notes that "obvious" goes beyond what a reasonably prudent person should know, but rather looks to "whether [a risk] was so obvious they *must* have known."   *Id.* (emphasis in original).   A plaintiff

44

may create a fact question on deliberate indifference where rights violations were "longstanding, pervasive, well-documented, or expressly noted by the [] officials in the past, and the circumstances suggested that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Good-faith efforts to remedy a plaintiff's problems will generally prevent a finding of deliberate indifference, as it is negligence, not deliberate indifference, that more appropriately describes instances where officials "try to help but fail to live up [to] expectations." *Id.* Lastly, liability can be imputed to a county only when a county official with authority to address the discrimination knew of the likely federal rights violation but failed to act. *Id.*

### a. A Reasonable Jury Could Find that Officer Inman Knew that Mr. LeRoux Required a Reasonable Accommodation Under the ADA.

As to individual Montgomery County officials, Plaintiffs' strongest argument for deliberate indifference is against Defendant Officer Inman. To establish Officer Inman's deliberate indifference, Plaintiffs must show that Officer Inman knew that Mr. LeRoux required some form of accommodation under the ADA and nonetheless failed to provide one. *See Koon*, 50 F.4th at 409 ("Deliberate indifference requires that [defendant] *knew* that [plaintiff] likely could not meaningfully access the library as was his right and nonetheless failed to give him a pass.").

Plaintiffs have produced evidence that Officer Inman knew—or that it was so obvious that he must have known—that Mr. LeRoux required a reasonable accommodation under the ADA to be able to effectively communicate with law enforcement. Per Officer Inman's training profile, he received training on the Americans with Disabilities Act in 2017. ECF No. 134-33, at 7. The MCPD ADA training instructs that, under the ADA, "Montgomery County Must: . . . Communicate with people who have a disability as effectively as with someone who does not." ECF No. 134-55, at 18; *see also* 28 C.F.R. § 35.160(a)(1) ("A public entity shall take appropriate

steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."). The training also directs officers to "attempt to recognize the person's needs and accommodate them if possible." ECF No. 134-55, at 68. Such training creates "a genuine fact dispute that [Defendant Officer Inman] had some familiarity with the legal requirements of reasonable accommodations," under the ADA. *Koon*, 50 F.4th at 408. It further evidences that Officer Inman "had been exposed to information concerning the risk," of ADA violations, "and thus must have known about it." *Koon*, 50 F.4th at 407 (quoting *Farmer*, 511 U.S. at 842).

As discussed above, there is also evidence that Mr. LeRoux's disability and need for accommodation were obvious. Officer Inman, the first officer on the scene, was immediately unsuccessful in his attempts to communicate with Mr. LeRoux, noting that Mr. LeRoux was entirely unresponsive to verbal commands. Officer Inman also knew that Mr. LeRoux had been stopped in the drive-thru lane of the McDonald's, unresponsive and with his headphones on, for over two hours. *See* ECF No. 126-12, at 01:30–01:38 ("He's unresponsive."); 07:50–08:00 ("He's been here for two hours."); 06:25–06:29 ("He's just looking at me like I'm fucking stupid."). Indeed, Officer Inman repeatedly remarked on Mr. LeRoux's odd behavior to other officers on the scene. *See id.*, at 06:25–06:29; 07:30–08:15; 16:50–17:10. Over the course of the entire interaction, Officer Inman observed as Mr. LeRoux remained unresponsive even though seventeen officers surrounded his car, yelled commands through a loudspeaker, placed stop sticks under his wheels, shone spotlights into his car, and targeted weapons at him for a prolonged period. Prior to the incident, Officer Inman had received several trainings on how to identify and respond to individuals with mental illness, supporting an inference that Officer Inman was familiar with behaviors indicative of mental health disabilities. ECF No. 134-33, at 6, 8, 9. Considered

altogether, Officer Inman's training on mental illness and the ADA, as well as the readily observable nature of the symptoms and subsequent limitations of Mr. LeRoux's mental illness, all create a genuine issue of fact as to whether Officer Inman knew, or whether it was so obvious that he must have known, that Mr. LeRoux required a reasonable accommodation under the ADA.

Defendants rely on *Koon v. North Carolina* to argue that the County lacked the knowledge required to satisfy the deliberate indifference standard, but *Koon* is distinguishable from the facts at hand.   In *Koon*, the plaintiff, Mr. Koon, was a disabled prisoner who walked with a cane.   50 F.4th at 401.   Prior to the incidents giving rise to litigation, the North Carolina prison system had identified Mr. Koon as an "ADA assigned inmate" with a climbing restriction.   *Id.*   When Mr. Koon was transferred to a different prison, he found himself in need of a "handicap pass" to access the facility's "handicap library."   *Id.*   Mr. Koon made several unsuccessful requests for a handicap pass.   *Id.* at 401–02.   His request was eventually sent to Nurse Practitioner Browning, who was unaware of Mr. Koon's previous attempts.   *Id.* at 402.   However, Mr. Koon's request had been incorrectly entered into the prison computer system as an application for a "renewed" handicap pass rather than a new handicap pass.   *Id.*   Thus, when Ms. Browning saw that Mr. Koon had never been previously issued a handicap pass, she denied the request without meeting with Mr. Koon or investigating further.   *Id.*   Ms. Browning admitted that had she known of Mr. Koon's climbing restriction, she would have provided him with a handicap pass.   *Id.*   Plaintiff, in response, produced evidence that Ms. Browning had seen Mr. Koon walking around the facility. *Id.*

As the Court in *Koon* explained, "[d]eliberate indifference require[d] that Browning *knew* that Mr. Koon likely could not meaningfully access the library as was his right and nonetheless failed to give him a pass."   *Id.* at 409 (emphasis in original).   The *Koon* court

declined to find a genuine issue of material fact as to whether Ms. Browning knew that Mr. Koon could not meaningfully access the library, because to do so would rely on impermissible "inferential leaps." *Id.* at 409–10. Specifically, plaintiff, based on evidence that Ms. Browning had seen Mr. Koon walking around the facility, inferred that Ms. Browning knew that Mr. Koon walked with a cane. *Id.* at 410. The court deemed this a permissible inference. *Id.* However, plaintiff then asserted that because Ms. Browning knew Mr. Koon walked with a cane, she also knew he could not meaningfully access the library. *Id.* The court took issue with this second inference, deeming it an impermissible "stacked inference." *Id.* Because the court found no genuine issue of fact as to Ms. Browning's knowledge, the court held that a reasonable jury could not find that Ms. Browning was deliberately indifferent.

Here, intermediary inferences are not required to create a genuine issue of material fact as to Officer Inman's knowledge that Mr. LeRoux could not effectively communicate with officers and required a reasonable accommodation. Officer Inman—who had been trained on identifying mental illness, interacting with people with mental illness, and the Americans with Disabilities Act—directly observed Mr. LeRoux's inability to respond to or engage and communicate with officers. Not only did Officer Inman attempt to communicate with Mr. LeRoux himself, but he directly observed as other officers unsuccessfully attempted the same. Thus, unlike in *Koon*, where Ms. Browning had not met directly with Mr. Koon or witnessed his inability to access the prison library, Officer Inman directly observed and commented on the obvious impacts of Mr. LeRoux's disability, including his abnormal behavior, inappropriate response to police presence, and inability to effectively communicate or respond to police commands. There is, conversely, evidence in the record that might lead a reasonable jury to conclude that Officer Inman was not deliberately indifferent—for example, Officer Inman testified at his deposition that he did not

consider that Mr. LeRoux was experiencing a mental health crisis.  EFC No. 134-9, at 39.
However, the evidence—taken as a whole and viewed in the light most favorable to Plaintiffs—is
sufficient to create a genuine issue of material fact as to whether Mr. LeRoux's need for
accommodation under the ADA was so obvious that Officer Inman must have known of that need,
regardless of what he claims now.

> ### b. A Reasonable Jury Could Find that Officer Inman Did Not Provide Mr. LeRoux with an Accommodation.

Plaintiffs have also produced evidence that Officer Inman failed to provide any
accommodations to Mr. LeRoux.  Though Officer Inman was CIT-trained, he did not follow his
CIT training.  ECF No. 134-21, at 22.  Rather than implement de-escalatory tactics, Officer
Inman engaged in escalatory behavior, holding Mr. LeRoux at gunpoint, screaming at him, and
suggesting that other officers "pepper spray his ass."  *See* ECF Nos. 134-21, at 18, 20–21; 126-
12, at 10:05–10:11.  *But see* ECF No. 134-9, at 43–46 (Officer Inman identifying shouting
commands over a loudspeaker and shining a spotlight into Mr. LeRoux's car as de-escalatory
tactics).  Indeed, Officer Inman—though the first officer on the scene and "primary officer," due
to his CIT training—did not take any affirmative steps to implement any plan or accommodations.
ECF No. 134-21, at 18; *see also* ECF Nos. 134-41, at 2–3 (explaining that "[o]nce the CIT officer
is on the scene of a mental illness call, the CIT officer becomes the 'primary officer'" and will
determine if other mental-health resources are required); 134-27, at 26–27 (explaining that
"primary officer" means that if the officer on-scene recognizes the situation as possibly a mental
illness call the officer would have "primary control" at the scene).  Rather, he asked multiple times
"What's the plan?" and "What do you guys want to do?"  ECF No. 126-12, at 06:05–06:10;
15:35–15:37.  Thus, Officer Inman did not make "good-faith efforts" to remedy Mr. LeRoux's

problems—either by applying his CIT training, implementing de-escalatory tactics, or calling for mental health supports—which would preclude a finding of deliberate indifference.

> ### c.  A Reasonable Jury Could Find that Officer Inman Was an Official with Authority to Correct the Discrimination Against Mr. LeRoux.

For Montgomery County to be liable for deliberate indifference, Plaintiffs must show that an "official with the authority to address [Mr. LeRoux's] problem both had knowledge of his federally protected rights and nonetheless failed to help him." *Koon*, 50 F.4th at 407.  While the Fourth Circuit in *Koon* did not parse the meaning of "official," other courts have.  *See Biondo v. Kaleida Health*, 935 F.3d 68, 75 (2d Cir. 2019); *Liese*, 701 F.3d at 350.  An "official," for the purposes of imputing liability to an entity like Montgomery County, is someone "who has some 'discretion at a "key decision point" in the administrative process.'"  *Biondo*, 935 F.3d at 76 (quoting *Liese*, 701 F.3d at 350).

Plaintiffs have produced evidence that Officer Inman had both discretion at a key decision point and the authority to implement accommodations on the night of Mr. LeRoux's death.  As the first officer on the scene, Officer Inman was empowered to call for crisis negotiators or implement other accommodations.  ECF Nos. 134-46, at 29; 134-35, at 21; 134-27, at 26–27.  Further, per MCPD policy, Officer Inman was CIT-trained and was thus also the "primary officer," tasked with determining if other mental health resources were needed.  ECF Nos. 134-41, at 2–3; 134-27, at 26–27.  A reasonable jury could thus conclude that Officer Inman was an "official" with the authority to implement an accommodation for Mr. LeRoux.

Accordingly, Plaintiffs have created a genuine dispute of material fact as to: (1) whether Officer Inman was deliberately indifferent by knowing Mr. LeRoux required an accommodation under the ADA and failing to provide one, and (2) whether such deliberate indifference could be imputed to Montgomery County.

### 2. A Reasonable Jury Could Find that Montgomery County Was Deliberately Indifferent in Failing to Train Officers on Federal Disability Law.

Plaintiffs next argue that Defendant Montgomery County was deliberately indifferent by failing to train its officers with respect to Mr. LeRoux's statutory rights under Title II and Section 504. ECF No. 136, at 66 ("Defendants were Deliberately Indifferent Because They Failed to Adequately Train Their Officers and ECC Personnel to Comply with Federal Law."). "A pattern of similar . . . violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). "In a 'narrow range of circumstances,' however, 'evidence of a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation,' suffices to establish deliberate indifference." *Montgomery II*, 2022 WL 1618741, at *17 (quoting *Bryan Cnty*, 520 U.S. at 409).

Plaintiffs have put forth evidence indicating that Montgomery County fails to uniformly train MCPD officers on disability law. Multiple officers testified in their depositions that they did not receive training on disability law or did not remember the training. *See* ECF No. 134-8, at 4 (Deposition of Officer Owen) ("Q: Were you trained on disability law? A: I do not recall."); ECF No. 134-10, at 8 ("Q: Officer Cerny, have you received training on disability law? A: Not that I recall."); ECF No. 134-12, at 14–15 (Officer Schmuck recalling that he had training on the ADA but does not remember the training including information about reasonable modifications). Though Officer Inman has received ADA training, he did not receive it until he had been with the MCPD for over nine years. ECF No. 134-33, at 7. While MCPD's forty-hour CIT training includes several sessions on identifying and interacting with individuals with mental health

51

disabilities, it provides no information on disability law or an officer's statutory duty to provide reasonable accommodations. *See* ECF No. 134-34, at 8–9.

A jury could reasonably find that Montgomery County's failure to uniformly or comprehensively train officers on their obligations under the ADA and Rehabilitation Act presents "an obvious potential" for violations of federal rights. *Bryan Cnty.*, 520 U.S. at 409. "When determining whether a situation presents such an obvious potential, courts have focused on the frequency with which public employees encounter the situation and their ability to properly handle the situation without specialized training." *Montgomery II*, 2022 WL 1618741, at *19. Montgomery County officers often engage with people with mental health disabilities. ECF No. 134-7, at 61 (Sergeant Worden stating that he encounters people with mental health disabilities "every day."); ECF No. 134-8, at 6–7, 9 (Officer Owen stating that she encounters people with mental illness on the job "weekly" and noting that "as patrol officers we know that we deal primarily with subjects that have mental illness."); ECF No. 134-14, at 44 (MCPD mental health training stating that "[t]here is rarely a workday that goes by without officers encountering someone with a mental illness in the course of their duties"). Complying with disability law during such interactions is not "the type of issue that an officer should be expected to handle properly without any training." *Montgomery II*, 2022 WL 1618741, at *20; *see also Connick*, 563 U.S. at 64 ("There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require."). Without specific training on disability law, "there is no reason to assume that an officer knows how to comply with the sensitive and nuanced obligations imposed upon him by the ADA and Rehabilitation Act." *Montgomery II*, 2022 WL 1618741, at *20.

While evidence of analogous training would undercut Plaintiffs' failure-to-train claim, *see, e.g.*, *Montgomery II*, 2022 WL 1618741, at *20 ("In cases rejecting failure-to-train claims, courts have often noted that the relevant public employees received analogous training that would have prepared them to handle the relevant situation.") (citing *Connick*, 563 U.S. at 64–66; *Medvedeva v. City of Kirkland*, No. C14-7RSL, 2015 WL 1849532, at *6 (W.D. Wash. Apr. 22, 2015)), training on mental illness generally is not a substitute for training on the "sensitive and nuanced obligations" that officers face under the ADA and Rehabilitation Act.   *Montgomery II*, 2022 WL 1618741, at *20.   There is insufficient evidence that the mental illness trainings MCPD provided—which, unlike ADA training, all Defendant Officers received, ECF Nos. 126-10, at 5; 127-3, at 6; 127-5, at 6; 127-7, at 6—informed officers of their statutory obligations to provide individuals with mental health disabilities with reasonable accommodations when necessary.   *See* ECF No. 134-8, at 4–5 (testifying "I don't recall" in response to queries as to whether the officer received training on the ADA or disability law more generally); ECF No. 134-37 (MCPD In-Service training on mental illness makes no mention of the ADA or officers' statutory obligations).

Defendant Montgomery County, in contrast to its officers' deposition testimony, asserts that all officers are trained on the ADA.   ECF No. 126-14, at 2 ("[A]ll police officers in Montgomery County received training at the academy and/or through in-service trainings regarding . . . signs and symptoms of mental health conditions, the Americans with Disabilities Act, crisis communication, de-escalation and use of force.").   However, in the face of evidence to the contrary, summary judgment is not appropriate.   *Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. 2020).

### 3. Plaintiffs' Alternative Arguments that the County Was Deliberately Indifferent Are Unsuccessful.

While the County may be held liable under the theories above, Montgomery County's response—or lack thereof—to various recommendations in reports from external organizations are insufficient to establish deliberate indifference. [8]   Plaintiffs claim that because these reports highlighted areas of improvement in Montgomery County's mental health response, the County was deliberately indifferent in failing to modify their policies and procedures.   ECF No. 136, at 63.   In arguing that the County knew its policies were deficient but failed to fix them, Plaintiffs rely primarily on a draft report from an organization called Effective Law Enforcement for All. ECF No. 134-16.   Montgomery County partnered with Effective Law Enforcement for All to conduct an audit of the MCPD as part of the County's "Reimagining Public Safety Initiative."   *Id.* at 4.   The "preliminary" report, dated June 30, 2021, was issued just two weeks before Mr. LeRoux's death, while the County's audit of MCPD was ongoing.   *Id.*   Plaintiffs also rely on a report from the Office of Legislative Oversight from March 9, 2021.   ECF No. 134-17.   That report made several recommendations for MCPD's policies, but overall concluded that "the County uses several research-supported practices to respond to mental health situations and is currently working to reduce reliance on law enforcement for crisis response."   *Id.* at 3.   Lastly, Plaintiffs rely on a February 2021 report from a group called the Reimagining Public Safety Task Force.   ECF No. 134-18.   At the request of Montgomery County, the Task Force "worked with County staff" to develop recommendations for the County to "consider as [it] advance[s] [its] public safety and racial justice strategies."   *Id.* at 6.   All three reports Plaintiffs rely upon had been been released less than six months prior to Mr. LeRoux's death; the Effective Law

---

[8] Although there is not a genuine dispute of material fact as to Plaintiffs' theories based primarily or exclusively on the reports, the report's findings – to the extent that relevant and sufficient findings exist therein – may still be used as evidence in support of the other theories which Plaintiffs may advance.

Enforcement for All draft report on which Plaintiffs primarily rely came out just seventeen days before the shooting.   Such a timeline is insufficient to deem Montgomery County's alleged inaction as deliberate indifference, as Montgomery County could not have feasibly implemented county-wide reforms in such a short period of time.   Further, two of the three reports Plaintiffs cite were created at the County's request as part of its own endeavors to improve its policies.   As noted above, generally, "good-faith" efforts to remedy a problem preclude a finding of deliberate indifference.   *Koon*, 50 F.4th at 407.   While simply putting a policy in place—or commissioning an audit—is not enough for an entity to avoid ADA liability without any subsequent adherence or action, *see Montgomery II*, 2022 WL 1618741, at *18 ("[T]he Court cannot conclude that the mere enactment of [a policy on working with suspects with mental illness] precludes a reasonable jury from finding the District was deliberately indifferent to the risk that officers would violate [the ADA]."); *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 278 (D.D.C. 2018) (rejecting the District's argument that the mere enactment of policies regarding disabled individual precluded a finding of deliberate indifference: "[T]he existence of such policies may prove to be irrelevant, given that the District has not asserted that they were followed in this case or that they comport with the ADA."), there is evidence that Montgomery County is in the process of improving its processes.   *See, e.g.*, ECF No. 134-16, at 20 ("The embedded social worker in MCPD is presently revamping online refresher training, which will be required annually.   This is a significant step in the right direction."); ECF No. 134-17, at 3 ("[T]he County . . . is currently working to reduce reliance on law enforcement for crisis response.").   Thus, the reports are insufficient to demonstrate that Montgomery County knew that its policies constituted a substantial risk to individuals' federal rights at the time of Mr. LeRoux's death and failed to act.

The same aforementioned reports do not create a genuine issue of material fact as to whether the County had failed to comply with the ADA for "years," constituting a "pattern of failure." ECF No. 136, at 75. While the reports all suggest various areas for improvement, they do not identify specific instances of the MCPD engaging in ADA violations. Thus, Plaintiffs' assertion that MCPD had been violating the ADA for "years" lacks sufficient evidentiary support to create a genuine issue of material fact as to the County's deliberate indifference.

Finally, Plaintiffs claim that Montgomery County was deliberately indifferent by failing to "support" the County's mental health resources "[a]vailable on [p]aper." ECF No. 136, at 72. Plaintiffs largely repeat their prior arguments as to the general deficiency of Montgomery County's policies and again rely on the same three reports issued less than six months before Mr. LeRoux's death. As discussed above, such allegations are insufficient to create a genuine issue of material fact as to Montgomery County's deliberate indifference at the time of Mr. LeRoux's death.

## II.     State Law Claims

In addition to Plaintiffs' federal law claims against Montgomery County, Plaintiffs have also brought claims of negligence, gross negligence, and wrongful death against individual Defendant Officers Inman, Vaughan, Schmuck, and Cerny. Defendants argue that the Court should grant summary judgment in the Defendant Officers' favor because they benefit from public official immunity. ECF No. 126-1, at 71.

### A.     A Reasonable Jury Could Find that Defendant Officers Are Not Entitled to Public Official Immunity.

"An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." Md. Code. Cts. & Jud. Proc. § 5-507(a)(1); *see also White v. City of Annapolis*, 439 F. Supp. 3d 522, 536 (D. Md.

2020).   Law enforcement officers are public officials for the purpose of public official immunity. *McGowan v. Prince George's County*, 401 F. Supp. 3d 564, 571 (D. Md. 2019) (citing *Cooper v. Rodriguez*, 118 A.3d 829, 856 (Md. 2015)).   However, there is no immunity for any alleged intentional torts, or any alleged acts committed with actual malice or which were grossly negligent. *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 297–98 (D. Md. 2020).

"Actual malice is established by proof that the defendant officer intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Id.* at 298 (quoting *Bord v. Baltimore County*, 104 A.3d 948, 964 (Md. Ct. Spec. App. 2014)).   Determining whether officers acted with malice is a fact-intensive exercise that looks to the whole record.   *See Williams v. Prince George's County*, 685 A.2d 884, 896 (Md. Ct. Spec. App. 1996) ("[W]e may look to the facts and circumstances set forth in the deposition testimony as well as other matters outside of the pleadings.").   Gross negligence, on the other hand, is defined as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them."   *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. App. Ct. 2007)).   It is "something more than simple negligence, and likely more akin to reckless conduct."   *Id.* (quoting *Barbre*, 935 A.2d at 717).   A party acts with gross negligence either if he inflicts injury intentionally or if he is "so utterly indifferent to the rights of others that he acts as if such rights did not exist."   *Id.* (quoting *Barbre*, 935 A.2d at 717).

"The Maryland Court of Appeals 'has recognized consistently that the determination of whether a State actor enjoys State personnel immunity is a question for the trier of fact.'"   *Kleger*

57

*v. Dorchester County*, No. 1:24-CV-00095, 2024 WL 3555044, at *11 (D. Md. July 23, 2024) (quoting *Francis v. Maryland*, No. CV ELH-21-1365, 2024 WL 1156407, at *23 (D. Md. Mar. 18, 2024)).   Thus, "the question of whether an officer acted with gross negligence or malice . . . is 'generally a question for the jury.'"   *Lewis v. Caraballo*, 98 F.4th 521, 537 (4th Cir. 2024) (quoting *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011)); *see also Housley v. Holquist*, 879 F. Supp. 2d 472, 483 (D. Md. 2011) ("This issue [gross negligence] is generally a question for the jury."); *Myers v. Town of Elkton*, 745 F. Supp. 3d 219, 243 (D. Md. 2024) ("Whether gross negligence exists is a fact-intensive inquiry, and is usually a question for the jury; it is a question of law only when reasonable jurors could not differ as to the rational conclusion to be reached." (quotation marks and citation omitted)).

Defendants, in their briefing, contemplate the questions of malice and gross negligence as applied primarily to Defendant Officers' use of force.   *See* ECF No. 126-1, at 78.   However, such reasoning constricts the scope of Plaintiffs' claims.   Plaintiffs need not show malice or gross negligence specifically as applied to Defendant Officers' use of force, but rather as to Defendant Officers' conduct across the police response as a whole.

A reasonable jury could find that the Defendant Officers were grossly negligent by failing to implement de-escalatory tactics and failing to attempt to secure mental health resources for Mr. LeRoux, despite the readily observable nature of his disability and related limitations.   As an initial matter, Plaintiffs have produced evidence that Defendant Officers did not abide by MCPD policy or their own training.   Per MCPD practice and policy, de-escalation tactics are to inform all officer interactions with any member of the community.   ECF No. 134-35, at 22, 29.   At the time of the incident, all Defendant Officers had been trained on de-escalation.   ECF Nos. 126-10, at 5; 127-3, at 6; 127-5, at 6; 127-7, at 6.   The de-escalation training instructed officers to utilize

time, space, and distance when engaging with a subject and to consider other available resources, such as the Crisis Intervention Team, if a subject is not "viable for communication." ECF No. 134-39, at 24.

All Defendant Officers had also received training "regarding response to individuals with mental health disabilities and conditions." ECF Nos. 126-10, at 5; 127-3, at 6; 127-5, at 6; 127-7, at 6. The training prepared officers to recognize the "signs or symptoms" of disabilities and equipped them with "de-escalation tactics in order to effectively communicate with somebody with those disabilities." ECF No. 134-12, at 19–20. Specifically, the training cautioned officers that individuals with mental health disabilities may "los[e] control of . . . verbal expression," or be unable to "respond appropriately." ECF No. 134-37, at 35. It also encouraged officers facing a "complex or high acuity situation" to "consider reaching out to the Crisis Center or CIT to see if they have any history with the individual that may be useful in mitigating the current crisis." *Id.* at 36. The training further stated that "when a person with a mental illness . . . refuses to obey your commands, it is possible that they are not intentionally ignoring your orders or being defiant," *id.* at 37, and directed officers to "make adjustments to [their] approach" when commands were not having an impact on a person, *id.* at 38. All MCPD officers are also "trained that they can call out on the radio for a crisis negotiator when appropriate," ECF No. 124-35, at 29, and Montgomery County's experts have opined that "it would be appropriate to have a Crisis Negotiator involved in a scene when the initial levels and initial efforts of communication from the responding officers to an individual in an agitated state or in a moment of crisis have proven unsuccessful," ECF No. 134-46, at 5.

During the incident that led to Mr. LeRoux's death, none of the Officer Defendants suggested de-escalating the situation—by, for instance, increasing the distance between officers

and Mr. LeRoux, turning off police cruiser lights, or referring to Mr. LeRoux by name, *see* ECF No. 134-46, at 17, 59–60—or altering MCPD's approach to communicating with Mr. LeRoux. Additionally, though all Defendant Officers witnessed the readily observable symptoms of Mr. LeRoux's mental health disability—such as his inability to communicate and engage with officers—none suggested reaching out to the variety of mental health resources available to MCPD officers as directed by their training.  Such inaction could lead a reasonable jury to find that Defendant Officers displayed a "thoughtless disregard of the consequences without the exertion of any effort to avoid them."  *Stutzman*, 350 F. Supp. 3d at 383.

Given the evidence, the jury must decide whether—despite officers' training on de-escalation and mental illness, Mr. LeRoux's observable mental health disability, and Mr. LeRoux's clear inability to engage or communicate with officers—it was grossly negligent for the officers to fail to implement de-escalatory tactics or summon mental health resources on the night of Mr. LeRoux's death.  *See, e.g.*, *Myers*, 745 F. Supp. 3d at 243 ("Here, the jury must decide whether, despite multiple warnings, it was grossly negligent for Officer Devine to enter through the gate and shoot Bella.").

### B.  Genuine Issues of Material Fact Exist as to Plaintiffs' State Law Claims.

Beyond the question of public official immunity, Plaintiffs' state law claims survive summary judgment.  Because a question of material fact exists as to Defendant Officers' gross negligence for the purposes of public official immunity, such a question also exists on Plaintiffs' gross negligence claim.  Additionally, as gross negligence is "something more" than simple negligence, *Stutzman*, 350 F. Supp. 3d at 383 (quoting *Barbre*, 935 A.2d at 717), Plaintiffs have necessarily established a genuine dispute of material fact as to Defendant Officers' negligence. Lastly, Defendants do not challenge the merits of Plaintiffs' wrongful death claim beyond the

assertion of public official immunity.   Accordingly, the Court will deny Defendants' Motion for Summary Judgment as to Plaintiffs' state law claims against the individual Defendant Officers.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment is, hereby, denied.

So ordered.

Date: October 24, 2025                                          _____/s/_____

Ajmel A. Quereshi
United States Magistrate Judge